UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X--------------------------------------------------------------X
CAN'T STOP PRODUCTIONS, INC.,

                    Plaintiffs,

-against-

SIXUVUS, LTD., ERIC ANZALONE, ALEXANDER
BRILEY, FELIPE ROSE, JAMES F. NEWMAN,
RAYMOND SIMPSON, and WILLIAM WHITEFIELD,

                    Defendants.
X--------------------------------------------------------------X

Case No.: 7:17-cv-06513-CS

## MEMORANDUM OF LAW IN SUPPORT OF SIXUVUS LTD'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

ADELMAN MATZ P.C.
1173A Second Avenue, Suite 153
New York, New York 10065
Phone: (646) 650-2207
*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 2

   A.      THE ORIGIN OF THE PARTIES' WORKING RELATIONSHIP ...................... 2

   B.      VICTOR WILLIS' INVOLVEMENT WITH VILLAGE PEOPLE ...................... 6

   C.      CAN'T STOP TRIES TO END SIXUVUS AS VILLAGE PEOPLE ................... 7

STANDARD OF REVIEW ........................................................................................................... 9

ARGUMENT ............................................................................................................................... 10

   I.     SIXUVUS IS LIKELY TO SUCCEED ON THE MERITS OR IN THE
      ALTERNATIVE THERE ARE SUFFICIENTLY SERIOUS QUESTIONS GOING
      TO THE MERITS TO MAKE THEM A FAIR GROUND FOR LITIGATION SO
      THAT THE INJUNCTION SHOULD ISSUE ................................................................ 10

       1.    SIXUVUS IS LIKELY TO PREVAIL ON THE MERITS OF ITS
       CLAIM THAT PLAINTIFF TORTIOUSLY INTERFERED WITH THE
       SETTLEMENT AGREEMENT ........................................................................... 10

       2.    CAN'T STOP NAKEDLY LICENSED ITS TRADEMARK .................. 12

       3.    SIXUVUS IS ALSO LIKELY TO SUCCEED ON ITS CLAIM
       FOR BREACH OF CONTRACT ....................................................................... 16

       4.    DEFENDANT IS LIKELY TO PREVAIL ON A CLAIM FOR
       PROMISSORY ESTOPPEL................................................................................ 17

       5.    CAN'T STOP TORTIOUSLY INTERFERED WITH SIXUVUS'
       PROSPECTIVE CONTRACTUAL/ECONOMIC RELATIONS....................... 18

II.      SIXUVUS WILL SUFFER IRREPARABLE HARM AND THE
BALANCE OF HARDSHIPS TIPS IN SIXUVUS' FAVOR ...................................................... 21

III.     THE PUBLIC INTEREST WOULD NOT BE DISSERVED BY THE
ISSUANCE OF A PRELIMINARY INJUNCTION .......................................................... 23

CONCLUSION ........................................................................................................................ 24

## TABLE OF AUTHORITIES

### Cases

*American Broadcasting Companies, Inc. v. Cuomo,*
  570 F.2d 1080 (2d Cir. 1977)..................................................................................... 9

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.,*
  448 F.3d 573 (2d Cir. 2006)..................................................................................... 16

*Halo Optical Prod., Inc. v. Liberty Sport, Inc.,*
  2017 WL 4011261 (N.D.N.Y. Sept. 11, 2017) ....................................................... 17

*Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc.,*
  1988 WL 52777 (S.D.N.Y. May 18, 1988)............................................................... 16

*Colony Liquor Distributor, Inc. v. Jack Daniels Distillery,*
  22 A.D.2d 247, 254 N.Y.S.2d 547 (1964) ............................................................... 16

*Cyberchron Corp. v Calldata Sys. Dev., Inc.,*
  47 F3d 39 (2d Cir. 1995)......................................................................................... 17

*Dawn Donut Co. v. Hart's Food Stores, Inc.,*
  267 F.2d 358, 367 (2d Cir. 1959)....................................................................... 12, 13

*General Motors Corp. v. Gibson Chemical & Oil Corp.,*
  786 F.2d 105 (2d Cir.1986).............................................................................. 12, 13

*Hannex Corp. v. GMI, Inc.,*
  140 F.3d 194 (2d Cir. 1998)..................................................................................... 18

*HarperCollins Publishers L.L.C. v Gawker Media LLC,*
  721 F. Supp. 2d 303 (S.D.N.Y. 2010)................................................................... 9, 21

*Highland Capital Mgmt. LP. v. Schneider,*
  198 F. App'x 41 (2d Cir. 2006) ............................................................................... 10

*In re Feit & Drexler, Inc.,*
  760 F.2d 406 (2d Cir.1985)...................................................................................... 9

*Jemzura v. Jemzura,*
  36 N.Y.2d 496 (1975) ............................................................................................. 16

*Kirch v. Liberty Media Corp.,*
  449 F.3d 388 (2d Cir. 2006)..................................................................................... 18

*Lader v. Delgado,*
 941 F. Supp. 2d 267 (E.D.N.Y. 2013)...................................................................................... 18

*Lama Holding Co. v. Smith Barney, Inc.,*
 88 N.Y.2d 413 (1996) ............................................................................................................. 10

*Laugh Factory, Inc. v. Basciano,*
 608 F. Supp. 2d 549 (S.D.N.Y. 2009)...................................................................................... 17

*Legacy Grp. of Am., Inc. v. N. Am. Co. for Life & Health Ins.,*
 336 F. App'x 87 (2d Cir. 2009)................................................................................................ 18

*Nadel v. Play-By-Play Toys & Novelties, Inc.,*
 208 F.3d 368 (2d Cir. 2000)..................................................................................................... 18

*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank,*
 392 F.3d 520 (2d Cir. 2004)..................................................................................................... 16

*Purgess v. Sharrock,*
 33 F.3d 134 (2d Cir. 1994)....................................................................................................... 18

*Salinger v. Colting,*
 607 F.3d 68 (2d Cir. 2010).................................................................................................. 9, 21

*Scutti Enterprises, LLC. v. Park Place Entm't Corp.,*
 322 F.3d 211 (2d Cir. 2003)..................................................................................................... 19

*Sheila's Shine,*
 486 F.2d 114 (5th Cir. 1973).................................................................................................. 13

*Twentieth Century Fox Film Corp. v. Marvel Enters.,*
 277 F.3d 253 (2d Cir.2002)...................................................................................................... 12

*Warner Bros. Inc. v. Dae Rim Trading, Inc.,*
 877 F .2d 1120 (2d. Cir. 1989)................................................................................................... 9

*Yocum,*
 216 USPQ (BNA) ¶ 210 (T.T.A.B. Nov. 29, 1982)................................................................ 13

**Rules**

Fed. R. Civ. P. 65(a) .................................................................................................................. 8

Rule 65 of the Federal Rules of Civil Procedure ....................................................................... 9

Defendant Sixuvus, Ltd. ("Sixuvus" or "Defendant") respectfully submits this memorandum of law in support of its motion for a temporary restraining order and a preliminary injunction, enjoining Plaintiff Can't Stop Productions, Inc. ("Plaintiff" or "Can't Stop") from taking any action, alone or in concert with others, that would interfere with Sixuvus' ability to perform live as Village People, as it has been doing for thirty (30) years.

## PRELIMINARY STATEMENT

Defendant brings the instant motion for a temporary restraining order and preliminary injunction to enjoin Plaintiff from preventing it from rendering live performance services as Village People, which it has done for the past thirty years.

The parties to this action are not strangers. Plaintiff, who originally founded Village People in the 1970s all but abandoned the group in 1985, until 1987 when Defendant was formed for the purpose of providing live entertainment services as Village People. Defendant Sixuvus and its performers are Village People, as it has been providing live entertainment services as Village People for the past thirty (30) years under an oral license. In the minds of millions of fans and the consuming public across the United States and the world the performers of Sixuvus are Village People as Defendant has been the sole and exclusive source of live Village People performances. But now after thirty years, Can't Stop is trying to stop Defendant from continuing to render these services.

Plaintiff is doing so by wrongfully and tortuously interfering with and inducing breach of the Settlement Agreement between Defendant and one of the other original group members of Village People, Victor Willis. Mr. Willis has tried many times to interfere with Sixuvus' business and to settle a prior litigation between Defendant, Mr. Willis and Plaintiff, Mr. Willis agreed to abide by that Court's preliminary injunction order which prevented him and those acting in concert with him from disrupting any live performance or public appearance of Sixuvus

performing as the Village People.   Despite its knowledge of this Settlement Agreement, Plaintiff is now working with Mr. Willis' agents and inducing them into disrupting Sixuvus performing as Village People, in blatant violation of the Settlement Agreement.

Plaintiff has no right to take any action that would prevent Defendant from continuing to provide live entertainment services as Village People.  While Plaintiff may be the recorded owner of registrations for Village People, for the past thirty (30) years, and continuing into the present, Plaintiff has wholly failed to have any quality control standards in connection with the use of the mark.  As such Plaintiff has abandoned its rights and is estopped from trying to stop Defendant from using the name.

In addition, the manner in which Plaintiff purported to terminate the license on one day's notice was a breach of the license itself.  Furthermore, it is Defendant's position that Plaintiff is barred by the doctrine of promissory estoppel from taking any action to prevent Defendant from using Village People in connection with live entertainment services.

Allowing Plaintiff to prevent Defendant from using Village People in connection with live entertainment services before the issues in this case are fully adjudicated would cause immediate and irreparable harm to Defendant as it would suffer damage to its reputation both within the industry and with its fans.  Such damage could never be repaired, and as such Defendant requires an immediate temporary restraining order and a preliminary injunction to prevent Plaintiff from causing any further irreparable harm.

## STATEMENT OF FACTS

### A.  The Origin of the Parties' Working Relationship

In 1977, Henri Belolo and Jacques Morali, two French music producers, sought to form a disco group. *See* Briley Decl. ¶ 5.[1] They assembled six men who would become known as "Village People".[2] The remainder of the 1970s resulted in Village People performing some of the most iconic songs in music history such as "Go West," "Macho Man," "In the Navy," and most prominently "Y.M.C.A." *See* Briley Decl. ¶ 6.

In 1985, as the popularity of disco music waned, Can't Stop decided to cease operations, and informed the then members of Village People group that they were shutting down their New York offices and were done with Village People. *See* Briley Decl. ¶ 8. Village People were on a hiatus beginning in 1985. *See* Briley Decl. ¶ 8. From 1985, until 1987, there were no live performances under the Village People Marks with no intent to resume use. Village People reunited only when former Sixuvus member Randy Jones helped re-assemble the group. *See* Briley Decl. ¶ 14. However, there was no indication or perceivable desire by Can't Stop to promote or provide any live entertainment services under Village People name. *See* Briley Decl. ¶ 9. When Village People reunited in 1987, Victor Willis, who had not performed live as the lead singer of Village People since 1979, was not asked to return. *See* Briley Decl. ¶ 7, 13; Simpson Decl. ¶9. Instead, Raymond Simpson, who sang the lead vocals for Village People for several years, a role which he continues to fulfil to this day, was asked to join. *See* Simpson Decl. ¶ 9.

When Village People reunited, the then members formed Sixuvus Ltd., to be the entity that they conducted their business through. *See* Simpson Decl. ¶ 6. At that time, Sixuvus entered into

---

[1] The "Briley Decl." shall refer to the Declaration of Alexander Briley, sworn to on November 30, 2017. The "Simpson Decl." shall refer to the Declaration of Raymond Simpson, sworn to on November 30, 2017. The "Rose Decl." shall refer to the Declaration of Felipe Rose, sworn to on November 30, 2017. The "Anzalone Decl." shall refer to the Declaration of Eric Anzalone, sworn to on November 29, 2017. The "Adelman Decl." shall refer to the Declaration of Gary Adelman, sworn to on November 30, 2017.

[2] While some refer to Village People as "the" Village People, the proper name of the group has been Village People.

3

an oral license agreement with Can't Stop where, in exchange for Sixuvus being allowed to use the Village People name in connection with live performances, Sixuvus would pay a 5% license fee, quarterly, payable on the gross amounts received by Sixuvus, net of agent's commissions. *See* Simpson Decl. ¶ 7.

Can't Stop is currently the owner of record with the United States Patent and Trademark Office registrations for the word mark "Village People" in International Class 041 under Registration Number 1101013 for entertainment services rendered by a musical and vocal group



(registered in 1978); as well as the following image mark:        in International Class 041 for Entertainment services, namely, live performances by a musical and vocal group (registered in 2000) (Collectively, the "Can't Stop Registrations").[3]  There is no dispute that Sixuvus was granted an oral license, as it has been confirmed by Plaintiff's pleading in the instant matter.  *See* Plaintiffs Complaint [Dckt. No. 1] ¶21-23.  It has also been confirmed by written declarations of Henri Belolo, the managing partner of Can't Stop.  *See* Simpson Decl. ¶27 Ex. 5, H. Belolo Decl. (Sixuvus "is the owner of a license granted by [Can't Stop] that allows Sixuvus to use Village People name and characters in performances and appearances in the United States and throughout the world.").

No member, employee or contractor of Can't Stop has ever engaged in live musical performances as Village People after 1985, nor did Can't Stop license the Village People name to any other person or entity until this year when Can't Stop purportedly gave an exclusive license to

---

[3]  In addition, Can't Stop also owns Registrations in Class 009 for pre-recorded music, namely US Reg. No. 3821800 and US Reg. No. 2184290.

Harlem West Entertainment and/or Karen Willis. *See* Simpson Decl. ¶ 23 and Plaintiffs Complaint ¶ 30.

From 1987 through the present, with the exception of several recent performances by Victor Willis and his group, Sixuvus has continually and exclusively utilized Village People in connection with live music performance services in the United States and around the world. *See* Simpson Decl. ¶ 10, 23. On average, Sixuvus is engaged to perform around fifty live performances per year. *See* Rose Decl. ¶ 12. This has included large events such as the Major League Baseball All-Star Game at Yankee Stadium in 2008, the American Music Festival, Jerry Lewis's Muscular Dystrophy Association Telethon, and in front of over 40,000 people as part of the pre-game entertainment for the New South Wales Rugby League Grand Final. *See* Simpson Decl. ¶ 10

However, since the formation of Sixuvus, Can't Stop has not exercised any type of quality control over Sixuvus' use of Village People in connection with Sixuvus' live performances. *See* Simpson Decl. ¶ 16 and Anzalone Decl. ¶ 8. In fact, when the oral license agreement was formed Plaintiff specifically told the group that Can't Stop was not interested in managing the group or overseeing its live performances as it had in the past. *See* Rose Decl. ¶ 8. Essentially, Sixuvus was led to believe that they would be in charge because they were Village People, and they could perform under the license as long as they still wanted to. *See* Rose Decl. ¶ 8.

Can't Stop did not require Sixuvus to receive permission from Can't Stop for the live performances it booked or dictate what territories it booked in. *See* Rose Decl. ¶ 8; Anzalone Decl. ¶ 5; and Simpson Decl. ¶ 16. Can't Stop did not have any production or rider requirements that Sixuvus had to adhere to. *See* Simpson Decl. ¶ 15. Similarly, Can't Stop never imposed any type of controls over the billing and use of Village People in connection with live performances. *See* Simpson Decl. ¶ 15 and Anzalone Decl. ¶ 10. Can't Stop never required specific set lists, set

5

rehearsals, oversaw choreography, required that the members of the group be in any type of physical shape or maintain a particular appearance. *See* Simpson Decl. ¶ 19 and Anzalone Decl. ¶ 6. Can't Stop never interviewed new performers of Sixuvus. *See* Simpson Decl. ¶ 17 and Anzalone Decl. ¶ 11. Sixuvus has essentially been given free reign and an unfettered right to use Village People as it saw fit in connection with live music performance without supervision or control by Can't Stop for the last thirty (30) years. *See* Simpson Decl. ¶ 15-16.

Sixuvus could dictate their set lists, rehearsals, their choreography, and their stage shows. *See* Simpson Decl. ¶ 19. For the last thirty (30) years, and until this year, Sixuvus has been the exclusive provider of live performances as Village People. *See* Simpson Decl. ¶10, 23. Until this year, every Village People performance that has been witnessed by a member of the consuming public was performed by Sixuvus. *See* Simpson Decl. ¶ 10, 23.

Can't Stop has never made an effort to exercise even the most basic types of quality control over the use of the name in connection with live performances, and it does not seem that Can't Stop is doing so now to protect consumers. *See* Simpson Decl. ¶ 15-16 and Anzalone Decl. ¶ 8. The only thing Can't Stop has been interested in for the last thirty (30) years is getting paid and making sure that the Can't Stop Registrations stayed in their name. The only times Can't Stop was involved, was when Sixuvus was doing something outside the scope of their license or when they needed additional music permissions or rights. *See* Rose Decl. ¶ 13.

**B. Victor Willis' Involvement with Village People**

Victor Willis, the original lead singer of Village People, had ceased performing live with Village People in 1979. *See* Briley Decl. ¶ 9. The interactions between Victor Willis and the performers in Sixuvus have been contentious, at best. *See* Briley Decl. ¶ 15. Victor Willis and those acting in concert with him have over the years engaged in a repeated pattern of conduct meant to disrupt Sixuvus' live performances and appearances as Village People through a variety

of means including harassing behavior and sending threatening letters to venues, promoters and other third parties. *See* Simpson Decl. ¶ 24 and Briley Decl. ¶ 15.

Willis' previous actions led to a complaint being filed in 2008 by Sixuvus in the Superior Court of California - County of San Diego against Victor Willis (the "California Action.") *See* Simpson Decl. ¶ 24 Ex. 1. Can't Stop was eventually impled by Willis into the California Action. *See* Simpson Decl. ¶ 25 Ex. 3. A Temporary Restraining Order and a Preliminary Injunction were both granted by the Court in that lawsuit against Victor Willis, in favor of Sixuvus. *See* Simpson Decl. ¶ 24-25 Ex. 2-3. The February 2, 2009, Preliminary Injunction that was issued enjoined "Victor Willis, as well as [his] associates, agents, suppliers, servants, employees, officers, directors, representatives, successors, assigns, and attorneys and any other person(s) acting in concert or participation with Victor Willis […] from engaging, committing, or performing directly or indirectly, any and all of the following acts: Disrupting any live performance or public appearance of Sixuvus performing as the Village People." *See* Simpson Decl. ¶ 25 Ex. 3; Rose Decl. ¶ 16 and Anzalone Decl. ¶ 14.

After approximately two years of litigation, the lawsuit was settled on the record in 2011. *See* Simpson Decl. ¶ 26 Ex. 4. The terms of the settlement were that Victor Willis would agree to abide by the requirements of the Preliminary Injunction. *See* Simpson Decl. ¶ 26 Ex. 4. Can't Stop was present for the settlement on the record and did not oppose the settlement. *See* Simpson Decl. ¶ 26 Ex. 4.

## C. Can't Stop Tries to End Sixuvus as Village People

Six years later, despite agreeing to refrain from doing so in the California Action, Victor Willis has, with the help of Plaintiff, breached the Settlement Agreement. Now, Victor Willis is using his wife's company and Can't Stop in an attempt to circumvent the Settlement Agreement so that he can disrupt and stop Sixuvus from performing as Village People.

7

Plaintiff, who was also aware that Willis had agreed not to take actions, alone or in concert with others, to disrupt performances or public appearance of Sixuvus performing as the Village People, gave him the means to do so by giving Karen Willis (his wife) and/or Harlem West Entertainment, her company) an exclusive license to Village People mark.

Then on or about May 30, 2017, after thirty years, Sixuvus was informed by Can't Stop that their license was being terminated on June 1, 2017, the next day.  Simpson Decl. ¶ 26 Ex. 8.

Here, the only reason that Sixuvus was disrupted from performing as Village People was that Mrs. Willis and/or Harlem West had obtained an exclusive license from Can't Stop.  Simpson Decl. ¶ 23.  Almost as soon as she received the license, Karen Willis began sending out letters to third parties Sixuvus had contracted to perform with, alleging that Sixuvus has no right to perform as Village People and threatening litigation against persons who permitted Sixuvus to perform as Village People.  Simpson Decl. ¶ 40-41 Ex. 9-10.[4]   This has resulted in the cancelation of several Sixuvus performances.   See Simpson Decl. ¶ 38.  As a result of Can't Stop having given an alleged exclusive license to Harlem West and Karen Willis' actions, venues and promoters are unwilling to book Sixuvus for live performances as Village People for the first time in its approximately thirty-year history.  See Simpson Decl. ¶39, 43.  As a result of Can't Stop's acting in concert with Victor Willis, Karen Willis, and/or Harlem West, Sixuvus' own booking agent has refused to book any new performances for Sixuvus to perform as Village People.  See Simpson Decl. ¶ 42.  This is causing severe harm to Sixuvus' reputation within the industry and with its fans.  See Simpson Decl. ¶ 35.

---

[4] In these letters, Karen Willis, while writing on letterhead bearing Harlem West Entertainment frequently refers to herself as the licensee holder of the Can't Stop Registrations.  See Simpson Decl. ¶ 41 Ex. 10.  Therefore Karen Willis and Harlem West Entertainment are referred to together herein.

## STANDARD OF REVIEW

In the Second Circuit, a court may issue a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) if the plaintiff demonstrates: (1) "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiffs favor"; (2) "that he is likely to suffer irreparable injury in the absence of an injunction"; (3) "the balance of hardships tips in the plaintiffs favor;" and (4) the "public interest would not be disserved" by the issuance of a preliminary injunction. *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal citation and quotations omitted).

A temporary restraining order is a short-term protective device authorized under Rule 65 of the Federal Rules of Civil Procedure. Its purpose is to protect a party from irreparable harm until more lasting relief, such as a preliminary injunction, can be sought. *HarperCollins Publishers L.L.C. v Gawker Media LLC*, 721 F. Supp. 303, 305 (S.D.N.Y. 2010) (*citing e.g. American Broadcasting Companies, Inc. v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977)); *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F .2d 1120, 1125 (2d. Cir. 1989) ("[t]he purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction.") (internal citation omitted).

"Courts in this circuit have required plaintiffs seeking a temporary restraining order to show (1) either a likelihood of success on the merits or 'sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the [applicant's] favor;' and (2) the likelihood of irreparable harm in the absence of such an order." *HarperCollins Publishers L.L.C.*, 721 F Supp 2d at 305 (*quoting In re Feit & Drexler, Inc.*, 760 F.2d 406, 415 (2d Cir.1985)).

9

## ARGUMENT

I.      **SIXUVUS IS LIKELY TO SUCCEED ON THE MERITS OR IN THE ALTERNATIVE THERE ARE SUFFICIENTLY SERIOUS QUESTIONS GOING TO THE MERITS TO MAKE THEM A FAIR GROUND FOR LITIGATION SO THAT THE INJUNCTION SHOULD ISSUE**

As set forth herein, Sixuvus is likely to succeed on the merits of its counterclaims and

defenses in this action for tortious interference with contract, declaratory judgment that Plaintiff

has engaged in naked licensing and therefore has abandoned its rights in the mark at issue and/or

is estopped from seeking to stop Defendant from using Village People, breach of contract,

promissory estoppel, and implied contract and tortious interference with prospective relations.   As

such and as set forth herein, Defendant is entitled to immediate injunctive relief to stop Plaintiff

from taking any action that would disrupt or prevent any live performance or public appearance of

Sixuvus performing as Village People.

### 1.  Sixuvus Is Likely to Prevail on the Merits of Its Claim that Plaintiff Tortiously Interfered with the Settlement Agreement

As set forth herein, Sixuvus has a strong likelihood of succeeding on the merits of its claim

for tortious interference with the Settlement Agreement, and to prevent the irreparable harm that it

will suffer unless an injunction issues to stop Plaintiff causing irreparable harm to Defendant.

"Under New York law, the elements of tortious interference with contract are: (1) the

existence of a valid contract between the plaintiff and a third party; (2) defendant's knowledge of

that contract; (3) defendant's intentional procurement of the third-party's breach of the contract

without justification; (4) actual breach of the contract, and (5) damages resulting therefrom." *See*

*Highland Capital Mgmt. LP. v. Schneider*, 198 F. App'x 41, 45 (2d Cir. 2006) *citing Lama*

*Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 424 (1996).

Sixuvus is likely to succeed on the merits of this claim as there is strong evidence to

support each of the elements thereof.  As an initial matter there can be no dispute that a valid and

enforceable contract exists between Sixuvus and Victor Willis i.e. the Settlement Agreement. *See* Simpson Decl. ¶ 25-26 Ex. 3-4.   After years of protracted litigation in California, Sixuvus and Victor Willis negotiated the Settlement Agreement in which Victor Willis agreed to abide by the Preliminary Injunction. *See* Simpson Decl. ¶ 25-26 Ex. 3-4. The central purpose for Sixuvus to enter into the Settlement Agreement, was that Victor Willis agreed to follow the Preliminary Injunction, which prohibited Victor Willis, his agents and those acting in concert with him, from directly or indirectly disrupting Sixuvus' live performances. *See* Simpson Decl. ¶ 30.

There is also no question that Plaintiff was aware of the Settlement Agreement and the terms thereof. *See* Simpson Decl. ¶ 26 Ex. 4. Not only was Plaintiff a party to the California Action, but Plaintiff's counsel actually recited the terms of the Settlement Agreement into the record. *See* Simpson Decl. ¶ 26 Ex. 4. Plaintiff was also aware of the acrimonious history between Sixuvus and Victor Willis. *See* Adelman Decl. ¶ 1 Ex. 1.

The plain meaning of the Settlement Agreement is that in the event that Victor Willis or his agents, representatives, assigns or any other person acting in concert or participation with him, engaged committed, or performed, directly or indirectly any act that would disrupt the live performance or public appearance of Sixuvus as Village People, such act would constitute a breach of the Settlement Agreement. *See* Simpson Decl. ¶ 26 Ex. 4.

Here, despite Plaintiff's awareness of the Settlement Agreement and its terms, Plaintiff induced and aided Mr. Willis' breach of the Settlement Agreement by giving Karen Willis or her company Harlem West Entertainment an exclusive license of the right to use Village People –*to the exclusion of Sixuvus*. *See* Anzalone Decl. ¶ 19 and Briley Decl. ¶ 21. In other words, by granting Karen Willis, Harlem West Entertainment, who are agents, representatives, assigns and/or are acting in concert or participation with Victor Willis, the exclusive right to use Village People in connection with live performances, Plaintiff has induced the direct and indirect

11

disruption of the live performance and public appearance of Sixuvus as Village People. *See* Simpson Decl. ¶ 38-40.

Plaintiff's actions directly caused Mr. Willis and those acting in concert with him, i.e. Mrs. Willis, to immediately resume their campaign of disrupting Defendant's livelihood and ability to perform live as the Village People, in violation of the Settlement Agreement. *See* Simpson Decl. ¶ 38-40 Ex. 9-10. The sole purpose of the Settlement Agreement was to prevent Mr. Willis, along with his agents and those with whom he is acting in concert, from ever again disrupting Sixuvus' ability to perform live as Village People. *See* Simpson Decl. ¶ 30, 45. Here, that is exactly what he has done. Regardless of the avenue employed, the result of Plaintiff giving Mr. Willis' wife or her company[5] an exclusive license is that it allowed Mr. Willis to disrupt Sixuvus' ability to perform live as Village People.

Here there is strong evidence that Plaintiff, with full knowledge that the Willis' were not allowed to take any such action, directly or indirectly, and knowing that an exclusive license would result in Mr. Willis breaching the Settlement Agreement, induced him to do so.

## 2. Can't Stop Nakedly Licensed its Trademark

Sixuvus is also likely to prevail on its claim for declaratory judgment that Can't Stop has engaged in naked licensing practices and as such has abandoned its rights in and to Village People name, that such abandonment has broken Can't Stop's chain of continuous use necessary to prove priority over Sixuvus, and/or that as a result of decades of naked licensing Can't Stop is now estopped from challenging Sixuvus' uncontrolled use.

---

[5] There can be no dispute that Mrs. Willis and Harlem West are acting in concert with Mr. Willis as he is clearly the intended beneficiary of the exclusive license to Harlem West. *See* Adelman Decl. ¶ 2 Ex. 2. Mr. Willis' breach should not be excused because he did it under the guise of another name

An owner of a mark who licenses it to another has an affirmative "duty to exercise control and supervision over the licensee's use of the mark." *Dawn Donut Co.*, 267 F.2d at 367; *see also Twentieth Century Fox Film Corp. v. Marvel Enters.*, 277 F.3d 253, 259 (2d Cir.2002); *General Motors Corp. v. Gibson Chemical & Oil Corp.*, 786 F.2d 105, 110 (2d Cir.1986).

Among other consequences, "[f]ailure to exercise such control and supervision for a significant period of time may estop the trademark owner from challenging the use of the mark and business which the licensee has developed during the period of unsupervised use." *Sheila's Shine*, 486 F.2d 114, 124 (5th Cir. 1973). A naked license that takes the form of a mere sale or renting of a name without adequate controls, can work as an abandonment, can negate any priority claim that an owner alleges to have and can divest the owner of any claim that its mark has origin indicating significance to the owner. *See Yocum*, 216 USPQ (BNA) ¶ 210 [TTAB Nov. 29, 1982] (holding that agreement without quality controls was mere sale or renting where "virtually only provision, so far as petitioner was concerned, being an agreement to pay petitioner 5% of the gross income of [the] group in return for allowing him to use the 'PIED PIPERS' name 'as purporting to be the name of a vocal group you are about to form.'").

The central question in any naked license claim is whether "the licensees' operations are policed adequately to guarantee the quality of products sold [or the services promised] under the mark." *GM v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 110 (2d Cir.1986). Whether a licensor has abandoned his rights to a mark by engaging in naked licensing depends on "whether the licensees' operations are policed adequately to guarantee the quality of the products sold under the mark." *General Motors Corp. v. Gibson Chem. & Oil*, 786 F.2d 105, 110 (2d Cir.1986).

Control over a trademark is a vital part of the Lanham Act, the Second Circuit explained:

If the licensor is not compelled to take some reasonable steps to prevent misuses of his trademark in the hands of others the public will be deprived of its most effective

13

protection against misleading uses of a trademark. The public is hardly in a position to uncover deceptive uses of a trademark before they occur and will be at best slow to detect them after they happen. Thus, unless the licensor exercises supervision and control over the operations of its licensees the risk that the public will be unwittingly deceived will be increased and this is precisely what the Act is in part designed to prevent.

*Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959)

Here for the past thirty years, Can't Stop has engaged in blatant naked licensing practices that are clearly nothing more than renting of their trademark in exchange for profit without controlling or monitoring the quality of services rendered under Village People.

Can't Stop has not exercised any type of quality control over Sixuvus' use of Village People name in connection with Sixuvus' live performances. *See* Simpson Decl. ¶ 16. Can't Stop did not require Sixuvus to ask what live performances it booked or what territories it booked them in. *See* Simpson Decl. ¶ 20. Can't Stop did not have any production requirements that Sixuvus had to adhere to. *See* Simpson Decl. ¶ 16. Can't Stop never imposed any type of controls over the billing and use of Village People name. *See* Simpson Decl. ¶15. Can't Stop never required rehearsals, oversaw choreography or required that the members of the group be in any type of physical shape. *See* Simpson Decl. ¶ 15. Can't Stop never interviewed new performers of Sixuvus, nor did it attend auditions. *See* Simpson Decl. ¶ 17 and Anzalone Decl. ¶ 11. Sixuvus has essentially been given free reign and an unfettered right to use Village People as it saw fit in connection with live music performance without supervision or control for the last thirty (30) years. *See* Simpson Decl. ¶ 15-16.

Furthermore, there is no familial relationships, overlap in ownership or other type of special relationship that could excuse Plaintiff's total failure to oversee the use and quality of services rendered under Village People name. *See* Simpson Decl. ¶ 6.

There was not a true licensor licensee relationship here. Just like in *Yocum*, the 'license' that was given to Defendant is really nothing more than a naked renting of the right to use Village

14

People name in exchange for 5% of certain profits. *See* Simpson Decl. ¶ 7. As such, just like in *Yocum,* Plaintiff's failure exert quality control over the mark's use, has operated to divest Village People from having any source indicating significance for live performances in Plaintiff's hands.

To the contrary of operating as a source indicator of Plaintiff—these naked licensing practices have caused Village People Marks to become synonymous with Sixuvus in the mind of consumers. *See* Adelman Decl. ¶ 3 Ex. 3. Sixuvus is Village People. They perform as Village People, they make appearances as Village People, and have for the last thirty years. *See* Simpson Decl. ¶ 14, 15, 34. Can't Stop may be the listed owner of record of the Can't Stop Registrations for live music performances, but it is and has been members of Defendant who the consuming public associates with Village People for decades. *See* Adelman Decl. ¶ 3 Ex. 3.

As such, and after years of failure to control or supervise the use of Village People, to the point where the mark has lost any connection to Plaintiff, Plaintiff should be estopped from now challenging Defendant's use of Village People in connection with live performances.

This is especially true where Plaintiff's failure to supervise and control the quality of its licensee's services (including Harlem West) is hurting consumers. *See* Adelman Decl. ¶ 4 Ex. 4-5. The entire purpose of requiring trademark owners to exert quality control is to protect the consuming public and ensure that it is not unwittingly deceived. Here because of Plaintiff's failure to exert any control that is exactly what is happening. *See* Adelman Decl. ¶ 6 Ex. 5.

As set forth above, Defendant is very likely to succeed on its claim for declaratory judgment that Can't Stop has engaged in naked licensing practices and as such that Plaintiff (a) has abandoned its rights in and to Village People Mark; (b) that such abandonment has broken Can't Stop's chain of continuous use necessary to prove priority over Sixuvus; and/or (c) that as a result of decades of naked licensing Can't Stop is now estopped from challenging Sixuvus' use.

### 3. Sixuvus Is Also Likely to Succeed on Its Claim for Breach of Contract

In addition to the foregoing, Sixuvus is likely to succeed on its claim that Plaintiff's termination of the license agreement upon one day's notice, was a breach of the parties' oral agreement that is causing irreparable harm.   After almost thirty years, on or about May 30, 2017 Plaintiff sent and Sixuvus an email purporting to terminate the license on June 1st –the next day. Simpson Decl. ¶ 26 Ex. 4.  Plaintiff's failure to provide reasonable notice under the oral agreement between the parties constitutes a breach of the agreement and Plaintiff should be estopped from harming Defendant by terminating the agreement without proper notice.

"To establish a prima facie case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

"A contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the presumed intention of the parties as indicated by their conduct. It is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 582 (2d Cir. 2006) *citing Jemzura v. Jemzura*, 36 N.Y.2d 496, 503-504 (1975).

Here, Plaintiff has allegedly been licensing Village People Marks for live performances to Defendant for thirty (30) years.  When the oral agreement was made Plaintiff told Defendant that Plaintiff was not getting involved with the management of the group or the live performances, because Defendant should be in charge because they were Village People.  *See* Rose Decl. ¶ 8. After working tirelessly to build their own career, Plaintiff cannot simply tell Defendant on one day's notice that they are not allowed to enter into any further agreements for use of the name.

16

Even if no definite period of termination was originally fixed, a contract is not terminable at will by either party.  Rather, if the contract existed for a reasonable duration, then a party is entitled to reasonable notice of termination.  *Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc.*, No. 87 CIV. 6294 (MJL), 1988 WL 52777, at *2 (S.D.N.Y. May 18, 1988); *Colony Liquor Distributor, Inc. v. Jack Daniels Distillery*, 22 A.D.2d 247, 249, 254 N.Y.S.2d 547, 549-550 (1964).  *See also Laugh Factory, Inc. v. Basciano,* 608 F. Supp. 2d 549, 556 (S.D.N.Y. 2009) (under New York law, in the context of an oral trademark license, "a contract that does not contain a termination provision is terminable only upon reasonable notice.").  *C.f. Halo Optical Prod., Inc. v. Liberty Sport, Inc.*, 2017 WL 4011261, at *3 (N.D.N.Y. Sept. 11, 2017) (a year notice found to be reasonable under the circumstances).

Here there is a strong likelihood that one day's notice period is inequitable and unreasonable in light of the parties' oral agreement and the length of their relationship.  Even a few months is an insufficient time frame to terminate the agreement, if Plaintiff has the right to terminate at all.

### 4.  Defendant is Likely to Prevail on A Claim for Promissory Estoppel

To this end, Plaintiff is also likely to prevail on the merits of its claim that Plaintiff is estopped from terminating the oral agreement. "In New York, promissory estoppel has three elements: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance.'" *Cyberchron Corp. v Calldata Sys. Dev., Inc.*, 47 F3d 39, 44 (2d Cir. 1995).

For thirty years, Sixuvus has relied on Plaintiff's statements and conduct which led Sixuvus to believe that they could have the license as long as they intended to perform as Village People.  *See* Rose Decl. ¶ 8; Simpson Decl. ¶ 27 Ex. 5 (Declaration of Henri Belolo affirming

"Sixuvus, Ltd. Is the owner of a license granted by [Can't Stop] that allows Sixuvus to use the Village People name and characters in performances and appearances in the United Sates and throughout the world.")

Now Plaintiff should be estopped from terminating Defendant's ability to use Village People Marks at all.

5. **Can't Stop Tortiously Interfered with Sixuvus' Prospective Contractual/Economic Relations**

Unless enjoined, Plaintiff's actions will further continue to interfere with Sixuvus' prospective contractual relations.

New York law provides for separate causes of action for interference with existing and prospective contractual relationships. *Lader v. Delgado*, 941 F. Supp. 2d 267, 272 (E.D.N.Y. 2013) "Under New York law, the elements of a claim for tortious interference with prospective business relations are: (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship." *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000). *See also Legacy Grp. of Am., Inc. v. N. Am. Co. for Life & Health Ins.*, 336 F. App'x 87, 91 (2d Cir. 2009) (Internal citations omitted). The fourth element has been further clarified to by the Second Circuit that "the [party's] interference [must have] caused injury to the relationship." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006). "In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994).

Furthermore, "[t]o state a claim for tortious interference with prospective business relations, a valid contract is not necessary […] it is well-settled that a plaintiff can recover if that plaintiff can prove that the defendant tortiously interfered with "a continuing business or other customary relationship not amounting to a formal contract." *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir. 1998) (internal citations omitted). In determining improper means, the Second Circuit has held that "the appropriate standard is whether [a party] employed wrongful means, [as] defined under New York law [is] representing physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone." *Scutti Enterprises, LLC. v. Park Place Entm't Corp.*, 322 F.3d 211, 216 (2d Cir. 2003) (Internal citations omitted).

Again, Defendant has strong proof that it will prevail on these claims. As for the first element, Sixuvus has had, throughout its thirty-year history, strong business relationships with various concert promoters and bookers, as it has been the exclusive source of live performances of Village People. *See* Simpson Decl. ¶ 12-14, 23. On average, these relationships yield approximately many live engagements to perform as Village People each year. *See* Rose Decl. ¶ 13. Plaintiff was generally aware of these relationships, as Sixuvus paid Plaintiff from monies obtained as a result of these engagements in connection with the oral license agreement between the parties. *See* Simpson Decl. ¶ 7. Here Plaintiff interfered with those relationships by (a) giving Mrs. Willis an exclusive license to use Can't Stop Registrations, which induced Mr. Willis to breach the Settlement Agreement; and (b) improperly and unfairly purporting to terminate the oral license agreement on one days' notice and thereafter informing third parties that Sixuvus did not have the right to perform as Village People. *See* Simpson Decl. ¶ 33 Ex. 8.

Plaintiff had no reason to give Mr. Willis the ability to interfere with these relationships, other than to hurt Defendant. Plaintiff is well aware of the acrimonious history between the

19

parties.  In the latest part of their vendetta against Sixuvus, Karen Willis/Harlem, as Can't Stop's licensee, has been sending letters to various concert venues and to Sixuvus' booking agent threatening litigation should Sixuvus take the stage as Village People.  *See* Simpson Decl. ¶ 40-41 Ex. 9-10.  Karen Willis/Harlem has only been enabled to interfere with Defendant's business because Plaintiff provided her with an exclusive license.  Plaintiff's decision to permit Karen Willis/Harlem to use the Can't Stop Registrations to the exclusion of Sixuvus has resulted in a substantial interference with Defendant's business relations.

Sixuvus has, and unless Plaintiff is enjoined, will continue to face enormous difficulties in arranging new performances and appearances.  Sixuvus' own booking agent, who has been threatened by Karen Willis/Harlem, and is no longer booking shows for Sixuvus.  Performance venues are also no longer willing to book Sixuvus because of the threats that come from Karen Willis.  *See* Anzalone Decl. ¶ 17-18; Simpson Decl. ¶ 39.

Can't Stop knew that by granting Karen Willis/Harlem a license to perform as Village People, that she would ensure that future endeavors from Sixuvus would be barred.  She has done as much by sending threatening letters to Sixuvus' booking agent, the very person responsible for securing the performances that Sixuvus relies on to be viable.

The fourth element has similarly been met as Karen Willis/Harlem has gone as far as to demand that concert venues not permit Sixuvus to perform as Village People.  Unfortunately for Sixuvus, her threats have proven successful as it is not in the position it once was to book concerts.  By threatening concert venues and Sixuvus' manager, Sixuvus can no longer contract with performance venues to put on concerts and make appearances like it once did.  Simpson Decl. ¶ 39.  Unless Plaintiff's is enjoined from interfering with Sixuvus' right to perform live as the Village People, Defendant will continue to lose the valuable business relationships that it has

cultivated for almost three decades. Once ruined, these relationships would be impossible to rebuild. Briley Decl. ¶ 20 and Rose Decl. ¶ 39.

## II.    SIXUVUS WILL SUFFER IRREPARABLE HARM AND THE BALANCE OF HARDSHIPS TIPS IN SIXUVUS' FAVOR

Sixuvus will suffer irreparable harm in the absence of an injunction and a temporary restraining order, and the balance of the hardships clearly weighs in Sixuvus' favor. As noted by the Second Circuit, these "two items, both of which consider the harm to the parties, are related." *Salinger v Colting*, 607 F. 3d. 68, 81 (2d Cir. 2010).

On the issue of irreparable harm, Courts must "actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *HarperCollins Publishers L.L.C. v Gawker Media LLC*, 721 F. Supp. 2d 303, 305 (S.D.N.Y. 2010) (quoting *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010)).

The Second Circuit has further noted that "[h]arm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." *Salinger v Colting*, 607 F3d 68, 81 (2d Cir. 2010).

Here, allowing Plaintiff to (i) prevent Sixuvus from using Village People in connection with live performances when such conduct constitutes tortious interference with contract and business relations; (ii) continue to induce third parties to breach their agreements with Defendant; (iii) prevent Sixuvus from using Village People as a mark when Plaintiff no longer has a right to do so because it has abandoned such rights through naked licensing; and/or (iv) terminate the term of Defendant's license in breach of the agreement, would cause an irreparable harm to Defendant.

21

Defendant has already expended a substantial amount of time and resources in prior litigation to avoid this exact situation. *See* Simpson Decl. ¶ 8. When Defendant entered into the Settlement Agreement with Victor Willis, it sought to never again be in a position where Victor Willis or those in concert with him could disrupt Defendant's ability to perform live as Village People. Plaintiff was aware of that agreement, and despite knowing that it would be a breach of the Settlement Agreement to work in concert with Victor Willis to disrupt Defendant's ability to perform live, Plaintiff induced and encouraged Victor Willis to break that promise by purportedly giving Victor Willis's wife's company an exclusive license to use Village People Marks. Now Karen Willis and Harlem West, working on Victor's behalf, are doing everything they can to disrupt Defendant's ability to perform live as Village People.

Similarly, through its naked licensing, Plaintiff has been divested of any claim that its Can't Stop Registrations have origin indicating significance to *Plaintiff*. Plaintiff lost those rights and through its failure to supervise the use of its marks it cannot now, after thirty years of failing to exert any quality control, try to stop Defendant from Defendant's use of Village People in connection with live performances.

Similarly, Plaintiff cannot be allowed to cause damages by improperly terminating the agreement, if it has the right to terminate at all.

Sixuvus has already suffered damages. However, if Plaintiff is not immediately enjoined from (i) taking any action in concert with the Willis' to disrupt any live performance or public appearance of Sixuvus performing as the Village People; or (ii) taking any action to stop Defendant from using Village People in connection with its live performances, until these issues are resolved Sixuvus will suffer and continue to suffer immediate and irreparable harm.

Sixuvus will suffer irreparable reputational damage both with its industry relationships and with its fans. *See* Rose Decl. ¶ 22 and Briley Decl. ¶ 20. Sixuvus has spent thirty (30) years

building its reputation within the industry and with its fans, and if Plaintiff's actions interfering with the Settlement Agreement are allowed to destroy that, it will be impossible to rebuild. *See* Rose Decl. ¶ 22 and Briley Decl. ¶ 20.  The continued disruption to Defendant's ability to perform live as Village People, will threaten the reputation of Sixuvus, as it is losing relationships that it took years to build with promoters, bookers and venues.  Moreover, these actions that could inhibit Defendant's ability to perform live will damage Sixuvus' reputation with its fans. *See* Simpson Decl. ¶ 36 and Rose Decl. ¶ 14.  There is no question that Victor Willis' performances are of an inferior quality, and if Defendants' are not allowed to perform live as Village People it may permanently damage Defendant's reputation with its fans, if they believe that Victor Willis' group is associated with the members of Sixuvus. *See* Rose Decl. ¶ 14 and Adelman Decl. ¶ 3-5.

If the TRO and Preliminary Injunction are denied and Defendant ultimately prevails on the merits in months or years and it is declared that Plaintiff and Harlem West cannot disrupt Defendant's ability to perform live as Village People, that Plaintiff through naked licensing has abandoned its rights in Village People Marks and Defendant is the owner of same, or that Plaintiff is estopped from preventing Defendant's use of same, the damage will be done.  Defendant will not be able to rebuild the reputation it has built over the last 30 years and the damages that Defendant will suffer would be impossible to quantify or replace with money damages.  As such irreparable harm has been established and the balance of the hardships in this case also decidedly tips in the defendants' favor.

## III.    THE PUBLIC INTEREST WOULD NOT BE DISSERVED BY THE ISSUANCE OF A PRELIMINARY INJUNCTION

Here also the public interest would not be disserved by the issuance of an injunction.  The public's interest is best served by (i) preventing Plaintiff from tortuously interfering with the Settlement Agreement by giving Victor Willis the means and ability to breach his obligation to refrain from disrupting Defendant's ability to perform live as Village People; (ii) preventing

Plaintiff from asserting trademark rights that it no longer owns; (iii) preventing Plaintiff from deceiving the consuming public by failing to exert any quality control measures; (iv) preventing Plaintiff from breaching its agreement with Defendant or taking actions it is estopped from taking; and (v) preventing further tortious interference of Defendant's prospective relations.

Moreover, given the strong showing of likelihood of success on the merits, as set forth above, the public's interest is served by estopping Plaintiff from preventing Defendant from performing as Village People while the Court makes a decision on the merits of this action. If Defendant ultimately prevails, which as set forth above it is likely that it will, then it would not serve the public to allow Plaintiff to continue to mislead the public by licensing rights it no longer owns to the exclusion of Defendant.

## CONCLUSION

For the reasons set forth herein, Defendant respectfully requests that the Court grant Defendant's motion for a temporary restraining order and preliminary injunction and enjoin Can't Stop from disrupting any live performance or public appearance of Sixuvus performing as Village People or otherwise preventing Defendant's use of "Village People" in connection with Sixuvus' live performances.

Dated: New York, New York
      November 30, 2017

Respectfully submitted,
ADELMAN MATZ P.C.

By: _____

  Sarah M. Matz, Esq.
  Gary Adelman, Esq.
1173A Second Avenue, Suite 153
New York, New York 10065
Tel: (646) 650-2207
Email: sarah@adelmanmatz.com
Email: g@adelmanmatz.com
*Attorneys for Defendant*