1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   CAN'T STOP PRODUCTIONS, INC.,,

4                   Plaintiff,

5            -against-                    17 CV 6513 (CS)

6   SIXUVUS, LTD, et al,

7                   Defendants.

8   ------------------------------------x

9
                                United States Courthouse
10                              White Plains, New York

11                              December 8, 2017

12
    B e f o r e:
13                      HONORABLE CATHY SEIBEL,
                               District Court Judge
14
    A P P E A R A N C E S:
15
    EISENBERG TANCHUM & LEVY
16           Attorneys for Plaintiff
             707 Westchester Avenue
17           White Plains, New York 10604
    BY:  STEWART L. LEVY
18
    ADELMAN MATZ P.C.
19           Attorneys for Defendants
             1173A Second Avenue, Suite 153
20           New York, New York 10065
    BY:  GARY PHILIP ADELMAN
21        SARAH MICHAL MATZ

22  REITLER KAILAS & ROSENBLATT LLC.
             Attorneys for Karen Willis
23           885 Third Avenue
             New York, New York 10022-4834
24  BY:  BRIAN D. KAPLAN
        ROBERT W. CLARIDA

25


              Angela O'Donnell, RPR, 914-390-4025

```
1                THE CLERK:  Can't Stop Productions Inc., versus

2    Sixuvus Limited.

3                THE COURT:  Good morning, Mr. Levy.

4                MR. LEVY:  Good morning.

5                THE COURT:  Ms. Matz and Mr. Adelman.

6                MR. ADELMAN:  Good morning, your Honor.

7                MS. MATZ:  Good morning.

8                THE COURT:  Mr. Caplan and Mr. -- I'm sorry, Clarida?

9                MR. CLARIDA:  Clarida.  Like Florida.

10               THE COURT:  Clarida.  Okay.

11               MR. CAPLAN:  Good morning, your Honor.

12               THE COURT:  Everyone can have a seat.

13               MR. CLARIDA:  Good morning.

14               THE COURT:  We are here because Karen Willis, doing

15    business as Harlem West Entertainment, wants to intervene in

16    this case and wants me to vacate, or at least modify the TRO

17    that I entered last week.

18               My first concern, Ms. Matz, is that it looks like

19    your clients have not been abiding by it.

20               MS. MATZ:  I'd be happy to address that, your Honor.

21               So as an initial matter, I do think that our clients

22    have been instructing all of their agents to abide by it.  If

23    you're talking about the Red Entertainment email blast that was

24    sent out, that's attached to their papers, it's the -- we did

25    instruct them how to present the name.  We have asked them
```

Angela O'Donnell, RPR, 914-390-4025

1    since to issue a correction and they're doing it.

2            THE COURT:  Well, I'm looking at Exhibits 6 through 9

3    of Ms. Willis's affidavit.

4            MS. MATZ:  Yes.  So my understanding is that these --

5    the first one, Exhibit 6, isn't dated.  Exhibit 7 is, and it's

6    from December 2nd.  Our client's marketing people were told

7    what to do and they're working on making sure that everything

8    is in compliance with it.

9            This was the day after the order was issued and they

10   have been moving everything so that it is Sixuvus presents The

11   Legendary Village People.

12           THE COURT:  All right.  Well, here's Exhibit 9 is

13   from, it looks like December -- looks like it was sent out on

14   December 7th.  And, you know, when there's an order working

15   toward complying is not complying.

16           Your individual clients on social media don't seem to

17   be abiding by the ruling.  Hash tag real Village People is not

18   what I said that they could use.  They need to understand that

19   they have to abide by it.  They can make arguments in English

20   sentences.  They can say my Village People is more authentic

21   than some other Village People, but they can't hold themselves

22   out as anything inconsistent with my ruling.

23           I'm going to modify my ruling anyway, because I do

24   think it's confusing.  But I had the opportunity to go back and

25   read the transcript from last time, and I looked at a little

1    bit of the case law.  I mean, we're in a funny position here.

2    We have the licensee who's been licensing the trademark for 30

3    years and paying for it, saying it's invalid; which may or may

4    not be a position for the licensee estopped from taking.  We

5    have the new licensee, the proposed intervenor, who presumably

6    is now going to argue that the trademark is valid after

7    spending years litigating against the plaintiff and trying to

8    argue that it's invalid.

9            I notice, Mr. Levy, that when we were last here, you

10   said something that sort of went by me at the time, which was

11   that Ms. Willis had been litigating with your client for ages

12   over the validity of the trademark, and she was taking the

13   position it was invalid, and you said that it had been upheld

14   repeatedly.

15           First of all, where was that litigation?

16           MR. LEVY:  The Trademark Appeals Board, wherever the

17   trademark office --

18           THE COURT:  I'm sorry.  Slow down.

19           MR. LEVY:  There were four petitions against us at

20   the trademark office and we had trademark counsel handle it,

21   but I think it was the trademark appeal -- it's whatever the

22   primary court is for the trademark office and went through --

23           THE COURT:  The TTAB or something?

24           MR. LEVY:  TTAB, right.

25           THE COURT:  And did Ms. Willis make any of the same

                 Angela O'Donnell, RPR, 914-390-4025

1    arguments on invalidity as the defendants are making here?

2              MR. LEVY:  Well, her big argument was that we had a

3    committed fraud on the trademark office when we renewed, and we

4    said we were renewing for records, and we put down cassettes

5    and CDs; she said, well, they don't put down records anymore,

6    and therefore, for us to say we were renewing it, was a fraud.

7    That took two years to litigate and we were upheld.

8              The other arguments -- you know, I didn't handle it,

9    your Honor.  I've seen it.  There's probably some overlap.

10             THE COURT:  All right.  Don't guess.

11             MR. LEVY:  I could find out from trademark counsel

12   who litigated it.

13             THE COURT:  Maybe, I don't know, Mr. Caplan and

14   Mr. Clarida, do you know?

15             MR. CAPLAN:  We were not her trademark counsel in

16   those proceedings.  I do know that there was an issue about the

17   trade dress with respect on the motorcycle cop character.

18   That's the only portion of the other proceedings that I was

19   ever filled in on.

20             MS. MATZ:  Your Honor, if I may.

21             THE COURT:  Yes.

22             MS. MATZ:  I don't know about all of them.  I am

23   familiar with at least one of the TTAB proceedings because I

24   reviewed the records.  Actually, one of the declarations from

25   them was attached to our papers, and one of them, the grounds

```
 1    was an abandonment argument, not a naked licensing argument.

 2            One of the ways that Ms. Willis had previously

 3    attacked the mark was by saying the plaintiff wasn't using it,

 4    our clients were using it, and that that use didn't count

 5    towards the plaintiff and they had abandoned it under the

 6    statute, which is three years, plus an intend not to resume

 7    use.

 8            THE COURT:  Well, it is funny because, as I said, the

 9    defendants have been licensing it and they now want to say it's

10    invalid, at least as between themselves and the plaintiff.

11            Then a party who's been saying it's invalid is now

12    saying, no, it's invalid and it's licensed to me.  Excuse me.

13    It's valid and it's licensed to me.

14            MR. CAPLAN:  Can I interject?

15            THE COURT:  That doesn't mean you can't say that, but

16    it's just funny.

17            MR. CAPLAN:  I would just like to make one

18    interjection, which is, if you've made the claim and the claim

19    was rejected, then you have to live by the law of the land,

20    which is, it's valid.  So obviously, at the time that Karen

21    Willis doing business as Harlem West Entertainment entered into

22    the ten-year trademark licensing agreement in May of 2017, at

23    that point in time, the prior arguments had been rejected by

24    the courts and the law of the land was that it's a valid

25    trademark, so she's going to with the law of the land --
```

1          THE COURT:  She's got to live with it.

2          MR. CAPLAN:  Right.  Exactly.

3          THE COURT:  So I guess her position now is, fine,

4    it's valid, it belongs to me.

5          And, as I think I said to Mr. Levy, previously, his

6    clients may have painted themselves into a corner, but

7    Mr. Levy, do you still have the optimism you had last time you

8    were here that something could be worked out?

9          MR. LEVY:  I do.  I would like to just point out, and

10   it was in my letter to the Court which accompanied my proposed

11   counter-order, I think one of the arguments that resonated the

12   most with the Court, that was made by the defendants, was that

13   we gave one day's notice of termination, and to quote the

14   Court, that was rotten on our part.

15         But the reality was, and it's in my letter, which is

16   docketed as Document 34, it's in the court transcript, they

17   were given six months.  We looked at -- in our agreement with

18   Harlem West, we said, look, we're going to terminate the

19   agreement, but we're going to give them six months, we're going

20   to work something out with them.  Harlem West wasn't thrilled

21   with it, but they lived with it.  And during that six-month's

22   period, we made offers.

23         Now, I think it's a little disingenuous towards, at

24   the end of six months for the defendants to come up and say,

25   oh, gee, you know, you gave us no notice.  We gave them six

 1   months to --

 2              THE COURT:  To wind up.

 3              MR. LEVY:  To wind up.  And now they come in here,

 4   and the cases they cited -- I was at a disadvantage, your

 5   Honor, I was here on a TRO, I hadn't read the cases.  I've read

 6   their cases now.  At most, at most, under New York Law when you

 7   have an oral agreement where there's no term, at most it can be

 8   one year, otherwise it would run afoul of the statute of

 9   frauds.  That would be most.  They've had six months already.

10   So it's not like we were so rotten to them at all.  That's one

11   point there.

12              To answer your question, am I still optimistic?  I

13   think I'm optimistic, because our position, and Mr. Clarida

14   ignored me when I came in and I said, I feel like Switzerland,

15   I want to be the neutral party.  He said, how can you be

16   neutral?  Your client licensed us.

17              Our position is, they are the exclusive licensees.

18   Okay?  For better or for worse, that's the deal we made, we

19   honor it.  But we can only give the rights that we have, and

20   our rights are governed by federal law.

21              It would be no different if I sold a house and then

22   the government came in and said, well, no, half that house was

23   on a U.S. Army base, you had no right to sell it.  Well, all

24   right.  Our trademark is governed by federal law.  We gave them

25   the exclusive right and we'll stand by that, but what do we

 1  have the right to give them?  I think under the Nominative Fair

 2  Use doctrine which comes out of the Ninth Circuit, but it's

 3  been cited in several courts, a musician, in order to identify

 4  what he did in the past, can make reference to a trademark.

 5          So I think the issue is, we can go through all this.

 6  I hope the mediation session works.  But afterwards, if it

 7  doesn't, when the Court rules on what the scope of our

 8  trademark is, that's what we gave an exclusive license to them

 9  for.  Now, I think that reasonable people can sit there and

10  say, okay, how can we work this out?

11          I don't think it's reasonable, your Honor, though, to

12  have the one modifier on the defendant's part being Sixuvus

13  presents.  Because Sixuvus is a limited corporation.  Nobody

14  knows what Sixuvus is.  Sixuvus presents.  That's like Stewart

15  Levy presents or Madison Square Garden presents.  What does

16  that mean?

17          If the whole idea is no consumer confusion, that

18  it's an accurate portrayal, and I think what I suggested in my

19  letter, I think what Mr. Caplan suggests in his papers as a

20  name, which is, the Sixuvus presents the two original members

21  of the legendary band and their new company and new band,

22  avoids consumer confusion and it would work out.

23          So I'm confident that if we were in a room together,

24  either with the imprimatur of the grace of the United States

25  and a Magistrate Judge there, the parties will come to their

```
1   senses, and if not, at a preliminary injunction hearing you
2   will decide what our senses should come to.  So, yes, I'm
3   optimistic.
4            MR. CAPLAN:  Your Honor, may I speak a moment?
5            THE COURT:  Yes, please.
6            MR. CAPLAN:  I think the first question that the
7   Court has to address is whether or not Karen Willis doing
8   business as Harlem West Entertainment is a necessary
9   indispensable party.
10           THE COURT:  Does anybody dispute that I ought to let
11  her intervene?
12           MS. MATZ:  Your Honor, we do.  So there's two things
13  going on.
14           One is, obviously, we just got these papers.  There
15  is two types of intervention, and depending on whether they
16  come in as an intervenor as of right or an intervenor
17  permissively does affect what their allowed to do in this case.
18           It's also unclear to me at this point if they have
19  standing to assert the claims they trying to assert.  Exclusive
20  licensees do not always have standing to assert trademark
21  claims, and the agreement that they have -- the exclusive
22  license agreement does not give them the right to prosecute
23  infringement, and, in fact, retains ownership rights of the
24  mark.  So whether they have standing is a threshold matter.
25  There is also a common law claim, and I'll be honest with the
```

1    Court, I don't know what the answer to that is, whether they

2    have standing to assert --

3              THE COURT:  Well, even if I might ultimately dismiss

4    their claim, what's before me right now is a preliminary

5    question of whether I should let them intervene to assert it.

6    And I don't have to rule on that today, I don't think, but I

7    think I have to say I think it's likely that I'm going to rule

8    on it.

9              They certainly have filed a timely application.  They

10   certainly have an interest relating to the property that's the

11   subject matter of the action.

12             Their interests may be impaired if the defendants

13   win, and Mr. Levy, to his credit, has been quite candid, that

14   his interests are not the same as the defendants in at least

15   one sense, which is that his client is weary and just would

16   like to make peace and go home, which may not be what

17   Ms. Willis wants to do.

18             The application to intervene as of right, it may be

19   that permissive intervention would apply anyway, but at least

20   for purposes of today, I'm going to allow them to intervene,

21   subject to whatever future opposition anybody may want to

22   raise.

23             And the question becomes, what are we going to do

24   going forward?

25             Is your client -- did you have more you wanted to

                 Angela O'Donnell, RPR, 914-390-4025

1    say, Mr. Caplan?

2                MR. CAPLAN:  Yes, I do.

3                THE COURT:  Okay.

4                MR. CAPLAN:  But thank you for permitting us to

5    intervene.

6                I would suggest a couple of things.  One is, and we

7    cite it in our brief, what I would call the higher standard

8    necessary for what I would deem to be a mandatory injunction,

9    which I believe that the TRO from last Friday is, and we cited

10   the *Tom Doherty Associates versus Saban* case, a Second Circuit

11   decision in which the court said:  Where preliminary injunction

12   orders relief that is mandatory and cannot be undone after

13   trial on merits, movant must meet a heightened standard of

14   showing a clear and substantial likelihood of success on the

15   merits and irreparable harm in the absence of injunction.

16               I think, one, those standards were probably not met

17   last Friday; but, two, if we're allowed to intervene, and we're

18   deemed to have been an indispensable and necessary party in the

19   action, I think we needed to have been heard prior to the TRO

20   being entered, and I know that you didn't have us in front of

21   you at that point in time.  If we are allowed to intervene as

22   of today, there is no claim that the defendants presently have

23   directly against my client.

24               THE COURT:  You would be intervening as the

25   plaintiff?

                    Angela O'Donnell, RPR, 914-390-4025

```
1              MR. CAPLAN:  Yes.

2              So until such time as the defendants create some form

3    of claim against my client, I think any TRO would be

4    inappropriate of any measure, because the law is clear that you

5    need to have an underlying pleading against a party and show

6    irreparable injury with respect to the claims in that

7    underlying pleading in order to have injunctive relief.

8              So I think as a matter of law, if you allow us to

9    intervene today, which it sounds like you are allowing us to

10   intervene, that the TRO should be vacated just for that reason

11   alone because we are a necessary and indispensable party.  The

12   injunctive relief that was created as of last Friday without us

13   here has a direct impact upon us.

14             THE COURT:  Let me interrupt you for one second.

15             Ms. Matz, if Ms. Willis intervenes as a plaintiff, do

16   you expect to counterclaim?

17             MS. MATZ:  I would imagine that if, ultimately, she's

18   allow to intervene as a plaintiff, that there would be claims

19   brought against her.

20             But this is -- so what Mr. Caplan just said is part

21   of the problem that I see with making this decision today, as

22   whether it is mandatory or permissive.  Because whether it's

23   mandatory or permissive intervention does allow the Court to

24   impose restrictions on the intervenor.  They can say, you have

25   to live by the things that have happened in this case thus far.
```

1          Also, I will just note that, to the extent we're

2   talking about whether they could have been bound or not by the

3   prior order, I know that some of the language your Honor had

4   problems with in the TRO that we had initially proposed that

5   was actually taken out of the one we ultimately submitted to

6   the Court after the conference, but I will note that Rule 65

7   does say that a TRO can bind other people who are in active

8   concert or participation with anyone who is a party to the

9   case.

10          THE COURT:  Yes, I hear you, but I do think they're

11  not aligned, really.  They're aligned in one sense, which is,

12  you know, Mr. Levy's agreeing that the trademark is valid, but

13  his client's interest is just to get all you people to go away.

14  It's not really the same intensity of interest as Mr. Caplan's

15  client.

16          And I do think that probably -- you know, this is why

17  I hate TROs, because you shoot from the hip and you do things,

18  upon reflection, may not have been so smart, one of which was,

19  I think by entering an order that, in effect, tied Mr. Caplan's

20  client's hands without hearing or giving an opportunity to be

21  heard to that party, there's a due process issue.

22          And I agree that it may make a difference whether the

23  intervention is permissive or as of right in the long run.  So

24  that's why I said I'm permitting them to intervene, at least

25  preliminarily, but I think the moment I grant such a motion,

```
 1    there's going to be a counterclaim, and then there will be a
 2    claim that could support a TRO.  So what I would like to do
 3    is --
 4               MR. CAPLAN:  Your Honor, can I suggest one last thing
 5    before you --
 6               THE COURT:  Yes.
 7               MR. CAPLAN:  Which is your question about whether
 8    this can be resolved.  I think that if we have this
 9    mediation -- I'm not available on January 5th, I have a jury
10    trial at the end of January in Nashville, Tennessee, and I have
11    to be in front of a judge in Memphis and that's the date that
12    was set prior to us being involved in the case.  I believe the
13    following week, the week of January 12th, will work for
14    everybody.  We can coordinate among ourselves.
15               THE COURT:  I'm sure Judge Smith will accommodate
16    you.
17               MR. CAPLAN:  Right.  And so I'm hopeful that if we
18    all get into a room that we can work something out, but I think
19    in the interim, it would be appropriate that the TRO, as
20    written, is vacated and the status quo is maintained.  Okay?
21               The defendants have done what they have sought to do.
22    The plaintiff did not move for injunctive relief against the
23    defendants.  So the status quo was changed as a result of your
24    order.  And we have looked on the Sixuvus website, and it does
25    not appear that they have a concert date set during the next 30
```

1    days.  So I would think that vacating the TRO and having some

2    type of agreement that they're not going to malign my client,

3    and we're not going to malign them or disparage going either

4    way, would be an appropriate mechanism to sort of preserve the

5    status quo through the 12th, have from the mediation session

6    with the magistrate judge, and if we can't reach resolution,

7    have an understanding that there's going to have to be some

8    form of preliminary injunction hearing hanging over everybody's

9    heads, to give everybody some incentive to try to work

10   something out the week of the 12th so that we don't have to

11   take up any more of your time but at least the status quo has

12   not been changed.  Thank you for hearing --

13           THE COURT:  Well, I like the part about not taking up

14   more of my time.

15           Does either party have dates booked between now and

16   the mediation?

17           MR. ADELMAN:  I'm sorry, what?

18           MS. MATZ:  Between now and January 18?

19           THE COURT:  Or the week of the 12th?

20           MR. ADELMAN:  The 12th?

21           THE COURT:  Is either party performing?

22           MR. CAPLAN:  Yes.

23           MS. MATZ:  The defendant isn't -- your Honor, could I

24   be allowed to respond to a couple of things he just said, if

25   you don't mind?

1          THE COURT:  Yes.

2          MS. MATZ:  I appreciate that.

3          I want to point out a couple of things.  First of

4   all, I actually disagree with Mr. Caplan regarding the

5   mandatory injunction and whether it was a mandatory injunction

6   or a change of the status quo.  I think some of what some of

7   the papers have glossed over here is that the plaintiff didn't

8   move for an injunction to stop my clients from doing anything.

9          The fact is they have admitted that our client was

10  allowed to continue performing and using it.  So what we were

11  asking for was maintaining the status quo.  I don't think it

12  was a mandatory injunction.  Even if it was, I still think we

13  met the standard.

14         I think part of the other problem here, though, is

15  that after your Honor issued the TRO, Ms. Willis and Mr. Willis

16  immediately started trying to create confusion and create the

17  very issues that they're coming to this Court now and

18  complaining about, which I think is incredibly unfair and

19  shouldn't be countenanced.

20         You know, the day after your Honor issued the TRO,

21  Victor Willis started changing some of these advertisements

22  that had previously billed as the Village People featuring

23  Victor Willis to starting using the words the Legendary Victor

24  Willis.  The legendary this, the legendary that.  And his

25  clients also have been going on social media and disparaging my

1    clients.

2          So I think part of the problem here is that they're

3    trying to say -- there's this issue and we're going to be

4    harmed, but I think that they're creating the very harm that

5    they're complaining about.

6          We brought some of this additional evidence that's

7    happened with us.  Obviously, it was not in our original

8    papers, it hadn't happened yet, but if the Court would like to

9    see any of it, I would be happy to show it to you.

10          THE COURT:  Sure.

11          MS. MATZ:  We are still amenable to having a

12    mediation, and we do think that something can and should be

13    worked out.  But in the meantime, there are -- Mr. Willis is

14    performing and people are saying to our clients that they can't

15    believe that this is the performance.  So their reputation is

16    going to be damaged unless they are continued to be allowed to

17    perform.

18          MR. ADELMAN:  It's clear from all the fan uploads and

19    texts and things that are coming out, that everyone is aware

20    that Victor Willis was performing in Australia, and not our

21    clients, and unhappy about it, and making it very clear that

22    they know the difference between our clients and Victor Willis.

23          The name that we picked the last time -- and I asked

24    your Honor and in actuality, a lot of people know who Sixuvus

25    is.  Sixuvus presents The Legendary Village People provided an

1    opportunity to make a clear break between my client, which is

2    owned by Sixuvus, and Victor Willis.  And we've also brought a

3    ton of advertising that says, Village People featuring Victor

4    Willis.

5         He wants people to know that Victor Willis is

6    performing.  That's his whole MO.  Hey, I'm back.  Me, Victor

7    Willis.  This is my group; Village People featuring the Victor

8    Willis.  That is what is going to stop the confusion.

9         If the Court leaves the name alone but orders the

10   parties not to interfere with the other, our parties are just

11   defending themselves.  Victor Willis's party is actively

12   calling our clients fake; actively saying that they're not the

13   real Village People; actively saying all kinds of things.

14   Using the word legendary in his name now, which he didn't do

15   before the Court order.  So I think what you said was very

16   intelligent.  We can get something done at the mediation.  It's

17   why we suggested it to Mr. Levy in the first place; that we all

18   get together and we all said at the last conference, we should

19   invite Ms. Willis to come so she can be part of this.  And the

20   reason is, you know, but the thing that I think was really

21   smart of you -- us -- whoever --

22        THE COURT:  Keep going with that.

23        MR. ADELMAN:  Yeah, I'll keep going on it.  Really, I

24   didn't mean to do that.  Which is, there has to be a hammer

25   hanging over everybody's head; not just our head, or not just

Angela O'Donnell, RPR, 914-390-4025

1   the Willis's head, and not just Can't Stop.  Everybody has to.
2   And by leaving the TRO in place, that actually keeps the hammer
3   on everybody's head.
4           MS. MATZ:  May I approach, your Honor?
5           THE COURT:  Yes.
6           Last words, Mr. Caplan.
7           Just hand it to my law clerk.
8           MR. CAPLAN:  Okay.  There is no TRO in place as
9   against Victor Willis or Harlem West Entertainment, one.
10          Two, the TRO that was created last Friday has not, as
11  your Honor noted, been followed by the defendants.  We have
12  suggested one of two alternatives.  And before you get to
13  alternatives.  They, the defendants, have maligned and
14  attempted to cause confusion in Australia by saying that the
15  band that's performing isn't the real Village People.
16          MR. ADELMAN:  Your Honor.
17          MR. CAPLAN:  We have proposed, we have proposed two
18  things:  One, either vacate the TRO, which we believe is
19  mandated, because we weren't a party when it was -- at the time
20  that it was entered, and there's no claim against my client
21  presently pending upon which to predicate a TRO against our
22  client;
23          Or, at a minimum, to modify the TRO to make it more
24  accurate by saying Sixuvus presents Felipe Rose, Alexander
25  Briley, former original members of The Legendary Village People

 1   and Company.

 2            And another issue with the order that you had entered

 3   on Friday was you said, in your order, that the Sixuvus should

 4   be 50 percent of the type size of the Village People; but

 5   actually the case law has it the reversed.  It's supposed to be

 6   that the branded name of the band should be 50 percent of the

 7   type size of who is presenting the band, because you're doing

 8   it to say, hey, the Sixuvus of us here, and then in much

 9   smaller letters, the size of the band.  But you did it actually

10   the opposite, and the case law supports a different -- I've

11   done a lot of band breakup cases, and the case law supports the

12   name of the band to be smaller than the entity that's

13   presenting that band, if it's going to be allowed at all.

14            THE COURT:  All right.  Here's what I think should

15   happen.

16            MR. ADELMAN:  Your Honor.

17            THE COURT:  Very last words, Mr. Adelman.

18            MR. ADELMAN:  Very last words.  And I've done a lot

19   of band cases also, including -- anyway.

20            What Mr. Caplan said is not true.  They did not say

21   we are the real Village People.  And he put in his papers,

22   Exhibit 3.  He love our Australian fans, so we want you to know

23   that we are not the ones performing at the show that's

24   apparently being advertised for Australia in December.  There

25   is no Alex, no Bill, no Eric, et cetera, on this tour.

```
 1              There's no mention in that post of the words Village
 2    People.  I think that's exactly what your Honor said before
 3    that the parties can do.  They can say, that's not us.
 4              THE COURT:  I think part of the issue here is there
 5    is really no such thing as the real Village People.  So it's
 6    not as simple as either side would have it.
 7              There are clearly some serious fans who are aware of
 8    the difference between the group that Mr. Willis and Ms. Willis
 9    are putting together, and the group represented by Ms. Matz and
10    Mr. Adelman.
11              There are probably a lot of people who aren't that
12    familiar with the history and who are confused.  I think
13    that -- I think that the proposed intervenors have a point that
14    they didn't have a chance to be heard last time, and having
15    heard them, I'm going to modify the injunction.
16              Their point that there's no claim against them right
17    now doesn't move me because, at the moment, or very soon after,
18    they formally intervene, assuming I allow that, there will be a
19    claim against them.  So right now they're here as a preliminary
20    plaintiff, but they are also a preliminary counterclaim
21    defendant.
22              It seems to me the best thing to do to clarify the
23    confusion is to put it all out there, so it seems to me that
24    both sides should be able to perform under the name the Village
25    People, with an asterisk, featuring, and then they can feature
```

1    whoever they want.  And if the person they're featuring is a

2    member of the original Village People from back in the '70s,

3    they can say that.

4              MR. ADELMAN:  Your Honor, could we take out the word

5    "the"?  I think all parties will agree --

6              MS. MATZ:  It should be Village People.

7              MR. ADELMAN:  It's not part --

8              THE COURT:  Oh, I'm sorry.  That's right.  You told

9    me that last time.  There is no "the."

10             MR. ADELMAN:  Thank you, your Honor.  Sorry for

11   interrupting.

12             THE COURT:  No, that's all right.

13             So Mr. Caplan's client can perform under the name

14   Village People, asterisk -- I'll tell you what goes in the

15   asterisk in a minute -- featuring Victor Willis of the original

16   Village People, and featuring whoever else they choose to

17   feature, or not.

18             Ms. Matz and Mr. Adelman's clients can do the same

19   thing; featuring whoever they want.  And if any of those people

20   they want to feature, if they want to say, Raymond, whoever he

21   is, of the original Village People, they can do the same.

22             And then what the asterisk is going to tell people is

23   the following.  And I'm open to suggestion on wording.  It's

24   going to say, the trademark, "Village People" is the subject of

25   litigation.  There are two groups performing under the name

1   Village People.  And then everybody is going to know, if they

2   care which one they're going to go see, that they need to

3   educate themselves.

4           And if either side wants to say featuring not only

5   Victor Willis of the original Village People but other people,

6   they can do that.  They can only denote somebody as being of

7   the original Village People if the person was in the band back

8   in the '70s that did, you know, "YMCA," "Macho Man," all that.

9           As I understand it, there are two such people in

10  defendant's group.

11          MR. ADELMAN:  That's correct.

12          THE COURT:  But if you want to feature somebody else

13  who's not of the first iteration, that's fine, but you just

14  can't represent that person to have been --

15          MR. ADELMAN:  Original.

16          THE COURT:  -- original.

17          MR. ADELMAN:  One thing about the asterisk, your

18  Honor.

19          So, as we know, social -- *Twitter*, for instance,

20  while they've increased their character limit recently, it will

21  be hard to say anything if we have to put an asterisk and that

22  whole line on a *Twitter* post.

23          THE COURT:  The other thing, if the asterisk is not

24  practicable, then the content of it has to be in brackets

25  immediately following the Village People featuring part.

1              And, yes, it takes up a lot of space --

2              MR. ADELMAN:  That's fine.

3              THE COURT:  -- but that's necessary to avoid the

4    confusion.

5              The material in the footnote has to be at least

6    50 percent the size of the material above, and it has to be at

7    least 12-point type.

8              MR. ADELMAN:  Okay.

9              THE COURT:  So it's got to be readable.

10             So if you make Village People Featuring Victor Willis

11   in 12-point type, you can't make the asterisk in 6-point type.

12   That asterisk also has to be in 12-point type.  But if you make

13   the Village People Featuring Victor Willis in 20-point type,

14   then you can make the footnote -- in 30-point type, you can

15   make the footnote in 15-point type.

16             MR. ADELMAN:  So then my next question is about,

17   there are certain social media platforms, such as Facebook and

18   others, that have specific rules as to how many -- where you

19   can put things, and how many things, and how to identify it.

20             So can we at least have some -- as long as the

21   footnote is in 12 points and is somewhere on the same page,

22   since we're going to have an asterisk --

23             THE COURT:  Yes, I don't think it necessarily has to

24   be immediately below it but it just has to be --

25             MR. ADELMAN:  Okay.  That makes sense.

                    Angela O'Donnell, RPR, 914-390-4025

26

1              THE COURT:  -- sufficient to direct the reader to the

2    footnote.  You can't bury it in some obscure place.

3              MS. MATZ:  That's fine.

4              Can I ask a clarification question?

5              THE COURT:  Yes.

6              MS. MATZ:  Because we would like to make sure

7    everyone is doing it correctly.

8              So, for example, on *Twitter*, on our client's *Twitter*

9    page, we had, you know, Village People featuring whoever they

10   decide to feature, and I'm talking about the title of the

11   *Twitter* page, the part that is always visible.  And then we

12   have the asterisk, and then we have the whole disclaimer below

13   it.  In a following tweet where, say, there's a character

14   limit, would saying, Village People, asterisk, featuring

15   whoever, and then the message, be sufficient given that the

16   asterisk refers to what's up on the page visible, or does it

17   have to be in every single tweet or post?  That's, I guess, the

18   question I'm trying to get clarification on.

19             MR. CAPLAN:  Should be in every tweet, I would think.

20             THE COURT:  I guess I am not familiar enough with

21   *Twitter*, but people get --

22             MR. ADELMAN:  That's what I was saying before.

23             THE COURT:  I happen not to follow anyone.

24             People get tweets in their phones.

25             MR. ADELMAN:  Correct.

                  Angela O'Donnell, RPR, 914-390-4025

1          THE COURT:  They don't necessarily see the page, they

2    just see the tweet.

3          MS. MATZ:  Okay.

4          THE COURT:  So I think it has to go in the tweet.

5    And, yeah, it's going to take up a lot of room.

6          MR. ADELMAN:  Okay.

7          THE COURT:  You can --

8          MR. ADELMAN:  Your Honor.

9          THE COURT:  You'll just have to be more creative.

10          MR. ADELMAN:  Okay.  One other technical problem --

11    and I'm sure more are going to come up, but the URLs of the

12    various social media, are we going to have to go out and buy

13    Village People featuring whoever it is, or can we just agree to

14    keep the URLs we have right now and make sure --

15          THE COURT:  What are the URLs now?

16          MR. ADELMAN:  They're the ones you type in the

17    address to get the --

18          THE COURT:  But what are they?

19          EURBGS:  I mean, we just bought one.

20          THE COURT:  Official Village People or something?

21          MR. ADELMAN:  Yeah, there's Official Village People.

22    There's the Real Village People.  There's -- we just bought one

23    called Sixuvus Legendary VP.

24          THE COURT:  What's your client's, Mr. Caplan?

25          MR. CAPLAN:  I'm not sure, your Honor.

                    Angela O'Donnell, RPR, 914-390-4025

```
 1              MS. MATZ:  It's in the license --

 2              MR. ADELMAN:  It's in their license agreement.

 3              MS. MATZ:  They have the officialvillagepeople.com

 4   website.  That's what they have.  That's what's in the license.

 5   I'm not sure if all their social media handles.

 6              MR. CAPLAN:  That hasn't been transferred over.

 7              MS. MATZ:  Yes, it has.

 8              MR. ADELMAN:  Your client has it.

 9              MS. MATZ:  It was attached to our exhibits in the

10   papers.  Our clients --

11              MR. ADELMAN:  Your Honor, if I may.

12              I think the most practical thing is until you order

13   otherwise, that having the URLs we already have in place is not

14   a violation of the order.  We just have to make sure the pages

15   reflect what your order states.

16              THE COURT:  I think that's right.  I think it's --

17   particularly because everybody's hopeful that something could

18   be worked out, and because the idea is basically just to make

19   things clear, pending a further hearing, if need be.  It seems

20   like it would be -- I don't think that it's necessary for

21   either side to change its URLs for now, but planning ahead, you

22   might want to.

23              MR. CAPLAN:  Your Honor.

24              THE COURT:  -- at least purchase the --

25              MR. ADELMAN:  Yes, your Honor.
```

```
 1              THE COURT:  -- URL that applies to whatever you think
 2     you may work out.
 3              MR. ADELMAN:  And the reason --
 4              THE COURT:  As long as, as soon as somebody types
 5     that in, on the first page they will see the information I've
 6     described so they will know that there are two, and they will
 7     be in a position, if the page they've landed on is not the one
 8     they're looking for, to keep looking.
 9              MR. ADELMAN:  Yes, we appreciate that, your Honor,
10     because one of the issues is is with Facebook, we each have a
11     URL that's verified.  It's very difficult to verify something.
12     So I would appreciate that order.
13              MR. CAPLAN:  Your Honor.
14              MS. MATZ:  Your Honor, I was going to say, can we
15     also have like maybe 72 hours to implement all of this?  Just
16     because we do have to get ahold of the people that --
17              MR. ADELMAN:  Technologically it's --
18              THE COURT:  I mean, both sides need to implement it
19     with all deliberate speed.
20              MS. MATZ:  Yes.
21              THE COURT:  72 hours should be the outside.
22              MR. CAPLAN:  Your Honor, there are ten tour dates in
23     Australia between today and, I believe, the 18th of December,
24     of which there's been significant marketing, advertising and
25     promotion for.
```

 1                THE COURT:  I mean, they can't go back and undo what
 2       they've already done but --
 3                MS. MATZ:  Your Honor, those dates already say,
 4       Village People Featuring Victor Willis.  That was submitted in
 5       our original motion.  That's how they were originally billed.
 6                MR. CAPLAN:  No, but it doesn't have the asterisk is
 7       what I am saying.
 8                Can we live with how it's been advertised already?
 9                THE COURT:  Look, to the extent things are already in
10       place --
11                MR. CAPLAN:  Yes.
12                THE COURT:  -- you know, yes.  But anything that --
13                MR. CAPLAN:  I got that.
14                THE COURT:  You know, if there's a commercial that is
15       set to run tonight in Australia, I don't expect you to change
16       it, but any new commercial that you buy or any new ad that
17       appears should have --
18                MR. CAPLAN:  A promoter will be involved, so we will
19       get the word out.
20                MR. ADELMAN:  This is one is on his Facebook page so
21       he does have the ability to change that.
22                THE COURT:  Look, some day you may be duking out
23       damages one way or the other, and anybody who doesn't move
24       swiftly on this is going to get hammered.
25                So things like Facebook can be changed today.  Things

                    Angela O'Donnell, RPR, 914-390-4025

1    like newspaper ad that's already been placed to run on Monday

2    in an Australia newspaper, you should be able to add the

3    asterisk, but something that's running tomorrow, you probably

4    won't be able to.

5             MR. ADELMAN:  Very good.

6             THE COURT:  I can't really micromanage it much more

7    than that.  I think all sides understand what my expectations

8    are.

9             MR. CAPLAN:  And this is a TRO that you expect to

10   stay in place until such time as we have the mediation session?

11            THE COURT:  That's what I was thinking, if that's all

12   right with everybody.

13            MR. ADELMAN:  That works for us, your Honor.

14            THE COURT:  All right.  And the parties are also --

15   they're free to speak the truth, which is, as long as it's

16   consistent with the footnote.  So Victor Willis can say, I'm

17   the guy who wrote all the songs.  I was in the original Village

18   People.  This band features me.  I'm great.

19            And the band that Ms. Matz and Mr. Adelman represent

20   can say, we performed as Village People for 30 years.  If

21   you've seen the Village People in the last 30 years, it's us.

22   Our production values are awesome.  We feature two members of

23   the original band.

24            What they can't do is disparage one another.  They

25   can't say the other guy's band is fake and they can't say the

                    Angela O'Donnell, RPR, 914-390-4025

1    other guy's band is inferior.  They can absolutely make clear

2    what's good about their band, and if they want to say the

3    difference between my band and their band is that we're the

4    ones who have been performing for 30 years.  Okay, but let's

5    stick to the facts.

6            MR. ADELMAN:  Would that include -- I assume this

7    order extends to all parties' agents as well?

8            THE COURT:  Yes, it does.

9            MR. ADELMAN:  I ask that because an agent on

10   Mr. Willis's team is calling up promoters of our team.

11           THE COURT:  Well, you know, promoters can call up and

12   say, just so it's clear, I represent the Village People

13   featuring Victor Willis, who is the guy who wrote all the songs

14   and the one everybody knows from the '70s, and there's another

15   group out there and they're different.

16           MR. ADELMAN:  I agree, your Honor.

17           THE COURT:  That's okay.  But the agents --

18           MR. ADELMAN:  What they've --

19           THE COURT:  Also I'm not purporting to constrain

20   unrelated third parties.  So if fans want to go on Facebook and

21   say, Victor Willis stinks, and our guys are great --

22           MR. CAPLAN:  Or visa versa.

23           THE COURT:  Or visa versa.  There's nothing I can do

24   about that.  But I think not only is it fair, but I think it's

25   more likely to lower the temperature and get everybody to a

1    place where they can get to some kind of agreement.

2            It may be one side or the other needs to start

3    thinking about another name under which they want to perform

4    going forward.

5            MR. ADELMAN:  Your Honor, I agree with healthy

6    competition.  The alleged -- what was allegedly said was, if

7    you continue to promote this band, we are going to sue you.

8    That is allegedly what was said.

9            So I just want to lower the temperature also, and as

10   are far as calling up and saying our band is better than their

11   band, book us, I think that's healthy.

12           THE COURT:  The agents of the parties, their

13   promoters, their managers, whatever other terms apply in the

14   business, are bound by this.  But third parties are not bound

15   by it.

16           MR. ADELMAN:  Thank you, your Honor.

17           THE COURT:  Let's do the same thing we did last time,

18   Mr. Adelman and Ms. Matz, take the first crack at drafting an

19   order --

20           MR. ADELMAN:  Yes.

21           THE COURT:  -- that reflects what I said.  Run it by

22   the other side.  If by some miracle you can agree, great.  If

23   you can't agree, send me one submission with everybody's

24   dueling suggestions and I'll figure out what best captures what

25   I've ruled on.

                Angela O'Donnell, RPR, 914-390-4025

1          This process should not be an opportunity to reargue

2      and tell me why what I've ruled is wrong.  It should just be

3      capturing what I've ruled.

4          MR. ADELMAN:  Your Honor.

5          THE COURT:  You know, the legal issue that's of most

6      interest here is the naked licensing argument, and whether the

7      defendants are estoped or not from making that argument, and

8      the reasonable notice point, you know, I think the notice

9      technically was one day, but built into it was a grace period

10     of six months.  So if you don't win on the trademark, and

11     probably by the time you have your mediation and we have -- if

12     it fails and we have a PI hearing, the time will have extended,

13     you know, closer to a year.

14         So as I said, to me the most interesting question

15     here is the validity of the trademark, and if it's invalid

16     because it's a naked license, does that mean the defendants get

17     to keep it, or does that mean anybody can -- it's a

18     free-for-all and anybody can perform under it.

19         But it seems to me, if it's a valid trademark, the

20     plaintiff does have a right, subject to reasonable notice,

21     unless there was an agreement for perpetuity to say, all right,

22     I'm going to give it to somebody else.

23         So I'm not reaching any conclusions on any of that,

24     but it's all food for thought.

25         MR. ADELMAN:  Your Honor, may I just note on the

1    order?

2            THE COURT:  Yes.

3            MR. ADELMAN:  Based on your comments today, and the

4    modification of the order, and the temporary intervening by

5    Ms. Willis, we'd ask either a reduction of the bond to zero,

6    since the playing field seems to have been leveled, or that

7    Ms. Willis put up a similar bond.

8            THE COURT:  I'm sorry.  Reduce it because why?

9            MR. ADELMAN:  Based on your comments, it seems that

10   the playing field is ostensibly leveled.  It doesn't seem to be

11   any damages --

12           THE COURT:  Well, if it turns out that Ms. Willis

13   prevails and the trademark belongs to her, if your guys perform

14   under it, she'll have some damages.

15           MR. ADELMAN:  And visa versa.  That's why I said,

16   either reduce the bond --

17           THE COURT:  Right, but you asked for the TRO, so you

18   get to put up the bond.

19           MR. CAPLAN:  Yeah, I don't think --

20           MR. ADELMAN:  Okay.  I mean I think it's a mutual.

21   He asked for a modification or a vacation of the TRO.  A

22   modification would seem to be he's asking for a similar TRO at

23   this point.

24           THE COURT:  No, I think that was his plan B.  I think

25   he wanted me to just vacate it.

                    Angela O'Donnell, RPR, 914-390-4025

1          MR. ADELMAN:  Okay.  Thank you, your Honor.

2          THE COURT:  So I think the bond should just stay in

3   place.

4          MS. MATZ:  Your Honor, I have one question.  I'm

5   sorry to ask, it's just one more clarification.

6          THE COURT:  Oh, okay.

7          MS. MATZ:  That is, I agree with everything you said

8   about, you know, positively, we're great, hire us, all that.

9   The one question I have is that, in the past couple of days,

10  there have been some performances in Australia.  Some fans are

11  coming onto your clients' Facebook page and saying, that was

12  terrible, whatever.  I know we can't stop third parties.  I'm

13  assuming we are allowed to respond and at least say that was

14  not our group.  This is our performance.  Point to *YouTube*

15  videos of us, whatever it is.

16         THE COURT:  That's factual and that's okay.

17         MS. MATZ:  Thank you.

18         MR. ADELMAN:  Thank you, your Honor.

19         MR. LEVY:  Your Honor, just since I sat here quietly,

20  two seconds.

21         Last Friday you asked me on the naked licensing, if

22  my client did anything.  After the hearing, I spoke to the

23  client.  Not only couldn't they put in new members, but they

24  had to clear what they were doing with us.  We knew exactly

25  where they were performing.  So I just don't want to leave it

1    with we were totally passive.

2         THE COURT:  Was that just so they could be sure to

3    get paid or was that artistic?

4         MR. LEVY:  This is artistic.  My client co-wrote the

5    songs and publishes the songs, and he markets it, and he

6    merchandises it.  It has to have a certain caliber, otherwise,

7    he can't sell his lunchpails and stuff like that.

8         So no, this is a business thing to keep the market

9    good.  If they had somebody who wasn't up to snuff, or didn't

10   look right, they're not approved.  So I just wanted to make

11   that clear.

12        THE COURT:  That may be good for you at the PI

13   hearing.  It may be that I don't have to reach that fascinating

14   legal issue because maybe you're going to show that you did

15   police the quality enough so that -- or the defendants will

16   fail to prove that you didn't police the quality enough for me

17   to even get to the issue.

18        MR. LEVY:  I just wanted it on the record because I'm

19   sitting here.

20        THE COURT:  That's fine.

21        MR. LEVY:  I assume we'll write a joint letter to the

22   magistrate judge asking for an adjournment meantime.

23        THE COURT:  Yes.  I'm sure she will find a way to

24   accommodate you.  And I don't have anything else in Court

25   today, so if you want to sit and chat, make yourselves at home.

                Angela O'Donnell, RPR, 914-390-4025

1              MR. CAPLAN:  Thank you, your Honor.

2              (Proceeding concluded)

3              _____
        Angela A. O'Donnell, RPR,Official Court Reporter, USDC, SDNY
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25