UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
CAN'T STOP PRODUCTIONS, INC.,

Plaintiff,

                                     7:17-cv-06513-CS

        -against-

SIXUVUS, LTD., ERIC ANZALONE,
ALEXANDER BRILEY, FELIPE ROSE,
JAMES F. NEWMAN, RAYMOND SIMPSON,
and WILLIAM WHITEFIELD,
               Defendants,


KAREN L. WILLIS dba HARLEM WEST
ENTERTAINMENT
               Intervenor.
--------------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF INTERVENOR'S EMERGENCY MOTION FOR A STAY PENDING APPEAL


Karen L. Willis, J.D.
220 West G Street, Suite E.
San Diego, CA.  92101
(619) 206-5311
INTERVENOR, Pro se

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................... 1

BACKGROUND........................................................................................ 5

STANDARD OF REVIEW FOR STAY PENDING APPEAL ....................................... 10

ARGUMENT........................................................................................... 11

I. THE SIXUVUS CANNOT ESTABLISH IRREPARABLE HARM............................ 11

II. THE TRO EXCEED RIGHTS GRANTED IN THE LICENSE AGREEMENT ....... 16

III. SIXUVUS DELAY IN SEEKING TRO NEGATES ANY SENSE OF URGENCY.. 17

IV. INTERVENOR WILL SUFFER IRREPARABLE HARM ....................................... 18

V. INTERVENOR IS LIKELY TO PREVAIL ON APPEAL AND THE BALANCE
OF THE HARDSHIP FAVORS A STAY ................................................... 19

CONCLUSION........................................................................................ 21

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Amoco Prod. Co. v. Village of Gambell,*
480 U.S. 531, 542 (1987)............................................................................................ 11, 18

*Arbegast,*
490 N.Y.S.2d at 757-58, 480 N.E.2d at 370-72........................................................ 18

*Boat Basin Inv'rs, LLC v. First Am. Stock Transfer, Inc.,*
2003 WL 282144, at *8 (S.D.N.Y. Feb. 7, 2003) ................................................... 4

*Cacchillo v. Insmed,*
638 F.3d 401 (2nd Cir. 2011)................................................................................... 14

*Covino v. Patrissi,*
967 F.2d 73, 77 (2d Cir. 1992)................................................................................. 20

*In re World Trade Center Disaster Site Litig.,*
503 F.3d 167, 170 (2d Cir. 2007).......................................................................... 22, 23

*Jock v. Sterling Jewelers, Inc.,*
738 F. Supp. 2d 445, 446 (S.D.N.Y. 2010)............................................................. 23

*Judicial Watch, Inc. v. Dep't of Commerce,*
501 F. Supp. 2d 83, 91 & n.3 (D.D.C. 2007)......................................................... 19

*Moore v. Consol. Edison Co.,*
409 F.3d 506, 510 (2d Cir. 2005)........................................................................... 20

*Mohammed v. Reno,*
309 F.3d 95, 101 (2d Cir. 2002)............................................................................. 13

*Ram v. Lal,*
906 F. Supp. 2d 59, 80 (E,D.N.Y. 2012)................................................................ 4

*Sampson v. Murray,*
415 U.S. 61, 88 (1974).......................................................................................... 18, 15

*Shenandoah v. U.S. Dep't of Interior,*
1997 WL 214949, at *3 (N.D.N.Y. Apr. 14, 1997)................................................. 4

*Thapa v. Gonzalez,*
460 F.3d 323, 336 (2d Cir. 2006)............................................................ 4

*Torres v. N.Y. State Bd. of Elections,*
462 F.3d 161, 207 (2d Cir. 2006)............................................................ 23, 20

*Tough Traveler, Ltd. v. Outbound Prods.,*
60 F.3d 964, 968 (2d Cir. 1995) ............................................................ 21

## Rules

Rule 19(a)(2)(i).......................................................................................... 16

Fed. R. Civ. P. 15, 19(a)(2)(i)................................................................... 16

Karen L. Willis ("Intervenor") submits this emergency motion for an immediate stay of the court's Amended December 14, 2017 Order pending appellate review. As demonstrated in the declarations of Sal Michaels and Karen L. Willis, a stay is needed urgently.

## PRELIMINARY STATEMENT

The Court ruled that "pending further order of the Court, Defendants Sixuvus, Ltd. ("Sixuvus") shall book live performances, advertise live performances, accept live engagements, perform live, and take any other action necessary to effectuate the foregoing actions, as "Village People* featuring" followed by the name of an individual group member or members of Sixuvus' choosing." [Doc. 52]. Intervenor requests that the Court stay the Order until the Second Circuit resolves the appeal because Intervenor has "some possibility of success" on appeal and "the balance of hardships tips decidedly in [her] favor." Thapa v. Gonzalez, 460 F.3d 323, 336 (2d Cir. 2006).

First, the Court erred when it failed to vacate the TRO knowing the Sixuvus had failed to join Intervenor as a necessary and indispensable party. See e.g., Ram v. Lal, 906 F. Supp. 2d 59, 80 (E,D.N.Y. 2012) failure to join necessary party disposes of movant's preliminary injunction motion because movant cannot show a likelihood of success on the merits of its lawsuit); Boat Basin Inv'rs, LLC v. First Am. Stock Transfer, Inc., 2003 WL 282144, at *8 (S.D.N.Y. Feb. 7, 2003) (same); Shenandoah v. U.S. Dep't of Interior, 1997 WL 214949, at *3 (N.D.N.Y. Apr. 14, 1997), aff'd, 159 F. 3d 708 (2d Cir. 1998) (same). If the TRO is not stayed, the Intervenor will lose future bookings with promoters who cancels as a result of confusion over two Village People out there performing, and may incur costs and damages associated with litigation over the cancellations. Willis Decl.¶9  This tips the balance of hardships in favor of a stay pending appeal.

4

Second, the Court erred when it altered the status quo by granting to the Sixuvus, rights prohibited in the disputed license agreement, *inter alia*, the TRO granted the Sixuvus the right to feature a member of its choice in contravention of the disputed agreement.

The TRO took away rights from Intervenor without due process in that the granting of the Temporary Restraining Order ("TRO") was, (1) without Intervenor (who's as an indispensable party) ever being put on notice by the Sivuvus of the planned TRO; (2) the Sixuvus having no underline pleading against Intervenor; (3) The Court failed to weigh the harm the TRO would cause Intervenor.

Moreover, the TRO undermines the status quo with respect to the exclusivity of the Sixuvus disputed agreement with Can't Stop Productions, Inc. ("Can't Stop"). Likewise, the TRO undermines the status quo with respect to the exclusive agreement between Can't Stop and Harlem West Entertainment ("Intervenor").

What's most disturbing about the TRO however is the granting of rights not afforded in the Sixuvus disputed agreement with Can't Stop. Rights the Sixuvus could not expect to obtain through the disputed agreement even were they to prevail at trial. That is, the right to feature an individual performer in conjunction with the Village People mark. Such right is a major leap in the Sixuvus limited rights under the disputed agreement and would tend to mislead the public into believing that Ray Simpson is the singer of iconic Village People hits like YMCA, Macho Man, In the Navy, San Francisco and Go West, when in fact he is not the singer of any of the Village People hits. Simpson is simply not entitled to featured-artist status under the disputed agreement.

The right to be a featured artist in a group does not come easily especially without the hits to justify such a feature status. Here, the TRO handed this right and title to Ray Simpson to

5

suddenly hold himself out as the featured artist in Village People without any justification

whatsoever or case law to back such extraordinary relief, temporary or otherwise. This aspect of

the TRO is causing irreparable harm to Intervenor including public confusion and dilution of the

mark because Intervenor actually **does** have the right to exclusively feature Victor Willis

("Willis") for billing purposes as "Village People featuring Victor Willis." Willis Decl. ¶6

The Sixuvus never had that right under the disputed agreement but the TRO has granted them

that right.

There was good reason for Can't Stop to allow Intervenor to feature Victor Willis. He is

the co-founder of Village People whose distinctive voice is heard on each and every Village

People hit (not Ray Simpson). Moreover, Victor Willis wrote the lyrics to all of the Village

People biggest hits including but not limited to YMCA, Macho Man, In the Navy, Hot Cop, and

Go West. In addition, Victor Willis owns upwards of 50% of the U.S. copyrights to the Village

People music catalog. What's more, Victor Willis created the Village People hot cop character

and admiral, and he claims ownership of these characters. By special agreement with Can't Stop

however, Willis recently transferred all of his interest in the characters to Can't Stop. Therefore,

Victor Willis has a legitimate and legal right to be featured in conjunction with Village People.

Ray Simpson does not. By granting such right to Simpson or any other member of the Sixuvus,

the court has substantially altered the status quo as opposed to simply maintaining the status quo

that the Sixuvus purportedly sought.

In addition, the Sixuvus disputed agreement never allowed for two Village People. Willis

Decl. ¶5  But now that Victor Willis is back, they seem all to ready to perform on a non-

exclusive basis in an attempt to muck things up. The TRO is causing untold damage to the

Village People brand which is the intent of the Sixuvus since they've lost their right to perform as

6

such. How is two Village People out there performing, maintaining the Sixuvus status quo? It is not.

Moreover, unbeknownst to the Court, it was the Sixuvus that caused their agents to cease booking concerts. Michaels Decl. ¶4 So the Sixuvus **cannot** now with any credibility, claim irreparable harm if they're not allowed to book shows. In any event, within six months of the Sixuvus notice and request that their agents cease booking shows for them, the Sixuvus remaining inventory of shows simply dried up as they knew very well would be the case. The Sixuvus then mislead the court to believe that Can't Stop and Intervenor interfered with their ability to book new shows when in fact they knew they could not book new shows because they informed all their booking agents not to book additional shows due the termination of their right to perform under the Village People mark. Their six month supply of shows dried up as a direct result of them making contact with each and everyone of their agents, including William Morris Endeavor, Pyramid Entertainment, and Red Entertainment, and personally informing these agents that the Sixuvus had lost their license to perform as Village People effective June 1, 2017.

These agents responded by either dropping the Sixuvus from their roster outright, or they ceased booking shows for the Sixuvus version of Village People effective June 1, 2017 per the Sixuvus notice and request. Michaels Decl.¶6 The Sixuvus then waited six months until they had finished their last show before seeking their tardy TRO. Their delay in seeking a TRO and other actions against Can't Stop (six months after receiving notice) negates any sense of urgency.

There's no other way to put it, the Sixuvus is dishonest. And they're liars too. In any event, Intervenor, and her husband Victor Willis (the iconic lead singer of the Village People) would simply like to see the Sixuvus who have made a good living off his music without having any real connect to it, to simply go away. Times up. And they should be grateful for the

7

opportunity Can't Stop allowed them that lasted so many years. But you can't prevent the original

lead singer from returning to Village People and that is what the Sixuvus has sought to do. But

the Sixuvus are **not** entitled to a TRO under the circumstances because Intervenor was a

indispensable party to the Sixuvus TRO from day one and the Sixuvus knew it. However the

Sixuvus purposely failed to name Intervenor in their cross-complaint because they feared

Intervenor's involvement. Nonetheless, the court should have denied the Sixuvus TRO on that

ground alone as Intervenor requested the court do in her motion to vacate. The court instead,

failed to address the issue.

In view of the immediate and profound effects of this Court's order on the Village People

brand and the immediacy in which Intervenor is being irreparably harmed by the order, the court

should immediately stay its order pending resolution of the appeal. In the alternative, the Court

should dissolve the TRO in lieu of a hearing on injunction, if any is sought.

## BACKGROUND

This is the curious case of the Sixuvus Ltd., a corporation that has organized live

performance as Village People (with its ever changing membership) under the strict control of

Can't Stop since the late 1980s. The main purpose of the Sixuvus formation was its diabolical

plan quickly put into  action, to use the corporation as a vehicle to prevent Victor Willis

("Willis") co-founder of Village People and actual singer of all the Village People hits, and co-

writer of all of the group's biggest hits as well, from ever having the ability to return as lead

singer of Village People by having the Sixuvus license the Village People mark. That way, Ray

Simpson who is not the singer of any of the Village People hits could remain entrenched in

Victor's position virtually for life as a member of the Board of the Sixuvus, Ltd. A brilliant

scheme they thought, until Intervenor entered the picture.

8

Willis was in the original Broadway production of "The Wiz" when he agreed to record the first Village People album at the urging of Horace Ott who had introduced him to Jacques Morali during a background music session for the Ritchie Family. During that session, Morali immediately took to Willis and his voice and informed him of his intent to form a yet un-named group around him. Morali said to Willis, "I had a dream that you sang lead on an album produced by me. I can't pay you much, but if you agree to do the album, I'll make you a star." Willis agreed, and the rest as they say, is history. The first album recorded by Victor Willis under the auspices of Village People is titled "Village People" which contains the hits "San Francisco" and "In Hollywood Everybody's A Star." "San Francisco" started racing up the disco chart and soon American Bandstand was calling.

One evening, upon conclusion of his performance in The Wiz, Morali waited backstage and immediately said to Willis: "darling, darling, you have a hit, Dick Clark would like Village People to appear on American Bandstand. Victor replied, Jacques, there is no Village People, it's just me, remember? I know, I know, Jacques replied. We'll have to find some people to accompany you on the show. I met this guy named Felipe, I'll invite him to join you. Who is Felipe, Victor replied? Oh, some guy I met on the streets. Do you know anyone else who could join you for the show? Victor replied, well, I working with a guy named Alex. I'll invite him. Soon, Jacques and Victor had assembled what would be the original seven Village People group members consisting of Victor Willis, Peter Whitehead (non-descript), Mark Mussler (original construction worker), Dave Forrest (original cowboy), Lee Mouton (original leather man), Alex Briley (non-descript), and Felipe Rose (Indian).

But Victor, Jacques and Henri Belolo were all unhappy with the original line up so they eventually held auditions for new members therein recruiting Glenn Hughes, Randy Jones and

9

David Hodo, just in time to make the cover of an already fully recorded second Village People album titled "Macho Man" with use, again, of session background singers to back Willis' lead vocals. In fact, Jacques and Victor decided that each and every Village People album where Victor was featured would continue to be recorded by Victor Willis under the auspices of Village People with use of session background singers. There was good reason for this, the Village People vocal sound was already established on the first and second albums. And neither Victor, Jacques or Henri wanted to tamper with that distinctive sound. Therefore, all of the Village People iconic hit albums were recorded by Victor Willis with use session background singers. Victor exited the group in 1979 and returned in 1982. His replacement, Ray Simpson, immediately started dressing like Victor, including grooming his beard and mustache to mimic Victor's appearance including the dawning of Victor's trademark shades, as well as emulating Victor's style of singing with use of Victor's trademark vocal inflections like "Aaowww."

After the exit of Victor Willis, Village People RIAA certified gold and platinum albums came to an end. In fact, the "Can't Stop the Music" motion picture soundtrack was the first Village People album to not be RIAA certified gold or platinum. Ray Simpson was eventually replaced by several other lead singers including Miles Jaye, Sy Murry, and Ray Stephens. Simpson rejoined a live version of the group in the late 1980s under the Sixuvus, Ltd.

Since its inception however, the Sixuvus has consistently mislead the public into believing that they are the original or real Village People though they are not the actual, or real singers of any of the iconic Village People hits like San Francisco, In Hollywood Everybody's A Star, YMCA, Macho Man, Go West, and In the Navy. In realty, the Sixuvus were merely licensed to perform live, the music of the Village People. And Unbeknownst to the public, they

performed music for which they did not record, but they claimed as their own, especially the first Village People album.

The misleading activities by the Sixuvus has included their use of Willis' voice and image in conjunction with the promotion of their live concerts; the Sixuvus lip syncing to Victor's voice on music videos on a number of television shows and music videos therein infuriating Willis as this gave the appearance that Ray Simpson was the face of Willis' voice and that Simpson is the actual singer of the Village People iconic hits; the Sixuvus claiming Sound Exchange royalties for original Village People recordings featuring Victor Willis and pocketing the money, only to release a portion of the funds after former Sixuvus member Jeff Olson informed Intervenor of the Sixuvus wrongdoing. In fact, Intervenor is informed that Ray Simpson was behind the Sound Exchange scam claiming he's entitled to Victor's Sound Exchange royalties, although Simpson has not recorded a Village People hit in his life, and of the songs he did record, they're scarcely played on radio.

In addition, the Sixuvus went so far as to claim a star on the Hollywood Walk of Fame, not in the category of live performances for which they were solely licensed, but in the area of recorded music for which the original Village People featuring Victor Willis are known. They then passed Ray Simpson off as the singer of the hits during the ceremony and refused to invite the real singer of the recorded music they claimed as their own.

By 2007, Intervenor had had enough and requested that the Sixuvus cease and desist their activities. The Sixuvus responded with a frivolous complaint against Intervenor's husband. Willis filed a cross complaint against the Sixuvus, for fraud and misappropriation of his image. The parties eventually settled with Sixuvus agreeing to no longer use the image of Victor Willis in

11

conjunction with their live performances and to inform the public that they are not the original Village People. The Sixuvus ignored the agreement and continued their activities from 2010, up until the termination of their verbal license agreement in 2017.

The Sixuvus also attempted to claim the 40th anniversary of the Village People first album recording as their own, never mind that it was actually the 40th anniversary of Victor Willis recording the first Village People album under the auspices of Village People before the group was ever founded. In fact, none of the Sixuvus members had anything to do with the recording of the first Village People album and Felipe Rose was credited after the fact but he could not keep the proper rhythm for foot bells, so Peter Whitehead (a seasoned percussionist) shook the bells instead.

It is important to note that the Sixuvus has only two original members in their live version of the Village People and neither of the two original members sang lead on any of the group's hits. Moreover, the Sixuvus live version was ever changing. For example, four members have come in and out of the Sixuvus group since 2012.

Finally, in 2013, Victor Willis started recapturing ownership of his Village People music catalog. Unlike the Sixuvus, Victor has a keen interest in Village People in that the group started out as simply him. He is a cofounder, co-writer and one of the owners of the group's music. Therefore, he has a legal interest in the Village People as lead singer of all group's hits, co-writer of the hits, and owner of the music catalog. It is therefore his prerogative to return to Village People like other recording artists who choose to return to the group they are so known for. As such, it was decided that Victor should return as lead singer of Village People in conjunction

12

with the 40th anniversary of his recording of the first Village People album. An exclusive license was issued to Intervenor in order to assure his return to Village People.

At the request of Can't Stop, Intervenor offered an opportunity to all of the Sixuvus live version to remain in Village People (with the exception of Ray Simpson) to join Victor in his return. Felipe Rose sent over a series of written communications to Can't Stop and Intervenor about his desire to join Victor. Rose also made the case for other Sixuvus members to join Victor. But Rose eventually informed Intervenor that Ray Simpson was "plotting" behind the scene to force him and other members to remain loyal to him and therefore refuse the offer. Eventually, Intervenor's offer to the Sixuvus allowing all of the Sixuvus members (with exception to one) to remain in Village People by joining Victor was refused by Felipe Rose in a written communication. Willis Decl. ¶7  On or about June 1, 2017, the Sixuvus asked each and everyone of their booking agents to cease booking live Sixuvus Village People shows as a result of the termination of their license agreement. Six months later and immediately after the completion of the last remaining show, the Sixuvus filed its claim against Can't Stop and obtained the TRO with false claims of immediate and irreparable harm, currently on appeal.

## STANDARD OF REVIEW FOR STAY PENDING APPEAL

The Second Circuit has held that the decision whether to stay a proceeding pending an interlocutory appeal requires consideration of three factors: (1) the likelihood of success on appeal; (2) whether irreparable injury will be sustained absent a stay; and (3) whether a stay will injure the non-appellant or the public. In re World Trade Center Disaster Site Litig., 503 F.3d 167, 170 (2d Cir. 2007); Thapa, 460 F.3d at 334–35; Mohammed v. Reno, 309 F.3d 95, 101 (2d Cir. 2002). These interrelated factors are generally assessed on a sliding scale, and "more of one

13

excuses less of the other." Mohammed, 309 F.3d at 101 (internal quotation marks omitted). As such, "the necessary level or degree of possibility of success will vary according to the court's assessment" of the other factors. Thapa, 460 F.3d at 334 (internal quotation marks omitted). Only "some possibility" of success on appeal is sufficient to justify a stay where "the balance of hardships tips decidedly in favor" of the party seeking the stay. Id. at 336.

The application of these factors to the case at bar supports the stay of these proceedings pending appeal because the Sixuvus failed to give Intervenor notice of their TRO and they failed to make a claim against Intervenor prior to seeking injunctive relief affecting Intervenor's rights. The Sixuvus would not be prejudiced by a stay because their ability to book shows was hampered by their own notice to agents to halt the booking of Sixuvus Village People live performances. The court's TRO granting the Sixuvus the right to resume booking shows with a featured singer has been in effect for less than 30 days. Accordingly, Intervenor respectfully submits that a stay of the TRO proceeding resolution of the appeal should be entered.

## ARGUMENT

### I.  SIXUVUS CANNOT ESTABLISH IMMEDIATE AND IRREPARABLE HARM

Injunctions are designed to maintain the "status quo" during litigation. See *Cacchillo v. Insmed, 638 F.3d 401 (2nd Cir. 2011).* "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Sampson v. Murray, 415 U.S. 61, 88 (1974) (internal quotation omitted); see also *Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987).*

Here, the Sixuvus sought and obtained a TRO with prior knowledge that no immediate and irreparable harm would occur because it was their own action, that is, their notification to

14

booking agents, that caused the Siuxvus shows to cease being booked. The Sixuvus withheld this information from the court. The Sixuvus was very much aware that it was only after they informed all of their major booking agents, including William Morris Endeavor, Pyramid Entertainment, and Red Entertainment, that they could no longer accept bookings, that their bookings dried up, not as a result of Can't Stop's notice of termination of their license for which they could have simply refused to ask their agents to cease booking shows. In the event that Can't Stop had made contact with any of their agents (and they did not) informing them that the Sixuvus could no longer accept new bookings, the Sixuvus could have immediately, at that time, filed a claim against Can't Stop and sought a TRO claiming immediate and irreparable harm. They did not. Instead, the Sixuvus waited six months, knowing full well that their live shows were about to come to an end because the Sixuvus shows were no longer being booked as a direct result of the Sixuvus specific notice to all of the agents to cease all live show bookings on their behalf.

Another fact that is fatal to the Sixuvus TRO with respect to Intervenor, is that the Sixuvus was **on notice** and was very much aware that Intervenor started booking shows as Village People featuring Victor Willis on June 1, 2017 and they did nothing to stop it. The Sixuvus could have easily gone into court at that time, to seek an injunction preventing Intervenor from booking any shows whatsoever pending a decision by the court. Instead, with full knowledge of the booking of Intervenors shows for the past 6 months, the Sixuvus stood by, watched, and did nothing. But six months later, with full knowledge that Intervemor had booked numerous shows, they now seek to interfere with these shows through a TRO allowing them to start accepting shows in competition with Intervenor. This is not right, and the TRO should be stayed.

15

The Sixuvus did not immediately seek a TRO because they knew very well that Can't Stop had not actually prevented the booking of any new shows. Instead, Can't merely requested they **not** book any new shows. Can't Stop also demanded the Sixuvus turn over all of its social media to Can't Stop as well. The Sixuvus however immediately refused to do so. If the Sixuvus could refuse to turn over any of the official Village People social media despite Can't Stop's demands that they do so, the Sixuvus could have just as easily refused Can't Stop's request that they no longer book shows after June 1, 2017. They did not. Instead, the Sixuvus at their own free will, informed all of their booking agents that they had lost their rights to the Village People name. In response, these booking agents, and each of them, immediately ceased booking new Sixuvus Village People shows. See Michaels Decl. ¶8  Now the Sixuvus is before this Court with claims of immediate and irreparable harm when it was actually their own action that caused their shows to dry up.  Intervenor believes the court would **not** have granted the TRO had these facts been known or revealed to the court by the Sixuvus.  Intervenor attempted to get into court on an ex parte or emergency basis to inform the court of these new facts and evidence to support a motion to vacate the TRO, but was unable to get into court, so Intervenor was force to file the instant appeal.

Even so, the relief granted in the TRO exceed the rights afforded in the Sixuvus license agreement with Can't Stop.  The license agreement specifically prohibits any feature or "featuring" rights.  Indeed, at no time in the history of the Sixuvus have they ever been allowed to "feature" any of their members in conjunction the subject mark.  Willis Decl. ¶5  Thus the TRO is overly broad and has expanded the rights the Sixuvus were entitled to under the disputed agreement.  Moreover, the TRO granted rights the Sixuvus could not expect under the disputed

16

license, even if they were to prevail (and they will not). Here again, the court should stay the TRO on this ground alone.

Simply put, the Sixuvus **cannot** establish irreparable harm because the harm they complain about was caused by the Sixuvus. Without question, it was the Sixuvus, not Can't Stop or Harlem West that informed each and every one of the Sixuvus' booking agents that the Sixuvus could not except any further bookings from any of its agents Michaels Decl. ¶6 As a direct result of the Sixuvus notification of these agents, the Sixuvus received no further bookings from any of the notified agents. As a result, their shows essentially dried up within six months.

If the Sixuvus really believed that Can't Stop's notice of termination of their license agreement was improper, surely they would **not** have made contact with their multiple booking agents, requesting said agents to, effective June 1, 2017, cease all further booking of new shows for them. Indeed, the Sixuvus had the option of simply ignoring Can't Stop's desire that they **not** book additional shows as they ignored Can't Stop's request that they turn over all social media without delay. To the contrary, in response to Can't Stop's notice that the Sixuvus social media was likewise terminated, the Sixuvus simply ignored Can't Stop's request to turn over all social media. And the Sixuvus still has control of all the official Village People social media including Facebook, Twitter, and Instagram accounts. Again, the Sixuvus could have likewise refused Can't Stop's request that it accept no further shows as of June 1, 2017. They then could have immediately filed suit and sought a TRO which may have allowed them to continue booking shows pending a decision by the Court. They did not.

In fact, the Sixuvus was so entrenched in their position that they have the right to continue using the Village People social media accounts despite Can't Stop's termination notice

17

and demands to turn over all social media, that when Intervenor asked Facebook to terminate the official Facebook page as no longer being authorized, the Sixuvus filed a counter-notification with Facebook in July 2017 stating that the Sixuvus is disputing Can't Stop's ownership of the mark. Willis Decl. ¶8   As a result, Facebook informed Intervenor that the social media account shall remain active as a direct result of the Sixuvus claimed dispute over ownership of the mark. However, the Sixuvus did not actually file a complaint challenging ownership of the mark until over six months later.

Nonetheless, if the Sixuvus inform their booking agents to **not** book any more Village People concerts after June 1, 2017, it stands to reason why they'd run out of shows and money within six months. They must have known this. The Sixuvus is not entitled to a TRO under the circumstances because they took affirmative action to prevent further booking of the Sixuvus Village People shows. The notification by the Sixuvus of their principle booking agents to cease all booking of Village People shows until further notice is tantamount to an express assumption of the risk. For example,  in *Arbegast, 490 N.Y.S.2d at 757-58, 480 N.E.2d at 370-72*, the New York Court of Appeals held that, even under the comparative negligence statute, express assumption of risk still operates as an absolute bar to recovery.  Simply put, the Sixuvus cannot cause their agents to stop booking shows and not assume the risk that the agents would immediately stop booking shows as they expressly requested, thus bringing harm to themselves and their business relations.

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v. Murray, 415 U.S. 61, 88 (1974) (internal quotation omitted); see also Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987).*  Here, the

Sixuvus cannot establish either of the basis for such extraordinary relief granted in the TRO. The Court should therefore stay its Order.

## II. THE TRO EXCEED RIGHTS GRANTED IN THE LICENSE AGREEMENT

The TRO granted the Sixuvus new rights beyond what was allowed in the disputed license agreement. The right to feature a particular singer is not afforded in their agreement with Can't Stop. Such rights they could not expect to receive even if they prevailed. The right to feature a particular singer in conjunction with a recording group is a major feat and accomplishment. As such, the TRO exceeds the Sixuvus rights. Moreover, the Sixuvus agreement with Can't Stop was for exclusivity. Willis Decl. ¶5 Intervenor's agreement with Can't Stop is exclusive as well. Willis Decl. ¶6 For the court to force Intervenor by way of a TRO where there is no claim against her, to declare that there are two groups performing as Village People, violates the essence of Intervenor's exclusive license agreement with Can't Stop. Moreover, the TRO violates long standing case law. Under Rule 19(a)(2)(i), the court must decide whether determination of the rights of those persons named as parties to the action would impair or impede an absent party's ability to protect its interest in the subject matter of the litigation. Fed. R. Civ. P. 15 19(a)(2)(i). The court erred when it failed to make such as inquiry. As a result, Intervenor is being irreparably harmed by the TRO because it among other things, forces Intervenor to denounce a crucial term of her agreement with Can't Stop as to exclusivity.

The TRO is causing mass confusion in the marketplace. Michaels Decl. ¶10 Since the TRO alters, rather than to maintain, the status quo, the Sixuvus must be held to the stringent standards imposed on a plaintiff seeking a TRO. *Judicial Watch, Inc. v. Dep't of Commerce, 501 F. Supp. 2d 83, 91 & n.3 (D.D.C. 2007).* The Sixuvus **cannot** meet the stringent standards

because they are unable to establish irreparable harm since they caused their agents to cease booking their shows.

### III. THE DELAY IN SEEKING THE TRO NEGATES ANY SENSE OF URGENCY

The Sixuvus sought a TRO premised on a preliminary injunction. To prevail on a motion for a preliminary injunction, "[t]he moving party must show (1) irreparable harm and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking the injunctive relief." Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir. 1992). "Such relief, however, is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co., 409 F.3d 506, 510 (2d Cir. 2005).*

The circumstances surrounding the Sixuvus' failure to act with any sense of urgency until six months later, and their specific request that each and everyone of their agents cease booking any and all shows for them effective June 1, 2017, negated any urgency and the Sixuvus was not entitled to a TRO.

Accordingly, the Sixuvus had an obligation to **not** put their agents on notice to cease booking any and all shows if they believed doing so would result in irreparable harm. Instead, if the Sixuvus really believed they were harmed by Can't Stop's notice, they had an obligation to immediately bring a complaint seeking to maintain the status quo, therein preventing the harm they are falsely claiming now. Essentially, the Sixuvus should not have waited six months to claim irreparable harm especially since they caused it. Harm for which they falsely represented to the court was caused by Can't Stop and Harlem West, instead, the harm they claim is self inflicted.

20

"[T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury[.] … delay alone may justify denial of a preliminary injunction." *See Tough Traveler, Ltd. v. Outbound Prods.*, *60 F.3d 964, 968 (2d Cir. 1995)* (emphasis added). Therefore, the Sixuvus is **not** entitled to a TRO or injunction. And since the Sixuvus cannot establish the first prong of this test, (irreparable harm) the court need not look to likelihood of success on the merits for which they could not credibly establish either. Intervenor is likely to prevail on appeal of the TRO. The court should stay the order pending appeal.

## IV.  INTERVENOR WILL SUFFER IRREPARABLE HARM

Intevenor has booked numerous shows in the U.S. and Internationally with contracts specifically calling for performances as VILLAGE PEOPLE or VILLAGE PEOPLE featuring Victor Willis. As it currently stands, the Sixuvus can now come into the same market with Intervenor's prior booked shows and compete with these shows in the same cities. This would cause substantial harm to the Village People brand. This is clearly not what these buyers bargained for with Intervenor who booked her shows based on exclusivity in the market and now these buyers are facing the prospect of two Village People in their market diluting their event's booking.

Intervenor, **cannot** now say to these buyers, sorry, you'll have to change the promotions to no-longer reflect VILLAGE PEOPLE as contracted or Village People featuring Victor Willis. Instead, you must now promote the act booked as Village People and Village People featuring Victor Willis to reflect, *Village People featuring Victor Willis (including asterisk) with a notice that there are now two Village Peoples. Intervenor may be sued for breach of contract, fraud and other causes of action if she is forced to informed existing buyers of this; notwithstanding the

21

fact that most if not all of the buyers would seek to cancel the shows. Michaels Decl. ¶11 See also Willis Decl. ¶4  This would damage the reputation of Intervenor with agents and buyers and likely costing her untold hundreds of thousands of dollars in imminent losses and legal fees therein inflecting irreparable harm to her ability to book future shows. Simply put, the Court erred when it failed to weigh the second prong of the four prong test in the Second Circuit for granting a TRO.  That is, the harm Intervenor would suffer if the Sixuvus TRO was granted.  *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170-71 (2d Cir. 2007).

The TRO has also emboldened the Sixuvus who have made numerous contacts, since the granting of the TRO, with buyers of Intervenor's existing shows including Disney and other venues informing these venues that they should cancel Intervenor's show and book the Sixuvus version featuring Ray Simpson instead.  These attempts to interfere was made by the Sixuvus representatives Deborah Crawford and Carlos Keys. in response, Disney and other venues immediately contacted Intervenor's agent to report the Sixuvus representatives attempts to interfere with Intervenor's already contracted shows. The Sixuvus also used the TRO to interfere and cause the cancellation of other of Intervenor's contracted shows at the Texan Theatre. Michaels Decl. ¶12 See also Willis Decl. ¶3 None of this disruption and confusion in the marketplace caused by the Sixuvus would be possible absent the wrongfully granted TRO.  The Sixuvus are essentially abusing the TRO by using it for unlawful purposes including the interference with Intervenor's contracted shows.

## V. INTERVENOR IS LIKELY TO PREVAIL ON APPEAL AND THE BALANCE OF THE HARDSHIP FAVORS A STAY

In this Circuit, four factors are considered before granting a stay pending appeal: "(1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer irreparable injury if a stay is issued, (3) whether the movant has demonstrated a

22

substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected." *Torres v. N.Y. State Bd. of Elections*, 462 F.3d 161, 207 (2d Cir. 2006), *rev'd on other grounds*, 552 U.S. 196 (2008); *see also In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170-71 (2d Cir. 2007)."

Intervenor's appeal has a sufficient possibility of success on appeal. The first factor – likelihood of success on appeal – weighs in favor of a stay pending appeal. The Second Circuit avoided "setting too high a standard" for the "likelihood of success" factor because "the trial judge is being asked to assess the likelihood that the ruling just made will be rejected on appeal." Mohammed, 309 F.3d at 101. Whether Intervenor was an indispensable party to the Sixuvus TRO considering that the Sixuvus specifically sought injunctive relief against Harlem West Entertainment (Intervenor) while failing to bring a claim against Intervenor, is an issue over which the Second Circuit could reasonably decide in the affirmative. Similarly, where as here, the appeal "presents an issue of first impression" over which the "Court of Appeals may disagree" with this Court's granting the Sixuvus the right to perform as "Village People featuring Ray Simpson" considering that the Sixuvus did not have such a right even in its disputed agreement with Can't Stop. "[T]hat reason alone" demonstrates a possibility of success. Jock v. Sterling Jewelers, Inc., 738 F. Supp. 2d 445, 446 (S.D.N.Y. 2010).

Moreover, Intervenor has demonstrated imminent and irreparable harm caused by the TRO, as shows booked by her months prior to the TRO are **now** in jeopardy of being cancelled and outright halted under a pall of confusion and dilution of the market, and the Sixuvus is driving this confusion pursuant to the TRO by contacting all of Intervenor's buyers and asking them to reconsider or not to sign an agreement with Intervenor. The balancing of equities tilts in Intervenor's favor because the Sixuvus informed all of their

23

agents to cease booking shows and Intervenor relied on the Sixuvus notice to their agents

that no further shows would be booked, therein clearing the way for Intervenor to accept

numerous shows on an exclusive basis. Michaels Decl. ¶5  If the Sixuvus did not want

Intervenor to book shows pursuant to her exclusive license agreement, they should have

immediately filed suit to stop her.  They did not. Instead they waited six months and now

Intervenor is harmed by the TRO.

The public interest favors a stay in that the confusion over two Village People

performing simultaneously is damaging the Village People brand and diluting the mark in

the marketplace.  The issue of who has rights to use the name pending resolution of the

litigation would revert back to the status quo prior to the TRO with Intervenor exclusively

having that right for which the Sixuvus conceded by notifying all of their agents to stop

booking shows for them as of June 1, 2017.  Intervenor's rights to exclusively book shows as

Village People was effective June 1, 2017, six months prior to the TRO. The Sixuvus has

presented **no** credible evidence that would justify the court having disturbed the **true** status

quo in Intervenor's favor.

Therefore, Intervenor respectfully request a ruling on this stay motion no later than

Wednesday, January 17, 2018, or sooner if the Court permits.  After which, Intervenor intend to

seek a stay from the Court of Appeals if the requested relief is denied or withheld.

## CONCLUSION

For all the foregoing reasons, Intervenor respectfully request that the Court stay its order

of December 14, 2017 pending resolution of the appeal, or in the alternative, dissolve the TRO in

lieu of a hearing on an injunction, if any.  If the TRO is dissolved or vacated, in efforts to

preserve judicial resources, Intervernor would immediately dismiss her appeal as moot.

24

Dated:  January ⧸⧸, 2018

KAREN L. WILLIS, J.D.

_____