UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X------------------------------------------------------X
CAN'T STOP PRODUCTIONS, INC.,

                Plaintiffs,                17-civ-06513-CS

-against-

SIXUVUS, LTD., ERIC ANZALONE,
ALEXANDER BRILEY, FELIPE ROSE,
JAMES F. NEWMAN, RAYMOND SIMPSON,
and WILLIAM WHITEFIELD,

                Defendants.
X------------------------------------------------------X

                PLAINTIFF CAN'T STOP PRODUCTIONS
                INC.'S PROPOSED FINDINGS OF FACT
                AND CONCLUSIONS OF LAW

I.      Findings of Fact

A. In the late 1970s Can't Stop Productions, Inc. ("Can't Stop") created a performing group known as "Village People."
B. Can't Stop recruited entertainers to perform music provided to them by Can't Stop and dressed them as iconic fantasy figures such as a soldier, police officer, Native American, construction worker, biker and cowboy.
C. On October 14, 1977, Can't Stop entered into an agreement for the entertainment services of Felipe Rose and Alexander Briley as members of Village People.
D. The remaining original members of Village People signed virtually identical agreements with Can't Stop dated either October 14, 1977 or November 28, 1977.
E. Each of the agreements provided that its signatory acknowledged "that the professional or fictitious name "THE VILLAGE PEOPLE" is owned by [Can't Stop] and that you shall not have any property or proprietary interest or rights of any nature or kind whatsoever in and to said name, and that for all purposes, the ownership of all rights in and to said name shall be and remain the sole and separate property of [Can't Stop]."
F. Beginning in 1978, Can't Stop registered federal trademarks for the name, "Village People," and the likenesses of its characters.
G. As of today, Can't Stop is the owner of the following incontestable trademarks (collectively referred to herein as the Village People Trademarks):

| Mark | Registration Number | Use/Date of Issuance |
| --- | --- | --- |

| Village People | 1,101,013 | Entertainment services | 8/29/78 |
| Village People | 2,184,290 | Records | 8/28/98 |
| Village People | 2,330,857 | Design mark characters in costume | 3/21/00 |
| Village People | 3,821,800 | Compact discs, downloadable Recordings | 12/21/09 |

H. By agreement dated January 1, 1979, Can't Stop entered into an agreement with the six original cast members of Village People, including defendants Felipe Rose and Alexander Briley, as well as Victor Willis, in which they reaffirmed that they had no interest in the Village People Trademarks and would cease using them upon the termination of the agreement. Defendant Raymond Simpson, who in 1980 had replaced Victor Willis as the lead singer of the group, signed an agreement dated August 15, 1979, pursuant to which he agreed to be bound by the terms set forth in the January 1, 1979 agreement signed by the others.

I. In 1983 Village People ceased being a "live" performing group, although its records and merchandise bearing the Trademarks continued to be sold and royalties paid to Can't Stop.

J. In 1988 Can't Stop entered into an oral agreement with six entertainers, who together operated through the entity known as Sixuvus Ltd. ("Sixuvus"), pursuant to which Can't Stop licensed Sixuvus to provide "live" performances of Village People in return for the payment of a 5% license fee payable on the gross amounts received by Sixuvus, net of agent's commissions.

K. For approximately the next thirty years Can't Stop and Sixuvus abided by the terms of this oral agreement.

L. Over this period Sixuvus, subject to Can't Stop's approval, replaced various group members.

M. All approved replacements signed agreements acknowledging Can't Stop's ownership of the Village People Trademarks (including all of the defendants in this action).

N. Can't Stop, in addition to controlling the membership of the group, at all times acted to ensure that the group continued to represent, in a consistent and appropriate manner, the image of Village People and the performance of its iconic songs.

O. Can't Stop, among other things, had input into the group's play list, especially when those songs were not generally associated with the group.

P. Can't Stop also explored and policed commercial opportunities for the Trademarks, for which Sixuvus received compensation, including items such as merchandise and product endorsements, with the aim of preserving the carefully crafted image of the group.

Q. In approximately 2010 and continuing through 2012, Karen Willis brought a series of proceedings in the Trademark Trials and Appeals Board seeking cancellation of all four of Can't Stop's Village People Trademarks asserting claims of fraud and abandonment. All of her claims were denied or otherwise dismissed.

R. Throughout thirty plus years of oversight, Can't Stop's goal was to ensure that Sixuvus used the Village People Trademarks in a consistent and appropriate manner so that

    audiences would know what to expect when they attended a concert, bought a product or listened to an endorsement from Village People.
S. On May 30, 2017, Can't Stop, having made a business decision to terminate its license with Sixuvus for the use of the Village People Trademarks, officially notified Sixuvus of the termination of the license effective June 1, 2017.
T. At the same time, Can't Stop granted an exclusive 10-year license to Harlem West Entertainment to use those Trademarks.
U. Can't Stop coupled its termination notice with an offer for Sixuvus to continue to use the Trademarks for six additional months through December 1, 2017, during which period Can't Stop and Sixuvus would negotiate a resolution of any claims that Sixuvus might have stemming from the termination.
V. When negotiations seemed ineffective, but Sixuvus continued to exploit the Trademarks, Can't Stop commenced this Action in late August, 2017, to obtain a declaratory judgment that Sixuvus would have to cease exploiting the Marks.
W. Despite the court filing, Sixuvus continued to perform using the Trademarks, with Can't Stop's acquiescence, and, in some cases, protection, through December 1, 2017.
X. On November 30, 2017, when it had exhausted the additional six month period, Sixuvus sought injunctive relief which would permit it to continue to use the Trademarks.

## II.  Conclusions of Law

A. There is no "Naked License"

1. A "Naked License" exists where the trademark owner abandons the mark by failing to control the quality of the mark in all its uses. *Freecycle Sunnyvale v. The Freestyle Network*, 626 F.3d 509, 515-16 (9th Cir. 2010).
2. With respect to the extent of control necessary, "[i]t is difficult, if not impossible to define in the abstract exactly how much control and inspection is needed to satisfy the requirement of quality control over trademark licensees ... [and] the standard of quality control and the degree of necessary inspection and policing by the licensor will vary with the wide range of licensing situations in use in the modern marketplace." *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 595-96 (9th Cir.2002) (internal citations and quotations omitted).Quoted in *Fuel Clothing Co. v. Nike, Inc.*, 7 F. Supp.3d 594, 606 (D.S.C. 2014).
3. The "quality control" required to avoid the finding of a naked license is not that the licensor ensure that the licensed product or service is of the highest quality, but rather that "[t]he sort of supervision required for a trademark license is the sort that produces consistent quality." *Eva's Bridal, Ltd. v. Halanick Enters.*, 639 F.3d 788, 790-91 (7th Cir. 2011)
4. "The trademark's function is to tell shoppers what to expect – and whom to blame if a given outlet falls short. The licensor's reputation is at stake in every outlet, so it invests to the extent required to keep the consumer satisfied by ensuring a **repeatable experience**." *Id.* (emphasis added)

5. "Because an assertion of insufficient control can lead to a forfeiture of rights, the party arguing for it must meet a 'high burden of proof." *Amscan Inc. v. Shutter Shades, Inc.*, 2015 U.S. DIST. Lexis 180647, *13 (S.D.N.Y. April 30, 2015).
6. The burden of proof is "stringent." *Exxon Corp. v. Oxford Clothiers, Inc.*, 109 F.3d 1070, 1075-76 (5th Cir. 1997)
7. This burden of proof is not met if only one element of a trademark is deemed abandoned as long the trademark owner has not abandoned other elements of the mark.
8. Thus, "[r]ights in a mark signifying a singing group are not abandoned by the owner upon the group's disbandment, so long as the owner continues to receive royalties from the sale of the group's previously recorded group." *Marshak v. Schaffner*, 2012 U.S. Dist. Lexis 66536, *13 (S.D.N.Y. May 11, 2012).

B. Reasonable Notice Cannot Exceed One Year

1. "The general rule under New York contract law [is] that a contract [which] does not contain a termination provision is terminable only upon reasonable notice." *Laugh Factory, Inc. v. Basciano*, 608 F.Supp.2d 549, 556 (S.D.N.Y. 2009). *Accord, Italian & French Wine Co. v. Negociants, U.S.A.* 842 F. Supp. 693 (W.D.N.Y. 1993) (finding it "well-settled New York law which provides that a contract with no stated duration is terminable only after a reasonable duration and after reasonable notice is given.")
2. One year, at a maximum, has been held to be reasonable notice of termination. *See, e.g., Colony Liquor Distributor v. Jack Daniels Distillery*, 22 A.D.2d 247, 249, 254 N.Y.S.2d 547, 549-50 (3d Dept. 1964).
3. In New York, an oral agreement can have a maximum duration of one year. New York General Obligations Law §5-701(a) (1).

C. No Grounds for Issuance of Preliminary Injunction

1. Monetary damages would be an adequate remedy if it is held that the termination notice was unreasonable.
2. Defendants have not established a likelihood of success on the merits on any claim that would entitle them to an injunction allowing them to perform as Village People.

Dated: January 27, 2018
White Plains, New York

EISENBERG TANCHUM & LEVY
Attorneys for Can't Stop Productions, Inc.
By: /s/ Stewart L. Levy
Stewart L. Levy
707 Westchester Avenue
Suite 300
White Plains, New York 10604
Tel.# 212-599-0777