ADELMAN MATZ P.C.
1173A Second Avenue, Suite 153
New York, NY 10065
Phone: (646) 650-2207
*Attorneys for Defendants/Counterclaim Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
 X--------------------------------------------------X
  CAN'T STOP PRODUCTIONS, INC.,

      Plaintiff,

-against-

SIXUVUS, LTD., ERIC ANZALONE,
ALEXANDER BRILEY, FELIPE ROSE,
JAMES F. NEWMAN, RAYMOND SIMPSON,
and WILLIAM WHITEFIELD,

      Defendants.
 X--------------------------------------------------X

Case No.: 7:17-cv-06513-CS

# DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**ADELMAN MATZ P.C.**
**1173A Second Avenue, Suite 153**
**New York, New York 10065**
**Phone: (646) 650-2207**
*Attorneys for Defendants*

Defendants Sixuvus, Ltd. ("Sixuvus"), Eric Anzalone, Alexander Briley, Felipe Rose, James F. Newman, Raymond Simpson, and William Whitefield (collectively "Defendants") through their undersigned counsel submit the following proposed findings of fact and conclusions of law, pursuant to the January 19, 2018 Order.

**PROPOSED FINDINGS OF FACT**

**I.     Background**

1. In 1985, as the popularity of disco music waned, Can't Stop decided to cease operations, and informed the then members of Village People group that they were shutting down their New York offices and were done with Village People.

2. Village People were on a hiatus beginning in 1985.

3. From 1985, until 1987, there were no live performances under the Village People Marks with no intent to resume use.

4. Village People reunited only when former Sixuvus member Randy Jones helped re-assemble the group.

5. However, there was no indication or desire by Can't Stop to promote or provide any live entertainment services under Village People name.

6. When Village People reunited in 1987, Victor Willis, who had not performed live as the lead singer of Village People since 1979, was not asked to return.

7. Raymond Simpson, who sang the lead vocals for Village People for several years, a role which he continues to fulfil to this day, was asked to join.

8. When Village People reunited, the then members formed Sixuvus Ltd., to be the entity that they conducted their business through.

9. At that time, Sixuvus entered into an oral license agreement with Can't Stop where, in exchange for Sixuvus being allowed to use the Village People name in connection with live performances, Sixuvus would pay a 5% license fee, quarterly, payable on the gross amounts received by Sixuvus, net of agent's commissions.

10. Sixuvus was told that they would be in charge because they were Village People, and they could perform under the license as long as they still wanted to.

11. At the time of the oral agreement, Sixuvus did not have an expectation as to how long they would perform, as their initial gigs were very small performances and they were not making much money.

12. No member, employee or contractor of Can't Stop has ever engaged in live musical performances as Village People after 1985, nor did Can't Stop license the Village People name to any other person or entity until this year when Can't Stop purportedly gave an exclusive license to Harlem West Entertainment and/or Karen Willis.

13. From 1987 through the present, with the exception of several recent performances by Victor Willis and his group, Sixuvus has continually and exclusively utilized Village People in connection with live music performance services in the United States and around the world.

14. On average, Sixuvus has been engaged to perform around fifty live performances per year.

15. This has included large events such as the Major League Baseball All-Star Game at Yankee Stadium in 2008, the American Music Festival, Jerry Lewis's Muscular Dystrophy Association Telethon, and in front of over 40,000 people as part of the pre-game entertainment for the New South Wales Rugby League Grand Final.

## II. Naked Licensing

16. For the past thirty years, Can't Stop has engaged in blatant naked licensing practices that are nothing more than renting of their trademark in exchange for profit without controlling or monitoring the quality of services rendered under Village People.

17. When the oral license agreement was formed Plaintiff told the group that Can't Stop was not interested in managing the group or overseeing its live performances as it had before the hiatus.

18. Sixuvus was told that they would be in charge because they were Village People, and they could perform under the license as long as they still wanted to.

19. Can't Stop has not exercised any type of quality control over Sixuvus' use of Village People name in connection with Sixuvus' live performances.

20. Can't Stop did not require Sixuvus to ask what live performances it booked or what territories it booked them in.

21. Can't Stop did not have any production requirements that Sixuvus had to adhere to.

22. Can't Stop never imposed any type of controls over the billing, set lists, and use of Village People name.

23. Can't Stop never required rehearsals, oversaw choreography or required that the members of the group be in any type of physical shape.

24. Can't Stop never interviewed new performers of Sixuvus, nor did it attend auditions.

25. Sixuvus has essentially been given free reign and an unfettered right to use Village People as it saw fit in connection with live music performance without supervision or control for the last thirty (30) years.

26. Sixuvus could dictate their set lists, rehearsals, their choreography, and their stage shows.

27. For the last thirty (30) years, and until this year, Sixuvus has been the exclusive provider of live performances as Village People.

28. Until this year, every Village People performance that has been witnessed by a member of the consuming public was performed by Sixuvus.

29. Can't Stop has never made an effort to exercise even the most basic types of quality control over the use of the name in connection with live performances.

30. Can't Stop is still not exercising any quality control over the name to protect consumers.

31. The only thing Can't Stop has been interested in for the last thirty (30) years is getting paid and making sure that the Can't Stop Registrations stayed in their name.

32. The only times Can't Stop was involved, was when Sixuvus was doing something outside the scope of their license or when they needed additional music permissions or rights such as a synch licenses, which as the copyright holder, Can't Stop would be involved in from the copyright perspective.

33. There is no excuse for Plaintiff's total failure to oversee the use and quality of services rendered under Village People name.

34. There was no true licensor licensee relationship between Sixuvus and Can't Stop, as the 'license' that was given to Sixuvus was really nothing more than a naked renting of the right to use Village People name in exchange for 5% of certain profits.

35. Plaintiff's failure exert quality control over the mark's use, has operated to divest Village People from having any source indicating significance for live performances in Plaintiff's hands.

36. To the contrary of operating as a source indicator of Plaintiff—these naked licensing practices have caused Village People Marks to become synonymous with Sixuvus in the mind of consumers.

37. Sixuvus is Village People.

38. They perform as Village People, they make appearances as Village People, and have for the last thirty years.

39. Can't Stop may be the listed owner of record of the Can't Stop Registrations for live music performances, but it is and has been members of Defendant who the consuming public associate with Village People for decades.

40. After years of failure to control or supervise the use of Village People, to the point where the mark has lost any connection to Plaintiff, Plaintiff should be estopped from now challenging Defendant's use of Village People in connection with live performances.

41. Plaintiff's failure to supervise and control the quality of its licensee's services is ongoing.

42. Plaintiff's failure to supervise and control the quality of its licensee's services is hurting consumers.

43. The entire purpose of requiring trademark owners to exert quality control is to protect the consuming public and ensure that it is not unwittingly deceived.

44. Here because of Plaintiff's failure to exert any control that is exactly what is happening.

III. **Breach of Contract**

45. In 1987, Sixuvus entered into an oral license agreement with Can't Stop where, in exchange for Sixuvus being allowed to use the Village People name in connection with live performances, Sixuvus would pay a 5% license fee, quarterly, payable on the gross amounts received by Sixuvus, net of agent's commissions.

46. When the oral agreement was made Plaintiff told Defendant that Plaintiff was not getting involved with the management of the group or the live performances, because Defendant should be in charge because they were Village People.

47. Sixuvus was told that they would be in charge because they were Village People, and they could perform under the license as long as they still wanted to.

48. From 1987 through the present, with the exception of several recent performances by Victor Willis and his group, Sixuvus has continually and exclusively utilized Village People in connection with live music performance services in the United States and around the world.

49. On average, Sixuvus is engaged to perform around fifty live performances per year.

50. This has included large events such as the Major League Baseball All-Star Game at Yankee Stadium in 2008, the American Music Festival, Jerry Lewis's Muscular Dystrophy Association Telethon, and in front of over 40,000 people as part of the pre-game entertainment for the New South Wales Rugby League Grand Final.

51. After working tirelessly to build their own career, Plaintiff cannot simply tell Defendant on one day's notice that they are not allowed to enter into any further agreements for use of the name.

52. Plaintiff's attempt to terminate the oral agreement is a breach of the agreement itself, (i) as Plaintiff does not have the right to terminate the agreement; or (ii) as one (1) day's notice was unreasonable in light of long history, and allowing Sixuvus to perform until November 30, 2017 or December 1, 2017, is not "notice" as Sixuvus were asked not to book new shows during that time.

IV. **Promissory Estoppel**

53. Plaintiff's statements and conduct led Sixuvus to believe that they could have the license as long as they intended to perform as Village People.

54. Sixuvus justifiably relied on Plaintiff's statements and conduct, and indeed fully performed under them for approximately thirty (30) years.

55. Plaintiff is estopped from terminating Defendant's ability to use Village People Marks at all.

V. **Toritous Interference with Sixuvus' Prospective Contractual/Economic Relations**

56. Sixuvus has had, throughout its thirty-year history, strong business relationships with various concert promoters and bookers, as it has been the exclusive source of live performances of Village People.

57. On average, these relationships yield approximately fifty (50) live engagements to perform as Village People each year.

58. Plaintiff was generally aware of these relationships, as Sixuvus paid Plaintiff from monies obtained as a result of these engagements in connection with the oral license agreement between the parties.

59. Intervenor was also aware of these relationships.

60. Here Plaintiff interfered with those relationships by (a) giving Mrs. Willis an exclusive license to use Can't Stop Registrations, which induced Mr. Willis to breach the Settlement Agreement; and (b) improperly and unfairly purporting to terminate the oral license agreement on one days' notice and thereafter informing third parties that Sixuvus did not have the right to perform as Village People.

61. Intervenor interfered with these relationships by contacting booking agents and venues in an attempt to disrupt Sixuvus' performances and relationships, and unless enjoined will continue to do so.

62. Plaintiff had no reason to give Mr. Willis the ability to interfere with these relationships, other than to hurt Defendant. Plaintiff is well aware of the acrimonious history between the parties.

63. In the latest part of their vendetta against Sixuvus, Karen Willis, as Can't Stop's licensee, has been sending letters to various concert venues and to Sixuvus' booking agent threatening litigation should Sixuvus take the stage as Village People.

64. Karen Willis has only been enabled to interfere with Defendant's business because Plaintiff provided her with a purported exclusive license.

65. Plaintiff's decision to permit Karen Willis to use the Can't Stop Registrations to the exclusion of Sixuvus has resulted in a substantial interference with Defendant's business relations.

66. Sixuvus has, and unless Plaintiff is enjoined, will continue to face enormous difficulties in arranging new performances and appearances.

67. Sixuvus' own booking agent, who has been threatened by Karen Willis, and is no longer booking shows for Sixuvus.

68. Certain performance venues are also no longer willing to book Sixuvus because of the threats that come from Karen Willis.

69. Can't Stop knew that by granting Karen Willis a license to perform as Village People, that she would interfere with Sixuvus' relationships.

70. She has done as much by sending threatening letters to one of Sixuvus' booking agent, the very person responsible for securing the performances that Sixuvus relies on to be viable.

71. Karen Willis has gone as far as to call venues the day of performances to demand that concert venues not permit Sixuvus to perform as Village People.

72. Unfortunately for Sixuvus, her threats have proven successful as it is not in the position it once was to book concerts. By threatening concert venues and Sixuvus' booker, Sixuvus can no longer contract with performance venues to put on concerts and make appearances like it once did.

73. Unless Plaintiff and Intervenor are enjoined from interfering with Sixuvus' right to perform live as the Village People, Defendant will continue to lose the valuable business relationships that it has cultivated for almost three decades. Once ruined, these relationships would be impossible to rebuild.

## VI. Tortious Interference With and Breach of Settlement Agreement

74. A valid and enforceable contract exists between Sixuvus and Victor Willis i.e. the Settlement Agreement.

75. Sixuvus and Victor Willis negotiated the Settlement Agreement in which Victor Willis agreed to abide by the Preliminary Injunction.

76. The central purpose for Sixuvus to enter into the Settlement Agreement, was that Victor Willis agreed to follow the Preliminary Injunction, which prohibited Victor Willis, his agents and those acting in concert with him, from directly or indirectly disrupting Sixuvus' live performances.

77. Plaintiff was aware of the Settlement Agreement and the terms thereof.

78. Not only was Plaintiff a party to the California Action, but Plaintiff's counsel actually recited the terms of the Settlement Agreement into the record. Plaintiff was also aware of the acrimonious history between Sixuvus and Victor Willis.

79. The plain meaning of the Settlement Agreement is that in the event that Victor Willis or his agents, representatives, assigns or any other person acting in concert or participation with him, engaged committed, or performed, directly or indirectly any act that would disrupt the live performance or public appearance of Sixuvus as Village People, such act would constitute a breach of the Settlement Agreement.

80. Despite Plaintiff's awareness of the Settlement Agreement and its terms, Plaintiff induced and aided Mr. Willis' breach of the Settlement Agreement by giving Karen Willis or her company Harlem West Entertainment an exclusive license of the right to use Village People –to the exclusion of Sixuvus.

81. By granting Karen Willis, who is an agent, representative, assign and/or is acting in concert or participation with Victor Willis, the exclusive right to use Village People in connection with live performances, Plaintiff has induced the direct and indirect disruption of the live performance and public appearance of Sixuvus as Village People.

82. Plaintiff's actions directly caused Mr. Willis and those acting in concert with him, i.e. Mrs. Willis, to immediately resume their campaign of disrupting Defendant's livelihood and ability to perform live as the Village People, in violation of the Settlement Agreement.

83. The sole purpose of the Settlement Agreement was to prevent Mr. Willis, along with his agents and those with whom he is acting in concert, from ever again disrupting Sixuvus' ability to perform live as Village People.

84. Mrs. Willis is acting in concert with Mr. Willis as he is clearly the intended beneficiary of the exclusive license to Harlem West.

85. Here, that is exactly what he has done. The result of Plaintiff giving Mrs. Willis an exclusive license is that it allowed Mr. Willis to disrupt Sixuvus' ability to perform live as Village People.

86. Plaintiff, with full knowledge that the Willis' were not allowed to take any such action, directly or indirectly, and knowing that an exclusive license would result in Mr. Willis breaching the Settlement Agreement, induced him to do so.

## VII. Sixuvus Will Suffer Irreparable Harm and the Balance of Hardships Tips in Sixuvus' Favor

87. Allowing Plaintiff to (i) prevent Sixuvus from using Village People in connection with live performances when such conduct constitutes tortious interference with contract and business relations; (ii) continue to induce third parties to breach their agreements with Defendant; (iii) prevent Sixuvus from using Village People as a mark when Plaintiff no longer has a right to do so because it has abandoned such rights through naked licensing; and/or (iv) terminate the term of Defendant's license in breach of the agreement, would cause an irreparable harm to Sixuvus.

88. Defendant has already expended a substantial amount of time and resources in prior litigation to avoid this exact situation.

89. If Plaintiff and Intervenor are not, during the pendency of this lawsuit, enjoined from (i) taking any action in concert with the Willis' to disrupt any live performance or public appearance of Sixuvus performing as the Village People; or (ii) taking any action to stop Defendant from using Village People in connection with its live performances, until these issues are resolved Sixuvus will suffer and continue to suffer immediate and irreparable harm.

90. Sixuvus will suffer irreparable reputational damage both with its industry relationships and with its fans.

91. Sixuvus has spent thirty (30) years building its reputation within the industry and with its fans, and if Plaintiff and Intervenor's actions are allowed to destroy that, it will be impossible to rebuild.

92. The continued disruption to Defendant's ability to perform live as Village People, will threaten the reputation of Sixuvus, as it is losing relationships that it took years to build with promoters, bookers and venues.

93. Moreover, if Plaintiff and Intervenor are not enjoined from interfering with Defendant's ability to perform live, Sixuvus' reputation with its fans could be irreparably damaged.

94. Victor Willis' performances are of an inferior quality, and if Defendants' are not allowed to perform live as Village People it may permanently damage Defendant's reputation with its fans, if they believe that Victor Willis' group is associated with the members of Sixuvus.

95. As shows are often times booked months in advance, if Sixuvus is prevented from performing live during the pendency of this lawsuit, which could take years, it will destroy Sixuvus' reputation, which Sixuvus may not be able to rebuild.

96. Intervenor's license was given in May of 2017, prior to the termination. Since Plaintiff signed the license with Intervenor, Intervenor has never actually had an exclusive right. As such, the balance of the hardships tips decidedly in Sixuvus' favor.

97. The public interest would not be disserved by the issuance of an injunction. The public's interest is best served by (i) preventing Plaintiff and Intervenor from tortuously interfering with the Settlement Agreement by giving Victor Willis the means and ability to breach his obligation to refrain from disrupting Defendant's ability to perform live as Village People; (ii) preventing Plaintiff from asserting trademark rights that it no longer owns; (iii) preventing Plaintiff from deceiving the consuming public by failing to exert any quality control measures; (iv) preventing Plaintiff from breaching its agreement with Defendant or taking actions it is estopped from taking; and (v) preventing further tortious interference of Defendant's prospective relations.

## PROPOSED CONCLUSIONS OF LAW

### VIII. Defendants Are Likely to Prevail On Their Naked Licensing Claim

98. An owner of a mark who licenses it to another has an affirmative "duty to exercise control and supervision over the licensee's use of the mark." *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959); *see also Twentieth Century Fox Film Corp. v. Marvel Enters.*, 277 F.3d 253, 259 (2d Cir.2002); *General Motors Corp. v. Gibson Chemical & Oil Corp.*, 786 F.2d 105, 110 (2d Cir.1986).

99. Among other consequences, "[f]ailure to exercise such control and supervision for a significant period of time may estop the trademark owner from challenging the use of the mark and business which the licensee has developed during the period of unsupervised use." *Sheila's Shine*, 486 F.2d 114, 124 (5th Cir. 1973).

100. A naked license that takes the form of a mere sale or renting of a name without adequate controls, can work as an abandonment, can negate any priority claim that an owner alleges to have and can divest the owner of any claim that its mark has origin indicating significance to the owner. *See Yocum*, 216 USPQ (BNA) ¶ 210 (TTAB Nov. 29, 1982) (holding that agreement without quality controls was mere sale or renting where "virtually only provision, so far as petitioner was concerned, being an agreement to pay petitioner 5% of the gross income of [the] group in return for allowing him to use the 'PIED PIPERS' name 'as purporting to be the name of a vocal group you are about to form.'").

101. Whether a licensor has abandoned his rights to a mark by engaging in naked licensing depends on "whether the licensees' operations are policed adequately to guarantee the quality of the products sold under the mark." *General Motors Corp. v. Gibson Chem. & Oil*, 786 F.2d 105, 110 (2d Cir.1986).

102. Control over a trademark is a vital part of the Lanham Act, the Second Circuit explained: "[i]f the licensor is not compelled to take some reasonable steps to prevent misuses of his trademark in the hands of others the public will be deprived of its most effective protection against misleading uses of a trademark. The public is hardly in a position to uncover deceptive uses of a trademark before they occur and will be at best slow to detect them after they happen. Thus, unless the licensor exercises supervision and control over the operations of its licensees the risk that the public will be unwittingly deceived will be increased and this is precisely what the Act is in part designed to prevent. *Dawn Donut Co.*, 267 F.2d at 367.

103. When a mark owner fails to affirmatively supervise or control a licensee's use of any trademark rights conveyed to it, under the naked licensing doctrine, the holder is estopped from enforcing rights against the licensee. *See e.g. Miller v Glenn Miller Productions*, 318 F Supp. 2d 923, 946 (C.D. Cal. 2004), *affd sub nom. Miller v Glenn Miller Productions, Inc.*, 454 F3d 975 (9th Cir. 2006).

104. Plaintiff's argument that it did not abandon rights in its trademark because it continued to receive royalties is incorrect and the legal authority in support is inapposite. *Marshak,* does not relate at all to the consequences of nakedly licensing a mark. To the contrary it deals with abandonment by non-use which is separate and inapposite to the circumstances here. *Marshak v Schaffner*, 11 CIV. 1104 DLC, 2012 WL 1658393, at *5 (S.D.N.Y. May 11, 2012) (discussing statutory abandonment if "an owner ceases to use a mark without an intent to resume use in the reasonably foreseeable future, the mark is said to have been 'abandoned.'").

105. Defendant is very likely to succeed on its claim for declaratory judgment that Can't Stop has engaged in naked licensing practices and as such that Plaintiff (a) has abandoned its rights in and to Village People Mark; (b) that such abandonment has broken Can't Stop's chain of continuous use necessary to prove priority over Sixuvus; and/or (c) that as a result of decades of naked licensing Can't Stop is now estopped from challenging Sixuvus' use.

## IX. Defendants' Are Likely to Prevail on Their Breach of Contract Claim

106. "To establish a prima facie case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

107. "A contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the presumed intention of the parties as indicated by their conduct. It is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 582 (2d Cir. 2006) *citing Jemzura v. Jemzura*, 36 N.Y.2d 496, 503-504 (1975).

108. Even if no definite period of termination was originally fixed, a contract is not terminable at will by either party. Rather, if the contract existed for a reasonable duration, then a party is entitled to reasonable notice of termination. *Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc.*, No. 87 CIV. 6294 (MJL), 1988 WL 52777, at *2 (S.D.N.Y. May 18, 1988); *Colony Liquor Distributor, Inc. v. Jack Daniels Distillery*, 22 A.D.2d 247, 249, 254 N.Y.S.2d 547, 549-550 (1964).

109. *See also Laugh Factory, Inc. v. Basciano,* 608 F. Supp. 2d 549, 556 (S.D.N.Y. 2009) (under New York law, in the context of an oral trademark license, "a contract that does not contain a termination provision is terminable only upon reasonable notice.").

110. *Halo Optical Prod., Inc. v. Liberty Sport, Inc.*, 2017 WL 4011261, at *3 (N.D.N.Y. Sept. 11, 2017) (a year notice found to be reasonable under the circumstances).

111. Defendant is likely to prevail on the claim that Plaintiff breached the contract by (i) trying to terminate the agreement when it was not entitled to do so at all; or (ii) trying to terminate the agreement on one day's notice period, which if Plaintiff was allowed to terminate, is inequitable and unreasonable in light of the parties' oral agreement and the length of their relationship.

## X. <u>Defendants Are Likely to Prevail on their Promissory Estoppel Claim</u>

112. "In New York, promissory estoppel has three elements: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance.'" *Cyberchron Corp. v Calldata Sys. Dev., Inc.*, 47 F3d 39, 44 (2d Cir. 1995).

113. Defendant disputes that the oral agreement would fall within the statute of frauds, NY GOL 5-701(a)(1). Under New York law, the Statute of Frauds requires an agreement to be in writing, and signed by the party to be charged, if it cannot be performed within one year from the date of its making. *See* N.Y. GEN. OBLIG. LAW § 5-701(a)(1) (McKinney 2012).

114. Regardless, promissory estoppel can provide relief to a party where the contract is rendered unenforceable by operation of the Statute of Frauds. *Merex A.G. v Fairchild Weston Sys., Inc.,* 29 F3d 821, 824 (2d Cir 1994) (*citing Restatement (Second) of Contracts* § 139(1) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise.")).

XI. **Tortious Interference with Sixuvus' Prospective Contractual/Economic Relations**

115. New York law provides for separate causes of action for interference with existing and prospective contractual relationships. *Lader v. Delgado*, 941 F. Supp. 2d 267, 272 (E.D.N.Y. 2013).

116. "Under New York law, the elements of a claim for tortious interference with prospective business relations are: (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship." *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000). *See also Legacy Grp. of Am., Inc. v. N. Am. Co. for Life & Health Ins.*, 336 F. App'x 87, 91 (2d Cir. 2009) (Internal citations omitted).

117.    The fourth element has been further clarified to by the Second Circuit that "the [party's] interference [must have] caused injury to the relationship." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006).

118.    "In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994).

119.    Unless Plaintiff and Intervenor are enjoined from interfering with Sixuvus' right to perform live as the Village People, Defendant will continue to lose the valuable business relationships that it has cultivated for almost three decades.  Once ruined, these relationships would be impossible to rebuild.

## XII. Tortious Interference with Contract

120.    "Under New York law, the elements of tortious interference with contract are: (1) the existence of a valid contract between the plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract, and (5) damages resulting therefrom." *See Highland Capital Mgmt. LP. v. Schneider*, 198 F. App'x 41, 45 (2d Cir. 2006) *citing Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 424 (1996).

## XIII. Irreparable Harm and Balance of the Hardships

121.    Irreparable harm in the absence of an injunction and balance of the hardship "both of which consider the harm to the parties, are related." *Salinger v Colting*, 607 F. 3d. 68, 81 (2d Cir. 2010).

122. On the issue of irreparable harm, Courts must "actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *HarperCollins Publishers L.L.C. v Gawker Media LLC*, 721 F. Supp. 2d 303, 305 (S.D.N.Y. 2010) (quoting *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010)).

123. The Second Circuit has further noted that "[h]arm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." *Salinger v Colting*, 607 F3d 68, 81 (2d Cir. 2010).

124. Damage to reputation is difficult to prove or quantify. *Stern's Miracle-Gro Products, Inc. v Shark Products, Inc.*, 823 F Supp 1077, 1094 (S.D.N.Y. 1993).

125. The public will not be disserved by the issuance of an injunction that will prevent consumer deception.

Dated: New York, New York
      January 28, 2018

Respectfully submitted,

ADELMAN MATZ P.C.

By:    */s/Sarah M. Matz*
    Sarah M. Matz, Esq.
    Gary Adelman, Esq.
1173A Second Avenue, Suite 153
New York, New York 10065
T: (646) 650-2207
F: (646) 650-2108
sarah@adelmanmatz.com
g@adelmanmatz.com
*Attorneys for Defendants/Counterclaim Plaintiffs*