UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X--------------------------------------------------------X
CAN'T STOP PRODUCTIONS, INC.,

                           Plaintiffs,                       17-civ-06513-CS

-against-

SIXUVUS, LTD., ERIC ANZALONE,
ALEXANDER BRILEY, FELIPE ROSE,I
JAMES F. NEWMAN, RAYMOND SIMPSON,
and WILLIAM WHITEFIELD,

                          Defendants.
X--------------------------------------------------------X

## PLAINTIFF CAN'T STOP PRODUCTIONS INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

EISENBERG TANCHUM & LEVY
707 Westchester Avenue
Suite 300
White Plains, New York 10604
Tel.# (212) 599-0777

LAW OFFICES OF ROBERT S. BESSER
17383 Sunset Blvd. Suite A-350
Pacific Palisades, CA 90272
Tel.# (310) 394-6611

Attorneys for Can't Stop Productions, Inc

# TABLE OF CONTENTS

Table of Authorities      iii

FINDINGS OF FACT      1

CONCLUSIONS OF LAW      12

    A.  Licensee Estoppel Precludes Defendants From Attacking Can't
Stop's Ownership of Village People Marks      7

    B.  There is No "Naked License"      9

    C.  Can't Stop Cannot Have Partially Abandoned its Rights in the Marks      12

    D.  Defendants' Sole Remedy Would Be Award Of Money Damages
For Insufficient Notice of Termination Where Reasonable Notice
Cannot Exceed One Year      15

    E.  Conclusion      22

# TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

*Amscan Inc. v. Shutter Shades, Inc.*
    2015 U.S. Dist. LEXIS 180647 (S.D.N.Y. April 30, 2015) ..................................17

*Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*
    289 F.3d 589 (9th Cir. 2002) ..................................................................15

*Beer Nuts, Inc. v. King Nut Co.,*
    477 F.2d 326 (6th Cir. 1973) ..................................................................14

*C.B.C. Dist. & Mktg., Inc. v. Major League Media, L.P.*
    505 F.3d 818 (8th Cir. 2007) ..................................................................13

*Clicks Billiards, Inc. v. Sixshooters, Inc.*
    251 F.3d 1252 (2d Cir. 2001)..................................................................19

*Colony Liquor Distributor v. Jack Daniels Distillery,*
    22 A.D.2d 247, 254 N.Y.S.2d 547 (3d Dept. 1964) ..............................................21

*Embedded Moments, Inc. v. International Silver Co.*
    648 F.Supp 187 (E.D.N.Y. 1986) ..............................................................16

*Engineered Mech. Servs. v. Applied Mech. Tools, Inc.*
    584 F. Supp. 1149 (M.D. LA 1984)............................................................16

*Eva's Bridal, Ltd. v. Halanick Enters.,*
    639 F.3d 788 (7th Cir. 2011) ..............................................................15, 16

*Exxon Corp. v. Oxxford Clothes, Inc.*
    109 F.3d 1070 (5th Cir. 1997) ................................................................17

*Freecycle Sunnyvale v. The Freestyle Network,*
    626 F.3d 509 (9th Cir. 2010) ..................................................................15

*Fuel Clothing Co. v. Nike, Inc.*
    7 Supp.3d 594 (D.S.C. 2014)..................................................................15

*HSW Enters. v. Woo Lae Oak, Inc,*
    2009 U.S. Dist. LEXIS 116576 (S.D.N.Y. December 15, 2009) ..........................13

*Idaho Potato Commission v. M & M Produce*
*Farm and Sales,*
    335 F.3d 130 (2d Cir. 2003).............................................................12, 13

*Italian & French Wine Co. v. Negociants, U.S.A.*,
    842 f. Supp. 693 (W.D.N.Y. 1993) .................................................................21

*Laugh Factory, Inc. v. Basciano*,
    =608 F. Supp.2d 549 (S.D.N.Y. 2009) ..............................................................21

*Lear, Inc. v. Adkins*,
    395 U.S. 653 (1969).........................................................................................13

*Marshak v. Schaffner*,
    2012 U.S. Dist. LEXIS 66536 (S.D.N.Y. May 11, 2012) ..................................17

*New Colt Holding Corp. v. RJG Holdings of Fla. Inc.*,
    312 F. Supp2d 195 (D. Conn. 2004) ..................................................................20

*Polaroid Corp. v. Polarad Elecs. Corp*,
    287 F.2d 492 (2d Cir. 1961).............................................................................20

*Ritz Assocs. v. Ritz-Carlton Hotel Co.*
    35 Mis.2d 425, 230 N.Y.S.2d 408 (Sup. Ct. N.Y. Co. 1962) ..............................20

*Studiengesellschaft Kohle M.B.H. v. Shell Oil Co.*
    112 F.3d 1566 (Fed. Cir. 1997)........................................................................14

*Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*
    315 F.Supp 45 (S.D.N.Y. 1970)........................................................................16

*Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*
    932 F.2d 1113 (5th Cir. 1991) ........................................................................15

## STATUTES, RULES AND REGULATIONS      PAGE(S)

New York General Obligations Law §5-701(a)(1)..............................................21

15 U.S.C. §1127................................................................................................19

Plaintiff Can't Stop Productions, Inc., through its undersigned counsel, submits the following proposed findings of fact and conclusions of law.

## I.    <u>Findings of Fact</u>

1. Henri Belolo and Jacques Morali, under the auspices of Plaintiff Can't Stop Productions, Inc. ("Can't Stop"), co-created and evolved the concept of Village People and wrote the songs for which the group is known. (Belolo, p. 35)

2. By 1979 Village People as a performing group had acquired a worldwide reputation as a fun disco group with six distinct characters. Rolling Stone magazine in its April 19, 1979 issue featured a picture of the Village People performing group on the cover and on an inside page over a full page cartoon drawing of the characters described Village People as "(T)he cartoon that conquered the world." (Exhibit 42).

3. The identity of Village People was cemented by a worldwide tour in 1979 produced by Can't Stop with 50 or more dates. (Belolo, p. 619). The vision of Village People that evolved in 1978 and 1979 was the vision of Mr. Morali and Mr. Henri Belolo. (Briley, p. 512)

4. In January of 1987 David Fishof Productions, Inc. ("Fishof") sought a license to put Village People back together again and Can't Stop agreed to allow it to use the service mark and trademark "Village People" in return for payment of royalties. (Exhibit 37).

5. By May of 1989 Can't Stop sought to end the contract with Fishof because Fishof had not met its minimum royalty obligations. (Exhibit 37, p.3).

6. By letter dated January 9, 1990, Felipe Rose requested that the contract between Fishof and Can't Stop be transferred to Sixuvus, Ltd. (Exhibit 37, p.4). Mr. Belolo

1

responded that Mr. Rose should contact Can't Stop's attorney, Steve Kopitko,  to

have the agreement done (Exhibit 37, p.5) and asked Mr. Kopitko to prepare a license

for touring at a royalty of 5% (Exhibit 37, p. 6).

7.  By facsimiles dated April 18, 1990 and May 10, 1990, Mitch Weiss, who had been

hired as the Sixuvus manager (Rose, p. 567), requested changes to the license

agreement that had been sent by Mr. Kopitko. (Exhibit 39).  Mr. Weiss acknowledged

in his facsimile dated May 10, 1990 that the "agreement is restricted to one year" and

expressed that within the year "we will all know if they [Sixuvus] can make a success

of themselves and then hopefully Henri will proudly choose to extend the option."

(Exhibit 39, pp. 3-4)

8.  Sixuvus presented no direct evidence of conversations between Sixuvus

representatives and Can't Stop to support the claim that the license from Can't Stop

was to last as long as Sixuvus wanted to perform.  This claim was directly

contradicted by page 2 of an e-mail dated September 7, 2007 from Henri Belolo to

Mitch Weiss (Exhibit IX4) in which Mr. Henri Belolo addresses the concerns of

Sixuvus, stating that "nothing in the past relationship between [the Sixuvus members]

should cause any worries in the future as long as the group wants to tour <u>and Can't

Stop agrees to it.</u>"   (Emphasis added)

9.  All parties agree that Sixuvus produced performances of Village People under an oral

license (the "License") to do so in return for payment by Sixuvus of a 5% royalty.

10. Can't Stop is the owner of the following incontestable trademarks (collectively

referred to herein as the "Village People Marks"):

2

| Mark | Registration Number | Use/Date of Issuance | |
|------|---------------------|---------------------|---|
| Village People | 1,101,013 | Entertainment services | 8/29/78 |
| Village People | 2,184,290 | Records | 8/28/98 |
| Village People | 2,330,857 | Design mark characters in costume in live entertainment 3/21/00 | |

(Plaintiff's Exhibit 29)

11. During the term of the License, Can't Stop required that any performer used by Sixuvus sign an agreement confirming Can't Stop's ownership of the Village People trademarks and agree never to challenge such ownership. (Belolo p.136-39, 235, Exhibits 21, 22, 23, 24, 25, 26 and 28)

12. Each of the agreements provides that its signatory acknowledged "that the professional or fictitious name "THE VILLAGE PEOPLE" is owned by [Can't Stop] and that you shall not have any property or proprietary interest or rights of any nature or kind whatsoever in and to said name, and that for all purposes, the ownership of all rights in and to said name shall be and remain the sole and separate property of [Can't Stop]."

13. By letter agreement dated July 1, 2013 involving payments to be made to Sixuvus for merchandising activities by Can't Stop, Sixuvus agreed that it "was licensed by Can't Stop to use the Village People name, marks and characters in live performances in the United States and throughout the world and does not have, nor has it ever had, any rights in or to the Village People Marks." (Belolo  p. 140-41, Exhibit 27)

14. Can't Stop supervised and controlled the use by Sixuvus of the Village People Marks and required Sixuvus to use the trademarked characters "and to incarnate – to become the Village People for the purpose of live performances." (Belolo p.  39-40)

3

15. The Village People live performances trace back to the late 1970s which were the heyday of the group, with the group having "evolved in 1978 and 1979" as the vision of Jacques Morali and Henri Belolo. (Briley Test p. 512)

16. Over the years, the performances of the Sixuvus Village People has been "fairly consistent" with the original performances designed by Messrs. Morali and Belolo. Briley p. 91) and "the characters never changed." (Briley p. 91)

17. Sixuvus "knew exactly what it was that made Village People successful, and what the fans and the public wanted, so they never strayed very far away." (Belolo p. 42, 241-42)

18. Sixuvus' Village People had since its inception in 1978 evidenced a consistency in its performances that was faithful to the Village People Marks and the manner in which Can't Stop wished the Marks to be presented. (Belolo p. 243, 245)

19. In the years that Defendants have performed as Village People, they have performed as the same six characters trademarked by Can't Stop: soldier, police officer, Native American, construction worker, biker and cowboy, and would never have considered changing the characters. (Simpson p. 345)

20. The Indian character portrayed by Defendant Felipe Rose has remained the same other than elements of "evolution" such as accommodations for "weight fluctuations" and his performance on stage has been consistent. (Rose p. 569)

21. The YMCA aspect of the Sixuvus Village People show, a major feature, has had only minor changes throughout the years, with the changes being age related (Anzalone p. 474)

22. The Sixuvus Village People "was largely an end to the artistic direction" of Henri Belolo and Jacques Morali, based upon the music of the Village People and which didn't need to be changed." (Rose p. 571)

23. Sixuvus received a glowing review of its performances in the trade magazine Record Mart & Buyer in January of 2000. (Exhibit 43).

24. Henri Belolo, Jonathan Belolo, employees of Can't Stop and Can't Stop's music licensees reviewed the performances of Sixuvus as Village People to ensure quality. As part of Can't Stop's supervision over Sixuvus and Sixuvus' handling of the license, Can't Stop employed the services of Steve Kopitko to act as agent for Can't Stop and police the mark, including dealing with occasions when Sixuvus attempted to exceed the scope of its licensed usages.   (Belolo p. 40-41, 135-36, Plaintiff's Exhibits 5 and 19).

25. Defendants offered no direct evidence of the many interactions between Can't Stop and Sixuvus. Although the record is replete with examples of correspondence with Sisuvus' managers (Mitch Weiss and Deborah Crawford), Sixuvus for unexplained reasons chose not to call either manager as a witness even though they were on Defendants' witness list.  Instead, they chose to offer the testimony of the performers, none of whom had any personal knowledge of the interactions between Can't Stop and Sixuvus' managers.

26. Typical is the testimony of Raymond Simpson. When asked if he was privy to the conversations between Mitch Weiss and Can't Stop, he answered "No…."  "Q. So if Mitch Weiss was seeking permission for Sixuvus to do things, would you know about that?  A. Not per se. Q. So yesterday, when you testified that Can't Stop wasn't

involved in various matters, you wouldn't know, would you, if in fact, it was Mitch Weiss, on behalf of Sixuvus, that was involved? A. I have no privy to what conversations that Mitch Weiss had. I only knew when he relayed something to me. I mean, I was speaking in terms of myself." (Ray Simpson, p.336, line 21 to 337, line11).

27. However, Mr. Simpson did admit awareness of the letters from Steve Kopitko requesting actions by Sixuvus: "Q. Were you aware of the letters that Mr. Kopitko sent to Sixuvus making requests that Sixuvus do this or do that? A. (after interjection by the Court) Yes." (Raymond Simpson, p. 346, lines 6-13).

28. In response to a question from the Court Raymond Simpson acknowledged cooperation with Mr. Kopitko's demands: "THE COURT: Well, are you aware of an instance where Kopitko said do this or don't do this and the group said, screw it, we're doing it anyway?    THE WITNESS: Well, I'm not sure if I can just blatantly say that we disobeyed or didn't. There was usually communication back and forth. He would say things, then we would answer him back, and then it would get worked out one way or the other. But it wasn't just –we would never say screw what you're saying, that type of thing. Q. So, ultimately, you complied with whatever they requested; isn't that true. A. We always tried to get along with Can't Stop and there not be any waves or any friction or anything like that." (Raymond Simpson, p. 346, line 19 to p. 347, line 6).

29. Exhibit 5 is an example of the exact process described by Raymond Simpson. Steve Kopitko sent a letter dated April 3, 2003 to Sixuvus and the performing members listing five specific matters with which Sixuvus needed to comply. On May 1, 2003,

6

on Sixuvus letterhead, "the Guys" wrote Henri Belolo expressing concerns about the letter. Mr. Belolo replied with two facsimiles. The first one, dated May 22, 2003 acknowledged their concern and reminded Sixuvus that "I have a responsibility, on behalf of Can't Stop Productions, the rights owner of Village People, to maintain the integrity of the property. Recent activities have impacted on this. This relates to changes in personnel, merchandising activities, website and, of course, the recent situation with David Hodo." The next paragraph of the letter advised Sixuvus that he "didn't think it inappropriate to be advised in advance of your itinerary and activities…Business and/or personnel decisions must be approved by me."

30. The fourth page of Exhibit 5 then advised Sixuvus of the precise points that "Can't Stop needs from [Sixuvus] to keep things in proper prospective:" and then listed 4 points from the Kopitko letter (Eric Anzalone signing a contract acknowledging Can't Stop's trademark rights; requirements for new members; monthly reports in advance as to itinerary and changes; and that all other uses of the trademark must be submitted PRIOR and would be dealt with, if approved by separate contract). By letter dated July 18, 2003, Sixuvus stated that it would comply with the requests. (Exhibit 5, pp.6-7).

31. The only non-performer witness that Defendants offered was Mrs. Simpson who tried to make the incredible claim that while working at Sixuvus as Mitch Weiss' assistant from 2009 to 2012 she had read every communication by Mitch Weiss to Can't Stop and that Mitch Weiss had never sent performance schedules to Can't Stop. (Leslie Simpson, pp. 582-586). At page 587, line 15-16 she made the same claim about Mitch Weiss' successor, Deborah Crawford: "I'm very aware that she does not send

7

anything to Can't Stop." This testimony is directly refuted by Exhibits 34, 35 and 36
(communications on schedules from Mitch Weiss in 2010, 2011 and 2012) and
Exhibit 19 (e-mail exchange between Deborah Crawford and Henri Belolo dealing
with tours and track listings). Her testimony lacks sufficient credibility to be given
any weight.

32. Sixuvus also informed third parties of the trademark status. "Sixuvus, Ltd. represents
the performers but does not control the music rights or trademark." (Exhibit 48 –e-
mail dated September 19, 2008 from Sixuvus with copy to Steve Kopitko)

33. The prominent role of social media was discussed by all parties at trial, including the
request for, and acquisition of, the right by Can't Stop to control the Sixuvus Domain
Name (Exhibit 2; Agreement dated October 1, 2007). Paragraph 5(a) of the
Agreement requires Sixuvus to "refrain from any and all marketing, sale, and
distribution (at the Domain Name or elsewhere) of products bearing (i) the mark
VILLAGE PEOPLE or a mark similar thereto; (ii) the images of the characters of
Village People," and/or (iii) any other any other trademarks, images, or copyrighted
material of CSP." Paragraph 6 of the Agreement specifies that Can't Stop "shall
have the right to control the nature and quality of the content and services emanating
from the website, and shall have the right to review and remove any and all content
thereon." Paragraph 9 grants Can't Stop the "right to revoke Sixuvus' license to use
the Domain name at any time at CSP's sole discretion." In addition, Can't Stop
reserved "the right to deactivate the website at the Domain Name…."

34. Another example of control and supervision by Can't Stop was its demand that
changes be made by Sixuvus to a press kit (Belolo p. 107, Exhibit 3).

35. In July of 2008, Henri Belolo reminded Mitch Weiss that he should have the French promoters contact him in order to discuss the artistic details. Mr. Belolo expressed the need to know the set list and the order and length of other artists that were performing. He did so for the express purpose of insuring that the "Guys be treated as they deserve …" (Exhibit 54)

36. By e-mail dated May 28, 2009, Mitch Weiss provided Henri Belolo with an update. Mr. Belolo responded with thanks and reported that he was with the Village People at the Zenith and "they were superb."

37. In addition to controlling Sixuvus' use of the mark, Can't Stop insured the continuing validity of the mark by policing trademark infringers such as Royal Caribbean Cruise lines (Belolo p.630, Exhibit 51)

38. Can't Stop throughout the years that it licensed Sixuvus the right to use the Village People Marks, policed the internet for improper usages through a company called Web Sherriff. (Exhibit 6).

39. Can't Stop further supported the validity of the mark by engaging in extensive licensing activities. Jonathan Belolo testified that there were "hundreds if not thousands of deals and licenses." These included Pepsi Cola, Hallmark cards, and WMS Gaming for slot machines as well as toys such as the Village People bus (Exhibit 60). (Belolo, p. 60). Belolo demonstrated with the videos marked Exhibit 30 that there were both regular commercials (Minute Maid and Pistachios) and humorous uses (*Despicable Me 2* and *Friends*) of the mark that were authorized by Can't Stop. Where Sixuvus appeared as Village People they were required to secure the approval of Can't Stop as in the Miracle Whip commercial (Exhibit 8). Can't

Stop also required Sixuvus to seek approval for their appearance in the *Bruno* movie
(Exhibit 13) and for the length of excerpts of performances used in interviews so as to
prevent unauthorized streaming (Exhibit 14 –another communication with Deborah
Crawford).

40. Can't Stop's agreements with licensees, as with its license to Sixuvus, required the
licensee to maintain quality of product and to protect the Marks (Belolo p. 119-20,
Exhibits 10 and 11).

41. In addition to controlling and policing the marks, Can't Stop provided economic
support to Sixuvus by paying in excess of $100,000 of their legal fees incurred in
their suit against Victor Willis (Exhibit 59) and contributing to the costs of a press
representative. (Exhibit 53).

42. Can't Stop's monitoring of the Village People brand included oversight of Sixuvus'
"live" performances, although Can't Stop generally thought that Sixuvus was doing a
"great job." (Belolo p. 640)

43. Can't Stop periodically warned Sixuvus about Sixuvus' improper use of the Marks
and the requirement that Sixuvus obtain Can't Stop's approval for any usages.
(Belolo p. 128-30, Exhibit 16)

44. Any changes by Sixuvus to the membership of its band and souvenir tour book had to
be approved by Can't Stop. (Belolo p. 130-33, Exhibits 17 and 18)

45. Can't Stop monitored how Sixuvus performed and maintained the Village People
Marks, with Defendant Rose admitting that Henri Belolo, a principal of Can't Stop,
had seen the group perform "live," and had expressed his approval. (Rose p. 569,
572)

10

46. "As soon as you have the music and a couple of hats ...you're in the Village People universe" [Belolo p. 245-47 (speaking of performance by cartoon characters in the film, *Despicable Me 2*)]

47. The "general public" do not know the individual members of Sixuvus who have performed as Village People except when the members are in costume. [Simpson p.296 ("But it's very interesting being in the Village People. When you put on the suit, it kind of dictates who you are, but if you take it off, you're kind of just a regular guy.")]

48. Alex Briley, a member of the group since 1977, admitted that he had never been stopped on the street by a fan. (Briley p. 506)

49. Licensing a live band to perform as Village People is "[p]art of a strategy of us [Can't Stop] using and exploiting the brand." (Belolo p. 63)

51. Having two bands perform using the Village People Marks does harm to the brand (Belolo p. 79)

52. By letter dated May 30, 2017 Jonathan Belolo notified Sixuvus that Can't Stop had terminated Sixuvus' license to use the Village People Marks in "live" performances as of June 1, 2018. (Belolo p. 71, Defendants' Exhibit A)

53. Can't Stop coupled its May 30, 2017 termination notice with an offer for Sixuvus to continue to use the Trademarks to perform as Village People and satisfy Sixuvus contractual commitments to third parties for six additional months through December 1, 2017 (Belolo p. 72-73)

54. Can't Stop contemplated using this six month period to negotiate a resolution of any claims that Sixuvus might have stemming from the termination. (Belolo p. 65-6)

11

55  Defendants did in fact perform as Village People through November 30, 2017 (Simpson, p. 318)

56  When negotiations did not occur and Sixuvus continued to exploit the Trademarks, Can't Stop commenced this Action in late August, 2017, to obtain, among other things, a declaratory judgment that Sixuvus would have to cease exploiting the Marks. (Complaint)

57  Sixuvus in its answer and counterclaims for the first time contested Can't Stop's rights in the Village People Marks, and on November 30, 2017, when it had exhausted the additional six month period, Sixuvus sought injunctive relief which would permit it to continue to use the Trademarks. (Answer)

58  In spring 2017 Can't Stop granted a written ten-year exclusive license to Harlem West to utilize the Village People Marks for "live" performances effective June 1, 2017. (Belolo  p. 29-31, Defendants' Exhibit B)

59  The license agreement with Harlem West  provides that Can't Stop retains approval rights over Harlem West's use of the trademarks (Belolo p. 76, Defendants' Exhibit B)

## II.    **Conclusions of Law**

A.  Licensee Estoppel Precludes Defendants From Attacking Can't Stop's Ownership of Village People Marks

1.  "Licensee estoppel" is a doctrine which, as a "general rule," "provides that when a licensee enters into an agreement to use the intellectual property of a licensor, the licensee effectively recognizes the validity of that property and is estopped from contesting its validity in future disputes."    *Idaho Potato Commission v. M & M Produce Farm & Sales,* 335 F.3d 130, 135 (2d Cir. 2003)

12

2. The doctrine was narrowed by the United States Supreme Court in *Lear, Inc. v. Adkins,* 395 U.S. 653 (1969) "which held that the contract doctrine of licensee estoppel was trumped by the federal policy embodied in the patent laws." Id. At 134.

3. The Supreme Court recognized that there is a strong public policy in allowing the public access to technology and, in particular, to non-patent worthy technology, which justified permitting licensees to challenge patents.

4. The Supreme Court adopted a balancing test weighing the strong federal policy encouraging "the full and free use of ideas" against "the competing demands of contract law." *C.B.C. Dist. & Mktg., Inc. v. Major League Media, L.P.,* 505 F.3d 818, 825 (8th Cir. 2007)

5. The licensee estoppel doctrine and what has become known as the *Lear* balancing test have been applied to trademark licensing contracts. *Idaho Potato Commission,* supra at 136.

6. The Second Circuit observed in *Idaho Potato Commission,* that courts "have generally precluded licensees from challenging the validity of a mark they have obtained the rights to use." Supra at 136

7. In the case of trademarks, "[c]ourts have generally been skeptical as to the weight of this public interest." *HSW Enters. v. Woo Lae Oak, Inc., 2009 U.S. Dist. LEXIS 116576,* *8 (S.D.N.Y. December 15, 2009)

8. This skepticism is rooted in the distinction between the principles underlying the laws of patents and trademarks. Specifically, when dealing with trademarks the public interest is less than in the case of patents. Since "the description of articles in commerce is not so great that it should take precedence over the rule of the law of

contracts that a person should be held to his undertakings." *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 329 (6th Cir. 1973)

9. The burden of attacking the validity of a license relating to a trademark rests on the party contesting that validity "'unless enforcement of the contract would result in *injury* to the public....'" *HSW Enters.*, supra at *9

10. This burden becomes virtually insurmountable where, as here, the party contesting the license never repudiated it. In *Studiengesellschaft Kohle M.B.H. v. Shell Oil Co.*, 112 F.3d 1566 (Fed. Cir. 1997) the Court of Appeals emphasized the distinction between a licensee that has repudiated its license and one that has not.

11. The Court of Appeals held that licensee estoppel could be avoided by a licensee if the licensee had repudiated the license by it having (i) stopped paying royalties under the license agreement and (ii) gave notice to the licensor that it is challenging the validity of the licensed patent." Id at 1568.

12. In both *HSW Enters* and *Beer Nuts*, the courts enforced the terms of the license, rejecting the licensee's claims attacking the licenses.

13. In the case at bar, Defendants operated under a license to use the Village People Marks for the better part of three decades.

14. Defendants never challenged Can't Stop's ownership of these marks nor the validity of the license until Can't Stop terminated the license.

15. The termination did not affect any element of public policy. Nor did it cause consumer confusion. On the contrary, Defendants' refusal to accept the license termination has led to two groups presenting live performances using the same marks, thereby creating consumer confusion.

14

16. As a result, the doctrine of licensee estoppel precludes Defendants from challenging Can't Stop's ownership of the Marks.

**B.  There is no "Naked License"**

17. A "Naked License" exists where the trademark owner abandons the mark by failing to control the quality of the mark in all its uses. *Freecycle Sunnyvale v. The Freestyle Network*, 626 F.3d 509, 515-16 (9th Cir. 2010).

18. With respect to the extent of control necessary, "[i]t is difficult, if not impossible to define in the abstract exactly how much control and inspection is needed to satisfy the requirement of quality control over trademark licensees ... [and] the standard of quality control and the degree of necessary inspection and policing by the licensor will vary with the wide range of licensing situations in use in the modern marketplace." *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 595-96 (9th Cir.2002) (internal citations and quotations omitted).Quoted in *Fuel Clothing Co. v. Nike, Inc.*, 7 F. Supp.3d 594, 606 (D.S.C. 2014).

19. The "quality control" required to avoid the finding of a naked license is not that the licensor ensure that the licensed product or service is of the highest quality, but rather that "[t]he sort of supervision required for a trademark license is the sort that produces consistent quality." *Eva's Bridal, Ltd. v. Halanick Enters.*, 639 F.3d 788, 790-91 (7th Cir. 2011). See also *Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1121 (5th Cir. 1991)* ("An owner may license its trademark or trade dress and retain proprietary rights if the owner maintains adequate control over the quality of goods and services that the licensee sells with the mark or dress.")

15

20. "The trademark's function is to tell shoppers what to expect – and whom to blame if a given outlet falls short. The licensor's reputation is at stake in every outlet, so it invests to the extent required to keep the consumer satisfied by ensuring a **repeatable experience**." *Eva's Bridal* at 791. (emphasis added)

21. The requirement of control is a flexible one, and "should be construed in light of the reason for the requirement, which is the need to prevent deception of the public." *Embedded Moments, Inc. v. International Silver Co.,* 648 F.Supp 187, 194 (E.D.N.Y. 1986)

22. In *Syntex Laboratories, INc. v. Norwich Pharmacal Co.,* 315 F.Supp 45,56 (S.D.N.Y.1970) , a case cited favorably in *Embedded Moments*, the district court held that "reliance upon the integrity of a licensee is sufficient to fulfill the control requirement where a history of trouble-free manufacture provides a basis for such reliance."

23. Here it is undisputed that the Sixuvus Village People performances did not change in any significant degree over nearly thirty years. The group's choreography, costumes and manner of selecting and training new members remained consistent, a fact that Sixuvus' original members bragged about in their testimony.  In such a case, only minimal quality control would be required of Can't Stop, although, as the evidence indicated, it exerted far more control than a minimal amount.

24. In *Engineered Mech. Servs. v. Applied Mech. Tools, Inc.,* 584 F.Supp 1149 (M.D. La 1984) the court rejected a defendant's argument that plaintiff had not adequately policed licensees of its trademarked mechanical process. The court, noting that there was little or nothing to police, held that "[r]etention of a trademark requires only

16

minimal quality control, for in this context we do not sit to assess the quality of products sold on the open market." The court concluded that the license was not naked but rather "it is fully clothed with adequate quality controls and the ultimate authority to terminate if quality is not adequate." *See also Exxon Corp. v. Oxxford Clothes, Inc.,* 109 F.3d 1070 (5th Cir. 1997) ("absent an ultimate showing of loss of trade significance, subsection 1127(b)(2) (and the incorporated doctrine of naked licensing) is not available as a defense against an infringement suit brought by that trademark owner.")

25. Because an assertion of insufficient control can lead to a forfeiture of rights, the party arguing for it must meet a 'high burden of proof." *Amscan Inc. v. Shutter Shades, Inc.,* 2015 U.S. Dist. LEXIS 180647, *13 (S.D.N.Y. April 30, 2015).

26. The burden of proof is "stringent." *Exxon Corp. v. Oxford Clothiers, Inc.,* 109 F.3d 1070, 1075-76 (5th Cir. 1997)

27. This burden of proof is not met if only one element of a trademark is deemed abandoned as long the trademark owner has not abandoned other elements of the mark.

28. Thus, "[r]ights in a mark signifying a singing group are not abandoned by the owner upon the group's disbandment, so long as the owner continues to receive royalties from the sale of the group's previously recorded group." *Marshak v. Schaffner,* 2012 U.S. Dist. LEXIS 66536, *13 (S.D.N.Y. May 11, 2012).

29. In the case at bar, Can't Stop avoiding a charge of naked licensing requires only a minimal degree of control over Defendants' usage, and far less control than Can't Stop actually administered.

17

30. Defendants have spent years singing songs written decades ago in part by Henri Belolo, and performing these compositions as characters created for them by Can't Stop.

31. Defendants at the hearing admitted that the preservation of links to the Village People performances of the 1970s remains the major attribute of their presentation. In many ways, Defendants have for three decades presented the same image, sang the same songs, and presented themselves on stage as if the Village People show had been preserved in amber.

32. Innovation is not an element of the Sixuvus Village People, making Can't Stop's role in supervising and controlling Sixuvus' use of the Marks, less difficult.

33. Even then, however, evidence introduced at the hearing indicates a more than sufficient control by Can't Stop over Sixuvus' usages of the Marks to rule out any possibility of Can't Stop's license being considered to be a naked one.

### C.  <u>Can't Stop Cannot Have Partially Abandoned its Rights in the Marks</u>

34. Defendants should therefore not be permitted to contest Can't Stop's ownership of the Village People Marks nor be allowed to pursue an argument that Can't Stop abandoned its rights in the mark.

35. Nor should Sixuvus be permitted to peel off one aspect of the rights belonging to the Marks and claim that by virtue of their years of performing under license, they have acquired rights in the Marks for "live" performances.

36. A trademark is "any word, name, symbol, or device, or any combination thereof … to identify and distinguish his or her goods, including a unique product, from   those

manufactured or sold by others and *to indicate the source* of the goods, even if the source is unknown." 15 U.S.C. §1127 (emphasis added).

37. Presumably, Defendants will argue that while Can't Stop may have evidenced sufficient control over the Marks in areas other than in "live" performances, in that one area there was a vacuum of control into which Defendants inserted themselves such that they have allegedly preserved and developed the Marks, giving the Marks a secondary meaning and limited ownership of the Marks to them.

38. As has already been detailed, no such vacuum of control existed.

39. Nevertheless, for purposes of argument, even assuming that Can't Stop was negligent in controlling the Marks for "live" performances, the effect of such a finding on other aspects of the Village People Marks must be considered.

40. In particular, no evidence has been presented that would affect Plaintiff's uses of the Marks in other areas such as merchandise, theater and social media. On the contrary, undisputed evidence was presented of Can't Stop's efforts to commercially exploit the Marks in these media and platforms.

41. If Defendants were permitted to inherit ownership of the Marks for "live" performances, with Plaintiff retaining ownership of the marks in other areas, there would be consumer confusion, the very result that the trademark law is designed to prevent.

42. Likelihood of confusion exists "when customers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." Clicks Billiards, Inc. v. Sixshooters Inc., 251 F.3d 1252, 1265 (2d Cir. 2001) (citation omitted) as quoted in

19

*New Colt Holding Corp. v. RJG Holdings of Fla. Inc.,* 312 F.Supp 2d 195, 220 (D. Conn 2004).

43. A balancing of factors, many of which are set forth in the seminal decision of *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir. 1961), are used to determine whether there is such likelihood:   1) actual confusion, 2) sophistication of the buyers, 3) strength of the mark, 4) degree of similarity between the two marks, 5) proximity of the products, 6) the likelihood that the prior owner will bridge the gap between its product and the alleged infringer's, 7) Defendants' good faith in adopting its own mark, and 8) the quality of Defendants' product. Id. at 495.

44. *Ritz Assocs. v. Ritz-Carlton Hotel Co.,* 35 Misc.2d 425, 230 N.Y.S.2d 408 (Sup. Ct. N.Y. Co. 1962), is the extreme case that, while finding the existence of a naked license, and holding that licensee could continue to use the mark without any obligation to the licensor, actually supports Can't Stop's position.

45. In *Ritz Associates* the Court found that the licensor, a hotel, had not only for nearly thirty years had "no connection whatsoever" with the licensee's building which used the mark in its name, but that (a) the licensor had itself ceased using the mark and (b) there was "widespread use" of the mark "by numerous establishments in the city and elsewhere" without any connection whatsoever to the licensor. 230 N.Y.S. 2d at 411.

46. Such total abandonment of the mark is not the case before this Court.

47. Splitting ownership of the Village People Marks between Can't Stop and Defendants is therefore not supported by case law and would result in the very consumer confusion that the trademark law is designed to prevent.

**D.  Defendants' Sole Remedy Would Be Award of Money Damages for Insufficient Notice of Termination Where Reasonable Notice Cannot Exceed One Year**

20

48. "The general rule under New York contract law [is] that a contract [which] does not contain a termination provision is terminable only upon reasonable notice." *Laugh Factory, Inc. v. Basciano*, 608 F.Supp.2d 549, 556 (S.D.N.Y. 2009). *Accord, Italian & French Wine Co. v. Negociants, U.S.A.* 842 F. Supp. 693 (W.D.N.Y. 1993) (finding it "well-settled New York law which provides that a contract with no stated duration is terminable only after a reasonable duration and after reasonable notice is given.")

49. One year, at a maximum, has been held to be reasonable notice of termination. *See, e.g., Colony Liquor Distributor v. Jack Daniels Distillery*, 22 A.D.2d 247, 249, 254 N.Y.S.2d 547,549-50 (3d Dept. 1964).

50. In New York, an oral agreement can have a maximum duration of one year. New York General Obligations Law §5-701(a) (1).

51. In the case at bar, while Plaintiff terminated its license to Defendants on one days' notice, in practical terms, Defendants have utilized the Marks since June 1, a period of nearly nine months.

52. Defendants also waited until the expiration of the six month negotiation period before seeking injunctive relief..

**E.  Conclusion**

53. Defendants are precluded from prosecuting this action by the doctrine of licensee estoppel.

54. Even without such preclusion, Plaintiff has not abandoned its trademark rights in the Village People Marks since the agreement it had with Defendants was adequately policed and does not constitute a naked license.

55. As a result of points 53 and 54 Defendants have not established a likelihood of success on the merits on any claim that would entitle them to an injunction allowing them to perform as Village People.

56. If Defendants were permitted to proceed, monetary damages would be an adequate remedy if it is held that the termination notice was unreasonable.

Dated: White Plains, New York
       February 12, 2018

EISENBERG TANCHUM & LEVY
Attorneys for Can't Stop Productions, Inc.
By: _____
      Stewart L. Levy
707 Westchester Avenue
Suite 300
White Plains, New York 10604
Tel.# (212) 599-0777

LAW OFFICES OF ROBERT S. BESSER
17383 Sunset Blvd. Suite A-350
Pacific Palisades, CA 90272
Tel.# (310) 394-6611