ADELMAN MATZ P.C.
1173A Second Avenue, Suite 153
New York, NY 10065
Phone: (646) 650-2207
*Attorneys for Defendants/Counterclaim Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X---------------------------------------------------X
CAN'T STOP PRODUCTIONS, INC.,

                      Case No.: 7:17-cv-06513-CS

                Plaintiff,

-against-

SIXUVUS, LTD., ERIC ANZALONE,
ALEXANDER BRILEY, FELIPE ROSE,
JAMES F. NEWMAN, RAYMOND SIMPSON,
and WILLIAM WHITEFIELD,

                Defendants.
X---------------------------------------------------X


**DEFENDANTS' POST HEARING PROPOSED FINDINGS OF FACT**


**ADELMAN MATZ P.C.**
**1173A Second Avenue, Suite 153**
**New York, New York 10065**
**Phone: (646) 650-2207**
*Attorneys for Defendants*

# TABLE OF CONTENTS

I.   PROCEDURAL BACKGROUND ........................................................................1

II.  FACTUAL BACKGROUND ............................................................................1

III. NAKED LICENSING .....................................................................................3

   A. CAN'T STOP'S INVOLVEMENT WITH VILLAGE PEOPLE PRIOR TO 1987 ..........3

   B. SIXUVUS FORMATION AND ITS ORAL AGREEMENT WITH CAN'T STOP..........6

   C. CAN'T STOP AFTER 1987..............................................................................6

      1. CAN'T STOP'S FAILURE TO ACTUALLY EXERT ANY QUALITY CONTROL...6

      2. CAN'T STOP LACK OF POLICING HAS CAUSED THE PUBLIC TO ASSOCIATE
         VILLAGE PEOPLE WITH SIXUVUS ..............................................................10

      3. PLAINTIFF'S ACTIONS IN ENFORCING ITS RIGHTS ARE DISTINGUISHABLE
         FROM ITS NAKED LICENSING AS IT WAS LIMITED TO MUSIC LICENSING AND
         NOT LIVE PERFORMANCE..........................................................................12

      4. WHAT FEW ACTIONS THAT WERE TAKEN BY PLAINTIFF IN POLICING ITS
         MARKS ARE MENIAL. ................................................................................14

IV.  BREACH OF CONTRACT ...........................................................................15

V.   PROMISSORY ESTOPPEL ..........................................................................18

VI.  TORTIOUS INTERFERENCE WITH SIXUVUS' PROSPECTIVE
     CONTRACTUAL/ECONOMIC RELATIONS........................................................19

VII. TORTIOUS INTERFERENCE WITH AND BREACH OF SETTLEMENT
     AGREEMENT.............................................................................................21

VIII..................SIXUVUS WILL SUFFER IRREPARABLE HARM AND THE BALANCE OF HARDSHIPS TIPS IN SIXUVUS' FAVOR …………………………………………………………22

Defendants Sixuvus, Ltd. ("Sixuvus"), Eric Anzalone ("Anzalone"), Alexander Briley ("Briley"), Felipe Rose ("Rose"), James F. Newman ("Newman"), Raymond Simpson ("Simpson"), and William Whitefield ("Whitefield") (collectively "Defendants") through their undersigned counsel submit the following proposed findings of fact.[1]

## I.        Procedural Background

1.   Plaintiff commenced this action on August 25, 2017.  Dckt. No. 1.[2]  The Complaint asserts claims for trademark infringement the Lanham Act and for a declaratory judgment stating that Plaintiff is the owner of all rights, title and interest in the "Village People Trademarks," an order enjoining Defendants from exploiting the "Village People Trademarks".  Dckt. No. 1.

2.   On November 30, 2017, Defendants brought an order to show cause for a temporary restraining order and a preliminary injunction.  Dckt. 41-46.

3.   A temporary restraining order was ordered on December 1, 2017 (the "12/1/17 TRO"). Dckt. 37.

4.   On December 8, 2017, Intervenor brought an order to show cause seeking to intervene in this action and vacate or otherwise modify the 12/1/17 TRO.[3]

5.   On December 14, 2017, Judge Seibel modified the 12/1/17 TRO and entered a modified temporary restraining order.  In that order, Judge Seibel permitted Karen Willis to temporarily proceed as an intervenor.  Dckt. 52.

## II.       Factual Background

6.   In 1985, as the popularity of disco music waned, Can't Stop Productions, Inc. ("Can't Stop" or "Plaintiff") decided to cease operations, and informed the then members of Village People group that they were shutting down their New York offices and were done with Village People.  *See* Tr. 272:25; Tr. 495:9-23; and Tr. 553:17-24.

---

[1] TR shall refer to the transcripts from the Temporary Restraining Order hearings held in front of Judge Cathy Seibel January 29, 30, 31, February 1, and 6.
[2] Dckt. shall refer to the Docket in this Action - *Can't Stop Productions, Inc. v. Sixuvus, Ltd. et al*, Case No.: 7:17-cv-06513-CS
[3] Intervenor, nor her prior counsel, has yet to file electronically file her moving papers.

7. As a result, of Can't Stop deciding to cease operations, Village People were on a hiatus beginning in 1985. *See* Tr. 272:19-23; Tr. 495:11-19 and Tr. 553:19

8. From 1985, until 1987, there were no live performances under the Village People Marks and Can't Stop had no intent to resume use. Tr. 272:19-23

9. Village People reunited only when former Sixuvus member Randy Jones helped re-assemble the group. Tr. 272:5-19; Tr. 497:5-10; and Tr. 555:2-11

10. However, there was no indication or desire by Can't Stop to promote or provide any live entertainment services under Village People name. Tr. 273:20-274:8; Tr. 337:12-338:7; Tr. 495:9-14; and Tr. 553:17-55:41.

11. When Village People reunited in 1987, Victor Willis, who had not performed live as the lead singer of Village People since 1979, was not asked to return. Tr. 270:3-17; Tr. 272:18; Tr. 273:5-19; and Tr. 494:5-11.

12. Raymond Simpson, who had previously sung lead vocals for Village People for several years, was asked to join. Tr. 274:18-275:2 and Tr. 555:2-15

13. When Village People reunited, the then members formed Sixuvus Ltd., to be the entity that they conducted their business through. Tr. 274:18-275:2 and Tr. 556:10-16.

14. Around that time, and by at least 1989,[4] Sixuvus entered into an oral license agreement with Can't Stop where, in exchange for Sixuvus being allowed to use the Village People name in connection with live performances, Sixuvus would pay a 5% license fee, quarterly, payable on the gross amounts received by Sixuvus, net of agent's commissions. Tr. 132:4-16; Tr. 173:14-174:17; Tr. 668:18-23; and Tr. 673:16-23.

15. Sixuvus was told that they would be in charge because they were Village People, and they could perform under the license as long as Sixuvus still wanted to. Tr. 232:10-15, Tr. 249:8-250:13 and Tr. 501:12-14.

16. At the time of the oral agreement, Sixuvus did not have an expectation as to how long

---

[4] Whether a third party held the license for a year briefly does not impact that there is no dispute that Sixuvus was given an oral license. Tr. 566:3-12; 213:8-214:2.

they would perform, as their initial gigs were very small performances and they were not making much money.  Tr. 276:9-277:19 and Tr. 559:22-560:7

17. No member, employee or contractor of Can't Stop has ever engaged in live musical performances as Village People after 1985, nor did Can't Stop license the Village People name to any other person or entity for live performances until this year when Can't Stop purportedly gave an exclusive license to Harlem West Entertainment and/or Karen Willis.  Tr. 37:17-24; Tr. 275:3-7; Tr. 302:14-16; and 437:15-438:1.

18. From 1987 through the present, with the exception of several recent performances by Victor Willis and his group, Sixuvus has continually and exclusively utilized Village People in connection with live music performance services in the United States and around the world.  Tr. 57:14-59:7; Tr. 274:18-275:2; 302:14-16; 437:15-438:1; and 559:17-23.

19. On average, Sixuvus has been engaged to perform around fifty live performances per year.  Tr. 59:4-9; Tr. 64:24-65:2; Tr. 374:3-5 and Tr. 393:7-20.  This has included large events such as the Major League Baseball All-Star Game at Yankee Stadium in 2008, and in front of over 40,000 people as part of the pre-game entertainment for the New South Wales Rugby League Grand Final.  Tr. 285:20-286:10; and Tr. 286:15-22.

## III.    Naked Licensing

20. For the past thirty years, Can't Stop has engaged in blatant naked licensing practices that are nothing more than renting of their trademark in exchange for profit without controlling or monitoring the quality of services rendered under Village People.  Tr. 274:9-15; Tr. 305:1-6; Tr. 310:7-21; Tr. 373:21-24; and Tr. 436:7-10.

### A.    Can't Stop's Involvement with Village People Prior to 1987

21. Beginning in 1977, Village People consisted of Glenn M. Hughes ("Hughes"), David Hodo ("Hodo"), Briley, Randolph Jones ("Randy Jones" or "Jones"), Rose, and Victor Willis (collectively the "First Lineup").  The members of the First Lineup were employees of Can't Stop Productions.  They did not receive compensation that was tied to the gross revenues of their

success, but instead received weekly paychecks, or payment calculated from a net revenue.  Tr. 498:15-19; Tr. 553:14-16; Px. 24 Pp. 1-2; and Px. 25 Pp. 1-2.[5]

22. On January 1, 1979, Can't Stop entered into an agreement (the "January 1979 Agreement") with the members of the First Lineup.  In the January 1979 Agreement, Can't Stop contracted the First Lineup to provide their exclusive vocalist, performer, dancer, and actor services for Can't Stop.  Px. 21 P. 1

23. The First Lineup were paid a "net income fee" subject to significant reductions for Can't Stop's costs (Px. 21 Pp. 4-5) and Can't Stop retained a twenty-five (25%) percent of the gross income "Tour Fee" Px. 21 P. 5.  They were also paid royalties for recordings, and income for merchandise.  Px. 21 Pp. 3-10.

24. The January 1979 Agreement does not contain a no contest clause or any express provision agreeing not to challenge Plaintiff's alleged Marks.[6]  Px. 21

25. The January 1979 Agreement terminated as of December 31, 1983.  Px. 21 P. 3

26. Victor Willis never signed the January 1979 agreement. Px. 21 P. 18.

27. On August 15, 1979 Simpson signed an agreement with Can't Stop, largely subjecting him to the January 1979 Agreement (the "1979 Simpson Agreement"). Px. 28 Pp. 1-5.

28. The 1979 Simpson Agreement does not contain a no contest clause or any provision expressly agreeing not to challenge Plaintiff's alleged Marks.  Px. 28

29. The 1979 Simpson Agreement terminated as of December 31, 1983.  Px. 28 p. 2

30. Both the January 1979 Agreement and the 1979 Simpson Agreement contained an amendment clause which forbade amendments or modifications unless they were made in writing and duly executed by Can't Stop and the other parties.  Px. 21 p. 17 and Px. 28 p. 4.

---

[5] Px. shall refer to Plaintiff's exhibits.
[6] The Marks are defined as the trademark registrations that Can't Stop is currently the owner of record with the United States Patent and Trademark Office registrations under Registration Number 1101013 for entertainment services rendered by a musical and vocal group (registered in 1978) for the word mark "Village People" in International Class 041; as well as the following image mark:  in International Class 041 for Entertainment services, namely, live performances by a musical and vocal group (registered in 2000).

4

31. Briley, Rose, and Simpson never signed an amendment to the January 1979 Agreement or the 1979 Simpson Agreement with Can't Stop.  Tr. 218:25-219:2; 509:25-510:2; and 557:2-4.

32. In 1979, Village People went on a large tour, which was a major undertaking that was put together and paid for by Can't Stop.  Can't Stop coordinated all aspects of the tour.  Moreover, Can't Stop's agreements dictated that the members of the First Lineup were exclusively performing for Can't Stop.  Tr. 499:8-500:3; 513:2-12; 553:12-14; Px. 21 pp. 4-5; Px. 28, p.1 (referencing Px. 21).

33. Prior to 1987, Can't Stop booked all live Village People performances, paid all costs and expenses, and controlled all aspects of Village People live performances.  Can't Stop would tell Village People what their touring schedule would be.  Prior to 1987 all expenses (direct or indirect) were paid by Can't Stop, which included, without limitation, Village People's travel, lodging, meals, costumes, salaries for road crew, road managers, and others, rehearsal fees, expenses, scenery, props, equipment, trucking, advertising and promotion, reasonable legal and accounting expenses, "…and all other expenses of any nature whatsoever incurred in the preparation and operation of the tour…." – Px. 21 pp. 4-5; Tr. 499:8-500:3; 513:2-12; and Tr. 553:1-11.

34. Prior to 1987, Jacques Morali, the late partner of Henri Belolo, was known to be a very strict person to work for and Village People followed whatever instructions were given by him.  Can't Stop, under Henri Belolo was not demanding.  Tr. 205:9-13; and Tr. 513:11-25.

35. In addition, prior to 1987, Can't Stop also purchased the costumes for Village People to use in live performances.  By way of example, after David Hodo suggested that Briley become the G.I. man, Can't Stop had a person who was responsible for putting together the costumes of Village People who was sent to Army and Naval stores to create an outfit at the time for Briley.  Tr. 493:7-9; and Tr. 498:15-22.  Can't Stop also paid for a choreographer for Village People live performances.  Tr. 498:23; and Tr. 512:18-24.

### B. Sixvus formation and its Oral Agreement with Can't Stop

36. Can't Stop never tried to reunite Village People for live performances.  Instead, in 1987, Randy Jones, the former Cowboy of Village People, brought together all of the original members except for Victor Willis, instead opting for Ray Simpson as the police officer and lead singer. Tr. 273:5-19; Tr. 479:5-10; Tr. 500:5-14 and; Tr. 555:2-25.

37. Around that time, Can't Stop granted Sixvus an oral license agreement.  Plaintiff told the group that Can't Stop was not interested in managing the group or overseeing its live performances as it had before the 1985 hiatus.  Tr. 273:20-274:15; and Tr. 500:11-14.

38. Can't Stop expressed no desire to have anyone else perform as Village People.  275:3-7

39. Sixvus was told that they would be in charge because they were Village People, and they could perform under the license as long as they still wanted to.  Tr. 275:21-276:5 and Tr. 433:14-16.

### C. Can't Stop After 1987

#### 1. Can't Stop's Failure to Actually Exert Any Quality Control

40. Since 1987, Can't Stop has never paid for Sixvus' travel, lodging, meals, costumes, salaries for road crew, road managers, and others, rehearsal fees, expenses, scenery, props, equipment, trucking, advertising and promotion, reasonable legal and accounting expenses, or any other expenses of any nature whatsoever incurred in the preparation and operation of any tour.  Tr. 303:11-304:25; Tr. 437:5-14; and Tr. 504:7-22.

41. Since 1987, Can't Stop has not exercised any type of quality control over Sixvus' use of Village People in connection with Sixvus' live performances.  There are Village People performers who have never even met anyone from Can't Stop prior to this action being filed.  Tr. 64:6-8; Tr. 376:6-8, 436:7-11; Tr. 533:25-534:2; and Tr. 656:13-17.

42. Since 1987, Can't Stop did not require Sixvus to obtain permissions over which live performances it booked or what territories it booked them in.  In addition, Sixvus was not told where it had to perform or was allowed to perform.  Tr. 63:23-64:5; Tr. 286:11-14; Tr. 303:20-

23; Tr. 304:9-17; 416:4-10; and 504:19-20.  This included that Can't Stop had no input or involvement with some of Sixuvus' largest live performances. Tr. 285:20-287:20; and Tr. 396:23-398:2.

43. Sixuvus was not given any instructions to perform in any territories to preserve Can't Stop's alleged trademark rights based on use requirements.  Tr. 304:9-17; and Tr. 416:4-10

44. Since 1987, Can't Stop did not have any production requirements that Sixuvus had to adhere to.  This includes that Can't Stop did not have any input into production riders or requirements to ensure that the production quality was at a certain level.  Instead, Can't Stop allowed Sixuvus to run its own shows.  Tr. 304:18-25; Tr. 416:11-13; and 533:20-24.

45. So long as the name Village People appeared and it was apparent that it was trademarked, Can't Stop never imposed any type of controls over the billing or use of Village People name. Tr. 274:9-15; Tr. 305:1-6; Tr. 310:7-21; Tr. 373:21-24; and Tr. 436:7-10.

46. Can't Stop did not mandate, or offer input on set lists.  Instead, Sixuvus decided which songs it would perform.  Moreover, Sixuvus decided this based on input from its members and sometimes promoters. Tr. 403:12-404:6; 407:17-21; Tr. 475:23-476:1; Tr. 478:5-7; and 585:24-586:2.

47. To this end Sixuvus regularly performed half of their set list to non-Village People songs, and decided to change those songs at Sixuvus' discretion, without any input or control by Can't Stop.  Tr. 49:23-50:6; Tr. 365:18-366:5; Tr. 403:6-494:6; and Tr. 436:17-21; 487:3-21.

48. Can't Stop never interviewed new performers of Sixuvus, nor did it attend auditions.  No one from Can't Stop was present at the auditions of Eric Anzalone, William Whitefield or James Newman, the three non-original members of Village People.  Tr. 371:18-372:10; Tr. 388:7-14; Tr. 524:8- Tr. 525:7.   Can't Stop's claim that they required new members to sign an agreement prior to performing is also not true.  For instance, Eric Anzalone, the fulltime leather man in Village People since November of 1995 (and a replacement performer since 1994) auditioned without a single member of Can't Stop present.  Furthermore, Can't Stop did not require the signing of any contract by Anzalone until October 8, 2003.  Tr. 389:22-390:2, Tr. 390:23-

391:18; Tr. 417:8-15; and Px. 23. Similarly, William Whitefield, performed with the group for years before he was asked to sign a contract. Tr. 524:16-528:18; and Px. 22.

49. Although, Defendants dispute that it was actually exercising any type of quality control, the first time that Can't Stop even contacted Sixuvus with requests for information appears to have been in April of 2003 (16 years after Sixuvus began to perform). In the letter, Can't Stop noted that "Effective Immediately" i.e. for the first time, it would need certain types of information "in order to continue to allow name and trade-dress to be utilized." Px. 4; and Tr. 170:3-20. However, there are no actual quality controls in the letter. Tr. 170:21-175:1. Nor is there any evidence that any type of guidelines or standards were provided to Sixuvus by Can't Stop or that thereafter Can't Stop actually implemented any type of supervision program for monitoring and controlling the quality of live performances. Tr. 177:6-180:25; Tr. 416:17-5; Tr. 425:4-21; and Tr. 426:7-21.

50. Plaintiff simply asked for new member information (where at least two of the members had been in place for years), agreements with the new members (which do not have quality control provisions), and that the touring itinerary be provided on a monthly basis, payment to be made on a monthly basis, for payment to be made on gross, and that no recordings activities utilizing the name and trade dress of Village People. Tr. 170:21-175:1; Tr. 220:2-20; Tr. 524:16-528:18; Px. 4 and Px. 22. On May 1, 2003, Sixuvus responded with a letter directly to Henri Belolo, rejecting the proposal. Px – 5 P.3.

51. After some back and forth, Sixuvus and Can't Stop came to an understanding, that Eric Anzalone would sign an agreement with Can't Stop, that Bob Reilly, the present manager of Sixuvus would provide certain information, and sent a photo and resume for William Whitefield, who had already been performing for some time. Tr. 170:3-175:1; Tr. 220:2-20; Tr. 524:16-528:18; Px. 5 P.7; Px. 22. However, as stated above, no actual monitoring, guidelines or supervision program was implemented. Tr. 177:6-180:25; Tr. 416:17-5; Tr. 425:4-21; and Tr. 426:7-21. Whitefield signed his agreement on December 26, 2013. Px. 22. Newman signed his agreement on July 22, 2013. Px. 26.

52. Anzalone's, Whitefield's, and Newman's agreements are nearly identical. Px. 22, Px. 23, Px. 26.

53. Whitefield and Newman are not shareholders of Sixuvus. Tr. 377:25-378:6; and Tr. 538:3-10.

54. Anzalone's, Whitefield's, and Newman's agreements do not contain any quality control provisions, including but not limited to physical appearance requirements, talent maintenance requirements, or character clauses. Px. 22, Px. 23, Px. 26. Anzalone's, Whitefield's, and Newman's agreements do not contain a no challenge clause or any express agreement not to challenge the validity of the Marks. Px. 22, Px. 23, Px. 26.

55. Anzalone, Whitefield, and Newman's agreements, are instead primarily focused on making sure that the performers look solely to Sixuvus for compensation and indemnity—and that Can't Stop is not responsible for any liability that arises from a live performance. Px. 22, Px. 23. ¶¶2(a), 3; Px. 26 ¶¶2(a), 3.

56. Can't Stop never required rehearsals, or even attended them when new performers were hired to ensure that live performances of Village People were of a consistent quality, even though there was ample opportunity as Sixuvus had new performers rehearse individually and as a group before performing live, and Can't Stop had representatives in New York. Tr. 373:21-24; 376:20-377:5; Tr. 388:2-6; 389:18-390:4; Tr. 525:8-527:14; Tr. 528:2-4; Tr. 530:11-531:6.

57. Can't Stop also never asked for tapes of rehearsals, or sent their representative to meet new members. Tr. 373:8-27; Tr. 376:18-377:5; Tr. 418:1-15; and Tr. 528:9-15.

58. Plaintiff had no involvement in the training of new members, nor did it provide Sixuvus with guidelines or standards on how to do so. Tr. 373:8-27; Tr. 418:1-15 and Tr. 528:9-15. Plaintiff had no role in overseeing choreography, nor did it hire or advise the choreographers to train Defendants to perform. Tr. 508:24-509:2, 365:14-366:13 and 375:14-376:5.

59. Can't Stop never required that the members of the group be in any type of physical shape. Tr. 365:6-8 and Tr. 410:13-20.

60. Sixuvus chose their own costumes, and Can't Stop had no role or input in costumes, nor

did it provide Sixuvus with guidelines or standards on how to do so. Tr. 327:14-331:4; Tr. 374:14-375:12; Tr. 390:7-14; Tr. 405:14-21; Tr. 414:4-415:12; and Tr. 531:24-532:2. Sixuvus has essentially been given free reign and an unfettered right to use Village People as it saw fit in connection with live music performance without supervision or control for the last thirty (30) years. Tr. 274:9-15; Tr. 305:1-6; Tr. 310:7-21; Tr. 313:19-314:3; Tr. 373:21-24; Tr. 436:7-10.

## 2. Can't Stop Lack of Policing has caused the public to associate Village People with Sixuvus

61. For the last thirty (30) years, and until this year, Sixuvus has been the exclusive provider of live performances as Village People.[7] Until this year, every Village People performance that has been witnessed by a member of the consuming public was performed by Sixuvus. Tr. 57:4-9; Tr. 302:14-303:2; 507:11-14; 559:17-21

62. Can't Stop has never made an effort to exercise even the most basic types of quality control over the use of the name in connection with live performances. Plaintiff did not even seem to know the decade when Anzalone, a member of Village People for over 20 years, began performing with Village People. Tr. 274:9-15; Tr. 220:2-20; 304:18-25; Tr. 305:1-6; Tr. 310:7-21; Tr. 373:21-24; and Tr. 436:7-10; and Tr. 656:13-17

63. Can't Stop is still not exercising any quality control over the name to protect consumers. Can't Stop did not ask Victor Willis to audition prior to granting a license to Intervenor, nor is Can't Stop aware of whether Victor Willis has a vocal coach, instead Can't Stop just took Karen Willis at her word that her husband would be ready to perform as the lead singer of Village People. Tr. 93:23-95:11. This is despite the fact that Plaintiff did not believe that Victor Willis was ready to be the lead singer of Village People. Tr. 93:5-14. Although, Intervenor's agreement contains a quality control provision (unlike Sixuvus') it does not appear that Plaintiff is exercising any control. Tr. 34:25-35:12; and Dx. B. It further appears that the Intervenor's

---

[7] Intervenor's letter motion asking the Court to consider the alleged newly discovered evidence of Defendant's application for THE KINGS OF DISCO should be denied, as this information has been publicly available since at least August of 2017. Nevertheless, the application is not evidence that Defendants have been performing under any other name as it is an intent to use application and it is wholly irrelevant to the issues in this preliminary injunction.

license was only granted to settle an attorneys fees claim in a royalty case.  Tr. 29:19-23; 668:15-670:5.  There is no excuse for Plaintiff's total failure to oversee the use and quality of services rendered under Village People name.

64. There is evidence that consumers are experiencing a differentiation in quality of the live performances, because of Plaintiff's failure to actually supervise and control.  DX J, K, OO, LL.

65. There was no true licensor licensee relationship between Sixuvus and Can't Stop, as the 'license' that was given to Sixuvus was really nothing more than a naked renting of the right to use Village People name in exchange for 5% of certain profits.  Tr. 210:1-23; Tr. 273:20-274:15; Tr. 274:9-15; Tr. 305:1-6; Tr. 310:7-21; Tr. 373:21-24; Tr. 436:7-10; and Tr. 560:8-13

66. Plaintiff's failure exert quality control over the mark's use, has operated to divest Village People from having any source indicating significance for live performances in Plaintiff's hands.

67. To the contrary of operating as a source indicator of Plaintiff—these naked licensing practices have caused Village People Marks to become synonymous with Sixuvus in the mind of consumers.  Tr. 488:9-490:17

68. They perform as Village People, they make appearances as Village People, and have for the last thirty years.  For thirty years, as Plaintiff testified, Sixuvus has been doing so with a high level of professionalism.  Tr. 57:4-9.

69. Despite having not recorded any of Village People's biggest hits, Raymond Simpson has not just been stopped on street by fans, but has been recognized by members of the general public as the original lead singer of Village People. Tr. 295:19-296:2; and Tr. 296:17-297:2.

70. Members of the public recognize even a newer member like James Eric Anzalone despite him not having the same distinguishing facial hair as the original biker. Tr. 404:7-9 and Tr. 410:10-17.

71. Can't Stop may be the listed owner of record of the Can't Stop Registrations for live music performances, but it is and has been members of Defendant who the consuming public associate with Village People for decades.  Tr. 283:25-284:23 and 465:2-10; Tr. 302:14-303:2.

72. After years of failure to control or supervise the use of Village People, to the point where

the mark has lost any connection to Plaintiff, Plaintiff should be estopped from now challenging Defendant's use of Village People in connection with live performances. As an example of this behavior, Plaintiff testified that Can't Stop controlled the costumes used by Sixuvus and that Sixuvus did a very good job at maintaining the costumes of Village People, but did not recall time where Sixuvus went on stage with half the lineup missing costumes due to unusual circumstances. Circumstances, which were, like travel and booking handled by Sixuvus without any help from Can't Stop - Tr. 38:15-23 Tr. 472:19-473:4 and Tr. 504:19-23.

73. Plaintiff's failure to supervise and control the quality of its licensee's services is ongoing. Plaintiff testified that he uses agents, but did not testify that any actually go to shows. Moreover, Plaintiff testified that the agents were not trained. Tr. 36:3-37:4 and Tr. 671:20-672:2.

74. Plaintiff's failure to supervise and control the quality of its licensee's services is hurting consumers. Dx. J; Dx. K; Dx. O; Dx. N; Dx. LL; and Dx. OO. The entire purpose of requiring trademark owners to exert quality control is to protect the consuming public and ensure that it is not unwittingly deceived. Dx. J; Dx. K; Dx. O; Dx. N; Dx. LL; and Dx. OO. Here because of Plaintiff's failure to exert any control that is exactly what is happening. Dx. J; Dx. K; Dx. O; Dx. N; Dx. LL; and Dx. OO

### 3. Plaintiff's actions in enforcing its rights are distinguishable from its naked licensing as it was limited to music licensing and not live performance.

75. The only times Can't Stop was involved, was when Sixuvus was doing something outside the scope of their license or when they needed additional music permissions or rights such as a synch licenses, which as the copyright holder, Can't Stop would be involved in from the copyright perspective. Tr. 287:10-20 and Tr. 560:8-13.

76. Virtually all of the correspondence that Can't Stop introduced to attempt to show instances of quality control, relates to instances where Sixuvus was involved in using the marks for activities outside of their license for live performances, such as synchronization licenses, merchandising rights, and appearances in television, films, and commercials, as well as the

recording of new music, or other non-control related items.  Px. 1, 3, 4, 6-15, 17-20, 27, 32, 48, 49, 53, 54, 57.

77. On a few rare and sporadic occasions, Can't Stop communicated with Sixuvus regarding live performances.  However, none of the communications evidence any type of systematic or organized quality control or supervision.  Can't Stop's first communications on the matter came after sixteen (16) years of Sixuvus performing as Village People.  Px. 5, 16.

78. Around May/June of 2010, 2011, and 2012, Sixuvus manager Mitch Weiss sent Henri Belolo a schedule of their upcoming shows.  There is no indication or evidence that Sixuvus sent the schedule prior to 2009 or after 2012. Px. 34-36.

79. Plaintiff did prevent Sixuvus from appearing on certain television shows and commercials.  However, those preventions involved copyright issues and not Sixuvus' license to perform live.   Tr. 43:18-44:25; Tr. 314:4-13; 400:2-9 and 560:8-13.

80. Sixuvus only sought permission from Can't Stop to take actions that were outside its license, but never for live performances.  In particular, Sixuvus would contact Can't Stop for music licensing.  Tr. 50:9-51:9; 314:4-13; 401:21-25.

81. For example, Sixuvus sought and received permission from Can't Stop to record a song entitled "Let's go back to the dance floor." Tr. 50:9-51:9.

82. Sixuvus also sought but was denied permission to perform on a German television show, but only because the television production company sought to own and distribute recorded performances of Village People.  Tr. 43:11-46:25 and Tr. 230:20

83. Furthermore, the only written agreements Can't Stop seems concerned with are to protect itself or get merch rights from Defendants.  For example, Felipe Rose, signed a merchandising agreement with Can't Stop.  That agreement had nothing to do with any performance.  Tr. 224:15-225:23; and Tr. 561:17-562:5

84. An example of Can't Stop policing its own rights is through the use of Web Sheriff, which works to remove online content that violates the Digital Millennium Copyright Act, but not trademark, and there is no evidence that this had anything to do with Sixuvus. Tr. 115:6-

116:9 and Tr. 175:9-18.

85. The only thing Can't Stop has been interested in for the last thirty (30) years is getting paid and making sure that the Can't Stop Registrations stayed in their name. To that point, even when presented with ideas for Village People merchandise by Sixuvus, Henri Belolo showed was just concerned that that the Trademark registration circle R was present next to Village People. Tr. 210:1-23; Tr. 273:20-274:15; and Tr. 560:8-13

86. Can't Stop testified that they advised which songs to perform and which not to perform. However, this was not specified as to whether this was for a live performance or whether it was a synching license, which is a copyright issue. As defendants testified, Sixuvus made the choice as to what songs were performed live. Tr. 41:5-42:15 Tr. 403:12-404:6; 407:17-21; Tr. 475:23-476:1; Tr. 478:5-7; and Tr. 585:24-586:2.

87. Can't Stop's actions being limited to commercial and synching purposes is highlighted by its involvement in a commercial for pistachio nuts, which was not a live performance. Plaintiff's own proffered evidence of agreements shows control over recording, but not touring. Tr. 141:16-142:8; 159:10-25; and Px. 1.

88. One of the few actual demands made by Can't Stop was over a commercial for the electronics brand Philips, which also had nothing to do with live performances. Furthermore, Can't Stop understood that Sixuvus had an oral agreement to perform as they wanted. Px. 4; Tr. 170:3-20; Tr. 213:8-214:2; Tr. 232:10-15, Tr. 249:8-250:13 and Tr. 501:12-14.

    **4.    What few actions that were taken by plaintiff in policing its marks are menial.**

89. At one point, Plaintiff's former counsel, sent a letter demanding that Sixuvus receive approval from Can't Stop for new members. As referenced above, this letter rings as a solitary hollow example, after years of doing nothing. Can't Stop never attended auditions. Current Cowboy has been performing with Sixuvus for several years, and was not approved by Can't Stop. Tr. 170:5-170:25 and Tr. 371:12-17.

90. As mentioned above, Plaintiff testified that he policed the Village People trademark by using Web Sherriff, a software that monitors web activity and issues take down notices. Jonathan Belolo did not testify to the usage of software that would monitor the activity that Sixuvus conducted with their live performances. Tr. 115:6-116:9 and Tr. 175:9-18.

91. Plaintiff testified that he monitored performances on the internet, but could not describe the typical search results he would find, the consistency of the search results, the number of videos he viewed, the number of videos found on a website such as YouTube, where or where the videos on YouTube came from, the quality of the videos, or how many videos were available as YouTube grew in popularity. Tr. 574:6-575:7. Occasionally looking at YouTube (which would not have been available until the mid -2000's at best) is not evidence of systematic control, especially where Plaintiff admitted that many videos were taken down by Plaintiff and Intervenor. Tr. 115:13-116:9; 649:22-650:17. Prior to the widespread use of the Internet, Can't Stop did not request videos from shows. Tr. 436:11.

92. Plaintiff also testified that he had agents who were monitoring Sixuvus performances on the Internet. Similarly, to his own purported monitoring of Sixuvus performances, he did not mention how the agents would monitor performances. Moreover, he testified that those agents were not trained. Tr. 671:20-672:2.

93. Henri Belolo may have occasionally seen shows that Sixuvus performed in Paris, but there was nothing consistently done, and Sixuvus is based in New York. Tr. 41:5-42:15 and Tr. 569:14-17.

94. Can't Stop testified that Sixuvus' touring was not as financially important as the rest of Can't Stop activities. Tr. 62:14-62:24.

95. Can't Stop's lack of monitoring and responsibility has even extended to not deeming itself responsible for its current licensee complying with the Court Order. Tr. 90:17-91:3; and Dx. 6.

IV. **Breach of Contract**

96. In 1987, Sixuvus was formed to manage the corporate affairs of the reunited Village

People. Tr. 274:18-275:2 and Tr. 556:10-16

97. Sixuvus, pursuant to a license agreement with Can't Stop where, in exchange for Sixuvus being allowed to use the Village People name and costumes in connection with live performances, Sixuvus would pay a 5% license fee, quarterly, payable on the gross amounts received by Sixuvus, net of agent's commissions. Tr. 132:4-16; Tr. 173:14-174:17; Tr. 668:18-23; and Tr. 673:16-23. It is not disputed that the license agreement between Can't Stop and Sixuvus included the right to use the name Village People and the characters to the extent that Can't Stop had the exclusive right to the characters.[8] Tr. 39:3-10 and Dx. ZZ.

98. Upon reuniting, Sixuvus was forced to play small venues and was not making much money. Tr. 276:9-22 and Tr. 514:15-18.

99. In a letter dated January 15, 1987, from David Fishof Productions Inc. ("Fishof") to Henri Belolo, Fishof made a proposal to license the worldwide rights to Village People. As part of that proposal, Can't Stop was to receive five (5) percent of the band's gross for Touring. Px. 37 P.1. Sixuvus does not possess and Can't Stop has not produced any agreement between Can't Stop and David Fishof. Px. 37; Tr. 653:19-655:11; 654:13-655:3; Tr. 656:1-658:3.

100. Rose was told after the fact that Fishof had negotiated a contract with Can't Stop for the license, but Sixuvus was disillusioned with the lack of enthusiasm Fishof showed, and they left Fishof. Tr. 565:17-566:12.

101. In a letter dated January 9, 1990 from Rose to Henri Belolo, Rose expresses the fact that they are no longer using Howard Silverman of formerly of Fishof as Sixuvus' manager. Rose further states they have been working under a "Gentleman's Agreement" and asks that Henri Belolo provide a written agreement or letter of intent under the same terms as the Fishof Agreement. Px. 37 p.4.

---

[8] Whether Can't Stop had those rights at the time is a matter of dispute as Can't Stop did not hold the costume registration then and Plaintiff has not presented any evidence as to when six men dressed in the costumes claimed would have obtained the acquired distinctiveness necessary to function as a trademark, and in fact, whether this is a valid trademark is disputed. Plaintiff did not even apply for registration of the mark until 1998, and it appears that Plaintiff may have mislead the United States Patent and Trademark Office as to the date of first use. Dx. ZZ (claiming first use of 1977, by their own admission, at least one of the characters, the G.I. man was not in use in 1977); Dx. V and Tr. 497:17-22.

102.     In a letter from Henri Belolo to his attorney Stephen Kopitko, Henri Belolo told Mr. Kopitko to work out an agreement with Rose, in which, Can't Stop grants a license to Sixuvus for the use of the name Village People for touring against a royalty of five (5%) percent on gross income. There is no mention of quality control. Px. 37 p.6 and Tr. 656:18-657:9.

103.     Henri Belolo also told his attorney Stephen Kopitko that the first period should be eighteen months and that an extension will be handled at a future date. Px. 37 p.6 and Tr. 656:18-657:9. However, following Henri Belolo's instructions to Stephen Kopitko, no agreement was ever signed between Can't Stop and Sixuvus. Tr. 657:13-657:17.

104.     The oral license continued for over 27 years uninterrupted without objection or comment from Can't Stop. Tr. 657:18-658:3. Nor did it renew it just went on and on. Tr. 653:19-657:21.

105.      In none of the proposals between Sixuvus and Can't Stop is quality control mentioned or discussed. Px. 37 Pp. 4, 6; Px. 39; and Tr. 656:18-657:9. When the oral agreement was made Plaintiff told Defendant that Plaintiff was not getting involved with the management of the group or the live performances, because Defendant should be in charge because they were Village People. Tr. 63:22-64:14; Tr. 273:20-274:15; and Tr. 500:11-14.

106.     Sixuvus was told that they would be in charge because they were Village People, and they could perform under the license as long as they still wanted to. Tr. 232:10-15; Tr. 249:8-250:13; Tr. 501:12-14.

107.     From 1987 through the present, with the exception of several recent performances by Victor Willis and his group, Sixuvus has continually and exclusively utilized Village People in connection with live music performance services in the United States and around the world. Tr. 57:4-9; Tr. 302:14-303:2; 507:11-14; 559:17-21.

108.     Sixuvus built Village People live performance brand to what it is today. Tr. 283:25-284:23; Tr. 464:16-465:13; Tr. 504:23-506:11; 505:24-506:11; and Tr. 560:14-10.

109.     On average, Sixuvus is engaged to perform around fifty live performances per year. Tr. 59:4-9; Tr. 64:24-65:2; Tr. 374:3-5 and Tr. 393:7-20. This has included large events

such as the Major League Baseball All-Star Game at Yankee Stadium in 2008, and in front of over 40,000 people as part of the pre-game entertainment for the New South Wales Rugby League Grand Final.  Tr. 285:20-286:10 and Tr. 286:15-22.

110.　　　After working tirelessly to build their own career, Plaintiff cannot simply tell Defendant on one day's notice that they are not allowed to enter into any further agreements for use of the name.  Tr. 297:3-11; Tr. 439:24-440:4; and 505:17-506:11; Dx. A.

111.　　　Plaintiff's attempt to terminate the oral agreement is a breach of the agreement as one (1) day's notice was unreasonable in light of long history, and allowing Sixuvus to perform until November 30, 2017 or December 1, 2017, is not "notice" as Sixuvus were asked not to book new shows during that time.  Tr. 439:24-440:4

V.　　**Promissory Estoppel**

112.　　　Plaintiff's statements and conduct led Sixuvus to believe that they could have the license as long as they intended to perform as Village People.  Tr. 227:16-229:15; Tr. 232:10-15; Tr. 249:8-250:13; and Tr. 501:12-14.

113.　　　Defendants' actions also support this position.  For one example, Felipe Rose and Raymond Simpson each signed a merchandising agreement allowing Can't Stop to use their images, relying on the belief that Can't Stop would not be able to cancel Sixuvus' license to perform as Village People.  Tr. 306:23-307:3; Tr. 562:2-5; Dx. KK; Px. 32; and Px. 28.

114.　　　Similarly, Plaintiff made representations when the group expressed concern over the term of the Domain Agreement that Sixuvus should stop being paranoid, and that there was no plan from Can't Stop to pull the rug out from under them.  Tr. 227:16-229:15 and Ix. 2.[9]  Yet that is exactly what happened.  Dx. A.

115.　　　Given Defendants' reliance on their understanding of the oral agreement, based on Can't Stop's statements, pursuant to which Defendants worked tirelessly to build their own career, Plaintiff cannot terminate the oral agreement.  Tr. 297:3-11; Tr. 439:24-440:4; and

---

[9] Ix. shall refer to Intervenor's Exhibit.

505:17-506:11; Dx. A.  Plaintiff is estopped from terminating Defendant's ability to use Village People Marks at all.

## VI.    Tortious Interference with Sixuvus' Prospective Contractual/Economic Relations

116.    Sixuvus has had, throughout its thirty-year history, strong business relationships with various concert promoters and bookers, as it has been the exclusive source of live performances of Village People.  Tr. 283:25-284:23; 465:2-10; and 505:24-506:11.

117.    On average, these relationships yield approximately fifty (50) live engagements to perform as Village People each year.  Tr. 59:4-9; Tr. 64:24-65:2; Tr. 374:3-5; Tr. 393:7-20; 505:24-506:11.  Sixuvus is booked by some of the same people every year.  Tr. 394:24-395:24; 284:9-18.

118.    Plaintiff was generally aware of these relationships, as Sixuvus paid Plaintiff for the last thirty years from monies obtained as a result of these engagements in connection with the oral license agreement between the parties.  Tr. 64:15-65:2

119.    Intervenor was also aware of these relationships.  Dx. C and Dx. E

120.    Here Plaintiff interfered with those relationships by (a) giving Mrs. Willis an exclusive license to use Can't Stop Registrations, which induced Mr. Willis to breach the Settlement Agreement; and (b) improperly and unfairly purporting to terminate the oral license agreement on one days' notice and thereafter informing third parties that Sixuvus did not have the right to perform as Village People.  Tr. 298:1-13 Tr. 299:21-300:10 Tr. 320:19-321:19 Tr. 439:24-440:4 and Dx. X

121.    Intervenor interfered with these relationships by contacting booking agents and venues in an attempt to disrupt Sixuvus' performances and relationships, and unless enjoined will continue to do so.  Tr. 320:19-321:19 and Dx. E.

122.    Plaintiff had no reason to give Mr. Willis the ability to interfere with these relationships, other than to hurt Defendant.  Plaintiff is well aware of the acrimonious history between the parties.  Tr. 298:1-299:19 and Tr. 612:8-11

123.     In the latest part of their vendetta against Sixuvus, Karen Willis, as Can't Stop's licensee, has been sending letters to various concert venues and to Sixuvus' booking agent threatening litigation should Sixuvus take the stage as Village People.  Tr. 80:25-81:11; Dx. C and Dx. E.

124.     Karen Willis has only been enabled to interfere with Defendant's business because Plaintiff provided her with a purported exclusive license.  Dx. B; Dx. C; and Dx. E.

125.     Plaintiff's decision to permit Karen Willis to use the Can't Stop Registrations to the exclusion of Sixuvus has resulted in a substantial interference with Defendant's business relations.  Tr. 80:25-81:11; Tr. 81:19-82:14; Tr. 82:20-83:25; Tr. 449:11-450:3; Dx. B; Dx. C; and Dx. E.

126.     Sixuvus has, and unless Plaintiff is enjoined, will continue to face enormous difficulties in arranging new performances and appearances.  Tr. 449:11-450:2; and Tr. 464:16-465:15.

127.     Sixuvus' own booking agent, who has been threatened by Karen Willis, and is no longer booking shows for Sixuvus and is no longer willing to book Sixuvus because of the threats that come from Karen Willis.  Tr. 449:11-450:3 and Dx. E.

128.     Can't Stop knew that by granting Karen Willis a license to perform as Village People, that she would interfere with Sixuvus' relationships.  Tr. 449:11-450:3

129.     She has done as much by sending threatening letters to one of Sixuvus' booking agent, the very person responsible for securing the performances that Sixuvus relies on to be viable.  Tr. 82:20-83:25; and Dx. E

130.     Karen Willis has gone as far as to call venues the day of performances to demand that concert venues not permit Sixuvus to perform as Village People.  Tr. 320:19-321:19.

131.     Unfortunately for Sixuvus, her threats have proven successful as it is not in the position it once was to book concerts.  By threatening concert venues and Sixuvus' booker, Sixuvus can no longer contract with performance venues to put on concerts and make appearances like it once did.  Tr. 82:20-83:25; Tr. 449:11-450:3; and Dx. E.

132.     Unless Plaintiff and Intervenor are enjoined from interfering with Sixuvus' right to perform live as the Village People, Defendant will continue to lose the valuable business relationships that it has cultivated for almost three decades.  Once ruined, these relationships would be impossible to rebuild.  Tr. 283:25-284:23 and Tr. 465:2-13

**VII.     <u>Tortious Interference with and Breach of Settlement Agreement</u>**

133.     A valid and enforceable contract exists between Sixuvus and Victor Willis i.e. the Settlement Agreement.  Tr. 298:1-13; and Dx. X.

134.     Sixuvus and Victor Willis negotiated the Settlement Agreement in which Victor Willis agreed to abide by the Preliminary Injunction.  Dx. X

135.     The central purpose for Sixuvus to enter into the Settlement Agreement, was that Victor Willis agreed to follow the Preliminary Injunction, which prohibited Victor Willis, his agents and those acting in concert with him, from directly or indirectly disrupting Sixuvus' live performances.  Dx. X; Tr. 298:6-13; and Tr. 510:22-511:4.

136.     Plaintiff was aware of the Settlement Agreement and the terms thereof.  Tr. 300:11-17; Tr. 511:8-9; and Tr. 664:6-12.

137.     Not only was Plaintiff a party to the California Action, but Plaintiff's counsel actually recited the terms of the Settlement Agreement into the record.  Plaintiff was also aware of the acrimonious history between Sixuvus and Victor Willis.  Dx. X

138.     The plain meaning of the Settlement Agreement is that in the event that Victor Willis or his agents, representatives, assigns or any other person acting in concert or participation with him, engaged committed, or performed, directly or indirectly any act that would disrupt the live performance or public appearance of Sixuvus as Village People, such act would constitute a breach of the Settlement Agreement.  Tr. 298:1-13 and Dx. X

139.     Despite Plaintiff's awareness of the Settlement Agreement and its terms, Plaintiff induced and aided Mr. Willis' breach of the Settlement Agreement by giving Karen Willis or her company Harlem West Entertainment an exclusive license of the right to use Village People –to the exclusion of Sixuvus.  Dx. B; Tr. 30:11-31:13.

140.    By granting Karen Willis, who is an agent, representative, assign and/or is acting in concert or participation with Victor Willis, the exclusive right to use Village People in connection with live performances, Plaintiff has induced the direct and indirect disruption of the live performance and public appearance of Sixuvus as Village People.  Tr. 80:25-81:11; Tr. 447:2-449:7 and Tr. 449:11-450:3

141.    Plaintiff's actions directly caused Mr. Willis and those acting in concert with him, i.e. Mrs. Willis, to immediately resume their campaign of disrupting Defendant's livelihood and ability to perform live as the Village People, in violation of the Settlement Agreement.  Mrs. Willis cited her license from Plaintiff as her basis for being able to prevent Sixuvus from performing.  Tr. 80:25-81:11; Tr. 447:2-449:7; Tr. 449:11-450:3 and Tr. 298:1-13; Dx. C; Dx. E; and Dx. X

142.    The sole purpose of the Settlement Agreement was to prevent Mr. Willis, along with his agents and those with whom he is acting in concert, from ever again disrupting Sixuvus' ability to perform live as Village People.  Tr. 298:1-13; Tr. 299:21-300:10; and Dx. X

143.    Mrs. Willis is acting in concert with Mr. Willis as he is clearly the intended beneficiary of the exclusive license to Harlem West.  Tr. 84:1-12.

144.    Here, that is exactly what he has done.  The result of Plaintiff giving Mrs. Willis an exclusive license is that it allowed Mr. Willis to disrupt Sixuvus' ability to perform live as Village People.  Tr. 80:25-81:11; Tr. 447:2-449:7; and Tr. 449:11-450:3

145.    Plaintiff, with full knowledge that the Willis' were not allowed to take any such action, directly or indirectly, and knowing that an exclusive license would result in Mr. Willis breaching the Settlement Agreement, induced him to do so.  Furthermore, Plaintiff make mere token efforts to stop Ms. Willis from interfering with Sixuvus' pre-existing scheduled performances.  Tr. 80:25-81:11; Tr. 81:19-82:14; Tr. 82:20-83:25; Dx. C; Dx. D; Dx. E.

VIII.    **Sixuvus Will Suffer Irreparable Harm and the Balance of Hardships Tips in Sixuvus' Favor**

146.    Allowing Plaintiff to (i) prevent Sixuvus from using Village People in connection

with live performances when such conduct constitutes tortious interference with contract and business relations; (ii) continue to induce third parties to breach their agreements with Defendant; (iii) prevent Sixuvus from using Village People as a mark when Plaintiff no longer has a right to do so because it has abandoned such rights through naked licensing; and/or (iv) terminate the term of Defendant's license in breach of the agreement, would cause an irreparable harm to Sixuvus.

147.      Defendant has already expended a substantial amount of time and resources in prior litigation to avoid this exact situation. Tr. 299:21-300:10

148.      If Plaintiff and Intervenor are not, during the pendency of this lawsuit, enjoined from (i) taking any action in concert with the Willis' to disrupt any live performance or public appearance of Sixuvus performing as the Village People; or (ii) taking any action to stop Defendant from using Village People in connection with its live performances, until these issues are resolved Sixuvus will suffer and continue to suffer immediate and irreparable harm. Tr. 283:25-284:23; Tr. 464:16-465:13; 465:2-10; and 505:24-506:11.

149.      As Plaintiff is aware, the likelihood of confusion will cause Sixuvus to suffer irreparable reputational damage both with its industry relationships and with its fans. Tr. 77:4-78:8 and Tr. 283:25-284:23

150.      Sixuvus has spent thirty (30) years building its reputation within the industry and with its fans, and if Plaintiff and Intervenor's actions are allowed to destroy that, it will be impossible to rebuild. Tr. 283:25-284:23; Tr. 464:16-465:13; and 505:24-506:11.

151.      It is further unjust for Intervenor to reap the rewards of Sixuvus' tireless work in building up Village People name in the field of live performances. Tr. 285:20-286:10 and Tr. 286:15-22; Tr. 297:3-11; Tr. 439:24-440:4; and 505:17-506:11.

152.      If enjoined from performing as it has for the last thirty years as Village People, Defendants risk significant harm to its reputation from confusion. Tr. 464:16-465:13; and 505:24-506:11. Given competitiveness of the music industry, an extended layoff from performing would be a fatal blow to the livelihood and reputations of Defendants. Tr. 464:16-

465:13. The continued disruption to Defendant's ability to perform live as Village People, will threaten the reputation of Sixuvus, as it is losing relationships that it took years to build with promoters, bookers and venues. Tr. 283:25-284:23 and Tr. 464:16-465:13

153. Moreover, if Plaintiff and Intervenor are not enjoined from interfering with Defendant's ability to perform live, Sixuvus' reputation with its fans could be irreparably damaged. Tr. 461:10-462:12; Dx. LL; and Dx. NN.

154. As shows are often times booked months in advance, if Sixuvus is prevented from performing live during the pendency of this lawsuit, which could take years, it will destroy Sixuvus' reputation with its fans if they believe that Victor Willis' group is associated with the members of Sixuvus, which Sixuvus may not be able to rebuild. This is especially true if Victor Willis' performances are of a different or inferior quality, while Defendants' are enjoined from performing. Tr. 461:10-462:12; Tr. 464:16-465:13; and Dx. LL; and Dx. NN.

155. Intervenor's license was given in May of 2017, prior to the termination. Since Plaintiff signed the license with Intervenor, Intervenor has never actually had an exclusive right. As such, the balance of the hardships tips decidedly in Sixuvus' favor. Dx. B. Furthermore, there is evidence that the continuation of the TRO for the pendency of this lawsuit will mitigate consumer confusion. Dx. O. Lastly, Plaintiff and intervenor have not presented any evidence of harm they would suffer if an injunction is issued.

156. The public interest would not be disserved by the issuance of an injunction. The public's interest is best served by (i) preventing Plaintiff and Intervenor from tortuously interfering with the Settlement Agreement by giving Victor Willis the means and ability to breach his obligation to refrain from disrupting Defendant's ability to perform live as Village People; (ii) preventing Plaintiff from asserting trademark rights that it no longer owns; (iii) preventing Plaintiff from deceiving the consuming public by failing to exert any quality control measures; (iv) preventing Plaintiff from breaching its agreement with Defendant or taking actions it is estopped from taking; and (v) preventing further tortious interference of Defendant's prospective relations.

Dated: New York, New York
      February 12, 2018

Respectfully submitted,

ADELMAN MATZ P.C.

By: ___*/s/Sarah M. Matz*_____
    Sarah M. Matz, Esq.
    Gary Adelman, Esq.
1173A Second Avenue, Suite 153
New York, New York 10065
T: (646) 650-2207
F: (646) 650-2108
sarah@adelmanmatz.com
g@adelmanmatz.com
*Attorneys for Defendants/Counterclaim*
*Plaintiffs*