ADELMAN MATZ P.C.
1173A Second Avenue, Suite 153
New York, NY 10065
Phone: (646) 650-2207
*Attorneys for Defendants/Counterclaim Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

X---------------------------------------------------X
CAN'T STOP PRODUCTIONS, INC.,

                        Case No.: 7:17-cv-06513-CS

               Plaintiff,

-against-

SIXUVUS, LTD., ERIC ANZALONE,
ALEXANDER BRILEY, FELIPE ROSE,
JAMES F. NEWMAN, RAYMOND SIMPSON,
and WILLIAM WHITEFIELD,

               Defendants.
X---------------------------------------------------X

**DEFENDANTS' PROPOSED CONCLUSIONS OF LAW**

**ADELMAN MATZ P.C.**
**1173A Second Avenue, Suite 153**
**New York, New York 10065**
**Phone: (646) 650-2207**
*Attorneys for Defendants*

**TABLE OF CONTENTS**

I.  JURISDICTION ........................................................................................................1

II.  DEFENDANTS ARE LIKELY TO PREVAIL ON THEIR NAKED LICENSING CLAIM.........................................................................................................................1

   A.  OWNER'S AFFIRMATIVE DUTY TO CONTROL .....................................................1

   B.  FAILURE TO CONTROL IS INHERENTLY DECEPTIVE AND FUNCTIONS AS AN INVOLUNTARY FORFEITURE OR ABANDONMENT OF RIGHTS IN THE MARK .......2

   C.  THE FACT THAT THERE IS NO ALLEGATION THAT DEFENDANT'S SERVICES WERE INFERIOR IS IRRELEVANT TO PLAINTIFF'S FAILURE TO EXERT QUALITY CONTROL ...........................................................................................................4

   D.  FAILURE TO HAVE EXPRESS QUALITY CONTROL PROVISIONS........................5

   E.  GENERAL STATEMENTS ABOUT EXISTENCE OF QUALITY CONTROLS ARE INSUFFICIENT....................................................................................................6

   F.  EFFECT OF NAKED LICENSING AND REMEDIES.................................................10

   G.  THE COURT CAN SEPARATE RIGHTS SO THAT SIXUVUS OWNS THE RIGHT TO PERFORM LIVE WHILE PLAINTIFF MAINTAINS RIGHTS IN DISTRIBUTING MUSIC AND MERCHANDISE ..........................................................................12

   H.  DEFENDANTS' ARE NOT ESTOPPED FROM RAISING THEIR CLAIM OF NAKED LICENSING ........................................................................................................13

III.  DEFENDANTS' ARE LIKELY TO PREVAIL ON THEIR BREACH OF CONTRACT CLAIM.......................................................................................................................18

IV.  DEFENDANTS ARE LIKELY TO PREVAIL ON THEIR PROMISSORY ESTOPPEL CLAIM.......................................................................................................................19

V.    DEFENDANTS ARE LIKELY TO PREVAIL ON THEIR CLAIM FOR TORTIOUS
INTERFERENCE WITH SIXUVUS' PROSPECTIVE CONTRACTUAL/ECONOMIC
RELATIONS ....................................................................................................................20

VI.    DEFENDANTS ARE LIKELY TO PREVAIL ON THEIR TORTIOUS
INTERFERENCE WITH CONTRACT CLAIM.......................................................................21

VII.    INTERVENOR IS NOT A NECESSARY PARTY AND ..............................................21

VIII.    IRREPARABLE HARM AND BALANCE OF THE HARDSHIPS ..........................23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Barcamerica Intern. USA Tr. v Tyfield Importers, Inc.,*
  289 F3d 589 (9th Cir 2002) ..............................................................................Passim

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.,*
  448 F.3d 573 (2d Cir. 2006) ...............................................................................18

*Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc.,*
  1988 WL 52777 (S.D.N.Y. May 18, 1988) .............................................................19

*Cyberchron Corp. v Calldata Sys. Dev., Inc.,*
  47 F3d 39 (2d Cir. 1995) ....................................................................................19

*Dawn Donut Co. v. Hart's Food Stores, Inc.,*
  267 F.2d 358 (2d Cir. 1959) ...............................................................................Passim

*Dept. of Parks and Recreation for State of California v Bazaar Del Mundo Inc.,*
  448 F3d 1118 (9th Cir 2006) ...............................................................................9

*Distributors, Inc. v Jack Daniel Distillery-Lem Motlow Prop., Inc.,*
  22 AD2d 247 (3d Dept 1964) ..............................................................................19

*E.I. Du Pont De Nemours & Co. v Celanese Corp. of Am.,*
  167 F2d 484 (CCPA 1948) ...............................................................................1, 10

*Eva's Bridal Ltd. v Halanick Enterprises, Inc.,*
  639 F3d 788 (7th Cir 2011) .................................................................................6

*Feathercombs, Inc. v. Solo Prods.,*
  306 F.2d 251 (2d Cir.1962) .................................................................................13

*First Interstate Bancorp v Stenquist,* C-89-4106 MHP,
  1990 WL 300321 (ND Cal July 13, 1990) ..............................................................4

*General Motors Corp. v. Gibson Chemical & Oil Corp.,*
  786 F.2d 105 (2d Cir.1986) ..............................................................................1, 7

*Halo Optical Prod., Inc. v. Liberty Sport, Inc.,*
  2017 WL 4011261 (N.D.N.Y. Sept. 11, 2017)........................................................19

*HarperCollins Publishers L.L.C. v Gawker Media LLC,*
  721 F. Supp. 2d 303 (S.D.N.Y. 2010)...................................................................24

*Highland Capital Mgmt. LP. v. Schneider*,
  198 F. App'x 41 (2d Cir. 2006) ...................................................................21

*HSW Enterprises, Inc. v Woo Lae Oak, Inc.*, 08 CIV.8476 (LBS),
  2009 WL 4823920 (SDNY Dec. 15, 2009) .............................................. 17, 18

*Idaho Potato Commission*,
  335 F3d ...............................................................................................Passim

*Jemzura v. Jemzura*,
  36 N.Y.2d 496 (1975) .............................................................................18

*Kirch v. Liberty Media Corp.*,
  449 F.3d 388 (2d Cir. 2006) ....................................................................21

*Lader v. Delgado*,
  941 F. Supp. 2d 267 (E.D.N.Y. 2013) .......................................................20

*Lama Holding Co. v. Smith Barney, Inc.*,
  88 N.Y.2d 413 (1996) .............................................................................21

*Laugh Factory, Inc. v. Basciano*,
  608 F. Supp. 2d 549 (S.D.N.Y. 2009) .......................................................19

*Legacy Grp. of Am., Inc. v. N. Am. Co. for Life & Health Ins.*,
  336 F. App'x 87 (2d Cir. 2009) ................................................................20

*Marshak v Schaffner*, 11 CIV. 1104 DLC,
  2012 WL 1658393 (S.D.N.Y. May 11, 2012) ............................................12

*MasterCard Intern. Inc. v Visa Intern. Serv. Ass'n, Inc.*,
  471 F3d 377 (2d Cir 2006) ............................................................ 21, 22, 23

*Melwani v Singh*, 04 CIV. 1322 (HB),
  2004 WL 1672556 (S.D.N.Y. July 26, 2004) .............................................16

*Merex A.G. v Fairchild Weston Sys., Inc.*,
  29 F3d 821 (2d Cir 1994) ........................................................................20

*Miller v Glenn Miller Productions*,
  318 F Supp 2d 923 (CD Cal 2004), *affd sub nom. Miller v Glenn Miller Productions, Inc.*, 454
  F3d 975 (9th Cir 2006) ................................................................ 9, 11, 14

*Moore Bus. Forms, Inc. v Ryu*,
  960 F2d 486 (5th Cir 1992) .......................................................................3

*Morgan Cr. Productions, Inc. v Capital Cities/ABC, Inc.*, CV-89-5463-RSWL(JRX),
    1991 WL 352619 (CD Cal Oct. 28, 1991)................................................................10

*Nadel v. Play-By-Play Toys & Novelties, Inc.*,
    208 F.3d 368 (2d Cir. 2000) .......................................................................................20

*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*,
    392 F.3d 520 (2d Cir. 2004) .......................................................................................18

*Patsy's Italian Rest., Inc. v Banas*,
    658 F3d 254 (2d Cir 2011) ...................................................................................12, 13

*Purgess v. Sharrock*,
    33 F.3d 134 (2d Cir. 1994) .........................................................................................21

*Ritz Assoc., Inc. v Ritz-Carlton Hotel Co.*,
    35 Misc 2d 425 (Sup Ct 1962), *affd sub nom. Ritz Assoc. v Ritz-Carlton Hotel Co.*, 19 AD2d
        522 (1st Dept 1963), *affd sub nom. Ritz Assoc., Inc. v Ritz-Carlton Hotel Co.*, 14 NY2d 670
        (1964) ............................................................................................................11, 14, 17

*Salinger v Colting*,
    607 F. 3d. 68 (2d Cir. 2010) ..................................................................................23, 24

*Sheila's Shine*,
    486 F.2d 114 (5th Cir. 1973) ...................................................................................7, 11

*Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v Alexander's Dept. Stores,
    Inc.*, 299 F2d 33 (2d Cir 1962)...................................................................................2, 15

*Stern's Miracle-Gro Products, Inc. v Shark Products, Inc.*,
    823 F Supp 1077 (S.D.N.Y. 1993)...............................................................................24

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
    768 F.2d 1001 (9th Cir.1985) .....................................................................................10

*Twentieth Century Fox Film Corp. v. Marvel Enters.*,
    277 F.3d 253 (2d Cir.2002) ..........................................................................................1

*Yocum*,
    216 USPQ (BNA) ¶ 210 (TTAB Nov. 29, 1982)...................................................3, 7, 10, 11

**Statutes**

15 U.S.C. 1064(5)...........................................................................................................13

15 U.S.C. § 1055...............................................................................................................1

15 U.S.C. § 1119 ..................................................................................................12

15 U.S.C. § 1127 .............................................................................................2, 13

28 U.S.C. §1367 ....................................................................................................1

28 U.S.C. §§ 1331 and 1338(a) .............................................................................1

NY GOL 5-701(a)(1) ...........................................................................................20

**Rules**

Fed. R. Civ. P. 65(d)(2) .......................................................................................23

**Other Authorities**

3 McCarthy on Trademarks and Unfair Competition § 18:48 .............................5, 10

3 McCarthy on Trademarks and Unfair Competition § 18:55 .............................4, 6

*Restatement (Second) of Contracts* § 139(1) .........................................................20

Restatement Third, Unfair Competition § 33 .......................................................5, 6

Defendants Sixuvus, Ltd. ("Sixuvus"), Eric Anzalone, Alexander Briley, Felipe Rose, James F. Newman, Raymond Simpson, and William Whitefield (collectively "Defendants") through their undersigned counsel submit the following proposed conclusions of law.

## I.   Jurisdiction

1. The Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

2. This Court has supplemental jurisdiction over Defendants' counterclaims pursuant to 28 U.S.C. §1367.

## II.   Defendants Are Likely to Prevail On Their Naked Licensing Claim

### A.   Owner's Affirmative Duty to Control

3. An owner of a mark who licenses it to another has an affirmative "duty to exercise control and supervision over the licensee's use of the mark." *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959); *see also Twentieth Century Fox Film Corp. v. Marvel Enters.*, 277 F.3d 253, 259 (2d Cir.2002); *General Motors Corp. v. Gibson Chemical & Oil Corp.*, 786 F.2d 105, 110 (2d Cir.1986).

4. A trademark can be "licensed separately from the business in connection with which it had been used provided that the licensor retained control over the quality of the goods produced by the licensee." *Dawn Donut Co.*, 267 F2d at 367 (citing *E.I. Du Pont De Nemours & Co. v Celanese Corp. of Am.*, 167 F2d 484 (CCPA 1948)).

5. While Plaintiff had the right to license its Marks, it had an affirmative duty to supervise the quality of the services rendered under the Marks for each service and good licensed.

6. "Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public." 15 U.S.C. § 1055

7. "The term "related company" means any person whose use of a mark is ***controlled*** by the

owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1127 (emphasis added).

8.   Where a licensee is not ***controlled*** by the owner of the mark with respect to the nature and quality of services the mark is used with, it is not a 'related company' within the meaning of the Lanham Act and such use does not inure to the benefit of registrant.

   **B.      Failure to Control is Inherently Deceptive and Functions As An Involuntary Forfeiture or Abandonment of Rights in the Mark**

9.   "Without the requirement of control, the right of a trademark owner to license his mark separately from the business in connection with which it has been used would create the danger that products bearing the same trademark might be of diverse qualities." *Dawn Donut Co.*, 267 F2d at 367

10. If a "licensor is not compelled to take some reasonable steps to prevent misuses of his trademark in the hands of others the public will be deprived of its most effective protection against misleading uses of a trademark." *Dawn Donut Co.*, 267 F2d at 367.

11. In other words, if there is no assurance i.e. the risk of losing their rights in the mark, that the licensor will control the quality of services rendered by a licensee of the mark, then the public is injured by being deprived of the licensor failing to fulfill its duty to protect consumers from misleading uses of a trademark.

12. "[A] bare license is a fraud upon the public." *Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v Alexander's Dept. Stores, Inc.*, 299 F2d 33, 35 (2d Cir 1962).

13. The public is hardly in a position to uncover deceptive uses of a trademark before they occur and will be at best slow to detect them after they happen. Thus, unless the licensor exercises supervision and control over the operations of its licensees the risk that the public will be unwittingly deceived will be increased and this is precisely what the Act is in part designed to prevent. Clearly the only effective way to protect the public where a trademark is used by licensees is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees.  *Dawn Donut Co.*, 267 F2d at 367 (citing Sen. Report No. 1333, 79th

Cong., 2d Sess. (1946)).

14. As the public has an interest in products and services bearing the same mark being of the same quality, if a trademark owner fails to control the quality of its licensees uses of the mark, the uncontrolled licensing creates a *danger* that the products or services could be of diverse quality.  The best way to prevent this is to place on the licensor an affirmative duty of policing its licensees.

15.  "Abandonment because of uncontrolled licensing is purely an involuntary forfeiture of trademark rights, for the mark owner probably has no subjective intent to abandon the mark."  *Yocum*, 216 USPQ (BNA) ¶ 210 (TTAB Nov. 29, 1982).

16.  "[W]here the licensor fails to exercise adequate quality control over the licensee, 'a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark.' Such abandonment 'is purely an 'involuntary' forfeiture of trademark rights,' for it need not be shown that the trademark owner had any subjective intent to abandon the mark."  *Barcamerica Intern. USA Tr. v Tyfield Importers, Inc.*, 289 F3d 589, 596 (9th Cir 2002) (citing *Moore Bus. Forms, Inc. v Ryu*, 960 F2d 486, 489 (5th Cir 1992)) (finding abandonment of "Da Vinci" mark where Owner (i) entered into license agreement with no quality control provisions, and instead contained provisions making licensee solely responsible for claims arising out of distribution of product using the mark; (ii) presented no evidence that was familiar with licensee's efforts to control quality; and (iii) failed to raise a triable issue of fact to preclude summary judgment where sole evidence of alleged control was "random tastings and reliance upon [licensee's] reputation", which according to principal was "good" and at the time the Plaintiff began licensing the winemaker was "world famous").

17. When adequate control is not actually exercised, the trademark owner involuntarily forfeits its rights to the mark, regardless of whether it intended to abandon them.

**C.    The Fact That There Is No Allegation That Defendant's Services Were Inferior is Irrelevant to Plaintiff's Failure to Exert Quality Control**

18. In a naked licensing claim, whether licensee's product or service was "objectively 'good' or 'bad' is simply irrelevant." *Barcamerica Intern. USA Trust*, 289 F3d at 597–98 ("Whether Renaissance's wine was objectively "good" or "bad" is simply irrelevant.")

19. "What matters is that [licensor] played no meaningful role in holding the [good or service] to a standard of quality—good, bad, or otherwise." *Barcamerica Intern. USA Trust*, 289 F3d at 597–98.

20.    "'[Q]uality control' does not necessarily mean that the licensed goods or services must be of 'high' quality, but merely of equal quality, whether that quality is high, low or middle." *See* 3 McCarthy on Trademarks and Unfair Competition § 18:55 (5th ed.)

21. "[C]ustomers are entitled to assume that at any one outlet, the nature and quality of goods and services sold under the mark will be ***substantially the same over time and will not suddenly and unexpectedly change without warning***. In other words, someone must be responsible for maintaining these consistent levels of the nature and quality of the licensed goods and services. That someone is the trademark licensor." 3 McCarthy on Trademarks and Unfair Competition § 18:55 (5th ed.).

22. Because the duty to control the goods or services of a licensee that utilize the mark, is meant to protect against the 'danger' that products or services bearing the same trademark might be of diverse qualities, whether the produces or services are of a high or inferior quality is not relevant.  What is relevant is that consumers are entitled to rely on a licensor's duty to control its licensees so that services sold under the mark are the same over time, and that the consumers will not be deceived by a sudden and unexpected change.

23. "[I]t is well established that where a trademark owner engages in naked licensing, without any control over the quality of goods produced by the licensee, such a practice is inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor." *Barcamerica Intern. USA Trust*, 289 F3d at 598 (citing *First Interstate Bancorp v*

*Stenquist*, C-89-4106 MHP, 1990 WL 300321 (ND Cal July 13, 1990)).

24. When a licensor fails to satisfy this duty, it is an inherently deceptive to consumers and functions as an abandonment of rights by the licensor. Because the licensor has failed to control the nature and quality of the services rendered under a mark, the mark can no longer serve as an indication to the public that licensor is controlling the quality of the goods i.e. the mark can no longer function as a source indicator to the licensor.

25. An uncontrolled or "naked" license authorizes use of the trademark on goods or services for which the trademark owner cannot offer a meaningful assurance of quality. When the trademark owner fails to exercise reasonable control over the use of the mark by a licensee, the presence of the mark on the licensee's goods or services misrepresents their connection with the trademark owner since the mark no longer identifies goods and services that are under the control of the owner of the mark. Although prospective purchasers may continue to perceive the designation as a trademark, the courts have traditionally treated an erosion of the designation's capacity for accurate identification resulting from uncontrolled licensing as a loss of trademark significance, thus subjecting the owner of the mark to a claim of abandonment under the rule stated in [Restatement] § 30(2)(b). 3 McCarthy on Trademarks and Unfair Competition § 18:48 (5th ed.) (citing Restatement Third, Unfair Competition § 33, comment b (1995)).

### D. Failure to Have Express Quality Control Provisions

26. Courts may properly note whether a contract contains an express right for a system of inspection and control. *See e.g. Dawn Donut Co.*, 267 F2d at 368; *Barcamerica Intern. USA Trust*, 289 F3d at 596 (although not conclusive evidence of lack of control, the Court correctly noted that agreements lacked an express contract right to inspect and supervise a licensee's operations and contained clauses to indemnify licensor against claims relating to distribution or sale of the product).

27. "The absence, however, of an express contract right to inspect and supervise a licensee's operations does not mean that the plaintiff's method of licensing failed to comply with the

requirements of the Lanham Act. Plaintiff may in fact have exercised control in spite of the absence of any express grant by licensees of the right to inspect and supervise." *Dawn Donut Co.*, 267 F2d at 368

28. Although not conclusive, the lack of express quality control in the agreement between Sixuvus and Can't Stop, the written correspondence concerning a written agreement that was never finalized, and the performer agreements between some of the individual Defendants and Can't Stop, and the fact that the performer agreements instead contained provisions limiting Can't Stop's liability arising from 'live' performances of Sixuvus, is evidence of a lack of quality control.

### E. General Statements About Existence of Quality Controls Are Insufficient

29. The question then, with respect to both plaintiff's contract and non-contract licensees, is whether the plaintiff in fact exercised sufficient control. *Dawn Donut Co.*, 267 F2d at 368.

30. "[T]he scope of quality control must be commensurate with the scope of uses of the mark permitted in the license. Each type of use of the mark permitted by license must be subject to adequate control by the licensor." 3 McCarthy on Trademarks and Unfair Competition § 18:55 (5th ed.)

31. "The ultimate issue is whether the control exercised by the licensor is sufficient under the circumstances to satisfy the public's expectation of quality assurance arising from the presence of the trademark on the licensee's goods or services." 3 McCarthy on Trademarks and Unfair Competition § 18:55 (5th ed.) (citing Restatement Third, Unfair Competition § 33, comment c (1995)).

32. "***Trademark law requires that 'decisionmaking authority over quality remains with the owner of the mark***.' How much authority is enough can't be answered generally; the nature of the business, and customers' expectations, both matter. Ours is the extreme case: plaintiffs had, ***and exercised***, no authority over the appearance and operations of defendants' business, or even over what inventory to carry or avoid." *Eva's Bridal Ltd. v Halanick Enterprises, Inc.*, 639 F3d

788, 791 (7th Cir 2011) (citing Restatement § 33 comment c.).

33. Whether a licensor has abandoned his rights to a mark by engaging in naked licensing depends on "whether the licensees' operations are policed adequately to guarantee the quality of the products sold under the mark." *General Motors Corp.*, 786 F2d at 110 (no abandonment found where licensor "specifies the various processes for refining its Dexron II fluid and carefully monitors the licensees' products").

34. Unlike cases where the licensor retains and exercises control over a licensee's services, where Plaintiff here (i) did not provide Defendants with standards or guidelines; (ii) did have any system for actively and systematically monitoring and controlling Defendant's performances, including where they took place, when they took place, what music performed, the choreography that was performed, the production requirements for the group, or what costumes were worn; (iii) did not play any role in choosing new members that would perform as part of the Group, including not attending auditions, not requiring interviews of any kind, not implementing any type of training program, not attending or reviewing new member rehearsals before performance, or any other act that would guarantee the consistent quality of the services rendered by Defendants, Plaintiff did not take adequate steps to guarantee the quality of the services for live performances under the mark.

35. Long periods of no or little communication, support a finding of naked licensing. *See Sheila's Shine*, 486 F.2d 114, 123 (5th Cir. 1973) ("[T]hat from February 1955 until May 1966 there was no communication whatever between the McCaffertys and Pan American" and that "[t]here was no direction or supervision of any kind by the McCaffertys over the activities of Pan American").

36. In cases dealing with the licensing of a service mark for live performances, it has been held that a period of only six years of inadequately controlled licensing functioned as "an 'abandonment' and divested the "PIED PIPERS" mark of origin-INDICATING significance in [licensor's] hands." *Yocum*, 216 USPQ (BNA) ¶ 210 (where one-page agreement contained no hint of supervision, quality control or performance standards, its primary and virtually only

7

provision, so far as the licensor was concerned, being an agreement to pay licensor 5% of the gross income of licensee's group in return for allowing him to use the name. The only explicit recapture conditions were licensee's failure to adhere to the agreement (i.e., his 5% "commission" obligation to licensor) and inability to obtain employment for licensee's group for 6 consecutive months (whereupon licensor could rescind). Testimony and evidence suggested no collateral oral agreements as to retention of supervisory controls from which we might infer something other than a simple sale or "renting" of the "PIED PIPERS" name to licensee, nor is it clear that such oral arrangements would cure the uncontrolled licensing arrangement).

37. Here Plaintiff engaged in prolonged periods, at least sixteen years, of virtually no communications with Defendants about the live performance services. That alone is sufficient to warrant a finding of uncontrolled licensing.

38. "[C]onclusory statements as to the existence of quality controls is insufficient to create a triable issue of fact on the issue of naked licensing." *Barcamerica Intern. USA Trust*, 289 F3d at 597 (holding that "[w]hile Mr. Barca's tastings perhaps demonstrate a minimal effort to monitor quality, Mr. Barca fails to state *when, how often, and under what circumstances he tastes the wine* . . . and according to Renaissance, Mr. Barca never 'had any involvement whatsoever regarding the quality of the wine and maintaining it at any level.'" [Barcamerica] has failed to demonstrate any knowledge of or reliance on the actual quality controls used by Renaissance, nor has it demonstrated any ongoing effort to monitor quality.") (emphasis added).

39. Conclusory statements that representatives 'regularly' visited customers and that 'in many cases' had an opportunity to observe, when he was able to get into the shop, failed to make clear the nature of inspection, how often inspection was made, and was not sufficient to determine whether it was periodic and thorough or only chance, cursory examinations by untrained salesmen. *Dawn Donut Co.*, 267 F2d at 368.

40. Plaintiff's conclusory testimony that they 'regularly' monitored Defendants' services is not sufficient to demonstrate control, as Plaintiff failed to demonstrate any type of periodic and thorough quality control program, and instead, at best shows chance, cursory reviews, many of

which appear to have been by licensees who were untrained, and does not constitute control.

41. Furthermore, where parts of the license are implied, even where an owner can point to measures of quality control in an agreement, there must be evidence to "support a finding that the [licensor] has exercised such quality control and supervision over [the licensee] that the marks truly 'reflect[ ] the goodwill and quality standards' of the [licensor], as opposed to [the licensee] itself. *See Dept. of Parks and Recreation for State of California v Bazaar Del Mundo Inc.*, 448 F3d 1118, 1131 (9th Cir 2006) (the agreement, lacked any provisions for routine inspections, adaptation or designs or operating manual for conduct of business. Although the parties agreed that 'food typical of the era would be served, employees would wear Mexican dress, and the premise would be kept clean, there was no redress if it were to deteriorate. Furthermore, the licensor points to no evidence revealing any effort to monitor or sample the quality of licensee's goods or services) (internal citations omitted).

42. General agreements concerning themes and costumes, i.e. Plaintiff's statement that Sixuvus agreed to perform as the six characters, without redress and without efforts to monitor or sample quality are also not sufficient to find quality control.

43. In a naked license challenge brought by a licensee, evidence of quality control and policing marks against non-licensee i.e. third parties does not establish that licensor has been supervising the trademark licensee. *See Miller v Glenn Miller Productions*, 318 F Supp 2d 923, 946 (CD Cal 2004), *affd sub nom. Miller v Glenn Miller Productions, Inc.*, 454 F3d 975 (9th Cir 2006) ("[T]he evidence submitted by [licensor] is irrelevant to [licensee's] defense of estoppel because none of the cease and desist letters was sent to [licensee]. Thus, while the cease and desist letters establish that at least to some extent, [licensor] have been policing their trademark rights vis-a-vis non-licensees, they do not establish that [licensor] have been supervising the trademark license their predecessor granted to [licensee]."

44. Plaintiff's efforts to send DMCA takedown notices through web sheriff, and its quality control programs with *other licensees* is irrelevant to the question of whether Plaintiff adequately controlled the quality of services rendered by Defendants. The only thing it shows is a stark

contrast between Can't Stop's other licensees and Defendants, who not only did not have express quality control provisions, were not controlled with respect to live performances.

45. "[C]ourts have upheld licensing agreements where the licensor is familiar with and relies upon the licensee's own efforts to control quality." *Barcamerica Intern. USA Trust*, 289 F3d at 596 (finding that Barcamerica did not prove the exception where, it failed to demonstrate any knowledge of or reliance on the actual quality controls used by licensee) (citing *Morgan Cr. Productions, Inc. v Capital Cities/ABC, Inc.*, CV-89-5463-RSWL(JRX), 1991 WL 352619 (CD Cal Oct. 28, 1991) (citing *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1017–18 (9th Cir.1985))). However, as stated at the Hearing, Plaintiff is not relying on this exception, and instead is relying on 'active supervision'. *See* Tr. 20:3-19. As such this exception is not addressed at length, however it is worth noting that there is no evidence that Can't Stop was familiar with or had justification to rely upon Defendant's efforts to control quality.

**F.    Effect of Naked Licensing and Remedies**

46. A finding of uncontrolled licensing may result in several possible effects: (i) abandonment of all rights in the mark; (ii) a break in the chain of continuous use necessary to prove priority of use over another; (iii) cancellation of a registration; and (iv) a finding that the license is void and/or that the licensor is estopped from challenging the licensee's uncontrolled use. *See Yocum*, 216 USPQ (BNA) ¶ 210. *See also* 3 McCarthy on Trademarks and Unfair Competition § 18:48 (5th ed.).

47. "[N]aked licensing, viz. the grant of licenses without the retention of control, [is] invalid." *Dawn Donut Co.*, 267 F2d at 367 (*citing E.I. Du Pont De Nemours & Co.*, 167 F2d at 489) (further noting that the rationale of *DuPont,* cases was carried forward with the passage of the Lanham Act).

48. A license agreement allowing a licensee "to use [the licensor's] distinctive trademark or name without any transfer of [licensor's] business and without any control by [licensor] of the nature or quality of the services rendered by the [licensee] under [licensor's] trademark or name .

. . is void, because of its tendency to confuse the public, which believes it will receive, in the building bearing [licensor's] name, services of the same nature and quality as those rendered in [licensor's] own hotel and restaurant". *Ritz Assoc., Inc. v Ritz-Carlton Hotel Co.*, 35 Misc 2d 425, 427 (Sup Ct 1962), *affd sub nom. Ritz Assoc. v Ritz-Carlton Hotel Co.*, 19 AD2d 522 (1st Dept 1963), *affd sub nom. Ritz Assoc., Inc. v Ritz-Carlton Hotel Co.*, 14 NY2d 670 (1964).

49. A licensor who has nakedly licensed its mark to a licensee, is also estopped from enjoining the licensee from use of the mark. *See Ritz Associates, Inc.*, 35 Misc 2d at 429 (declaring that license agreement was void and that licensee, may continue to use the name 'Ritz Tower', without payment to or consent form licensor).

50. When a mark owner fails to affirmatively supervise or control a licensee's use of any trademark rights conveyed to it, under the naked licensing doctrine, the holder is estopped from enforcing rights against the licensee. *See e.g. Miller*, 318 F Supp 2d at 946.

51. Among other consequences, "[f]ailure to exercise such control and supervision for a significant period of time may estop the trademark owner from challenging the use of the mark and business which the licensee has developed during the period of unsupervised use." *Sheila's Shine Products, Inc.*, 486 F2d at 124.

52. Under this doctrine, the Court may find that the license agreement between Sixuvus and Can't Stop was void as against public policy, and that Can't Stop is now estopped from enjoining Sixuvus from using the Marks in connection with live performances, and that Sixuvus may do so without consent from Can't Stop.

53. A naked license that takes the form of a mere sale or renting of a name without adequate controls, can work as an abandonment, can negate any priority claim that an owner alleges to have and can divest the owner of any claim that its mark has origin indicating significance to the owner. *See Yocum*, 216 USPQ (BNA) ¶ 210 (holding that agreement without quality controls was mere sale or renting where "virtually only provision, so far as petitioner was concerned, being an agreement to pay petitioner 5% of the gross income of [the] group in return for allowing him to use the 'PIED PIPERS' name 'as purporting to be the name of a vocal group you are

about to form.'").

54. The Court may also find that Can't Stop has been divested of its claim of priority, as the mark no longer has origin indicating significance to Can't Stop in connection with live performances, and Sixuvus, who has been continuously using the Marks since 1987 in connection with live performances would have priority over Can't Stop.

**G.      The Court Can Separate Rights So that Sixuvus Owns the Right to Perform Live While Plaintiff Maintains Rights in Distributing Music and Merchandise**

55. Plaintiff's argument that it did not abandon rights in its trademark because it continued to receive royalties is incorrect and the legal authority in support of the argument that the Court cannot cancel part of its Marks is unsupported. *Marshak,* does not relate at all to the consequences of nakedly licensing a mark. To the contrary it deals with abandonment by non-use which is separate and inapposite to the circumstances here. *Marshak v Schaffner*, 11 CIV. 1104 DLC, 2012 WL 1658393, at *5 (S.D.N.Y. May 11, 2012) (discussing statutory abandonment if "an owner ceases to use a mark without an intent to resume use in the reasonably foreseeable future, the mark is said to have been 'abandoned.'").

56. Furthermore, the Lanham Act itself contradicts Plaintiff's argument, as it expressly provides that "[i]n any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, ***in whole or in part***, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action." 15 U.S.C. § 1119.

57. "[W]e agree with the district court that a mark owner can abandon a mark through naked licensing in a particular geographic area without abandoning its rights throughout the entire United States." *Patsy's Italian Rest., Inc. v Banas*, 658 F3d 254, 265 (2d Cir 2011)

58. Cancellation of a registration does not take all rights away from licensor, as it can retain rights it did not abandon through naked licensing, "[r]ather, the cancellation simply precludes appellants from utilizing the statutory presumptions and other benefits conferred to a mark owner through federal registration." *Patsy's Italian Restaurant, Inc.*, 658 F3d at 267.

59. "[A]lthough some forms of trademark abandonment may result in a loss of all rights in the mark, . . . abandonment of a mark through naked licensing has different effects on the validity of the mark in different markets. For example, if a restaurant operates in both New York and California, but engages in naked licensing only in California, the restaurant's registered mark may lose its significance in California while retaining its significance in New York. Thus, naked licensing will lead to an abandonment of a mark only where the mark loses its significance. 15 U.S.C. § 1127." *Patsy's Italian Restaurant, Inc.*, 658 F3d at 264–65 (citing *Feathercombs, Inc. v. Solo Prods. Co.*, 306 F.2d 251, 256 (2d Cir.1962); *Dawn Donut Co.*, 267 F2d at 369 (a finding of naked licensing in the retail market would not result in the loss of trademark rights in the wholesale market)).

60. Here the Court may divest Can't Stop of part of its ownership rights i.e. those that relate to exclusive control of the Marks for live performances, and cancel only those registrations, while leaving Can't Stop's other registrations where the Marks have not lost their significance to Can't Stop in tact.

61. Can't Stop's argument that this would destroy its goodwill in the Marks misses the point—which is that Can't Stop, through 30 years of uncontrolled, naked licensing, has already abandoned that part of the goodwill associated with the Marks and it is owned by Sixuvus.

### H. Defendants' Are Not Estopped From Raising Their Claim of Naked Licensing

62. In *Idaho Potato,* the Second Circuit applied the *Lear v. Adkins* balancing test, which struck down the licensee estoppel rule of patent licenses, to determine the question of whether a prior licensee of a certification mark, who had signed a written agreement with an express no challenge provision, could challenge the certification mark based on IPC's violations 15 U.S.C. 1064(5), including that the IPC "discriminately refuses to certify or to continue to certify the goods or services of" persons who maintain the standards or conditions which the mark certified. *Idaho Potato Commission*, 335 F3d at 134.

63. In *Idaho Potato Commission*, 335 F3d 130, the District Court originally held that "the

owners of certification marks can license their marks, just as trademark holders can, and are therefore clearly entitled to licensee estoppel where the licensing agreement specifically provides for it" also noting that M&M had signed an agreement that specifically stated that it would "not during the term of the agreement, or at any time thereafter, attack the title or any rights" of the IPC in the relevant marks. *Idaho Potato Commission*, 335 F3d at 133–34.

64. Generally, the rule that has been followed in this Jurisdiction, as in some others, is that unlike other types of challenges, licensee estoppel does not preclude licensees from challenging licensor's mark based on uncontrolled or naked licensing. *See e.g. Ritz Associates, Inc.*, 35 Misc 2d at 427–28 (holding that license agreement was void, and that the claim that licensee was estopped from claiming that the agreement was void for naked licensing because it assumed the agreement was "not correct" allowing naked licensing claim to void agreement and estop owner from enjoining use of the mark). Other jurisdictions support this finding as well. *See e.g. Miller*, 318 F Supp 2d at 946. *Idaho Potato* does not change that rule.

65. *Idaho Potato,* may not be analogous here as it involved deciding an agreement where there were express no challenge clauses in the license agreements in question, which is unlike the few writings here.

66. In the event the Court decides that *Idaho Potato* does apply, for any reason, the balancing test set forth therein does not estop Defendant from raising naked license against Plaintiff.

67. The *Lear* test, balanced that public interest against the "competing demands of the common law of contracts" as follows:

> Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued.

*Idaho Potato Commission*, 335 F3d at 135

68. Courts applying the principles articulated in *Lear* to patent disputes have enforced no-challenge contract provisions only when the interests in doing so outweigh the public interests. *Idaho Potato Commission*, 335 F3d at 135

69. Even when courts have not expressly applied the Lear test, they have recognized that agreements related to intellectual property necessarily involve the public interest and have enforced such agreements only to the extent that enforcement does not result in a public injury. *Idaho Potato Commission*, 335 F3d at 136

70. "It should never be overlooked that trade-mark ... cases are affected with a public interest. A dealer's good will is protected, not merely for his profit, but in order that the purchasing public may not be enticed into buying A's product when it wants B's product." *Idaho Potato Commission*, 335 F3d at 136

71. Lear itself recognized that federal policy embodied in the law of intellectual property can trump even explicit contractual provisions. *Idaho Potato Commission*, 335 F3d at 137

72. In balancing the public interest and the public injury that might result from the decision that defendant is estopped from asserting a naked licensing defense, with the enforcement of a contract provision (*Idaho Potato Commission*, 335 F3d at 137–38) the argument for licensee estoppel is in direct conflict with strong federal policy that mandates quality control to protect the public from injury.

73. "[T]rademark owners are granted a monopoly over their marks and can choose to license the marks to others on whatever conditions they deem appropriate, so long as confusion does not result". *Idaho Potato Commission*, 335 F3d at 138. Quality control mandates are required for the express purpose of preventing a fraud on the public and to ensure that the public is not confused or deceived.

74. "[A] bare license is a fraud upon the public." *Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac*, 299 F2d at 35.

75. If a "licensor is not compelled to take some reasonable steps to prevent misuses of his

trademark in the hands of others the public will be deprived of its most effective protection against misleading uses of a trademark." *Dawn Donut Co.*, 267 F2d at 367.

76. "Without the requirement of control, the right of a trademark owner to license his mark separately from the business in connection with which it has been used would create the danger that products bearing the same trademark might be of diverse qualities." *Dawn Donut Co.*, 267 F2d at 367

77. Clearly the only effective way to protect the public where a trademark is used by licensees is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees. *Dawn Donut Co.*, 267 F2d at 367 (citing Sen. Report No. 1333, 79th Cong., 2d Sess. (1946)).

78. "[T]o decide the issue of public injury we must look to the public interest implicated by the merits of the licensee's challenges." *Idaho Potato Commission*, 335 F3d at 139.

79. Just as the certification mark regime "protects a public interest", naked licensing challenges protect the public interest of not being deceived by a licensor's failure to satisfy its duty to control the quality of services that are rendered under a mark.

80. This is especially important where, "[t]he public is hardly in a position to uncover deceptive uses of a trademark before they occur and will be at best slow to detect them after they happen." *Dawn Donut Co.*, 267 F2d at 367 (citing Sen. Report No. 1333, 79th Cong., 2d Sess. (1946)).

81. The considerations of injury to the public and that it is more likely to be harmed if Defendant is not allowed to challenge Plaintiff's naked licensing practices, outweigh the de minimums harm of making Plaintiff defend its thirty (30) year naked licensing practice, which was a blatant abdication of its duty. *See Melwani v Singh*, 04 CIV. 1322 (HB), 2004 WL 1672556, at \*4 (S.D.N.Y. July 26, 2004) (in considering licensee estoppel in a statutory abandonment case the Court noted that "fairness considerations do not weigh so heavily against the defendants because SNC abdicated its duty").

82. Additionally, as in *Lear*, in light of the fact that many cases that assert naked license are

brought by licensees, "[l]icensees may often be the only individuals with enough economic incentive to challenge" the licensor's uncontrolled practices. *Idaho Potato Commission*, 335 F3d at 135 (citing *Lear*).

83. "[T]his case lacks a strong countervailing public interest other than the general interest in enforcing written contracts (like the interest in settlements) that persuaded courts to enforce contractual no-challenge provisions in other agreements." *Idaho Potato Commission*, 335 F3d at 139

84. After all Plaintiff should not be allowed to enforce a contract that is void as against public policy. *Ritz Associates, Inc.*, 35 Misc 2d at 427.

85. Nor should it be allowed to abdicate its duty of quality control which risks injury to the public as Plaintiff has taken *no steps* to ensure that live performance services will be of a consistent quality, and they have in fact changed without warning.

86. The only Southern District case that has applied *Idaho Potato*, to a naked licensing challenge, and estopped the licensee is not binding and is distinguishable on its face. *HSW Enterprises, Inc. v Woo Lae Oak, Inc.*, 08 CIV.8476 (LBS), 2009 WL 4823920, at *3 (SDNY Dec. 15, 2009), *judgment entered,* 08 CIV. 8476(LBS), 2010 WL 1630686 (SDNY Apr. 21, 2010), judgment entered, 08 CIV. 8476(LBS), *HSW Enterprises, Inc. v Woo Lae Oak, Inc.*, 08 CIV. 8476(LBS), 2010 WL 1630686 (SDNY Apr. 21, 2010). In *HSW,* the Court applied *Idaho Potato* to an express no-challenge clause, which is not present here. *See id.* Unlike the case here, in analyzing whether the "enforcement of the contract would result in injury to the public through confusion" so as to void the contractual provision estopping a licensee from challenging the mark, the Court noted that in *HSW* there had been no allegation that the quality of services between the two outlets was of different quality, where, as here, there is evidence that the quality of services between Defendant and Plaintiff's current licensee has varied and changed without warning, and in fact Plaintiff has failed to do anything to protect the consumer's expectations that the quality will not suddenly change. *See id.* Also, unlike here, in *HSW*, the interest in contract expectations between those parties was stronger than normal where "it took six years

after the previous trademark-related action between the parties to agree to a License Agreement, which included an express term prohibiting WLO from challenging HSW's rights in the Mark" and "there is the public interest in enforcing settlements with regards to trademark disputes." HSW Enterprises, Inc. v Woo Lae Oak, Inc., 08 CIV.8476 (LBS), 2009 WL 4823920, at *4 (SDNY Dec. 15, 2009), judgment entered, 08 CIV. 8476(LBS), *HSW Enterprises, Inc.*, 2010 WL 1630686.

87. As set forth in *Ritz*, *Dawn Donut*, and many others there is a strong public and federal interest in forcing licensors to actively control the quality of their licensee's services. Failure to do so results in inherent consumer deception, the result of which is abandonment of rights and being estopped from controlling a former licensee's continued use of the mark without consent.

88. Defendant is very likely to succeed on its claim for declaratory judgment that Can't Stop has engaged in naked licensing practices and as such that Plaintiff (a) has abandoned its rights in and to Village People Mark; (b) that such abandonment has broken Can't Stop's chain of continuous use necessary to prove priority over Sixuvus; and/or (c) that as a result of decades of naked licensing Can't Stop is now estopped from challenging Sixuvus' use.

## III. Defendants' Are Likely to Prevail on Their Breach of Contract Claim

89. "To establish a prima facie case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

90. "A contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the presumed intention of the parties as indicated by their conduct. It is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 582 (2d Cir. 2006) *citing Jemzura v. Jemzura*, 36 N.Y.2d 496, 503-504 (1975).

91. Even if no definite period of termination was originally fixed, a contract is not terminable at will by either party. Rather, if the contract existed for a reasonable duration, then a party is entitled to reasonable notice of termination. *Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc.*, No. 87 CIV. 6294 (MJL), 1988 WL 52777, at *2 (S.D.N.Y. May 18, 1988); *Colony Liq. Distributors, Inc. v Jack Daniel Distillery-Lem Motlow Prop., Inc.*, 22 AD2d 247, 249 (3d Dept 1964). *See also Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 556 (S.D.N.Y. 2009) (under New York law, in the context of an oral trademark license, "a contract that does not contain a termination provision is terminable only upon reasonable notice."). *Halo Optical Prod., Inc. v. Liberty Sport, Inc.*, 2017 WL 4011261, at *3 (N.D.N.Y. Sept. 11, 2017) (a year notice found to be reasonable under the circumstances).

92. Here where there was an oral agreement in place for almost three decades, one day's written notice is clearly insufficient.

93. Defendant is likely to prevail on the claim that Plaintiff breached the contract by trying to terminate the agreement on one day's notice, which if Plaintiff was allowed to terminate, is inequitable and unreasonable in light of the parties' agreement and the length of their relationship.

## IV.     Defendants Are Likely to Prevail on their Promissory Estoppel Claim

94. "In New York, promissory estoppel has three elements: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance.'" *Cyberchron Corp. v Calldata Sys. Dev., Inc.*, 47 F3d 39, 44 (2d Cir. 1995).

95. Here, Defendants have established all three elements of promissory estoppel i.e. that it was promised that it could perform as Village People as long as Sixuvus wanted to continue performing, Defendants relied on that promise by *inter alia,* spending time and effort building their reputation as Village People, allowing Plaintiff to use their images on Village People merchandise, and signing over the Domain Name to Plaintiff, after Plaintiff told them they were

being paranoid and it would not 'pull the rug' out from underneath Sixuvus.

96. Unfortunately, that is what happened, Plaintiff did 'pull the rug' out from underneath Sixuvus, when in direct contravention to its promise that Defendants could perform as Village People as long as they wanted to, it tried to terminate the license on one (1) day's notice.

97. Defendant disputes that the oral agreement would fall within the statute of frauds, NY GOL 5-701(a)(1). Under New York law, the Statute of Frauds requires an agreement to be in writing, and signed by the party to be charged, if it cannot be performed within one year from the date of its making. *See* N.Y. GEN. OBLIG. LAW § 5-701(a)(1) (McKinney 2012).

98. Regardless, promissory estoppel can provide relief to a party where the contract is rendered unenforceable by operation of the Statute of Frauds. *Merex A.G. v Fairchild Weston Sys., Inc.,* 29 F3d 821, 824 (2d Cir 1994) (*citing Restatement (Second) of Contracts* § 139(1) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise.")).

99. Here Plaintiff's promise that Sixuvus can perform as Village People as long as they want to is enforceable, notwithstanding the statute of frauds, where Plaintiff induced Defendants' reliance and enforcement of that promise is the only way to avoid a great injustice.

## V.     Defendants Are Likely to Prevail on their Claim for Tortious Interference with Sixuvus' Prospective Contractual/Economic Relations

100.     New York law provides for separate causes of action for interference with existing and prospective contractual relationships. *Lader v. Delgado*, 941 F. Supp. 2d 267, 272 (E.D.N.Y. 2013).

101.     "Under New York law, the elements of a claim for tortious interference with prospective business relations are: (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business

20

relationship." *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000). *See also Legacy Grp. of Am., Inc. v. N. Am. Co. for Life & Health Ins.*, 336 F. App'x 87, 91 (2d Cir. 2009) (Internal citations omitted). The fourth element has been further clarified to by the Second Circuit that "the [party's] interference [must have] caused injury to the relationship." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006).

102.     "In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994).

103.     Unless Plaintiff and Intervenor are enjoined from interfering with Sixuvus' right to perform live as the Village People, Defendant will continue to lose the valuable business relationships that it has cultivated for almost three decades. Once ruined, these relationships would be impossible to rebuild.

## VI.     Defendants Are Likely to Prevail on their Tortious Interference with Contract Claim

104.     "Under New York law, the elements of tortious interference with contract are: (1) the existence of a valid contract between the plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract, and (5) damages resulting therefrom." *See Highland Capital Mgmt. LP. v. Schneider*, 198 F. App'x 41, 45 (2d Cir. 2006) *citing Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 424 (1996).

## VII.     Intervenor Is Not a Necessary Party and

105.     A party is "necessary" under Rule 19 if:
  (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest . . .

*MasterCard Intern. Inc. v Visa Intern. Serv. Ass'n, Inc.*, 471 F3d 377, 385 (2d Cir 2006).

106.　　　Intervenor also not likely to succeed on her argument that she is a necessary party to this action.  As in *MasterCard*, Intervenor does not fit into these categories.  There is no reason why complete relief cannot be afforded among Defendants and Plaintiff i.e., those that were already parties to this lawsuit without Intervenor.  *See MasterCard Intern. Inc.*, 471 F3d at 385 (even if further litigation between the Visa and FIFA for FIFA's alleged breach of its warranties in contract granting Visa exclusive sponsorship, when Mastercard claimed it held those exclusive rights, was likely, Rule 19(a)(1) is only concerned with those who were already parties and Mastercard could obtain complete relief without Visa in the case).

107.　　　Similarly, Intervenor is not a necessary party under Rule 19(a)(2)(i).  Intervenor's argument appears to be that because she is allegedly Plaintiff's exclusive licensee by contract, that she is a necessary party under Rule 19(a)(2)(i).  However even in situations where a party seeks to enjoin the other party from performing a contract with a third-party, that does not mean that the third party is a necessary party.  Again, the Second Circuit's decision in *Mastercard* is instructive.  In that case, Visa argued it was a necessary party and claimed that "because MasterCard seeks to enjoin FIFA from performing the Visa Contract, its interests are clearly implicated and it is therefore entitled to appear in this litigation."  *MasterCard Intern. Inc.*, 471 F3d at 386.  Like *Mastercard,* the basis of the claims between Plaintiff and Defendants lies in the interactions between Plaintiff and Defendants and the question of whether or not Plaintiff holds valid rights or whether Defendants own those rights, can be decided without Intervenor.

108.　　　Here as in *Mastercard*, if Defendants prevail it will not impair any rights Intervenor may have to protect an interest in her contract with Plaintiff.  While Defendants prevailing may adversely affect Intervenor, that is not the standard.  Like *Mastercard,* the primary flaw in Intervenor's argument is that she has

> [C]onstrued Rule 19(a)(2)(i) to extend to any party whose interests would be impaired or impeded by a litigation. This overlooks a key element of the definition of "necessary" party under Rule 19(a)(2)(i). It is not enough under Rule 19(a)(2)(i) for a third party to have an interest, even a very strong interest, in the litigation. Nor is it enough for a third party to be adversely affected by the outcome of the

litigation. Rather, necessary parties under Rule 19(a)(2)(i) are only those parties whose ability to protect their interests would be impaired because of that party's absence from the litigation.

*MasterCard Intern. Inc.*, 471 F3d at 387.

109.     While intervenor may have an interest that would be impaired by the outcome of this litigation, the harm will not be caused by her absence from this litigation, or the November 30, 2017 hearing.  To the contrary, any harm that Intervenor would suffer as a result of a finding that Plaintiff could not and/or improperly terminated its contract with Defendants, and/or has abandoned its rights in the Can't Stop Registrations by naked licensing, results from Plaintiff's conduct in awarding Intervenor exclusive rights it could not legally give.  *MasterCard Intern. Inc.*, 471 F3d at 387 ("Visa still does not qualify as a necessary party under Rule 19(a)(2)(i) because the harm Visa may suffer is not caused by Visa's absence from this litigation. Any such harm would result from FIFA's alleged conduct in awarding Visa sponsorship rights it could not legally give.").

110.     It "would be significantly broadening both Rule 19(a)(2)(i) and the principle discussed in *Crouse–Hinds* if we found that because the outcome of this case may impact a separate contract involving a different party, that finding would transform the action into "an action to set aside a lease or a contract."  *See id.*

111.     In any event, as Intervenor has been allowed to temporarily intervene in this action, this issue is moot.

112.     Even if Intervenor were not a party, she could still be bound as she is in active concert and participation with Plaintiff.  Fed. R. Civ. P. 65(d)(2) provides that "[t]he order binds only the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in" (A) or (B).

## VIII.   <u>Irreparable Harm and Balance of the Hardships</u>

113.     Irreparable harm in the absence of an injunction and balance of the hardship "both of which consider the harm to the parties, are related." *Salinger v Colting*, 607 F. 3d. 68, 81 (2d

Cir. 2010).

114.    On the issue of irreparable harm, Courts must "actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *HarperCollins Publishers L.L.C. v Gawker Media LLC*, 721 F. Supp. 2d 303, 305 (S.D.N.Y. 2010) (quoting *Salinger*, 607 F3d at 80).

115.    The Second Circuit has further noted that "[h]arm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." *Salinger*, 607 F3d at 81.

116.    Damage to reputation is difficult to prove or quantify. *Stern's Miracle-Gro Products, Inc. v Shark Products, Inc.*, 823 F Supp 1077, 1094 (S.D.N.Y. 1993).

117.    The damage to Defendants' relationships and reputation with booking agents, venues and its fans that it will suffer if it is maligned for two years, while Intervenor's group is performing, is impossible to quantify, and would be impossible to re-build the success and relationships that they built over the last 30 years.

118.    Moreover, the evidence shows that the public will not be disserved by the issuance of an injunction that will prevent consumer deception. To this end it was apparent that there was consumer deception prior to the TRO being issued, and the TRO and the injunctive relief granted therein is actually helping mitigate consumer confusion by allowing consumers to understand the sudden change in quality of the services rendered under the Marks, because Plaintiff has done nothing to prevent such deception.

119.    Moreover, neither Plaintiff nor Intervenor have introduced *any evidence* that they would be damaged by the issuance of injunctive relief requested. As such the balance of the equities and public interest tip decidedly in Defendants' favor.

Dated: New York, New York
       February 12, 2018

Respectfully submitted,

ADELMAN MATZ P.C.

By: ___*/s/Sarah M. Matz*___ _____
    Sarah M. Matz, Esq.
    Gary Adelman, Esq.
1173A Second Avenue, Suite 153
New York, New York 10065
T: (646) 650-2207
F: (646) 650-2108
sarah@adelmanmatz.com
g@adelmanmatz.com
*Attorneys for Defendants/Counterclaim*
*Plaintiffs*