UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
CAN'T STOP PRODUCTIONS, INC.,

                                        Plaintiff,

            - against -

SIXUVUS, LTD., ERIC ANZALONE, ALEXANDER
BRILEY, FELIPE ROSE, JAMES F. NEWMAN,
RAYMOND SIMPSON, and WILLIAM WHITEFIELD,

                                        Defendants.
------------------------------------------------------------------------x

**MEMORANDUM DECISION
AND ORDER**

No. 17-CV-6513 (CS)

<u>Appearances</u>:

Stewart L. Levy, Esq.
Eisenberg Tanchum & Levy
White Plains, New York

Robert S. Besser, Esq.
Law Offices of Robert S. Besser
Pacific Palisades, California
*Counsel for Plaintiff*

Karen Willis d/b/a Harlem West Entertainment
San Diego, California
*Plaintiff-Intervenor Pro Se*

Sarah M. Matz, Esq.
Gary Adelman, Esq.
Adelman Matz P.C.
New York, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

      This case involves a dispute over the "Village People" trademarks associated with the

disco group that had several hits – including "Macho Man," "In the Navy," and most famously

"YMCA" – in the late 1970s.  On February 16, 2018, the Court issued an Order, with opinion to

follow, that denied Defendant's motion for a preliminary injunction and vacated the amended

temporary restraining order ("TRO") that was in place.  (Doc. 115.)  This Memorandum explains the reasons for the Court's decision.

## I.     PROCEDURAL BACKGROUND

Plaintiff Can't Stop Productions, Inc. filed this lawsuit against Defendants Sixuvus Ltd. and its members Eric Anzalone, Alexander Briley, Felipe Rose, James F. Newman, Raymond Simpson, and William Whitefield on August 25, 2017, for trademark infringement and a declaratory judgment that Plaintiff is the owner of all rights, title and interest in the "Village People" trademarks.  (Doc. 1 ("Compl.").)  On November 30, Defendants answered and asserted counterclaims for (1) tortious interference with a settlement agreement between Defendants and former Village People lead singer, Victor Willis; (2) naked licensing; (3) breach of contract; (4) breach of contract implied in fact / promissory estoppel; (5) tortious interference with contractual relations; and (6) tortious interference with prospective contractual relations / prospective economic advantage.  (Doc. 32 ("Answer").)

On December 1, 2017, Defendants filed a motion for a TRO and preliminary injunction, seeking to enjoin Plaintiff "from taking any action, alone or in concert with others, that would interfere with Sixuvus'[s] ability to perform live as Village People."  (Doc. 41 at 1.)  After reviewing Defendants' moving papers and hearing oral argument from Plaintiff and Defendants, the Court entered a TRO on December 1, 2017, temporarily permitting Defendants to perform as "Sixuvus Presents The Legendary Village People" and restraining Plaintiff from directly or indirectly interfering with Defendants' ability to book live performances.  (Doc. 37.)

On December 8, 2017, Karen Willis d/b/a Harlem West Entertainment ("Intervenor") filed a motion to intervene and to vacate or modify the TRO, contending that Harlem West Entertainment was the exclusive licensee of the Village People marks and that vacating or

modifying the TRO was necessary to avoid harm to Intervenor and a likelihood of confusion. (Doc. 110.)  After reviewing Intervenor's motion papers and hearing argument from the parties, the Court temporarily allowed Karen Willis – who is Victor Willis's wife – to intervene as a preliminary plaintiff and a preliminary counterclaim defendant, and issued an amended TRO. (Doc. 52.)  The amended TRO provided that Intervenor's group would perform as "Village People* featuring Victor Willis" and Defendants would perform as "Village People* featuring _____," followed by the name of an individual group member or members of Defendants' choosing, provided that the following disclaimer accompanied any advertising or other use of the name:  "*The trademark 'Village People' is the subject of litigation.  There are two groups performing under the name 'Village People.'"  (*Id.* at 2-3.)  The amended TRO further provided, among other things, that the parties would not disparage the opposing group or interfere with their ability to perform, (*see id.* at 6-7), and that on consent of the parties the briefing schedules and hearings in connection with Defendant's and Intervenor's motions were stayed pending the parties' participation in mediation, (*id.* at 8).

On December 14, 2017, Defendants filed a letter requesting a pre-motion conference to compel Intervenor's immediate compliance with the amended TRO or else hold her in contempt. (Doc. 53.)  Intervenor responded on December 15, 2017, (Doc. 57), and a pre-motion conference was held on December 15, 2017, during which the Court declined to impose contempt sanctions but reiterated that strict compliance with the Court's amended TRO was expected, (Minute Entry dated December 15, 2017).

On January 25, 2018, the parties participated in mediation.  (Minute Entry dated January 25, 2018.)  Because no settlement agreement was reached, (*see id.*), a preliminary injunction hearing was held on January 29 through February 1, 2018, and February 6, 2018.  On February

12, 2018, the parties submitted proposed findings of fact and conclusions of law.  (Docs. 104-106.)

The Court issued an Order dated February 16, 2018, denying Defendant's motion for a preliminary injunction and vacating the amended TRO.  (Doc. 115.)  The Court now explains its reasoning.

## II.  <u>LEGAL STANDARD</u>

For decades, a party seeking a preliminary injunction in this Circuit was required to "show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (internal quotation marks omitted).  But in *Salinger v. Colting*, 607 F.3d 68, 74-75 (2d Cir. 2010), the Second Circuit announced that this standard had been abrogated in the copyright infringement context by *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), and held that a plaintiff seeking a preliminary injunction must show (1) "a likelihood of success on the merits" or "sufficiently serious questions going to the merits to make them a fair ground for litigation"; (2) "that he is likely to suffer irreparable injury in the absence of an injunction"; (3) that "the remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (4) that, "consider[ing] the balance of hardships between the plaintiff and defendant," a remedy in equity is warranted; and (5) that "the public interest would not be disserved by the issuance of a permanent injunction," *Salinger*, 607 F.3d at 79-80 (internal quotation marks omitted); *see id.* at 77.  "Although the holding in *Salinger* was explicitly 'limited to preliminary injunctions in the context of copyright cases,' the Court saw no reason

why '*eBay* would not apply with equal force to an injunction in *any* type of case.'" *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 539 (S.D.N.Y. 2011) (emphasis in original) (citation omitted) (quoting *Salinger*, 607 F.3d at 78 n.7), *aff'd*, 511 F. App'x 81 (2d Cir. 2013) (summary order). The panel further "noted that '*eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context.'" *Id.* (quoting *Salinger*, 607 F.3d at 78). Like other courts in this Circuit, this Court finds "no principled reason not to adopt the . . . [*Salinger*] standard in the trademark context." *Id.* (collecting cases).[1]

## III.  FINDINGS OF FACT

In the 1970s, Henri Belolo and Jacques Morali of Can't Stop Productions, Inc., created the concept of Village People – a disco group featuring six distinct characters:  police officer, construction worker, Native American, leatherman/biker, cowboy, and soldier/military officer[2] – and co-wrote the songs for which the group is known.  (Hearing Transcript ("Tr.") 35:16-21; 63:17-21; 518:7-13; 519:1-4, 20-22.)  Victor Willis, the original police officer character, was the lead singer and co-wrote a number of the group's hits.  (*Id.* 84:3-6; *see id.* 238:24-239:7)  He left the group in 1979 and was replaced by Ray Simpson.  (*Id.* 272:7-11.)  The other original members were Felipe Rose, Alexander Briley, Randy Jones, David Hodo, and Glenn Hughes.  (*Id.* 342:25-343:5.)  Village People as a performing group acquired a worldwide reputation by 1979, (*see* Plaintiff's Exhibit ("P's Ex.") 43), but in 1985, as the popularity of disco music waned, Plaintiff decided to cease touring operations under the Village People marks, (Tr. 272:20-273:4).

---

[1]  Because this ruling turns on the merits, the outcome would be the same even under the old standard.

[2]  Although the police officer and soldier/military officer were not characters from the very beginning, these characters were developed in 1978 or 1979 after the release of the first Village People album.  (Tr. 46:17-47:7, 520:7-9.)

In 1987, Jones sought to re-assemble the group and formed Sixuvus Ltd., the entity through which the members from then on would conduct business.  (*Id.* 273:5-19, 274:18-21, 556:10-16.)  At that time the members of Sixuvus included Jones, Rose, Briley, Hodo, Hughes, and Simpson.  (*Id.* 342:10-343:2.)  By letter dated January 15, 1987, David Fishof Productions Inc. ("Fishof"), which Sixuvus utilized for booking and management services, made a proposal to Belolo to grant Sixuvus a license to use the Village People marks in exchange for five percent of the group's gross for touring, and Plaintiff agreed.  (*See id.* 565:3-9; P's Ex. 37 at 1, 3.)

By May 1989, Plaintiff wanted to end the contract with Fishof because Fishof had not satisfied the minimum royalty obligations under the agreement.  (P's Ex. 37 at 3.)  On January 9, 1990, Felipe Rose sent a letter to Belolo to inform him that Sixuvus was changing management services and to request that the license agreement with Fishof be transferred to Sixuvus and put in writing on the same terms as the Fishof agreement.  (*Id.* at 4.)  According to Rose's letter, since April 1, 1989, Plaintiff and Defendants had been operating under "a verbal Gentleman's Agreement" allowing Defendants to use the Village People marks under the terms of the Fishof agreement.  (*Id.*)  Belolo responded that Rose should contact Plaintiff's attorney, Stephen Kopitko, to execute the agreement, and asked Kopitko to prepare a license for touring in exchange for a five percent royalty fee.  (*Id.* at 5-6.)  Rose did not directly negotiate with Plaintiff, and believes Randy Jones negotiated the agreement (presumably because it was Jones who explained the events to him).  (Tr. 558:5-13.)  In any event, no agreement was ever codified and signed by the parties, but Plaintiff and Defendants agreed orally that Defendants could use the mark "Village People" for live performances in exchange for five percent of the gross receipts after expenses such as air travel were deducted.  (*See, e.g.*, *id.* 64:6-23, 173:20-174:3, 501:6-11, 557:2-10.)

The parties dispute the duration of the oral license granted to Sixuvus.  Defendants contend that the license was of infinite duration or for as long as Defendants sought to perform, while Plaintiff asserts that the license was for as long as Plaintiff agreed to the license.  Although the Court does not doubt that Defendants genuinely believe that the license was for as long as Defendants wanted to perform, they have not established that this was the agreement into which the parties entered.  Various Defendants testified that they believed that the license was of infinite duration based on conversations they had with other Sixuvus members, (*id.* 275:21-25, 433:14-17, 501:6-14, 558:14-19), but none of those witnesses were involved in reaching the agreement or negotiating its terms, (*see id.* 273:20-274:1, 378:18-25, 502:2-17, 558:5-19).[3] Indeed, no witness who was directly privy to the negotiations was called by either side to testify at the hearing to explain the terms of the agreement.

Nevertheless, other evidence offered at the hearing supports a finding that the license was for a limited duration and subject to Plaintiff's continued approval.  For example, on January 12, 1990, Belolo sent a fax to Plaintiff's attorney Kopitko to request that he contact Rose to draft an agreement "for a first period of 18 months (will see for extension after)."  (P's Ex. 37 at 6.) Then, in April and May of 1990, Defendants' new manager, Mitchell Weiss, corresponded with Kopitko to request changes to the agreement.  (P's Ex. 39.)  On May 10, 1990, Weiss acknowledged in a fax that the licensing "agreement [was] restricted to one year" and expressed that within the year "we will all know if [Sixuvus] can make a success of themselves, and then hopefully Henri will proudly choose to extend the option."  (*Id.* at 3-4.)  And on April 3, 2003,

---

[3]  These witnesses attributed their belief that the license had no time limit to conversations with Randy Jones, but they also recalled that Randy Jones had negotiated directly with Henri Belolo in 1987 when the group was first revived and made no mention of Fishof's involvement, (*see* Tr. 273:20-274:1, 433:6-434:8, 502:2-17, 558:5-19), suggesting that they do not accurately remember the events, or at least that their information was further removed from the source than they realized.

Kopitko sent Sixuvus and its members a letter containing a series of requirements with which Sixuvus needed to comply to continue utilizing the marks, (P's Ex. 5 at 1-2), further demonstrating that the license was more limited than Defendants contend.

Additionally, in a September 7, 2007 e-mail addressed to Weiss and the members of Sixuvus, in response to Sixuvus's expressed concern regarding Plaintiff's assertion of an ownership interest in a Village People website and domain name that Sixuvus had created, Belolo stated, "It seems to be that NOTHING in the past relationship between Felipe [Rose], David [Hodo], Alex[ Briley,] Jeff [Olson[4]] and Ray [Simpson] and Can't Stop should cause any worries in the future as long as the group wants to tour and *Can't Stop agrees to it*." (Intervenor's Exhibit ("I's Ex.") 4 at 2 (second emphasis added); *see* I's Ex. 2 at 2.)  Weiss's response expressed no surprise that the license was subject to Plaintiff's continued approval, (*see* I's Ex. 4 at 1), nor did Defendants offer any evidence that there was any subsequent discussion that would suggest that Plaintiff's approval of Defendants' license was a new requirement.  And, finally, it would be, at the very least, an unusual business choice for the trademark holder to put the power to control the trademark in the hands of the licensee.  Accordingly, the Court finds that Defendants have not shown by a preponderance of the evidence that their license to use the Village People marks in connection with live performances was for an unlimited duration and terminable only if Defendants elected to cease performing.

Following the negotiations with Plaintiff in 1990, Sixuvus went on to exclusively utilize the Village People mark in connection with live music performances for approximately thirty years, with an average of fifty live performances per year, and in exchange paid Plaintiff five percent of their gross receipts.  (*See, e.g.*, Tr. 277:2-6, 302:17-303:2, 393:7-14, 560:24-561:1.)

---

[4]  By September 2007, Jeff Olson had replaced Jones as the cowboy in Village People.  (*See, e.g.*, Tr. 391:14-15, 531:10-11.)

Defendants' performances were generally consistent with the original Village People performances, including their use of original "Y.M.C.A." choreography and other routines, albeit with minor adjustments based on, for example, the size and orientation of the stage at a given venue or the performers' aging.  (*Id.* 42:20-25, 49:3-9, 345:12-21, 402:21-403:5, 474:1-18, 516:13-23, 571:6-11.)[5]  Although the performers independently made some tweaks to their costumes, and added or subtracted songs from their set lists, the characters and vibe never changed.  (*See, e.g.*, *id.* 240:2-5, 333:3-9, 367:3-9, 375:4-10, 403:6-11, 569:4-13.)  As Belolo's son, Jonathan Belolo, testified, Defendants "knew exactly what it was that made Village People successful and what the fans and the public wanted, so they never strayed very far away" from the original Village People concept.  (*Id.* 42:22-25.)

While three of the members performed since the inception of Sixuvus – specifically, Simpson, the police officer; Rose, the Native American; and Briley, the soldier/military officer – the remaining characters (namely the leatherman, construction worker, and cowboy) were played by various individuals over the years.  (*See id.* 270:25-271:6, 371:12-17, 386:21-387:18, 493:5-12, 524:6-18, 550:18-552:12.)  Plaintiff required that Sixuvus seek Plaintiff's approval of its current and future members and temporary substitutes by furnishing their biographical information, headshots, and lists of their prior entertainment experience, (P's Ex. 5 at 2), but that information was not always promptly sought.  Whitefield, for example, began performing with Sixuvus in the fall of 2001, (Tr. 524:16-18), but his photo and resume were not sent to Plaintiff until July 18, 2003, (P's Ex. 5 at 7).  Plaintiff further required that Sixuvus's new performers sign agreements confirming that Plaintiff owned the Village People marks, that Plaintiff could assign the agreement or cause Sixuvus's members to be removed, and that Sixuvus's members

---

[5]  As Anzalone testified, "the older we get, moves get a little more difficult, so where there once was a squat, there is now a turn."  (Tr. 403:1-3.)

had no rights to the marks except for their right to perform – agreements similar to those signed by the original members of Village People.  (*See* P's Exs. 21-26, 28; *see* P's Ex. 5 at 2.)  The contracts, too, were not always promptly sought, but in those instances they were eventually required.  For example, Defendants William Whitefield and Eric Anzalone performed for a few years before signing an agreement with Plaintiff, (*see* Tr. 220:2-20, 524:16-528:18; P's Ex. 22), while Defendant James Newman signed an agreement shortly after joining Sixuvus, (*see* Tr. 371:12-24; P's Ex. 26).

During the license period, Belolo, his son, and Plaintiff's other employees and licensees reviewed Sixuvus's performances to ensure their quality.  (*See, e.g.*, Tr. 641:1-642:11.)  This review entailed watching videos posted by Defendants and fans online, monitoring websites with Village People content, and periodically attending live performances and meeting with Defendants in France and New York.  (*See, e.g.*, *id.* 42:5-8, 632:13-19, 641:1-642:11; P's Ex. 57.)  Plaintiff had agents in twenty countries and used them to monitor the use of the trademarks in their territories, which sometimes entailed viewing live performances to ensure that the quality of the trademarks was maintained.  (Tr. 36:3-37:16.)  Plaintiff also employed its attorney, Kopitko, to address occasions when Defendants attempted to exceed the scope of the license or failed to properly denote the trademark in their press kit and on their website.  (*See, e.g.*, Exs. 3, 4, 5 at 2-4; Tr. 107:5-15.)

Beginning in at least April of 2003 – the record does not reflect either way on the period from 1990 to 2003 – Plaintiff required that Defendants provide on a monthly basis an itinerary of the group's upcoming performances, emphasizing that "[b]usiness and/or personnel decisions must be approved by [Belolo,]" and that Plaintiff "shall have approval over each and every present member comprising the group as well as any and all future replacements and/or

temporary substitutes."[6]  (Ex. 5 at 2, 4; *see id.* at 6; I's Ex. 4 at 1 (Belolo requesting updated

itinerary).)  Some of Defendants' witnesses testified that communications between Sixuvus and

Plaintiff were sparse and did not concern Sixuvus's live performances.  (Tr. 287:7-24; 584:14-

586:5, 587:7-18).  The evidence, however, reveals that Defendants heeded Plaintiff's request:

their managers, Weiss and Deborah Crawford, provided itineraries and updates regarding the

group's performances, (*see, e.g.*, P's Exs. 12, 16, 19, 34, 35, 36, 53 at 2, 54; Tr. 134:7-23), albeit

not always on a monthly basis, (Tr. 173:5-13 (sometimes monthly, sometimes only two to four

times per year)).  Evidently Defendants' managers did not relay to the group or its employees

that these communications were transpiring.  (*Id.* 476:16-24).

  Belolo frequently responded to such updates with instructions and suggestions.  On July

16, 2008, for example, Belolo expressed that he "was not 100% happy by the way [Defendants]

were treated [in France] last time" and reminded Weiss "to ask the promoters to contact [him] in

order to discuss . . . the artistic details" so he could "make sure that this time everything is 100%

perfect."  (P's Ex. 54.)  He further requested that Weiss provide a song list and indicated that his

studios would upgrade the mixing of backing tracks so that Defendants would have the "[b]est

possible sound."  (*Id.*; *see* Tr. 123:21-124:22.)  Likewise, in response to a January 16, 2009 e-

mail with Defendants' upcoming schedule, Belolo stated that he was "surprised" about some of

the schedule and stated, "[P]lease note that nothing can be 'decided' without me being informed

and consulted in advance, and it is subject to my prior checking and approval," and that he

wanted Defendants "to FIRST consult with [him] before [S]ixuvus g[a]ve its ok for any of the

projected dates" so he could "make sure that everything is rightfully done for the . . . tour."  (P's

---

[6] In a letter dated May 22, 2003, Belolo states that he didn't "think it [was] inappropriate to be advised in advance of [Sixuvus's] itinerary and activities."  (P's Ex. 5 at 4.)  Neither this statement nor the other evidence produced at the hearing makes clear whether prior to April of 2003 Plaintiff required information concerning Sixuvus's performances in advance, as they were happening, or after the fact when the five percent license fee became due.

Ex. 16 (emphasis in original).)  He suggested that Defendants tell promoters, "'please talk to Henri [b]efore we can accept anything,'" requested copies of all contracts, and stated that he and Sixuvus would decide "how many, and w[h]ich songs, will be performed during the tour and make sure to finali[z]e the mix/sound of the tracks of each songs to be perform" to avoid "the problems we had in the last tour," (*id.*), which problems apparently arose from Sixuvus making decisions without Plaintiff's approval, (Tr. 129:8-130:9).  Additionally, in May of 2009, Belolo informed Weiss that his son Jonathan was revising the music tracks for "YMCA," "Macho Man," and "In the Navy" for Defendants' upcoming France Tour, (P's Ex. 12), as Plaintiff had done before for other songs, (*see, e.g.*, I's Exs. 6-7).

Plaintiff, however, was not involved in many aspects of Defendants' live performances. Defendants hired their own agents and booked their own shows without obtaining Plaintiff's permission or instructions regarding where, or where not, to perform.  (*See* Tr. 63:22-64:5, 132:4-16, 286:11-14, 303:20-23, 304:9-17, 416:4-10, 504:17-20.)  They designed their own costumes, while staying true to the six Village People characters, and made adjustments to some of the choreography.  (*See, e.g.*, *id.* 132:10-16, 327:14-17, 345:3-21, 410:10-20, 411:6-14, 413:4-414:21, 504:7-15, 569:4-9.)  Although Defendants did not need Plaintiff's approval for costumes and dance routines, Plaintiff nevertheless kept an eye on these aspects of Defendants' performances and would have informed Defendants if changes needed to be made, but such instructions were not necessary because Plaintiff was pleased with Defendants' performances. (*See, e.g.*, *id.* 47:11-21, 49:13-14.)  Defendants further held auditions, trained new members, and rehearsed for upcoming performances without Plaintiff's involvement.  (*See, e.g.*, *id.* 371:18-372:10, 388:2-14, 389:25-390:2, 524:16-525:7, 528:2-15.)  Indeed, some of the new members of

Sixuvus never met with Plaintiff or its representatives.  (*Id.* 376:6-8, 436:23-437:4, 533:25-534:2.)

Beginning in at least 2010, Intervenor's husband Victor Willis initiated a series of lawsuits against Plaintiff and Defendants concerning, among other things, Willis's rights in Village People songs and Plaintiff's rights in the trademarks.  (*See id.* 26:11-13, 27:12-24, 28:11-29:13, 31:16-32:19; Defendants' Ex. ("Ds' Ex.") X.)  For at least one such lawsuit that was ongoing in 2010 and 2011, Plaintiff paid over $100,000 toward Defendants' legal fees, (*see* P's Ex. 59), and Plaintiff's counsel met with Defendants regarding their litigation strategy, (*see* P's Ex. 57).

In the spring of 2017, as part of a settlement agreement in another lawsuit initiated by Willis against Plaintiff, Plaintiff granted Intervenor a ten-year, written and exclusive license to use the Village People marks for live performances effective June 1, 2017.  (*See* Ds' Ex. B; Tr. 29:8-33:11.)  By e-mail dated May 30, 2017, Jonathan Belolo notified Defendants that Plaintiff had terminated their license to use the Village People marks in live performances and that such termination was effective June 1, 2017.  (Ds' Ex. A.)  At that time, Plaintiff offered Defendants the ability to perform as Village People for their existing contractual commitments through December 1, 2017, and Defendants continued performing.  (*Id.*; Tr. 72:22-73:5; *see id.* 317:2-7.)  After Defendants began questioning Plaintiff's rights to the Village People marks, the instant litigation ensued.  (*See* Compl. ¶¶ 35-36.)

## IV.  CONCLUSIONS OF LAW

### A.  Naked Licensing of Trademark

"The Lanham Act provides that a trademark registration may be cancelled where the trademark has become abandoned."  *Thomas Am. Corp. v. Fitzgerald*, 869 F. Supp. 221, 226

(S.D.N.Y. 1994) (citing 15 U.S.C. § 1064(3) (1988)).  "The Act defines 'abandoned' to include '[w]hen any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or to otherwise lose its significance as a mark.'"  *Id.* (quoting 15 U.S.C. § 1127). "In interpreting this provision, the Second Circuit has held 'that the Lanham Act places an affirmative duty upon a licensor of a registered trademark to take reasonable measures to detect and prevent misleading uses of his mark by his licensees or suffer cancellation of his federal registration.'"  *Id.* (quoting *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 362 (2d Cir. 1959)).  "The purpose of this duty is to prevent the public from being misled into thinking it will receive a product of similar quality and character from a licensee as it would receive from the licensor, if in fact there is no such similarity."  *HWS Enters., Inc. v. Woo Lae Oak, Inc.*, No. 08-CV-8476, 2009 WL 4823920, at *3 (S.D.N.Y. Dec. 15, 2009).

Accordingly, "it [is] unlawful for . . . a trademark owner to grant . . . a license to a licensee for the use of a mark without the retention of supervisory control."  *Direct Mktg. Educ. Found., Inc. v. John Wiley & Sons, Inc.*, No. 08-CV-1464, 2008 WL 650288, *1 (S.D.N.Y. Mar. 11, 2008) (collecting cases).  Such a license is called a "naked license."  *See HWS Enters.*, 2009 WL 4823920, at *3.  "Under the naked licensing doctrine, a naked licensor may be estopped from challenging a breach of a licensing agreement, or even be deemed to have involuntarily abandoned the rights to the mark."  *Id.*; *see Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 124 (5th Cir. 1973) ("Failure to exercise . . . control and supervision [over the licensee's use of the mark] for a significant period of time may estop the trademark owner from challenging the use of the mark and business which the licensee has developed during the period of such unsupervised use.").  "This principle is an analogue to the estoppel against a trademark

14

owner who knowingly sits silently by while infringers use his trademark over a significant period of time." *Sheila's Shine*, 486 F.2d at 124. "The critical question in determining whether a licensing program is controlled sufficiently by the licensor to protect his mark is whether the licensees' operations are policed adequately to guarantee the quality of the products sold under the mark." *Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 110 (2d Cir. 1986).

1.    *Licensee Estoppel*

A licensee, however, is limited in its ability to assert that a trademark holder has abandoned its mark through naked licensing. "[A] licensee is estopped to contest the validity of the licensor's title during the course of the licensing [agreement]," because "[t]he licensee has, by virtue of the agreement, recognized the holder's ownership." *Prof'l Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665, 671 (5th Cir. 1975) (collecting cases); *see In re Houbigant Inc.*, 914 F. Supp. 964, 993 (S.D.N.Y. 1995). Courts have adopted different approaches to address whether a licensee can challenge the validity of the trademark holder's ownership of the mark once the license has terminated. *Prof'l Golfers*, 514 F.2d at 671. "Some courts have held that the estoppel expires with the license," while "[o]thers have refused to allow any subsequent challenges by former licensees." *Id.* Other courts have adopted a middle-of-the-road approach in which "a former trademark licensee may challenge the licensor's title on facts which arose after the contract has expired." *Id.* Under that approach, a former licensor is estopped from arguing abandonment where the facts upon which the licensor relies arose during the course of the agreement with the licensor. *Id.*[7]

The Second Circuit seems to have taken a policy-based approach with respect to licensee estoppel. In *Idaho Potato Commission v. M & M Produce Farm & Sales*, 335 F.3d 130 (2d Cir.

---

[7] If the Court were to apply the middle-of-the-road approach, Sixuvus's argument would fail, as Sixuvus relies exclusively on facts that arose during the course of the licensing agreement.

2003), the Court considered whether, after the termination of a license, a former licensee was estopped from challenging the validity of a certification mark where the licensing agreement contained provisions through which the licensee expressly recognized the validity of the mark and promised not to challenge the rights of the trademark holder in those marks during the term of the agreement or at any point thereafter. *Id.* at 134. The Court held that, regardless of whether the license agreement contained a no-challenge provision, every claim of licensee estoppel should be evaluated by balancing the public interest in challenging invalid trademarks against the private interest in the enforcement of contracts. *Id.* at 137.[8]

The public interest served by a challenge to the Village People mark based on naked licensing turns on the reason "[t]rademark law imposes an affirmative duty on a licensor to exercise quality control over the licensee's product[, which is] to prevent the public from being misled into thinking it will receive a product of similar quality and character from a licensee as it would receive from the licensor, if in fact there is no such similarity." *HSW Enters., Inc.*, 2009 WL 4823920, at *3. "Accordingly, the public interest being served by [Defendants]'s naked licensing challenge is the prevention of the [Village People concert]-going public from being misled into believing that one will receive a [live performance] of similar quality and character [from Defendants] as they will receive [from Plaintiff] in the alleged absence of adequate quality control by [Plaintiff]." *Id.* "Courts have generally been skeptical as to the weight of this public interest." *Id.* (collecting cases). Here, the record shows and the parties agree that Defendants at all times produced a high-quality product with which Plaintiff was happy, and thus the public was not at risk of being misled or of obtaining a lower-quality product from Defendants than it would have gotten from Plaintiff. The absence of any alleged quality deficiency in Defendants'

---

[8] In so holding, the Court adopted for use in the trademark context the licensee estoppel test articulated by the Supreme Court in the patent context in *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969). *See HSW Enters., Inc.*, 2009 WL 4823920, at *2.

use of the Village People marks demonstrates that the public interest served by their naked-licensing challenge is minimal.  *Id.* at *4; *cf. Idaho Potato Comm'n*, 335 F.3d at 138-39 (public interest more substantial and more likely to be harmed where mark owner's conduct inhibits consumers' access to quality products).

On the other hand, "there is [a] strong public interest in protecting the reliance that contracts induce."  *HSW Enters., Inc.*, 2009 WL 4823920, at *4 (internal quotation marks omitted).  By entering into the agreement, the licensee affirms the licensor's ownership of the mark.  *See, e.g.*, *Prof'l Golfers*, 514 F.2d at 671.  Further, "[l]icensee estoppel is more persuasive in . . . instances in which the licensee had implicitly acknowledged the validity of the trademarks over an extended licensing relationship," *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 153 F. Supp. 2d 512, 522 (S.D.N.Y. 2001) (collecting cases where the licenses were in place for 5 to 42 years), *aff'd*, 43 F. App'x 408 (2d Cir. 2002) (summary order), and never repudiated the agreement, *see Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co.*, 112 F.3d 1561, 1567 (Fed. Cir. 1997).  Here, the license lasted for approximately three decades; Defendants repeatedly acknowledged Plaintiff's ownership of the marks; and there is no evidence that Sixuvus ever repudiated or even questioned the agreement.

Having weighed the relevant interests, I conclude that Sixuvus is estopped from challenging Can't Stop's ownership of the mark pursuant to the doctrine of licensee estoppel.  In this case, where there is no real possibility that the public was "'enticed into buying A's product when it wants B's product,'" *Idaho Potato Comm'n*, 335 F.3d at 136 (quoting *T & T Mfg. Co. v. A. T. Cross Co.*, 587 F.2d 533, 538 (1st Cir. 1978)), "'the public interest in [trademarks] . . . is not so great that it should take precedence over the rule of the law of contracts that a person

should be held to his undertakings,'" *id.* (alterations in original) (quoting *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 329 (6th Cir. 1973)).

Even if, as Defendants suggest, *Idaho Potato Commission* is limited to certification marks,[9] courts in this district and elsewhere that have declined to extend *Lear* to the trademark context have nevertheless held that licensees are estopped from challenging the validity of a mark using a naked-license theory.  *See E.G.L. Gem Lab Ltd. v. Gem Quality Institute, Inc.*, 90 F. Supp. 2d 277, 291-292, 292 n.112 (S.D.N.Y. 2000) (collecting cases), *aff'd*, 4 F. App'x 81 (2d Cir. 2001) (summary order).  Defendants rely on *Ritz Associates, Inc. v. Ritz-Carlton Hotel Co.*, 230 N.Y.S.2d 408 (N.Y. Sup. Ct. 1962), *aff'd*, 240 N.Y.S.2d 439 (N.Y. App. Div. 1st Dep't 1963), *aff'd*, 198 N.E.2d 905 (N.Y. 1964), for the proposition that "licensee estoppel does not preclude licensees from challenging [the] licensor's mark based on uncontrolled or naked licensing," (Doc. 105-1 ("Ds' COL") ¶ 64), but *Ritz* does not stand for this proposition.  Rather, the court in *Ritz* held that precedent indicating that "a licensee is estopped from denying that the licensor has the right to the patent or mark which he is licensing" did not support the licensor's argument that "the licensee is estopped from asserting that the *licensing agreement itself* is void as against public policy because it purports to grant a naked license."  230 N.Y.S.2d at 411 (emphasis added).  The court made only a passing reference to licensee estoppel in the context of challenging the licensor's rights to the mark, *see E.G.L.*, 90 F. Supp. 2d at 292 n.113, and holding that a licensee is not estopped from challenging the licensing agreement as void is distinct from permitting a licensee to challenge the licensor's rights to the mark itself.  Likewise, Defendants' reliance on *Miller v. Glenn Miller Productions*, 318 F. Supp. 2d 923 (C.D. Cal. 2004), is misplaced.  In *Miller*, the licensee raised naked licensing and licensor estoppel as

---

[9] Defendants present no reasoned argument why the logic of *Idaho Potato Commission* would not apply to trademarks other than certification marks.

defenses to the trademark holder's claims for trademark infringement, but there is no indication that the trademark holder raised the issue of licensee estoppel and the opinion does not address it. *See id.* at 945-46.

    2.    *Sufficiency of Control*

Even if Defendants are not estopped from raising a naked license challenge, the Court concludes that they have not demonstrated that Plaintiff failed to adequately police the Village People marks.

As a preliminary matter, there is no requirement that a licensing agreement expressly provide for quality control. But "where courts have excused the lack of a contractual right to control quality, they have still required that the licensor demonstrate *actual* control through inspection or supervision." *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 516-17 (9th Cir. 2010) (emphasis in original); *see Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 871 (10th Cir. 1995), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014); *Dawn Donut*, 267 F.2d at 368; *Thomas Am. Corp.*, 869 F. Supp. at 226.

Although it is clear that "[a] party asserting that it was granted a naked license faces a high burden of proof," *LPD New York, LLC v. Adidas Am., Inc.*, No. 15-CV-6360, 2017 WL 1162181, at *13 (E.D.N.Y. Mar. 27, 2017) (internal quotation marks omitted); *see Amscan Inc. v. Shutter Shades, Inc.*, No. 13-CV-1112, 2015 U.S. Dist. LEXIS 180647, at *13 (S.D.N.Y. Apr. 30, 2015) (citing *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir. 1983)); *Alexander Ave. Kosher. Rest. Corp. v. Dragoon*, 762 N.Y.S.2d 101, 104 (N.Y. App. Div. 2d Dep't 2003), "it is difficult, if not impossible to define in the abstract exactly how much control and inspection is needed to satisfy the requirement of quality control over trademark licensees,"

*Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 598 (9th Cir. 2002) (alteration omitted) (internal quotation marks omitted).  Indeed, "the standard of quality control and the degree of necessary inspection and policing by the licensor will vary with the wide range of licensing situations in use in the modern marketplace."  *Id.* (alteration omitted) (internal quotation marks omitted).

Nevertheless, courts generally have held that, to avoid abandonment, a licensor must exercise a "reasonable degree of supervision and control over licensees under the facts and circumstances of the particular case."  *Dawn Donut*, 267 F.2d at 367-68.  "The critical question in determining whether a licensing program is controlled sufficiently by the licensor to protect [its] mark is whether the licensees' operations are policed adequately to guarantee the quality of the products sold under the mark."  *Gen. Motors*, 786 F.2d at 110.  Because "[t]he purpose of the quality-control requirement is to prevent the public deception that would ensue from variant quality standards under the same mark . . . ,"  *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991), *aff'd sub nom. Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992), "[t]he sort of supervision required for a trademark license is the sort that produces *consistent* quality," *Eva's Bridal Ltd. v. Halanick Enters., Inc.*, 639 F.3d 788, 790 (7th Cir. 2011) (emphasis in original).   If a licensor fails to play a "meaningful role" in holding its licensee's products to a standard of quality, it will be found to have abandoned its mark.  *Barcamerica*, 289 F.3d at 597-98.  In other words, "a naked or uncontrolled license may provide the basis for an inference of abandonment of a trademark, [while] a controlled licensing program may not." *Gen. Motors*, 786 F.2d at 110 (citation omitted).

Some courts in this district have stated that "[t]he law . . . requires [the licensee] to show that [the licensor] exercised '*no control* over the nature or quality of the goods or services

provided in connection with the mark.'" *LPD*, 2017 WL 1162181, at *14 (emphasis in original) (quoting *Patsy's Italian Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 212 (E.D.N.Y. 2007)); *see Stiftung v. V. E. B. Carl Zeiss, Jena*, 293 F. Supp. 892, 918 (S.D.N.Y. 1968) ("[A] 'naked' license may be the basis for an inference of abandonment where the licensor maintains no control over the quality of goods made by the licensee."), *aff'd as modified on other grounds by* 433 F.2d 686 (2d Cir. 1970); *see also Engineered Mech. Servs., Inc. v. Applied Mech. Tech., Inc.*, 584 F. Supp. 1149, 1159 (M.D. La. 1984) ("'Retention of a trademark requires only minimal quality control . . . .'") (quoting *Ky. Fried Chicken, Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977)).  Other courts have not gone so far, requiring only a showing that "[the trademark holder] allowed [the licensee] to use the trademarks with so few restrictions as to compel a finding that [the trademark holder] engaged in naked licensing and abandoned the trademarks." *FreecycleSunnyvale*, 626 F.3d at 516.  Either way, "[i]f in fact the licensor has made a reasonable inspection . . . and there is no showing that any of the [services] were below the essential quality standards, the [naked-licensing argument] must fail." *Stiftung*, 293 F. Supp. at 918.

Further, even where a licensor's control measures did not guarantee the quality of the licensee's product, courts have rejected naked licensing arguments where the licensee was experienced in the manufacture of the product and there was a history of trouble-free manufacture or an absence of complaints about the quality of the product.  *See Stock Pot Rest., Inc. v. Stockpot, Inc.*, 737 F.2d 1576, 1580 (Fed. Cir. 1984) (restaurant licensor exercised sufficient control where licensor testified to general knowledge she had of restaurant's operations and her supervision when necessary, licensee had previously been licensor's "right hand," licensee used same menus and food, and jointly advertised with licensor, and "there was no

depreciation of the quality of the restaurant services rendered" during license period); *Land O'Lakes Creameries v. Oconomowoc Canning*, 330 F.2d 667, 670 (7th Cir. 1964) (noting that license agreement had been in place for forty years and there had been no complaints about quality of goods); *Direct Mktg.*, 2008 WL 650288, at *2 ("[A] licensee [has] supervisory control if the licensee has demonstrated past competence in a supervisory role with that particular product."); *Printers Servs. Co. v. Bondurant*, No. 91-CV-916, 1991 WL 332055, at *8 (C.D. Cal. Apr. 16, 1991) (sufficient quality control where licensor relied upon licensee's reputation and integrity, their long-term relationship, and lack of complaints to satisfy himself that the quality was maintained); *Embedded Moments, Inc. v. Int'l Silver Co.*, 648 F. Supp. 187, 194 (E.D.N.Y. 1986) (evidence of licensor's reliance on integrity of licensee based on prior relationship, licensor's willingness to continue the relationship, and a history of trouble-free manufacture would be "sufficient to establish compliance with the requirement of supervisory control"); *Engineered Mech. Servs.*, 584 F. Supp. at 1159 (license was not naked because effectiveness of trademark was maintained and there were no complaints regarding quality of product where licensor retained right to terminate license for failure to maintain proper quality control); *Syntex Labs., Inc. v. Norwich Pharmacal Co.*, 315 F. Supp. 45, 56 (S.D.N.Y. 1970) ("[R]eliance upon the integrity of a licensee is sufficient to fulfill the control requirement where a history of trouble-free manufacture provides a basis for such reliance."), *aff'd*, 437 F.2d 566 (2d Cir. 1971); *Alexander Ave.*, 762 N.Y.S.2d at 104 (restaurant licensor exercised sufficient control because licensing agreement required licensee to maintain kosher premises and comply with health codes; licensor trained employees and shared menus and venues with licensee; and licensee was former manager so licensor could rely on his ability to maintain restaurant's standards).[10]

---

[10]  Some cases have held that a licensor's familiarity with and reliance on the licensee's own efforts to control quality can defeat a naked-licensing challenge even if the licensor did not exercise any degree of actual control. *See,*

In so holding, these courts have emphasized the need to construe the control requirement in light of its purpose:  "to avoid the danger that the public may be deceived as to the quality of a product sold under a recognized name."  *Syntex*, 315 F. Supp. at 56; *see Printers Servs.*, 1991 WL 332055, at *8 ("[T]he requirement of quality control must be construed in light of the reason for the requirement, which is the need to prevent deception of the public."); *First Interstate Bancorp v. Stenquist*, No. 89-CV-4106, 1990 WL 300321, at *3 (N.D. Cal. July 13, 1990) ("[T]he amount of control a licensor must have over a licensee is limited to that which is necessary to prevent deception . . . ."); *Embedded Moments*, 648 F. Supp. at 194 ("[T]he requirement of control should be construed in light of the reason for the requirement, which is the need to prevent deception of the public.").  In other words, "[w]here the particular circumstances of the licensing arrangement persuade [the Court] that the public will not be deceived, [the Court] need not elevate form over substance and require the same policing rigor appropriate to more formal licensing and franchising transactions."  *Taco Cabana*, 932 F.2d at 1121.

Here, Defendants have not shown that Plaintiff's control measures were inadequate. Undisputed testimony shows that Plaintiff and its agents monitored Defendants' performances by attending live shows; reviewing media content on the Internet; and requiring that new members sign contracts and that Defendants periodically provide itineraries and set lists for upcoming

---

*e.g.*, *FreecycleSunnyvale*, 626 F.3d at 518.  Typically this exception to the requirement of actual control is limited to circumstances in which the licensor and licensee engaged in a particularly close relationship, such as:  "(1) a close working relationship for eight years; (2) a licensor who manufactured ninety percent of the components sold by a licensee and with whom it had a ten year association and knew of the licensee's expertise; (3) siblings who were former business partners and enjoyed a seventeen-year business relationship; and (4) a licensor with a close working relationship with the licensee's employees, and the pertinent agreement provided that the license would terminate if certain employees ceased to be affiliated with the license."  *Id.*  Although Defendants are correct that Plaintiff is not relying on this exception, (*see* Ds' COL ¶ 45 (citing Tr. 20:3-19)), the decisions cited in the text make clear that where a licensor does exercise actual control, the licensor's history with the licensee and the licensee's demonstrated use of the license over time can be considered in evaluating the sufficiency of that control.  Thus, to the extent Defendants contend that Plaintiff's familiarity with Defendants and Defendants' efforts to control the quality of their live performances is irrelevant to assessing the sufficiency of Plaintiff's control, the argument is without merit.

performances.  Plaintiff remixed the backing tracks used in Defendants' performances to promote the sound quality of their shows and made other efforts to ensure that Defendants were well-received during their tours.  Although some of Sixuvus's members testified that they did not interact with Plaintiff and, to their knowledge, Defendants' communications with Plaintiff were non-existent or sparse, their testimony is at odds with documentary and other evidence presented during the hearing that makes clear that such communications did occur and that they were principally between Plaintiff and Defendants' managers, who were not called to testify and evidently did not relay the extent of the communications to Defendants.

The evidence further demonstrates that Defendants' performances as Village People were consistent with the original Village People performances and did not change in a significant manner during the license period, adhering to the artistic vision of its founders Belolo and Morali and the essentials of the showmanship that originally made Village People so popular.  (*See, e.g.*, Tr. 343:6-10; 571:6-11.)  Although Defendants modestly modified their costumes and choreography over the years, they retained the six Village People characters and dance numbers, and, by all accounts, never strayed far from the manner in which Plaintiff wanted the marks to be utilized.  Indeed, the evidence presented demonstrates that Defendants had a history of satisfactory performances for decades, with no risk of public deception.  Greater supervision by Plaintiff was not required, given Defendants' long-term reputation and integrity in maintaining the product. *See Stock Pot Rest.*, 737 F.2d at 1580; *Land O'Lakes Creameries*, 330 F.2d at 670; *Printers Servs.*, 1991 WL 332055, at *8; *Embedded Moments*, 648 F. Supp. at 194; *Syntex Labs.*, 315 F. Supp. at 56.

Defendants raise several legal arguments to contend that this evidence does not demonstrate that Plaintiff exercised adequate control, but none is unpersuasive.  First, citing the

Second Circuit's decision in *Dawn Donut Co. v. Hart's Food Stores, Inc.*, Defendants assert that conclusory statements regarding "regular" inspections of, or "many" opportunities to observe, a licensee are insufficient to demonstrate the level of supervision and control necessary to comply with the Lanham Act.  (*See* Ds' COL ¶¶ 39-40 (citing 267 F.2d at 368-69).)  But in so doing they rely on Judge Lumbard's partial dissent from the Court's opinion,[11] and so, presumably, the Court's majority found the evidence at issue sufficient to defeat a naked-licensing challenge.  *See Dawn Donut*, 267 F.2d at 360 (majority "conclude[s] that the district court's finding that the plaintiff exercised the degree of control over the nature and quality of the products sold by its licensees required by the Act was not clearly erroneous").  In any event, the evidence of Plaintiff's familiarity with Defendants' performances; the measures taken by Belolo, his son Jonathan, and Plaintiff's other employees and agents to monitor Defendants' performances; and Plaintiff's awareness of Defendants' dedication to maintaining the Village People concept as originally envisioned by Village People's founders and embraced by its fans, suffices to show that Defendants have not met their burden of establishing that they are likely to succeed in demonstrating insufficient control or a sufficiently serious question on that point.  *See Dawn Donut*, 267 F.2d at 360-61; *cf. Barcamerica*, 289 F.3d at 596-97 (naked licensing found because no evidence licensor was familiar with or relied upon licensee's efforts to control quality and licensor gave only conclusory statements about existence of quality controls).

Second, Defendants assert that, notwithstanding Plaintiff's undisputed policing of the use of the Village People marks in other areas such as merchandising and recordings, the sixteen-year period from 1987 to 2003 where Defendants allege Plaintiff engaged in virtually no communications with Defendants regarding live performances is alone sufficient to warrant a

---

[11]  This mistake is arguably understandable in light of the fact that Judge Lumbard wrote the Court's decision along with his partial dissent, and did so in one opinion without the break between opinions that lawyers are accustomed to seeing when a panel's decision is divided.

conclusion that Plaintiff engaged in naked licensing, and that the Court can separate live performances from the rest of Plaintiff's rights in the mark to conclude that Plaintiff has forfeited its rights in the live performance area.  (*See* Ds' COL ¶¶ 35-37, 55-61.)  Defendants are correct that some courts have held that long periods of inadequately controlled licensing may estop a licensor from challenging a licensee's use of the mark or function as an abandonment of the license that divests the licensor of its ownership of the mark.  *See Sheila's Shine*, 486 F.2d at 123-24 (licensor that did not communicate with or attempt to supervise licensee for eleven years was estopped from challenging licensee's use of the mark in trade area where licensee operated); *Yocum v. Covington*, 216 U.S.P.Q. 210, 1982 WL 52024, at *6 (T.T.A.B. 1982) (abandonment because no evidence the licensor retained any "supervisory controls from which [to] . . . infer something other than a simple sale or 'renting' of the [mark]").  But even assuming that it is possible to siphon off live performances from the rest of Plaintiff's rights to the Village People marks, which the Court does not find to be clear,[12] Defendants have not demonstrated a likelihood of success or sufficiently serious questions, because they have not shown that Plaintiff in fact relinquished control over live performances of Village People.  It is no surprise that there is more electronic evidence of communications occurring post-2000 than pre-2000.  That Kopitko's April 3, 2003 letter to Sixuvus indicated that a series of requirements necessary to maintain the license was "[e]ffective immediately," (P's Ex. 5 at 1-2), does not establish that

---

[12]  It is clear that "a mark owner can abandon a mark through naked licensing in a particular geographic area without abandoning its rights throughout the entire United States."  *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 265 (2d Cir. 2011).  This is so because there is no risk of confusion.  *See HSW Enters., Inc.*, 2009 WL 4823920, at *4.  Whether this holds true in the context of a partial abandonment in a particular product market is unclear.  In *Patsy's*, the Second Circuit characterized *Dawn Donut* in a parenthetical as "finding [that] naked licensing in the retail market would not result in the loss of trademark rights in the wholesale market."  658 F.3d at 264 (citing *Dawn Donut*, 267 F.2d at 369).  But that finding was made by Judge Lumbard in his dissent and was not addressed by the panel.  Other than Judge Lumbard's dissent, Defendants have pointed to no authority that provides clear support for the proposition that a trademark can be divided into separate uses of the mark, nor have Defendants addressed how Plaintiff's policing of the unauthorized use of the Village People marks in live performances by individuals other than Defendants, (*see, e.g.*, P's Ex. 51), affects the analysis.

there were no controls or monitoring in place before that date, only that the controls in place were not as formal or stringent, or had faded somewhat with time, (*see id.* at 4 (Belolo acknowledging that he had "not been involved as much as [he] should have" because "after a period of time a certain comfort level sets in" but noting his obligation on behalf of Plaintiff to maintain integrity of mark)).  The burden lies with Defendants to establish abandonment, *see Dawn Donut*, 267 F.2d at 360-61, but with respect to the pre-2003 period they showed essentially only that some of the performers had no contact with Plaintiff, not that no representative of Defendants had such contact or that Plaintiff did not exercise even minimal supervision.  Further, even assuming there was no control by Plaintiff for a long period, Defendants have provided no authority for the proposition that a lengthy period of inadequate policing, followed by an equally lengthy period of adequate policing, permits a court to infer abandonment, and the Court does not see how such evidence logically could support such an inference.

In sum, the Court finds that Defendants are estopped from challenging Plaintiff's ownership of the Village People marks, and even if they could assert a naked-licensing challenge, they have not demonstrated that Plaintiff inadequately controlled Defendants' use of the marks under the licensing agreement.  Accordingly, they have failed to demonstrate a likelihood of success on the merits on their naked licensing claim or sufficiently serious questions going to the merits to make them a fair ground for litigation.

**B.  Breach of Contract**

"To establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach."  *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

Contracts can be written, oral, or implied in fact based on the facts and circumstances of the case. *See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 582, 587 (2d Cir. 2006).  If a contract does not contain a termination provision, it is terminable only after a reasonable duration and upon reasonable notice.  *Copy-Data Sys., Inc. v. Toshiba Am., Inc.*, 755 F.2d 293, 301 (2d Cir. 1985); *Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 556 (S.D.N.Y. 2009); *Italian & French Wine Co. of Buffalo, Inc. v. Negociants U.S.A., Inc.*, 842 F. Supp. 693, 698-99 (W.D.N.Y. Nov. 10, 1993) (collecting cases).

Courts have held that notice periods of one year or less are reasonable, depending on the circumstances.  *See Halo Optical Prods., Inc. v. Liberty Sport, Inc.*, No. 14-CV-282, 2017 WL 4011261, at *3 (N.D.N.Y. Sept. 11, 2017) (one year); *Colony Liquor Distribs., Inc. v. Jack Daniel Distillery-Lem Motlow Prop., Inc.*, 254 N.Y.S.2d 547, 549-50 (N.Y. App. Div. 3d Dep't 1964) (forty-five day's notice, plus nearly a year's extension through court action, for eleven-year contract); *Bailey v. S.S. Stafford, Inc.*, 166 N.Y.S. 79, 82 (N.Y. App. Div. 1st Dep't 1917) (six months); *see also Halo Optical Prods., Inc. v. Liberty Sport, Inc.*, No. 14-CV-282, 2017 WL 1082443, at *7 (N.D.N.Y. Mar. 22, 2017) (sixty-day notice may be reasonable); *Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc.*, No. 87-CV-6294, 1988 WL 52777, at *3 (S.D.N.Y. May 18, 1988) (two weeks' notice too short given two-year plus business relationship and fact that plaintiff made arrangements on Defendant's behalf extending beyond two weeks); *Creative Foods Corp. v. Chef Francisco, Inc.*, 458 N.Y.S.2d 917, 918 (N.Y. App. Div. 1st Dep't 1983) (reversing finding that three months was more reasonable than one month where plaintiff presented no evidence that one month was unreasonably short).

As previously discussed, Defendants have not met their burden of demonstrating that the licensing agreement with Plaintiff was for an infinite duration.  Accordingly, they must show that

Plaintiff terminated the license agreement after a license period that was unreasonably short or upon unreasonably short notice.  Defendants do not assert (with good reason) that a nearly thirty-year license period is too short, but they do contend that the notice period concerning the termination of the license was unreasonable.  In so arguing, Defendants focus almost exclusively on the alleged one-day notice on May 30, 2017, that the license would terminate June 1, 2017.  (Doc. 41 at 17; Ds' COL ¶ 93.)  But Plaintiff gave Defendants an additional six months to fulfill their existing contractual obligations to perform through December 1, 2017, and Defendants' notice period was effectively extended an additional two-and-a-half months through court action in light of the Court's entry of a TRO and amended TRO that enabled Defendants to continue utilizing the marks.  Defendants have made no effort to demonstrate that this notice period was unreasonable, and the Court finds no basis to conclude that it was.  For example, they did not adduce evidence showing that they incurred expenses that a longer notice period would have avoided, *see Chenoweth*, 1988 WL 52777, at *3, or that a longer notice period is more customary in the industry, *see Creative Foods Corp.*, 458 N.Y.S.2d at 918.  That Defendants were allowed to continue performing for an additional six months (or arguably almost nine) without breaking any contractual obligations seems reasonable under the circumstances.

      Accordingly, Defendants have not met their burden with respect to their breach-of-contract claim.[13]

---

[13] Even if Defendants had demonstrated a likelihood of success on the merits on their breach-of-contract claim or sufficiently serious questions going to the merits to make them a fair ground for litigation, they failed to demonstrate that they would be irreparably harmed in the absence of an injunction.  On this issue, "the Second Circuit has directed courts to 'actually consider the injury the [moving party] will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury.'"  *HarperCollins Publishers L.L.C. v. Gawker Media LLC*, 721 F. Supp. 2d 303, 307 (S.D.N.Y. 2010) (quoting *Salinger*, 607 F.3d at 80)).  Here, even if Defendants ultimately could show that they should have been allowed to perform as Village People for another few months, that harm can be remedied by money.  Any harm they might suffer from no longer being permitted to perform as Village People would have been suffered sooner or later anyway.  Moreover, "[l]ack of diligence, standing alone, may . . . preclude the granting of preliminary injunctive relief, because it goes primarily to the issue

### C. Promissory Estoppel

"In New York, promissory estoppel has three elements:  a clear and unambiguous promise[,] a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance." *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (internal quotation marks omitted).  Here, Defendants contend that they have established that Plaintiff promised Defendants that they could perform as Village People for as long as Defendants wanted, that Defendants relied on that promise, and that they were injured when Plaintiff reneged on that promise.

For the same reasons discussed above in connection with their breach-of-contract claim, Defendants have failed to show such a promise and therefore have failed to demonstrate that they are likely to succeed on their claim for promissory estoppel or that sufficiently serious questions on that issue exist.

### D. Tortious Interference with Prospective Contractual / Economic Relations

"Under New York law, the elements of a claim for tortious interference with prospective business relations are:  (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship." *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000); *see Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994).  Here, Defendants assert that "[u]nless

---

of irreparable harm rather than occasioned prejudice."  *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985); *see Hirshfeld v. Bd. of Elections in City of N.Y.*, 984 F.2d 35, 39 (2d Cir. 1993) (delay "severely undermines" irreparable harm argument).  Here, Defendants were notified on May 30, 2017, that the license would be terminated, but did not move for injunctive relief until December 1, 2017.  Defendants' six-month delay impedes their ability to show irreparable harm absent injunctive relief.

Plaintiff and Intervenor are enjoined from interfering with [their] right to perform live as Village

People, Defendant[s] will continue to lose valuable business relationships."  (Ds' COL ¶ 103.)

Defendants have failed to demonstrate a likelihood of success on the merits or

sufficiently serious questions going to the merits to make them a fair ground for litigation,

because they have not shown any basis that could entitle or enable them to continue using

Plaintiff's trademarks.  Further, it was plain from the hearing testimony that Plaintiff terminated

the license not out of ill will toward Defendants but to put an end to a draining legal battle with

Intervenor and her husband.

### E.  Tortious Interference with Settlement Agreement & Existing Contracts

"Under New York law, the elements of tortious interference with contract are:  (1) the

existence of a valid contract between the plaintiff and a third party; (2) defendant's knowledge of

that contract; (3) defendant's intentional procurement of the third-party's breach of the contract

without justification; (4) actual breach of the contract, and (5) damages resulting therefrom."

*Highland Capital Mgmt. LP v. Schneider*, 198 F. App'x 41, 45 (2d Cir. 2006) (summary order)

(citing *Lama Holding Co. v. Smith Barney, Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)).

Defendants assert two claims for tortious interference of existing contractual relations.

First, Defendants contend that Plaintiff's grant of an exclusive license to Intervenor

interfered with a settlement agreement in a prior lawsuit between Sixuvus and Victor Willis that

included an injunction prohibiting Willis, his "associates, agents, suppliers, servants, employees,

officers, directors, representatives, successors, assigns, and attorneys, and any other person(s)

acting in concert or participation with Victor Willis, [from] . . . engaging, committing, or

performing, directly or indirectly, any and all of the following acts:  **Disrupting any live**

**performance or public appearance of Sixuvus performing as the Village People.**"  (Doc. 45

Ex. 3 at 2 (emphasis in original); *see* Ds' Ex. X at 64:4-16; Answer at 15-19.)  Defendants argue

that Plaintiff's actions induced Intervenor to disrupt Sixuvus's performances by contacting

venues to inform them that she, not Sixuvus, possessed an exclusive license to perform as

Village People.  (*See* Doc. 105 ¶¶ 140-45.)  Defendants have not shown a likelihood of success

on the merits or sufficiently serious questions going to the merits to make them a fair ground for

litigation, because they have not established an actual breach of their contract with Willis or

Plaintiff's intentional inducement of such a breach.  The plain language of the injunction –

prohibiting Willis from disrupting Defendants' live performances and public appearances, (*see*

Doc. 45 Ex. 3 at 2) – refers to his showing up at Defendants' shows and causing problems

(which apparently had happened, (Tr. 298:1-299:20)).  Had the parties agreed that Willis would

never do anything to prevent Defendants from performing as Village People, they would have

used much broader language to that effect.  The conduct here – giving Intervenor the license to

perform live as Village People going forward – does not strike the Court as the type of conduct

that would constitute a violation of the settlement agreement.  Defendants have not shown that

the settlement agreement was designed to preclude contacting venues or promoters concerning

licensing issues, or that it would preclude Plaintiff from terminating Defendants' license and

granting one to Willis or Intervenor.  Accordingly, Defendants have not shown that they are

likely to prevail on their claim for tortious interference with the settlement agreement or that

there are sufficiently serious questions going to the merits to make them a fair ground for

litigation.

      Second, Defendants assert that Plaintiff's termination of Defendants' license on one day's

notice and Plaintiff's grant of an exclusive license to Intervenor caused third parties to breach

their agreements with Sixuvus.  (Answer at 25-27.)  Although Simpson testified that at least one

show in Mexico was canceled during the six-month period following the notice of termination of

the license, and that he believed that it was canceled because Intervenor had contacted the venue,

he could not provide a basis for this belief and, accordingly, the Court excluded his testimony.

(*See* Tr. 318:14-320:9.)  Defendants further failed to present evidence that Plaintiff intentionally

caused the Mexico promoter or any other third party to breach a contract.  Instead, the record

reveals that Defendants had performances scheduled until November, (*id.* 317:2-7), and Plaintiff

expressly permitted Defendants to honor their existing obligations, (Ds' Ex. A).  Defendants

have therefore failed to show a likelihood of success on the merits, or sufficiently serious

questions going to the merits to make them a fair ground for litigation, on their claim for tortious

interference with contract.

## V.   <u>Conclusion</u>

For the foregoing reasons, Defendants' motion for a preliminary injunction is DENIED,

and the previously entered TRO is vacated.  Intervenor's original and amended motions to

introduce newly discovered evidence, (Docs. 109, 112), are DENIED as moot.  The Clerk of

Court is respectfully directed to terminate the pending motions.  (Docs. 109, 112.)

The parties are directed to appear for a status conference on Wednesday, March 28, 2018

at 2:30 p.m.

**SO ORDERED.**

Dated: March 6, 2018
       White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.