180206can'tstopH1           Hearing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CAN'T STOP PRODUCTIONS, INC.,

4                  Plaintiff,

5          v.                           17 Civ. 6513(CS)

6   SIXUVUS, LTD., et al.,

7                  Defendants.

8          v.

9   KAREN WILLIS, doing business
    as Harlem West Entertainment,
10
                   Intervenor.
11  ------------------------------x
                                       United States Courthouse
12                                     White Plains, N.Y.
                                       February 6, 2018
13                                     9:35 a.m.

14  Before:

15            THE HONORABLE CATHY SEIBEL,

16                                         District Judge

17                      APPEARANCES

18  EISENBERG, TANCHUM & LEVY
          Attorneys for Plaintiff
19  STEWART L. LEVY

20  ROBERT STEPHEN BESSER
          Attorney for Plaintiff
21
    ADELMAN, MATZ, P.C.
22        Attorneys for Defendants
    GARY PHILIP ADELMAN
23  SARAH MICHAL MATZ

24  KAREN WILLIS, Pro Se Intervenor

25

180206can'tstopH1              Hearing

1          (In open court)

2          THE COURT:  Everyone can have a seat.

3          Since we were last here, I got an application from

4   Ms. Willis regarding jurisdiction, which I've denied, and I now

5   have a motion for reconsideration, which doesn't seem to say

6   anything different, whether the appeal is from the TRO or even

7   if it were from a preliminary injunction it doesn't divest me

8   from jurisdiction, so I'm not really following why we shouldn't

9   continue this hearing.

10          It did just make me wonder as a matter of curiosity

11  what, if anything, is going on in the circuit.

12          Have you briefed anything or argued anything?

13          MS. WILLIS:  Your Honor, they referred it to the full

14  panel, so the full panel on the state panel, they're reviewing

15  it.  I think the last I've heard is they might get around to it

16  not this week, but next week.  There's sort of a backlog on

17  that.

18          THE COURT:  Well, I'm going to press on.

19          I also have a motion to dismiss and then an amended

20  motion to dismiss.  Essentially, Ms. Willis arguing that

21  Sixuvus is unlikely to prevail on its claims against Can't Stop

22  for failure to name -- to join the necessary party.  That's

23  certainly something that anybody can raise as part of their

24  argument at the conclusion of this hearing as to why I

25  shouldn't enter the injunction.  In other words, you can argue

180206can'tstopH1            Hearing

1    that the failure to name a necessary party means that Sixuvus
2    is unlikely to succeed, and, therefore, I should not grant the
3    injunction, but we're not at the motion to dismiss stage.
4    Regardless of what happens with the injunction, I expect we'll
5    get there, and at that point, I'll consider it.  And I'll
6    consider the likelihood of that argument carrying the day as
7    part of my decision whether to grant the injunction.  But I
8    also don't see that it's any reason why we shouldn't press on
9    here.
10          And I was actually confused because I thought that
11    Ms. Willis was one of the most eager to get this TRO lifted if
12    it was going to be lifted.  Frankly, at this stage, I don't
13    know why anybody would want to just not finish this.
14          Just give me one second.
15          MS. MATZ:  If I may say a couple of things.  We
16    obviously want the preliminary injunction hearing to continue
17    to move forward, but I did just want to ask a couple of
18    housekeeping questions.
19          When Mrs. Willis, her attorney filed an order to show
20    cause to intervene in this action, that was one of the things
21    that everyone had agreed would be stayed, the opposition and
22    the briefing on that motion would be stayed until after the
23    mediation.  And I do think it would be prudent, given that
24    Mrs. Willis is objecting on the grounds of subject matter
25    jurisdiction and still asking to put in a complaint in this

180206can'tstopH1            Hearing

1   matter, if we could set a briefing schedule to move that

2   forward, because, as your Honor may recall, we had, at the very

3   least, objected on the grounds that we do not think she's an

4   intervenor as of right.  We're happy to brief the issue of

5   whether she is a necessary party which is a related question in

6   the papers.

7           Should that be done as a separate brief that we turn

8   in or -- I just want to understand.

9           THE COURT:  Well, they're not exactly opposite sides

10  of the same coin, whether she's entitled to intervene or

11  whether she's a necessary party.

12          The issue of whether Ms. Willis is a necessary party

13  could go to the likelihood of success; whether she's entitled

14  to intervene doesn't.  So I don't think it has to be briefed on

15  the same schedule, but that's up to you, if you guys want to

16  kill yourselves.

17          MS. MATZ:  I'm not saying that it does have to be

18  briefed on the schedule.  I just would like clarity on what

19  motions we're responsible for responding to.  There were

20  several things filed.  There was no pre-motion conference

21  requested.

22          THE COURT:  I basically just denied what's out there.

23          MS. MATZ:  Okay.

24          THE COURT:  And I don't think you have anything to

25  respond to right now.  I think it's fine to -- we set a

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206cantstopH          Whitefield - Cross - Besser

1    briefing schedule on the application to intervene, but as a

2    practical matter, it might make more sense to await my ruling

3    on the P.I., because, frankly, depending on what happens there,

4    then you might finally be able to agree on something, but I

5    don't care if you want to brief it sooner.

6             MS. MATZ:  I'm fine with that.  I just wanted to raise

7    it because it hadn't been raised before.  And we had tried to

8    put them all on hold, so I just wanted to bring it up to make

9    sure you weren't expecting a response right now.  I'm happy to

10   set a briefing schedule after this is over.

11            THE COURT:  That's fine, and you haven't waived

12   anything as far as I'm concerned.

13            MS. MATZ:  Thank you.

14            THE COURT:  And we had Mr. Whitefield, if I remember.

15            You are still under oath.

16            THE WITNESS:  Yes.

17            THE COURT:  And you had finished your direct,

18   Ms. Matz, so now it is Mr. Besser's turn.

19            MR. BESSER:  Yes, your Honor.

20    WILLIAM WHITEFIELD,

21   CROSS-EXAMINATION

22   BY MR. BESSER:

23   Q.  Good morning, Mr. Whitefield.

24   A.  Good morning.

25   Q.  I will be handing you Plaintiff's Exhibit 33.  Would you

                  SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                              (914)390-4053

1    take a look at that please, sir.

2    A.   Yes.

3    Q.   Have you seen it before?

4    A.   I don't think so, but I'd have to really examine it to see.

5    Q.   Look at page 2, if you would.

6    A.   Uh-huh.

7    Q.   Is this a headshot of yours?

8    A.   Yes.

9    Q.   Do you know when was taken?

10   A.   I would -- I don't know the exact date, no.  It's probably

11   at least -- it's probably about eight or nine years old.

12   Q.   Now, there's a stack of exhibits in front of you that are

13   clipped.

14   A.   Uh-huh.

15   Q.   Would you look at Exhibit 22.  If you -- and go on down.

16   A.   Yes.  Okay.

17   Q.   And I'd ask you to look in particular at the last page of

18   Exhibit 22.  Is that your signature?

19   A.   Yes.

20   Q.   Did you sign this contract?

21   A.   Yes.

22   Q.   Did you read it before you signed it?

23   A.   Um, yes.

24   Q.   I believe you told us in testimony on Thursday that at

25   about the time of this contract, you became a regular member of

180206cantstopH                 Whitefield - Cross - Willis

1    the group; is that true?

2    A.   Correct.

3    Q.   And what was your position in the group?

4    A.   I was the Construction Worker.

5    Q.   And as you rehearsed and trained to become the Construction

6    Worker, were you shown -- strike that.

7              You were familiar -- excuse me -- withdraw it.

8              You were familiar with the performances of the Village

9    People for a number of years?

10   A.   Yes.

11   Q.   You had acted as a swing or a substitute, correct?

12   A.   Yes.

13   Q.   So when you were asked to become the Construction Worker,

14   did you rely on past performances to help you, that is, past

15   performances of the Village People to help you get ready?

16   A.   Sure, for certain songs.

17   Q.   And you knew what your obligations were as the Construction

18   Worker?

19   A.   Sure.  Yes.

20   Q.   Nothing further, your Honor.

21              THE COURT:  Ms. Willis.

22   CROSS-EXAMINATION

23   BY MS. WILLIS:

24   Q.   Good morning, Mr. Whit-field?  Whitefield?

25   A.   Whitefield.

180206cantstopH          Whitefield - Redirect

1   Q.  Which one is it again?  I'm sorry.  Whitefield.  Okay.

2   A.  Whitefield.

3   Q.  Okay.  You are an employee, I'm not sure I'm understanding

4   that, of the Sixuvus; is that correct?

5   A.  Well, technically, I consult.  I have an LLC, and they pay

6   my LLC for my services, but, yes --

7   Q.  Okay.

8   A.  -- to be technical.

9   Q.  So then exactly who do you report to?

10  A.  I report to the board of Sixuvus.

11  Q.  And so, quite naturally, are you authorized to make direct

12  contact yourself with Can't Stop, or is it only the Sixuvus?

13          MS. MATZ:  Objection to form; compound.

14          THE COURT:  The witness can answer if he understands.

15  A.  I've never really had any need to, but I don't know that I

16  couldn't.  I was never told that I couldn't.

17  Q.  But normally, the business of Can't Stop is through the

18  Sixuvus, the board; isn't that correct?

19  A.  Yes.

20  Q.  Thank you.

21          THE COURT:  Any redirect?

22          MS. MATZ:  Yes, your Honor.  Give me one moment.

23  REDIRECT EXAMINATION

24  BY MS. MATZ:

25  Q.  Good morning.

               SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                         (914)390-4053

180206cantstopH            Whitefield - Redirect

1   A.  Good morning.

2   Q.  When Mr. Besser was asking you about relying on your past

3   performances when you became a permanent member of the group,

4   and you said you did rely on your past performances.  You're

5   talking about the past performances of Sixuvus, right?

6   A.  Yes.

7   Q.  Not anything prior to your being a swing or substitute in

8   the group?

9   A.  Correct.

10  Q.  And when you said that your understanding of your

11  obligations as the Construction Worker, you understood your

12  obligations.  Did you understand those from Sixuvus?

13  A.  Yes.

14  Q.  And the members of Sixuvus?

15  A.  Yes.

16  Q.  Not Can't Stop?

17  A.  Correct.

18          MS. MATZ:  Thank you, your Honor.  No further

19  questions.

20          THE COURT:  You may step down, --

21          THE WITNESS:  Thank you.

22          THE COURT:  -- Mr. Whitefield.

23          THE WITNESS:  Just put these in the same order they

24  were in.

25          (Witness excused)

180206cantstopH                Rose - Direct

1             THE COURT:  Defendants may call their next witness.

2             MR. ADELMAN:  He just went to the bathroom.

3             THE COURT:  Okay.

4             (Pause)

5             MR. ADELMAN:  We call Felipe Rose.

6             MR. ROSE:  Sorry.  Fighting a cold.

7             THE COURT:  Remain standing.  Raise your right hand.

8             (Witness sworn)

9   FELIPE ORTIZ ROSE,

10      called as a witness by the Defendants,

11      having been duly sworn, testified as follows:

12  DIRECT EXAMINATION

13  BY MR. ADELMAN:

14  Q.  Good morning, Mr. Rose.

15  A.  Good morning.

16  Q.  Are you familiar with Sixuvus, Ltd.?

17  A.  Yes, I am.

18  Q.  Are you currently a board member of Sixuvus?

19  A.  I am.

20  Q.  Okay.  And how long have you been a board member of

21  Sixuvus?

22  A.  Since 1987.

23  Q.  Okay.  Prior to becoming a board member of Sixuvus, are you

24  familiar with the plaintiff in this case, Can't Stop?

25  A.  Yes.

180206cantstopH          Rose - Direct

1  Q.  And when did you first meet any of the members of Can't

2  Stop?

3  A.  1977.

4  Q.  Okay.  And who was it that you met?

5  A.  I met Jacques Morali, Beauris Whitehead, Henri Belolo, and

6  Victor Willis.

7  Q.  And where did you meet them?

8  A.  I met Jacques Morali and Beauris Whitehead at a club where

9  I was performing and they wanted to speak to me about a music

10  project that they were working on with Victor Willis.

11  Q.  Okay.  And as part of the performance at this club, were

12  you wearing a costume?

13  A.  I was wearing my tribal gear, yes.

14  Q.  And that is, you are Native American?

15  A.  My dad.

16  Q.  Your dad.  And that is actual, Native tribal gear?

17  A.  Yes.

18  Q.  It's not a costume, is it?

19  A.  No.

20          THE COURT:  What word did you call it?  Your "Dan"?

21          THE WITNESS:  My dad.

22          THE COURT:  D-A-D?

23          THE WITNESS:  D-A-D.  My father, my father.

24          MR. ADELMAN:  His father is the Native American.

25  A.  My dad is Native and Spanish, and my mother is Puerto Rican

          SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                    (914)390-4053

180206cantstopH              Rose - Direct

1    and Italian, so I have a mixture there.

2            MR. ADELMAN:  Okay.

3    Q.  At some point, did you begin recording music for Can't

4    Stop?

5    A.  Yes.

6    Q.  Okay.  And what -- what type of music were you recording?

7    A.  It was the -- for the second album, "Macho Man."

8    Q.  Okay.  And at some point, did you enter into an agreement

9    with Can't Stop?

10   A.  I did.

11   Q.  Okay.  What type of agreement did you enter into?

12   A.  It was a contract for employment.

13   Q.  Okay.  And you were paid a salary, correct?

14   A.  Yes.

15   Q.  And what were your duties under the contract?

16   A.  To be ready to go out on the road, to perform, promote the

17   new single, radio, television, on-the-road appearances.

18   Q.  And then at some point, an album came out called "Macho

19   Man," correct?

20   A.  Yes.

21   Q.  And that -- the group which recorded that song had a name,

22   correct?

23   A.  Yes.

24   Q.  And what was that name?

25   A.  Village People.

180206cantstopH            Rose - Direct

1    Q.  Okay.  And at that point, who was in that group?

2    A.  It was, let's see, Alex Briley, David Hodo, Randy Jones,

3    and the late Glenn M. Hughes, and Victor.

4    Q.  At some point, did this group start touring?

5    A.  Yes.

6    Q.  All right.  And who booked that tour -- those tours?

7    A.  Can't Stop.

8    Q.  Okay.  And who paid for the travel on those tours?

9    A.  Can't Stop.

10   Q.  And who paid for your lodging on those tours?

11   A.  Can't Stop.

12   Q.  And who coordinated all the aspects of the tour?

13   A.  Can't Stop.

14   Q.  And you were paid under the contract as a salaried

15   employee, correct?

16   A.  Yes, I was.

17   Q.  At some point, did the group stop touring?

18   A.  We stopped touring in mid-80s, 1985.

19   Q.  And why did the group stop touring?

20   A.  We were told by the, I believe it was either the office

21   manager of Russell Sedowski (ph) at the time of Can't Stop,

22   that they weren't going to be in need of the group to continue

23   as a group, and that they were closing down their operations in

24   New York.

25   Q.  And at that point, did you work for Can't Stop any longer?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206cantstopH          Rose - Direct

1  A.  No.  I -- no.

2  Q.  And what did you do in 1985 when you no longer worked for

3  Can't Stop?

4  A.  I went off to auditions for television, movie parts.

5  Q.  Okay.  Before we move on from there, at some point prior to

6  1985 did the group perform on American Bandstand?

7  A.  It was the initial performance -- oh, my goodness, I'm

8  trying to recall.  We did perform to present the concept of the

9  group early on.

10  Q.  And as of the date that you performed on American

11  Bandstand, was the traditional hand motions, YMCA, was that

12  known to anybody?

13  A.  No.

14  Q.  Who invented those hand signals, in a sense?

15  A.  It was the dancers of American Bandstand.  And it was done

16  as a tribute to the song - they loved it so much.  And so Dick

17  Clark, I think prior to the taping, he would sit in with the

18  audience or the dancers, and he said we have a surprise for

19  you.  And so they played the chorus of the song and the kids

20  jumped up.

21  Q.  And started doing the --

22  A.  And started doing the arm -- the hand signals.

23  Q.  So, in essence, it was Dick Clark who choreographed the

24  YMCA?

25  A.  Well, he didn't, but the dancers on his show.

180206cantstopH              Rose - Direct

1    Q.  The dancers.  Okay.  And -- thank you.

2              Let's turn to 1987.  At some point, did someone

3    approach you to start performing again as the Village People?

4    A.  One of the ex-members, Randy Jones.

5    Q.  And can you tell us what happened?  How did he approach

6    you?

7    A.  He approached everyone.  He invited us to a birthday party

8    first to see if during that period of not being together, how

9    we looked together and how did we react with each other.  And

10   then shortly right after that, he called us all up to get back

11   together to see if we could perform.

12   Q.  Okay.  And who amongst the original members did he call?

13   A.  David Hodo, the late Glenn M. Hughes, Ray --

14   Q.  Ray Simpson?

15   A.  Ray Simpson, himself, and me.

16   Q.  And at that point, did you form Sixuvus?

17   A.  Yes, we did.

18   Q.  And why did you form Sixuvus?

19             THE COURT:  Can I interrupt one second.

20             You named five:  Hodo, Hughes, Simpson --

21             THE WITNESS:  Jones.

22             THE COURT:  Jones, and yourself.

23             THE WITNESS:  Yes.

24             THE COURT:  That's five.

25             THE WITNESS:  And Alex Briley.

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                            (914)390-4053

180206cantstopH              Rose - Direct

1              THE COURT:  Okay.

2              THE WITNESS:  We always leave one out for, for some

3      reason.

4      BY MR. ADELMAN:

5      Q.  He's only sitting right there.

6      A.  I know.

7              THE COURT:  You'll get some grief later for that.

8              THE WITNESS:  You're telling me.

9      BY MR. ADELMAN:

10     Q.  At that point, why did you form Sixuvus?

11     A.  Randy explained to us that -- he told us that if we were

12     going to get together and seek out work with booking agents,

13     that we had to become a company, because you can't hire six

14     people and pay six people.  So we form a corporation and they

15     would pay the corporation.  Then we would draw salaries from

16     that.

17     Q.  And at the time, you were a member as in an owner of

18     Sixuvus, correct?

19     A.  Yes.

20     Q.  And you had access, from that moment on, all the books and

21     records of Sixuvus, correct?

22     A.  Certain.

23     Q.  And you were involved in the decision-making of Sixuvus,

24     correct?

25     A.  Yes.  When it came to touring, logistics, calendar,

180206cantstopH              Rose - Direct

1    vacations, pretty much the overall running a business.

2    Q.   Okay.  And in 1987 when you formed Sixuvus, did you make an

3    arrangement or an agreement with Can't Stop?

4    A.   Well, yes, we did, to perform and use the name.

5    Q.   And what was the arrangement?  What were the deal terms?

6    A.   I don't recall all of them.  I know that it was an oral

7    agreement with a 5% commission on any money generated every

8    quarter of the calendar year from touring.

9    Q.   Understood.  For live performances?

10   A.   Uh-huh.

11   Q.   And what was the term or the length of this agreement, your

12   understanding?

13   A.   For as long as we wanted to stay as Village People.

14            MR. BESSER:  Objection; lack of foundation.

15            THE COURT:  Sustained.

16            Lay a foundation.

17   BY MR. ADELMAN:

18   Q.   Sir --

19            MR. ADELMAN:  Your Honor, I asked him if he was

20   involved in the decision-making of Sixuvus.

21            THE COURT:  But this was not a unilateral decision of

22   Sixuvus.  This was --

23            MR. ADELMAN:  Okay.

24            THE COURT:  -- a deal with somebody else.  So you can

25   ask him, was he involved in the discussions with Can't Stop,

180206cantstopH            Rose - Direct

1   who he spoke to at Can't Stop, what that person said.  And if

2   he got it from someone else within his group, then he needs to

3   say that.

4        MR. ADELMAN:  Yes.  Understood.

5   Q.  Who did the direct negotiations with Can't Stop?

6   A.  I believe it was Randy with them.  And then, of course, he

7   basically informed us as to what the discussions were.  I

8   wasn't part of that, so I don't recall all of what was --

9   Q.  I understand, but were you part of the decision to accept

10  the Can't Stop deal?

11  A.  Yes, I was.

12  Q.  Did Randy Jones explain the terms of the deal to you?

13  A.  Yes, he did.

14  Q.  And what did he explain was the term or the length of the

15  deal?

16  A.  He basically told us that we're going to be allowed to use

17  the name and that we would pay a commission and the -- for as

18  long as we wanted to stay as Village People, but we had no idea

19  how long that was going to be.  We were just starting to

20  even -- the thought of working --

21  Q.  And did you all vote or did you all discuss the deal with

22  Can't Stop amongst the Sixuvus members?

23  A.  I believe so.

24  Q.  Okay.  And you all agreed to do it, correct?

25  A.  Yes.

180206cantstopH            Rose - Direct

1          MR. BESSER:  I move to strike.  It's based upon

2    hearsay of a person who is not here in court.  Randy --

3          THE COURT:  That's true, but so was Jonathan

4    Belolo's testimony, and neither side has presented the horse's

5    mouth on this subject for reasons that elude me.  I let your

6    client testify as to what his understanding was, and I'm

7    letting these witnesses testify as to what their understanding

8    was.  If it was one degree removed, if there was another

9    witness here who said somebody in the group told me what Randy

10   Jones said, and I think I didn't allow that, I said call the

11   person between you and Randy Jones.

12          But I've let both sides not rely on the firsthand

13   knowledge.  It's only a P.I. hearing.  So I'll allow it.

14   Obviously, it goes to the weight, but not to the admissibility.

15          MR. BESSER:  Understood, your Honor.

16          MR. ADELMAN:  Thank you, your Honor.

17   Q.   Okay.  How long has Sixuvus been performing live as Village

18   People?

19   A.   Since we started the company, since 1987.

20   Q.   So approximate -- a little over 30 years, correct?

21   A.   Over 30, 38 to be exact.

22   Q.   And has it been a successful 30 years?

23   A.   Yes, it has been.

24   Q.   And why do you think that is?

25   A.   Well, when we first started, we started in little -- tiny

180206cantstopH          Rose - Direct

1  little clubs and not making very much money, and we went from
2  one booking agent to another, just sort of climbing that ladder
3  of a better booking agent.  They got us better shows, better
4  venues, and we actually were quite surprised at the fan base.
5  They woke up.  They realized, oh, they're back.  And it's been
6  a terrific ride and a privilege to have been doing what I love
7  and the guys love to do, so, it was a pretty successful.
8  Q.  Okay.  To your knowledge, what has been the interaction
9  between Sixuvus and Can't Stop over the last 30 years?
10 A.  Not much.  Interaction in as far as anything regarding
11 television for music rights, to be allowed to sing on TV, or
12 any commercials for music sync licensing, but outside of that,
13 not much.
14 Q.  And over the last 30 years, have you built up relationships
15 with venues and vendors and other folks in the touring
16 industry?
17 A.  Well, the relationship that we built, in my case 40 years,
18 a fan base, television and radio people, independent
19 contractors, promoters, music vendors, and just the people that
20 we've worked with, all the booking agents from, like, the very
21 first ones all the way to the ones now we've had, William
22 Morris, we -- that's been a terrific relationship and a loyal
23 relationship that we've had.
24 Q.  How many shows a year approximately do you perform now?
25 A.  I'm going to say 50.  Some years it was a little over 50,

180206cantstopH          Rose - Direct

1   but I'm going to say 50.

2   Q.  Okay.  And do you feel over the last 30 years you've -- the

3   Sixuvus Village People have built up a reputation?

4   A.  Yes, a reputation of representing the music to the great

5   music that was written and produced by the producers and Victor

6   Willis and the presentation, and how we carried ourselves with

7   a certain decorum to really show people that on stage, it's one

8   thing, but offstage, that's really where the test is, is how

9   you relate to your public and to your fans.  And so, it was

10  just an overall great experience.

11  Q.  Okay.  Does Sixuvus have a Facebook page for Village

12  People?

13  A.  I believe it does.

14  Q.  Okay.  Have you seen it?

15  A.  No, because I don't like to look at anything as of late on

16  social media.

17  Q.  Now, switching topics for a second.  A few years ago around

18  2013, Can't Stop offered you and some of the other members of

19  Sixuvus a merchandising deal, is that correct?

20  A.  Yes.

21  Q.  Do you recall what it was for?

22  A.  It was a program, sort of a merchandising program to revamp

23  the image of the group on a merchandising scale.

24  Q.  And you agreed that they would be able to use your image,

25  correct?

180206cantstopH          Ortiz - Cross - Besser

1   A.  Yes.

2   Q.  Okay.  Now, if you had thought that Can't Stop could

3   terminate the license for you to be able to tour as Village

4   People, would you have signed that merchandising agreement?

5   A.  Absolutely not.  I would have never have done that.

6           MR. BESSER:  Objection.

7           THE COURT:  I'll allow it.

8           MR. BESSER:  Not the facts.

9           MR. ADELMAN:  Thank you, your Honor.

10  BY MR. ADELMAN:

11  Q.  Thank you very much.  It's a pleasure speaking with you.

12          MR. ADELMAN:  Your Honor.

13          THE COURT:  Mr. Besser.

14  CROSS-EXAMINATION

15  BY MR. BESSER:

16  Q.  Good morning, sir.

17  A.  Good morning.

18  Q.  You just testified that you had signed a merchandising

19  agreement?

20  A.  I did.

21          MS. MATZ:  It's already in as KK.

22          MR. BESSER:  You put it in as KK.  I apologize.

23          MS. MATZ:  Clarity of the record.

24          MR. BESSER:  Thank you for clarifying.

25  Q.  Do you have Exhibit KK in front of you which would be in a

180206cantstopH            Ortiz - Cross - Besser

1    stack, not in a clipped stack, which are plaintiff's exhibits?

2    It would be one over here.

3    A.  Oh, okay.  I don't see it.  Either it's not in order --

4          THE COURT:  If you have it marked as 32, why don't you

5    just give it to the witness.

6    BY MR. BESSER:

7    Q.  Do you have Exhibit 32 still in front of you?  The one I

8    just handed up?

9          THE COURT:  Do you have something that says

10   Plaintiff's Exhibit 32 that Mr. Besser just gave you, not in

11   the stack?

12         THE WITNESS:  No.  He just took something away.  I

13   didn't -- I wasn't looking.  I don't see it here.  L --

14         THE COURT:  You know what?  I'll try to find mine.

15         MR. BESSER:  I have it here.

16         THE COURT:  I'll try to find my KK and I'll give it to

17   you.

18         THE WITNESS:  Even with glasses on, I can't see.

19         MR. BESSER:  We have a copy.

20         THE COURT:  Good.

21         THE WITNESS:  This is not in order.  Thank you.

22   BY MR. BESSER:

23   Q.  Sir, would you please look at Exhibit 32.

24   A.  Yes.

25   Q.  And that is the merchandising contract you signed for your

180206cantstopH                Ortiz - Cross - Besser

1    image?

2    A.  Yes.

3    Q.  And you understand in there that you confirmed that Can't

4    Stop controls the trademark?

5    A.  Yes.

6           MR. ADELMAN:  Objection to form.

7           THE COURT:  Overruled.

8    Q.  And when you signed this contract in 2013, was there any

9    question in your mind but that the trademark to the Village

10   People was owned by Can't Stop?

11   A.  Repeat the question.

12   Q.  I'm establishing the date when you signed this contract,

13   correct?

14   A.  Yes.

15   Q.  Was there any question in your mind at that time that Can't

16   Stop did not own the trademark to Village People?

17          MR. ADELMAN:  Objection; calls for a legal conclusion.

18          THE COURT:  Overruled.

19          At the time you signed this, which looks like it was

20   July 1, 2013, what was your understanding about the ownership

21   of the trademark Village People?

22          THE WITNESS:  Everything that it's saying right in the

23   first couple of paragraphs, that only -- "the rights of the

24   trademark associated with performing and recording group as" --

25   and, basically, Jonathan, through his letters, told Mitch Weiss

180206cantstopH            Ortiz – Cross – Besser

1    what the program was about, the merchandising program.  So all

2    of that was laid out first.

3    Q.  Now I'd like to refer you back to the time when you told us

4    that Sixuvus first was formed in 1987.  Do you recall an entity

5    by the name of Fischoff Productions?

6    A.  David Fischoff.

7    Q.  And what is it that you recall about David Fischoff?

8    A.  We went to him to -- actually, Randy went to him about

9    booking us, managing us.

10   Q.  Do you know whether or not Mr. Fischoff approached Can't

11   Stop about the use of the trademark Village People for

12   performances?

13   A.  I can't recall.

14   Q.  Were you aware of any of the negotiations that went on

15   between Mr. Fischoff and Can't Stop?

16   A.  No.

17   Q.  Isn't it a fact, sir, that as part of those negotiations

18   that, ultimately, Fischoff Productions acquired a contract from

19   Can't Stop to produce the Village People for live performances?

20   A.  I found that out after the fact, after those negotiations

21   took place.  I wasn't the one dealing with that; randy was with

22   David Fischoff and Can't Stop.

23   Q.  So there was originally a contract between Fischoff

24   Productions and Can't Stop under which Fischoff Productions

25   received the license to do performances of the Village People,

180206cantstopH            Ortiz - Cross - Besser

1   isn't that true?

2   A.  I believe it is; yes.

3   Q.  And then after a year or two, and I'm talking from 1987

4   maybe '88, '89, problems occurred, didn't it?

5   A.  I believe so.

6   Q.  So Fischoff Productions no longer kept the contract, did

7   they?

8   A.  But we were not happy with -- we were disillusioned with

9   the lack of enthusiasm they showed.  So they acquired the

10  rights for the name of the group, but they really showed no

11  interest in us, and so, therefore, we then want -- didn't want

12  to be part of David Fischoff.  In fact, we asked to leave.

13  Q.  And one of the members of Fischoff Productions left

14  Fischoff to manage you, didn't he?

15  A.  No.  Not anyone.

16  Q.  No one from Fischoff became involved with you at that

17  point?

18  A.  I can't recall if there is a -- working for Sixuvus Ltd.,

19  you mean?

20  Q.  Working with Sixuvus Ltd., yes?

21  A.  No, not with David Fischoff.

22  Q.  And then, sir, isn't it a fact that you then approached

23  Mr. Belolo and asked that the contract, that the Fischoff

24  Productions contract be assigned to Sixuvus?

25  A.  Yes.

180206cantstopH          Ortiz - Cross - Besser

1  Q.  And was it assigned to Sixuvus?

2  A.  In an oral discussion.  Not in paper.

3  Q.  And after you asked Mr. Belolo to have it assigned to

4  Sixuvus, it was Mitch Weiss that followed up with the

5  negotiations, wasn't it?

6  A.  Well, we hired him to assist us with all of the everyday

7  laundry list of things to do having to do with business travel,

8  trademark, everything.

9  Q.  When did you hire Mr. Weiss?

10 A.  I can't recall the date.  I know that he -- probably it was

11 shortly after we got together -- back together.  Then he left

12 and then he came back, so I can't recall the dates.

13 Q.  Well, he was there in 1990, wasn't he?

14 A.  Yes, I believe so.

15 Q.  And were you aware that Mr. -- strike that.  When you --

16 I'll withdraw the question.

17         When you approached Mr. Belolo, Mr. Belolo responded

18 to you that you should get in touch with their attorney in New

19 York, Mr. Kopitko, didn't he?

20 A.  Yes.

21 Q.  And it was Mr. Weiss who followed up with Mr. Kopitko to

22 attempt to negotiate the agreement; is that correct?

23 A.  On your behalf, yes.

24 Q.  Were you aware of the terms that Mr. Weiss was proposing to

25 Mr. Kopitko?

180206cantstopH              Ortiz - Cross - Besser

1   A.  No.  Only what was relayed to us.

2   Q.  Were you aware that Mr. Weiss -- Mr. Mitch Weiss was

3   negotiating with him so that the initial term would either be a

4   year or 18 months?

5   A.  I can't recall that.

6   Q.  And that there was discussion of a possible option after

7   that?

8   A.  I can't recall that, either.

9   Q.  So when you testified that it was your understanding that

10  this contract would go on forever, or for as long as you wanted

11  it to go, I guess, you were unaware of any of these

12  negotiations that Mr. Weiss carried on?

13  A.  Mr. Weiss -- Mr. Weiss basically reported to us what

14  discussions he had with Kopitko, but there was so much going on

15  then, I can't recall that.

16  Q.  But Mr. Weiss was authorized by Sixuvus to have those

17  discussions with Mr. Kopitko?

18  A.  I believe so; yes.

19  Q.  You discussed in your testimony the beginnings of the YMCA

20  hand signals; do you recall that?

21  A.  Uh-huh.

22  Q.  Those are still the same YMCA hand signals that are used at

23  concerts, aren't they?

24  A.  Of course, yes.

25  Q.  So the group itself carried that on from 1977 up until the

180206cantstopH          Ortiz - Cross - Besser

1  last performance of Sixuvus?

2  A.  As a tribute to American Bandstand and to acknowledge what

3  they presented that -- yes.

4  Q.  How much has your role as the Native American changed since

5  1977?

6  A.  It evolves through the years.  Weight fluctuates.  I change

7  things.  Everything I've -- I wear, I design with either

8  designers, or my father helps me with different vests and all

9  my jewelry he makes for me, my breastplates, things like that.

10  Q.  But the performance, in essence, continues to encompass a

11  Native American, which is you or sometimes your substitute,

12  throughout from 1977, correct?

13  A.  Yes.  Yes.

14  Q.  Can you recall Mr. Belolo being at any shows?

15  A.  In Europe, he would pop in to a show.  Yeah, in Paris.

16  Q.  So he saw shows over the period of time?

17  A.  Or a television show and he would show up.

18  Q.  Do you believe that Mr. Belolo was aware of how the group

19  was performing?

20  A.  Yes.

21  Q.  And do you believe Mr. Belolo approved of how the group was

22  performing?

23  A.  Absolutely.

24  Q.  Were you part of the, what's been described in this court

25  as the international tour that took place in 1979?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206cantstopH            Ortiz - Cross - Besser

1   A.  Since the very beginning I've been involved.

2   Q.  And I believe you told us in your testimony this morning

3   that -- how did you put it?  That the purpose of the group

4   throughout the years has been to represent the great music?

5   A.  The music, the entire concept.

6   Q.  And the entire concept is what in your mind?

7   A.  Is the characters of the group, the music, the show, the

8   live show, just everything that made this group very different

9   apart from many other groups.

10  Q.  It was intended to be fun disco; isn't that true?

11  A.  Yes.

12  Q.  Along with the great music?

13       And when you refer to great music, you're talking

14  about the Village People's songs?

15  A.  Absolutely.  Yeah.

16  Q.  Has the group, to your knowledge, ever done anything that

17  would disrespect the music, that is, the Village People music?

18  A.  I don't understand that question, "disrespect."

19  Q.  Well, has the group ever done anything to play down the

20  effect of the Village People music?

21  A.  No.  Never.

22  Q.  It's there to hold it up, isn't it?

23  A.  I beg your pardon?

24  Q.  It's there to hold it up and support it?

25  A.  The music is pretty much -- it speaks for itself.  You

180206cantstopH          Ortiz - Cross - Willis

1    don't need to change it.  You -- it is what it is.  Great songs

2    written by Jacques Morali, Victor Willis.  You know, you

3    can't -- it stands on its own.  And you have to deliver -- the

4    public cannot be deceived by disrespecting any kind of music

5    like that.

6    Q.  And the formation of the group was largely an end to the

7    artistic direction of Jack Belolo and Morali?

8    A.  Yes.

9    Q.  And that same artistic direction, that same artic impact

10   was carried through all these years by Sixuvus?

11   A.  Since I've been there from the beginning.

12           MR. BESSER:  Nothing further, your Honor.

13           THE COURT:  Ms. Willis.

14   CROSS-EXAMINATION

15   BY MS. WILLIS:

16   Q.  Hello, Felipe.

17   A.  How are you?

18   Q.  Good.  Can I call him Felipe?  We like each other, so I'm

19   going to call you Felipe, okay?

20   A.  Sure.  Why not?

21   Q.  David Fischoff, isn't it true that he was the first, I

22   guess, company to have the agreement with Can't Stop?

23   A.  Uh-huh.

24           THE COURT:  You have to say "yes" or "no."

25   A.  Yes, yes.

180206cantstopH              Ortiz - Cross - Willis

1   Q.  In fact, isn't it true that in 1987 to, I think I saw the

2   things from 1989, I believe it was when Fischoff left, isn't it

3   true that the Sixuvus did not have an agreement with Can't Stop

4   at that time directly?

5           MR. ADELMAN:  Objection to form.

6           THE COURT:  Overruled.

7   A.  Oh, I'm sorry.

8   Q.  You can answer.

9           THE COURT:  That means you can answer.

10          The question was, in the period '87 to '89, is it

11  correct that Sixuvus did not have an agreement directly with

12  Can't Stop.

13  A.  No, we did not.

14  Q.  It was David Fischoff?

15  A.  They did.  Yeah.

16  Q.  Okay.  Great.  And so that agreement with Mr. Fischoff was

17  a written one, wasn't it?

18  A.  I believe so.  I never saw it.

19  Q.  Okay.  Is it your testimony here today that Can't Stop has

20  not really exercised any considerable control over the Sixuvus,

21  you know, in the last 30 years?

22  A.  No.  You know, they loved what we were doing.  Henri

23  loved -- whenever we would get together, even at his house for

24  dinner, he expressed, oh, I heard that the show in whatever

25  country was terrific.  I mean, he was overall happy.

180206cantstopH            Ortiz - Cross - Willis

1   Q.  And he was sort of hands-on, right, wasn't he?

2   A.  Well, with schedules and knowing where we were going, but

3   hands-on as to our shows or anything like that, no.

4   Q.  So let's talk about the Hollywood Star.

5   A.  Star.

6   Q.  Walk of Fame.

7   A.  The Star.

8   Q.  Did Henri approve of that?

9   A.  I believe he did because I was recovering from an injury so

10  I wasn't part of all of the discussions, but Mitch Weiss had

11  reached out to Henri.  He was going to be there.  I believe

12  Victor and Randy were going to be there.  Everyone was going to

13  be there.  And my first plane trip back going to California

14  from -- after my injury was to the Star on the Hollywood Walk

15  of Fame.

16  Q.  So he was even involved in that, in some sense, in that he

17  showed an interest?

18  A.  He showed an interest, and he was actually very excited and

19  happy to see that the group was receiving this huge honor in

20  the industry.

21  Q.  And you know, with the Internet now, right, lots of videos

22  online, we're, sort of, in the information age.  You don't have

23  to appear now --

24  A.  No.

25  Q.  -- backstage to see an artist, to check up on them; isn't

180206cantstopH          Ortiz - Cross - Willis

1    that true?

2    A.  Sure.  I believe so.  You know that and I know that.

3    Q.  What do you do?  You can turn on YouTube, is that correct,

4    and see -- isn't it true?

5           MR. ADELMAN:  Objection.

6    Q.  I'll rephrase that.  Isn't it true that there are perhaps

7    hundreds, I don't know the number, of performances of the

8    Sixuvus Village People on YouTube and other things?

9    A.  Yes, by fans.

10   Q.  So in this day, in this age, you don't have to show up.

11   You can just take a look at the videos and see what's happening

12   with the Sixuvus; isn't that correct?

13   A.  Yes.

14   Q.  So, if I wanted to know whether or not -- let's say I say I

15   want to know if Felipe is wearing his long tribal headwear,

16   right --

17   A.  The gear.

18   Q.  -- and if I knew you were performing at the, I don't know,

19   at the Greek theater, right, and I knew what particular day you

20   were performing, isn't it true that if that performance is on

21   YouTube, I only need to see that to see exactly what you were

22   doing at that performance?

23   A.  After it happened.

24   Q.  So when would you then agree that Can't Stop need only look

25   at some YouTube videos to see what's happening with the

180206cantstopH          Ortiz - Cross - Willis

1  Sixuvus?

2          MR. ADELMAN:  Objection.  This -- all of this is

3  argument.

4          THE COURT:  Yes.  Sustained.

5          You can certainly make the argument, Ms. Willis, and I

6  get your point which is nowadays, one doesn't have to show up

7  at a concert, one can see it on YouTube or pieces of it.

8          MS. WILLIS:  Uh-huh.

9  Q.  So you agree with that?

10          MR. ADELMAN:  Objection.

11          THE COURT:  It doesn't matter if the witness agrees.

12  It's an argument.

13  Q.  So I've reviewed a lot of communications.  As you know, we

14  obtained discovery during the Sixuvus trial with Victor.

15  Remember that?  Do you recall that?

16  A.  Yes.

17  Q.  And as you know, there was a lot of discovery back and

18  forth.  And I've reviewed a considerable -- as a matter of

19  fact, I have it all -- a whole lot of conversations with you

20  and Henri.

21          So I wanted to ask you, do you recall any

22  conversations with Henri or Can't Stop, you know, that dealt

23  with issues of controlling you in that you wanted to do certain

24  things and they didn't want you to do it?

25  A.  No.  I don't recall that at all.

180206cantstopH          Ortiz - Cross - Willis

1   Q.  So you -- is it your testimony that Can't Stop never

2   refused anything that you wanted to do?

3   A.  I think that Henri was very happy with me up until -- well,

4   Can't Stop -- until May of last year.  But for the most part,

5   even in San Diego when Jonathan was present with me and Deborah

6   Crawford at lunch and dinner, he expressed his utmost

7   gratitude.

8   Q.  Well, isn't it true that Can't Stop refused over and over

9   again your request to move from verbal to written agreement?

10  A.  He did, I believe so, but I don't -- I never asked why.

11  Q.  He was -- I guess he controlled that, would you say?

12  A.  I believe so; yes.

13  Q.  So there -- you know, there were at least some --

14  A.  Yeah.

15  Q.  -- instances of -- that Can't Stop did, in fact, control.

16  A.  Yeah, but not in performance.  We were free to perform and

17  elevate the group as much as possible.

18  Q.  But wouldn't you agree if you want him to go into a written

19  agreement, that deals with your performances; isn't that

20  correct?

21       MR. ADELMAN:  Objection to form.  I'm not even sure

22  what this question --

23       THE COURT:  What I'm understanding the witness to be

24  saying is that Henri did not tell them how to execute the live

25  performance, but he did decline to enter into a written

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206cantstopH            Ortiz - Cross - Willis

1  license.

2  Q.  And are you aware that Can't Stop from time to time denied

3  the Sixuvus an opportunity to perform live, for example, on

4  television?

5  A.  I can recall maybe once or twice for reasons that had to do

6  with licensing and sync and things like that.

7  Q.  Could you tell me about those instances so that we can

8  understand them so more.

9  A.  I can't recall all of the details.  I know that it was for

10  one commercial which was "Let Go."  I can't recall the other,

11  but --

12  Q.  Do you recall the PBS performance on the disco show, some

13  sort of a PBS disco show?

14  A.  I do, but that was so long ago that it's in fragments in my

15  memory.

16  Q.  But isn't it true that you were to do a live performance

17  for that television show?

18  A.  I found out afterwards that we weren't going to do it.

19  Q.  Right, but you were to do that, though?

20  A.  No.  I didn't even know we were going to do it.  It was,

21  like, it went to them, and then we found out, oh, we're not

22  doing it, but I heard we were going to.

23  Q.  But Can't Stop prevented that; isn't that correct?

24  A.  I suppose.  I mean, I didn't have a lot of discussions or

25  interaction with Can't Stop.  Whenever they wanted to deny

180206cantstopH            Ortiz - Redirect

1  anything, it was not up to me to question them as to why -- I

2  felt that they knew what they were doing, and so if it was good

3  for them, it was good for me.

4  Q.  But it was a live performance, though, for television?

5  A.  The television show was a live -- but, again, I only found

6  out about it after the fact that we were going to perform.

7  Q.  But Can't Stop stopped it; is that correct?  Can't Stop

8  prevented that performance?

9  A.  I don't know.  I heard through K.C. of the Sunshine Band

10 that we were supposed to be on it.  That's how I found out.

11 Q.  Thank you, Felipe.

12 A.  Thank you.

13         THE COURT:  Any redirect?

14 REDIRECT EXAMINATION

15 BY MR. ADELMAN:

16 Q.  Mr. Rose, this Fischoff agreement that plaintiff is

17 referring to, did you ever see it?

18 A.  I never saw it, no.

19 Q.  Earlier, Ms. Willis asked if Henri approved of a Star on

20 the Walk of Fame.  Why would Henri have to approve an honor

21 given to the Village People?

22 A.  He didn't approve; we let him know that we were being

23 honored.  It was a presentation pitched by Kirk Weber and

24 Deborah Crawford and they submitted the application.  And in

25 reviewing so, the chamber of commerce in Los Angeles, they gave

180206cantstopH              Hearing

1   us the nomination.

2   Q.  Okay.  And you just mentioned the "Let Go" commercial.  You

3   did actually do the "Let Go" commercial, it was on TV; correct?

4   A.  Yes.

5   Q.  However, it was without the Village People music, correct?

6   A.  Yes.

7   Q.  So your understanding is that it was without the Village

8   People music because Victor Willis refused to license his share

9   of the music?

10  A.  Yes.

11          MR. ADELMAN:  Thank you.

12          THE COURT:  You may step down, Mr. Rose.

13          THE WITNESS:  Thank you.

14          (Witness excused)

15          MR. ADELMAN:  Before we call our next witness, a

16  housekeeping request.

17          THE COURT:  Okay.

18          MR. ADELMAN:  In our last session or, I'm sorry, on

19  Tuesday -- I believe Wednesday's session, plaintiff submitted

20  three printouts from the Internet that were pages relating to

21  the three trademarks at issue in this case.

22          There are other items within the trademark office that

23  refer to that file that we would like to use in our

24  post-arguments.  I'm wondering if it's just easier if we submit

25  them then with our arguments, because it is part of an entire

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206cantstopH             Hearing

1    file with TTAB.  For example, the whole thing would be lengthy.

2    We just have little snippets of what we'd like to use.  If we,

3    as a housekeeping measure, can just agree that we can use

4    anything from the registration filed with the TTAB of the three

5    trademarks, is my proposal.

6         THE COURT:  That's fine with me, but I think in

7    fairness before -- I don't want to have the plaintiff say, oh,

8    we need to now submit supplemental arguments because now we

9    know what portions of the file you're using.  So that's fine,

10   but just before the record closes here, tell the other parties

11   what portions of the file you're going to be offering so they

12   can take them into account.

13        I don't want to make you take the time to do it now,

14   but I think it should be part of the record at the hearing so

15   that everybody is aware of what you're going to be relying on.

16        MR. ADELMAN:  I can tell you right now.  It's the top

17   pages -- it's hard to describe this.  When you do a search on

18   USPTO, there's a top page which gives all the information on

19   the registration, the filing, the first-use date.  It's

20   basically a summary of all the aspects of the file.

21        We want to use those pages and we want to use the

22   specimens attached to the original filing of all the trademarks

23   and for all of the supplemental filings for each of the

24   trademarks when they verified the trademarks found at the

25   8-year and 15-year marks.

180206cantstopH            Hearing

1        THE COURT:  Well, you guys know what you're talking

2    about.  If that's good enough for the other parties to

3    understand specifically what you're talking about, great.  If

4    it's not, they will tell you, and you will have to give them

5    more details.

6        MR. ADELMAN:  I can provide the actual -- if you want

7    the printouts, I can provide the actual printouts by tomorrow.

8        MR. BESSER:  That's what I was going to --

9        THE COURT:  Is it going to be a stack a foot high?

10       MR. ADELMAN:  No, I don't think so.  I think it will

11   probably be within 30 to 40 pages.

12       THE COURT:  That's probably best.  Then mark it as an

13   exhibit and it will be a part of a record.

14       MR. ADELMAN:  I'm not going to be here tomorrow.

15       THE COURT:  I would be thrilled not to be here

16   tomorrow.  In that event, you can just send electronic copies

17   to me and to your adversaries.

18       MR. ADELMAN:  That's what I was asking.  Thank you.

19       THE COURT:  All right.  Who is next?

20       MS. MATZ:  Your Honor, we call Leslie Simpson to the

21   stand.

22       THE DEPUTY CLERK:  Watch the bags, come around

23   carefully, the bags, wires.  Come around this way.

24       MS. MATZ:  May I approach.

25       THE COURT:  After the oath.

180206cantstopH                L. Simpson - Direct

1          MS. MATZ:  Okay.

2          THE DEPUTY CLERK:  Raise your right hand.

3          (Witness sworn)

4          MS. MATZ:  May I approach.

5          THE COURT:  Yes.

6          MS. MATZ:  If I may.  Before I begin with

7   Mrs. Simpson, I just wanted to go over one other housekeeping

8   item.  I just handed up -- if you recall, last week we had

9   submitted some Internet evidence that was printed in vertical

10  format that was a little difficult to read.

11         THE COURT:  Yes.

12         MS. MATZ:  We have just reprinted those exact same

13  screen shots in horizontal format so they are larger on the

14  actual page.  These were already admitted into evidence the

15  vertical way, but we were providing replacement copies so they

16  were a little easier for everyone to read.

17         THE COURT:  So we'll substitute G, H, L, M, O, Q, R,

18  LL, NN, PP, and QQ for the old versions.

19         MS. MATZ:  Thank you very much.

20   LESLIE SIMPSON,

21       called as a witness by the Defendants,

22       having been duly sworn, testified as follows:

23  DIRECT EXAMINATION

24  BY MS. MATZ:

25  Q.  Good morning, Mrs. Simpson.  How are you today?

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                              (914)390-4053

180206cantstopH              L. Simpson - Direct

1    A.   Good morning.

2    Q.   What's your current profession?

3    A.   I have two professions.  I work with the Village People --

4    with Sixuvus.  I've been working Sixuvus for quite some time.

5    And I'm also a realtor.

6    Q.   And what's your original relationship to Sixuvus?

7    A.   I am married to Raymond Simpson.

8    Q.   And when did you meet him?

9    A.   1979.

10   Q.   And when did the two of you get married?

11   A.   1987.

12   Q.   Okay.  And --

13            THE COURT:  You're a patient woman.  You're patient.

14            (Laughter)

15   BY MS. MATZ:

16   Q.   You mentioned that part of what you do is working with

17   Sixuvus; is that correct?

18   A.   That is correct.

19   Q.   And that's the company, Sixuvus Ltd.?

20   A.   Sixuvus.

21   Q.   Can you tell me in what capacity and when you have worked

22   with Sixuvus, what your role's been?

23   A.   Well, in the beginning, I was Mitch Weiss' assistant.  I

24   started in 2009, and I've been working with them until the

25   present.

180206cantstopH            L. Simpson - Direct

1  Q.  Okay.  And how long were you Mitch Weiss' assistant

2  specifically?

3  A.  Three years.

4  Q.  So 'til approximately 2012?

5  A.  Yes, because I was -- I had to work outside the office for

6  a year, so I was -- someone else took my place.  And then Mitch

7  left and I came back.

8  Q.  And what do you currently do for Sixuvus Ltd., what

9  kinds --

10 A.  I wear many hats with Sixuvus.  I'm their bookkeeper.  I

11 run the Facebook page.  I do a lot.  Let me think.  I attend

12 meetings with booking agents, accountants.  I did more when I

13 was in the office then when I've been out of the office.

14 Q.  And when you were in the office, is that when you were

15 Mr. Weiss' assistant?

16 A.  Yes.

17 Q.  And so when you were his assistant, did you interact with

18 him on a daily basis?

19 A.  Yes, I did.

20 Q.  And were you -- did you have any -- withdrawn.

21      In your interactions with him or as part of your

22 duties, did you regularly see his incoming and outgoing

23 e-mails?

24 A.  Yes.  I had to look at them every day.

25 Q.  Okay.  And why would you look at them every day?

180206cantstopH           L. Simpson - Direct

1   A.  Well, because he wanted me to go through them and he

2   wanted -- he didn't want to build them up, so he wanted me to

3   eliminate the ones that weren't necessary.

4   Q.  Okay.  During the time when you were working as Mr. Weiss'

5   personal assistant, were you aware of whether or not he

6   regularly corresponded with representatives of Can't Stop?

7   A.  He didn't -- he didn't regularly correspond --

8           MR. BESSER:  I couldn't hear.  There was a cough.

9   A.  I was aware of what Mitch was doing, and he was not

10  regularly corresponding with Can't Stop, not on a regular basis

11  at all.

12  Q.  Do you recall any instances where he did correspond with

13  them?

14  A.  Yes.

15  Q.  And could you tell me the reason for that interaction or

16  what it was about?

17  A.  I noticed when we were in court with Mr. Besser and

18  Mr. Levy, he did correspond with Henri every so often about the

19  court case.

20  Q.  And when you refer to the court case, are you talking about

21  the lawsuit in San Diego?

22  A.  Yes.

23  Q.  Were you aware of whether or not -- or did -- withdrawn.

24          Did Mr. Weiss regularly send Can't Stop set lists?

25  A.  No.

180206cantstopH          L. Simpson - Direct

1    Q.  Did he do that at any time you can recall?

2    A.  No.

3    Q.  What about upcoming performance schedules?  Do you know if

4    he sent those?

5    A.  No.

6    Q.  Were you aware of him corresponding with Can't Stop about

7    him needing approvals for any of the live performances for

8    Sixuvus?

9    A.  No.

10   Q.  Did you -- when you were his assistant, did you also -- was

11   it part of your duties to answer the phone?

12   A.  Yes.

13   Q.  And that's the phone for the Sixuvus Ltd. office; is that

14   right?

15   A.  Yes, it is.

16   Q.  And did you answer pretty much all the calls that would

17   come in?

18   A.  Unless I was at lunch.

19   Q.  Did representatives of Can't Stop regularly call the office

20   to speak with Mr. Weiss?

21   A.  No.

22   Q.  Can you recall any instances where they did?

23   A.  I've never spoken to anyone from Can't Stop.

24   Q.  So you've never spoken to either Mr. Henri Belolo or

25   Jonathan Belolo?

180206cantstopH          L. Simpson - Direct

1   A.  I've never spoken nor seen Henri Belolo.  I've never spoken

2   to Jonathan, and I've just met him recently.

3   Q.  As related to this lawsuit?

4   A.  Yes.

5   Q.  What do you currently do -- withdrawn.  You answered that

6   question.

7          Do you work closely with Ms. Crawford?

8   A.  Yes.

9   Q.  And do the two of you -- what do the two of you interact --

10  what does she do and what do you do?  How do you interact?

11  A.  She manages the Sixuvus office, and we work on projects

12  together.

13  Q.  Okay.  And do you know whether or not she regularly sends

14  set lists to Can't Stop?

15  A.  I'm very aware that she does not send anything to Can't

16  Stop.

17  Q.  And what about upcoming performance schedules?

18  A.  No.

19  Q.  Do you know who Robert Bell is?

20  A.  Yes.

21  Q.  Can you tell me who that is?

22  A.  Robert Bell is Kool of Kool & The Gang.

23  Q.  Is that a musical group?

24  A.  Yes, it is.

25  Q.  Are you personally acquainted with Mr. Bell?

180206cantstopH          L. Simpson - Direct

1   A.  Yes, I am.

2   Q.  What about his wife?

3   A.  I know her well.

4   Q.  Okay.  How long have you known them?

5   A.  Oh, God, I would think by now about 35 years.

6   Q.  Has Sixuvus ever performed in the past with Kool -- I'm

7   sorry, did you say it was Kool & The Gang or Kool & Gang?

8   A.  Kool & The Gang.

9   Q.  Has Sixuvus ever performed in the past with Kool & The

10  Gang?

11  A.  Countless times.

12  Q.  Did you recently see Mr. and Mrs. Bell?

13  A.  I did.

14  Q.  Can you tell me when that was?

15  A.  September -- January 14, a couple weeks ago.

16  Q.  And where did you see them?

17  A.  I was at Ms. Harlem in Harlem at an open mic. and they were

18  seated next to myself and my daughter.

19  Q.  Okay.  And did you have any discussions with them about

20  upcoming performances?

21       MR. BESSER:  This is pure hearsay.  I object to the

22  whole line of questioning.

23       THE COURT:  If it's offered for its truth, it is.  If

24  it's offered for the fact it's said, it's not.

25       And I don't know yet which it is, so you can proceed,

180206cantstopH          L. Simpson - Direct

1   and we'll see.

2          MS. MATZ:  Okay.

3   Q.  Can you tell me what the sum and substance was of your

4   conversation?

5   A.  Well, Sakina was sitting with me most of the time.  Robert

6   was sitting at the other table until the end.  When she came

7   over, she was just getting reacquainted and said it was great

8   to see me and she asked how Ray was doing.  And then at the

9   end, when they were about to leave, Robert came over and joined

10  us, and Sakina said to be sure to tell Ray that they said hello

11  and they look forward to seeing him at their next gig.

12  Q.  Are you aware that -- whether or not Sixuvus has any

13  upcoming performances with Kool & The Gang?

14  A.  No, they don't.

15  Q.  And are you aware of whether or not Intervenor's group has

16  any upcoming performances with Kool & The Gang?

17  A.  Yes.

18  Q.  So, it's your understanding that she was referencing

19  Intervenor's upcoming performances when she said that?

20  A.  At the time I didn't realize that's what she meant, but I

21  do now.

22          MR. BESSER:  This is a lack of foundation.  How could

23  she know what she meant?  This is just pure speculation.

24          THE COURT:  Well, she's inferring from the fact that

25  that comment was made, the fact that the defendants don't have

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206cantstopH          L. Simpson - Direct

1  a gig, and from that alone, I think one could infer that the

2  declarant was talking about the other group.  I don't know that

3  we have anything in the record that there is, in fact, a

4  performance with the other group, but --

5            MS. MATZ:  We do.  We put it in as Facebook evidence.

6  Intervenor posted an upcoming show on their wall.  I can find

7  the exhibit number.  It's Exhibit Q, one of the ones I just

8  reprinted.

9            THE COURT:  It's an inference I can draw.  It doesn't

10 really matter whether the witness draws it.

11           MR. BESSER:  Then it's being offered for the truth of

12 what was said.

13           THE COURT:  It's being offered for the fact that the

14 declarant believed that her husband's group and the witness'

15 husband's group were going to be performing together.

16           THE WITNESS:  Exactly.

17           THE COURT:  I don't think that's offered for its truth

18 because I don't think there's any evidence it's true.  I think

19 it's being offered to show that the witness believed --

20 erroneously believed it to be true.

21           MS. MATZ:  Thank you, your Honor.

22 Q.  You said that part of what you do is you work with the

23 Facebook page for Sixuvus?

24 A.  I do.

25 Q.  And is that official Facebook.com/OfficialVillagePeople?

180206cantstopH          L. Simpson - Cross - Besser

1    A.  OfficialVillagePeople; yes.

2    Q.  Do you know approximately how many fans Sixuvus has of that

3    Facebook page?

4    A.  Approximately 40K.  40,000.

5    Q.  And how long did that take to build up?

6    A.  About ten years.

7           MS. MATZ:  Thank you, your Honor.  I don't have any

8    further questions.

9           THE COURT:  Mr. Besser.

10   CROSS-EXAMINATION

11   BY MR. BESSER:

12   Q.  Good morning.

13   A.  Good morning.

14   Q.  I was a little unclear as to the dates you were, as I

15   believe you put it, examining Mr. Weiss' e-mails back and

16   forth.

17           When did that occur?

18   A.  I was there from 2009 to 2012.

19   Q.  Two thousand- when?

20   A.  '09.

21   Q.  So between 2009 and 2012, you saw Mr. Weiss' correspondence

22   with Can't Stop?

23   A.  Most of them, I'm sure.

24   Q.  Now, I've just placed in front of you Plaintiff's

25   Exhibit 34.  Would you look at it, please.

180206cantstopH          L. Simpson - Cross - Besser

1          (Pause)

2   A.   Okay.

3   Q.   Have you seen it before?

4   A.   Yes.

5   Q.   Now, this -- you would agree, this is a communication from

6   Mitch Weiss --

7   A.   One of the rare few; yes.

8   Q.   -- providing his schedule on page 2?

9   A.   Yes, for the shows.

10  Q.   And also providing general updated information about the

11  group.

12  A.   This isn't a normal schedule.  This is a schedule -- okay.

13  Let me look at this again.  Sorry.  Oh, okay.  Uh-huh.

14          MR. BESSER:  I'd offer 34 into evidence, your Honor.

15          THE COURT:  34 is received.

16          (Plaintiff's Exhibit 34 received in evidence)

17  Q.   I've just placed in front of you the exhibit that has been

18  marked as Plaintiff's 35.  I ask you to look at that and tell

19  me whether you've seen it before.

20  A.   Yes.

21  Q.   And this, again, is a e-mail from Mitch Weiss to Henri

22  giving him an updated schedule; isn't it?

23  A.   It looks like he did it once a year.

24  Q.   And this is during the time period you where are there --

25  A.   Yes.

180206cantstopH          L. Simpson - Cross - Besser

1   Q.  -- when you told us he didn't do this?

2   A.  Well, he didn't.  He rarely did anything.  This is a year

3   apart.

4            MR. BESSER:  I offer 35 in evidence, your Honor.

5            THE COURT:  It's received.

6            (Plaintiff's Exhibit 35 received in evidence)

7   Q.  I've just handed you Exhibit 36, and I would like you to

8   take a look at it and tell me whether you've seen that before.

9   A.  It appears he's updating him yearly.

10  Q.  I'm sorry?

11  A.  It appears that he's updating him yearly.

12  Q.  My question is, have you seen this before?

13  A.  No, I haven't seen this one.

14  Q.  You do see that he's giving Henri information about the

15  tour and other related information such as Sixuvus offices are

16  moving, things like that?

17  A.  He's just -- it's a friendly conversation.  He's letting

18  him know what's happening with us.  Said he -- he says hasn't

19  spoken in years.  It feels like we haven't spoken in years.

20            THE COURT:  There you go.

21  A.  It seems to me like he's just updating him each year.

22  You've shown '10, '11 and now '12.

23  Q.  Well, you told us that he didn't do this.

24  A.  On a regular basis, he did not.

25            MR. BESSER:  I'll I offer 36 in evidence.

180206cantstopH          L. Simpson - Cross - Besser

1          MS. MATZ:  No objection.

2          THE COURT:  Received.

3          (Plaintiff's Exhibit 36 received in evidence)

4   Q.  I believe you told us you never met Mr. Belolo, either

5   Mr. Henri Belolo or his son Belolo?

6   A.  Correct.

7   Q.  Does that mean you were never at any concerts that he

8   attended?

9   A.  Correct.

10  Q.  You don't know whether or not he attended concerts, do you?

11  A.  No.

12  Q.  You don't know what activities Mr. -- or Henri, to take the

13  Senior, you don't know what activities Henri monitored, what he

14  said to the group at all, do you?

15  A.  I know what he did with Sixuvus.

16  Q.  Were you present at any meetings he had with Sixuvus?

17  A.  No.

18          Were there any meetings?

19  Q.  You don't know whether there were any meetings, do you?

20  A.  I've been a part of all meetings during the time I was

21  there, and I don't recall there ever being a meeting that was

22  requested with Henri because I would have been there.

23  Q.  To be specific, you were there for three years, 2009 to

24  2012?

25  A.  And then from 2014 on.

180206cantstopH          L. Simpson - Cross - Besser

1   Q.  And during those first three years, you don't recall any

2   meetings?

3   A.  Not any business meetings, no.

4   Q.  Were you present for the litigation in San Diego at all?

5   A.  No.

6   Q.  Do you know what role, if any, Can't Stop played in that

7   litigation?

8   A.  Yes.

9   Q.  What is -- what is your belief as to what role?

10  A.  Oh, they were in a lawsuit against Karen and Victor Willis.

11  Q.  Your husband testified earlier, or someone testified from

12  Sixuvus, I'm not sure who it was, that Can't Stop was on the

13  same side as Karen and Victor Willis.

14          That's not true, is it?

15  A.  No.

16  Q.  Were you aware that Can't Stop had extensive discussions

17  with Sixuvus involving supporting them by paying their legal

18  fees?

19  A.  I don't recall.

20  Q.  Are you aware of any discussions that took place during

21  that three-year period?

22  A.  Yes.

23  Q.  What are you aware of, that is, discussions between Can't

24  Stop and Sixuvus?

25  A.  Oh, okay.  I'm aware of what was going on, but I wasn't

180206cantstopH          L. Simpson - Cross - Willis

1   aware of the discussions that had anything to do with Sixuvus

2   as a company.  There were none.

3   Q.  Were you aware that members of Sixuvus attended

4   depositions?

5   A.  Absolutely.

6   Q.  And were you aware that Henri was present at some of those

7   depositions?

8   A.  No.

9   Q.  Were you aware that when Sixuvus appeared in France, Henri

10  was present at performances?

11  A.  I don't know about performances.  I know about a

12  performance.

13  Q.  Were you present at any of the performances?

14  A.  No.

15  Q.  So you don't know whether they discussed anything to do

16  with the group at that time, that would be Henri and --

17  A.  No.  I wouldn't be aware of it because I wasn't there.

18          MR. BESSER:  I have nothing further, your Honor.

19          THE COURT:  Ms. Willis.

20  CROSS-EXAMINATION

21  BY MS. WILLIS:

22  Q.  Good afternoon, Ms. Simpson.

23  A.  Good afternoon, Ms. Willis.

24  Q.  You testified earlier or you implied, at least, on the

25  record here that Robert "Kool" Bell, and possibly his wife, was

180206cantstopH          L. Simpson - Cross - Willis

1    unaware that the Village People featuring Victor Willis was

2    performing with them; isn't that correct?

3              MS. MATZ:  Objection; mischaracterizes the testimony.

4              THE WITNESS:  I don't understand the question.

5              THE COURT:  Rephrase the question.

6    BY MS. WILLIS:

7    Q.  Didn't you testify that you had a meeting or you met with

8    Robert "Kool" Bell and his wife, and isn't it true that you --

9    your position to the Court was that they were unaware, Robert

10   "Kool" Bell and his wife was unaware that Village People

11   featuring Victor Willis was performing on the bill with them?

12   Didn't you testify to that?

13   A.  My position with the Court is that I did not meet with

14   them.  I saw them there.  We were seated next to each other.

15   Sakina came over and sat with me and started talking to me and

16   asked me how things were going with Raymond and I in our lives

17   because we're friends.

18             At the end, I said that Robert came over and joined

19   us.  And she told me to tell Raymond to give him their best and

20   that she looked forward to seeing him at the next gig.

21             I don't know anything about what you're talking about.

22   Q.  "The next gig."  Did she say what gig that was?

23   A.  No.

24   Q.  Ms. Simpson, who is Tia Sinclaire?  Do you know you sent

25   over -- isn't it true --

1  A.  I don't know a Tia Sinclaire.

2  Q.  Isn't it true that you sent over some communication

3  regarding Robert "Kool" Bell to a person related to the Village

4  People featuring Victor Willis' performance with Kool & The

5  Gang?

6  A.  Say that again.

7  Q.  Isn't it true, Ms. Simpson, that you had communication,

8  written communication via e-mail, to someone complaining about

9  the performance with Robert "Kool" Bell, Kool & The Gang's

10 performance with Victor Willis and the Village People.  Isn't

11 that true?

12 A.  No.

13 Q.  So you didn't have any communication -- you've not had any

14 communication with anyone regarding the performance of Village

15 People featuring Victor Willis and the Kool & The Gang?

16        MS. MATZ:  Objection to form.  That wasn't the prior

17 question.

18        THE COURT:  She didn't say she had no communication.

19 She said she didn't complain.

20        THE WITNESS:  Right.

21 Q.  Isn't it true that you had communication with someone

22 regarding -- by the way -- rephrase this.

23        Isn't it true that you had written communication with

24 someone regarding Village People featuring Victor Willis and

25 Kool & The Gang?

180206cantstopH          L. Simpson - Cross - Willis

1   A.  No.  That wasn't what it was regarding.

2   Q.  Really?  Why don't you tell us what it was regarding,

3   Ms. Simpson.

4   A.  We were tagged on Facebook that we were performing with

5   Kool & The Gang; that's when it came to my attention that there

6   was going to be a performance in July.

7        I asked the person - I do not know who it was - to

8   please untag us.

9   Q.  So it is true that you had communications with someone

10  regarding Kool & The Gang and Victor Willis?

11  A.  I don't know who that was.  I just asked that whoever it

12  was that tagged us, untag us.  I don't know who it was.

13  Q.  Mrs. Simpson, isn't it true --

14        THE COURT:  It sounds like the witness had

15  communication with this unknown person who tagged Sixuvus --

16        THE WITNESS:  Yeah.

17        THE COURT:  -- regarding Sixuvus and Kool & The Gang

18  to say we're not performing.

19        THE WITNESS:  I didn't want it on my page, on our

20  page.

21        MS. WILLIS:  Your Honor, she said she had no

22  communication at all.

23        THE COURT:  Well, you asked her if she had

24  communication regarding Kool & The Gang and Victor Willis.

25        She sounds like she's saying her communication was

180206cantstopH          L. Simpson - Cross - Willis

1   regarding Kool & The Gang and Sixuvus' version of Village

2   People.

3           Either way, I'm not sure what the relevance is.

4           MS. WILLIS:  Actually, it's not.

5           THE COURT:  If you want to put a document in evidence

6   and put us all out of our misery, go ahead, but I'm not sure

7   what the relevance is.

8           MS. WILLIS:  Okay.  The relevance is I'm basically

9   rebutting something that she testified to earlier.  It was her,

10  your Honor, who brought up the issue of Village People and Kool

11  & The Gang.  You know that's what --

12          THE COURT:  She didn't say anything about

13  communicating with third persons.  You've brought that up.  I

14  would like to know the relevance of it.

15          MS. WILLIS:  The relevance is that I am rebutting her

16  conversation, her testimony.

17          THE COURT:  What did she say that this communication

18  rebuts?

19          MS. WILLIS:  I will read it into the record, then,

20  your Honor.  I have a communication here that was --

21          THE COURT:  You have to mark it as an exhibit and show

22  it to the witness and she'll tell you if it's authentic, and

23  then you can read it into the record once it's in evidence.

24          MS. WILLIS:  All right.  I wasn't planning on entering

25  it into the record.  I was --

180206cantstopH            L. Simpson - Cross - Willis

1          THE COURT:  You don't have to do anything, but you

2    need to explain to me how it rebuts something that she said.

3          MS. WILLIS:  Well, she claimed --

4          THE COURT:  And in the event it does rebut something

5    that she says, you need to put it in the record.

6          MS. WILLIS:  Okay.  She claims that in her meeting

7    that Robert "Kool" Bell, or Kool & The Gang, was unaware that

8    it was Village People featuring Victor Willis.

9          THE COURT:  She testified that they said they were

10   looking forward to seeing Ray at the next gig and she may have

11   inferred or defendants may want me to infer that they were

12   under the mistaken impression that it was Village People

13   featuring Ray Simpson that they had a gig with.

14         MS. WILLIS:  That's what I'm rebutting, right there.

15         THE COURT:  What is it in that document that

16   undermines the witness' testimony?

17         MS. WILLIS:  Well, shall I read?

18         THE COURT:  Does it show anything about Kool & The

19   Gang's state of mind?

20         MS. WILLIS:  It does.  It shows that Ms. Simpson here

21   was very much aware that Kool & The Gang didn't make any such

22   representation at all.

23         I'll read it here.

24         THE COURT:  What's the date of that?

25         MS. WILLIS:  This is an e-mail that was forwarded.

180206cantstopH          L. Simpson - Cross - Willis

1    The date of this is January 25, 2018.  It was forwarded over to

2    Sal Michaels and on to me, to a lady by the name of Tia

3    Sinclaire, whereby Ms. Simpson sent over a communication

4    complaining about the performance of Village People

5    featuring --

6            THE COURT:  Let me see it.  I can't make head nor tail

7    out of what you're saying.  Why don't you hand it up.  We'll

8    mark it as whatever your next exhibit is.

9            What's your next exhibit?

10           MS. MATZ:  Can we get a copy?

11           MS. WILLIS:  I have to make copies of that.

12           THE COURT:  What's your next exhibit?

13           MS. WILLIS:  I believe it would be 14.

14           THE COURT:  All right.  Intervenor's Exhibit 14.  I'm

15   going to take a look at it, and then I'll let the other parties

16   take a look at it.

17           MS. WILLIS:  Sure.  And I'll pass it around.  Sure.

18           (Pause)

19           THE COURT:  Show it to the other parties.  It does

20   tend to suggest that the inference that the defendant wants me

21   to draw is not the inference that Ms. Simpson drew at the time

22   of her conference with -- excuse me -- at the time that she ran

23   into Mr. Bell and his wife.

24           MS. MATZ:  My only issue with this is I have no idea

25   who is writing.  It says "from Tia Sinclaire," and then it

180206cantstopH        L. Simpson - Cross - Willis

1   says, "Hi, I'm Leslie Simpson."

2           THE COURT:  It sounds like it's a forward.

3           MS. WILLIS:  And I said that on the record.

4           THE COURT:  The witness can tell us whether she wrote

5   the content or not.  If she says that's not her e-mail, then we

6   have an authentication issue, but if it is, I'll receive it for

7   what it's worth.

8           MS. MATZ:  All right.

9           THE COURT:  Has Mr. Besser seen it yet?

10          MS. WILLIS:  And if she does not, I can get the actual

11  long-form e-mail in.  I can give it to you in a second.

12          (Pause)

13          THE COURT:  Right now the question is, Ms. Simpson, is

14  the part of that document that begins "Hi, I'm Leslie Simpson,"

15  is that written by you?

16          THE WITNESS:  May I read it.

17          THE COURT:  Yes.  Of course.

18          THE WITNESS:  Thank you.

19          (Pause)

20          THE WITNESS:  Oh, yes.

21          THE COURT:  All right.  I'll receive Intervenor's

22  Exhibit --

23          THE WITNESS:  But that proves that I didn't know

24  because it says it right there --

25          THE COURT:  What did we say?  14, is that what we

180206cantstopH            L. Simpson - Cross - Willis

1  decided?

2          MS. WILLIS:  14, your Honor.

3          THE COURT:  All right.  And you'll need to send a copy

4  of that to the Court and the other parties.

5          (Intervenor Exhibit 14 received in evidence)

6  BY MS. WILLIS:

7  Q.  So Ms. Simpson, when you told your story to the Court

8  inferring what your Honor has stated earlier --

9          THE COURT:  Let me ask a question.

10          Ms. Simpson, when you had the conversation with

11  Ms. Bell at the club, did you, at that time, understand that

12  she was referring to a particular gig that had been scheduled

13  or did you understand that she was just talking generally about

14  the future?

15          THE WITNESS:  I just thought she was saying see them

16  soon, you know.  I didn't know when or where until I saw that.

17          THE COURT:  So if I understand you, when you saw that

18  tag, that's when you put two and two together?

19          THE WITNESS:  Yeah.

20          THE COURT:  All right.  Now I get it.

21          Go on, Ms. Willis.

22          MS. WILLIS:  Well, your Honor, she -- your Honor

23  leaded her into that, but, you know, she had made it clear on

24  the record what she meant.

25  Q.  So my question to you, Ms. Simpson, since you've changed

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                              (914)390-4053

180206cantstopH              L. Simpson - Redirect

1  your story here, --

2          MS. MATZ:  Objection, your Honor.

3          THE COURT:  No.  I think what happened is the

4  defendants wanted me to draw an inference from the

5  conversation.  I don't think the witness said that she drew,

6  herself, that inference at the time.  And before I said a word,

7  the witness said something to the effect that this e-mail shows

8  that she didn't draw that inference at the time.

9  BY MS. WILLIS:

10 Q.  Well, she -- well, my question to Ms. Simpson would be were

11 you lying about it then?

12         THE COURT:  Sustained.

13 Q.  Well, your Honor, I can ask her is she lying about it now?

14         MS. MATZ:  Objection, your Honor.

15         THE COURT:  Sustained.

16 Q.  Or is she, in fact, a pathological liar?

17         MS. MATZ:  Objection.

18         THE COURT:  Sustained.

19         MS. WILLIS:  That's all, your Honor.

20         THE COURT:  Any redirect, Ms. Matz?

21         MS. MATZ:  Give me one moment.  I'm going to be brief.

22 REDIRECT EXAMINATION

23 BY MS. MATZ:

24 Q.  Mrs. Simpson, if you could please look at Plaintiff's 34

25 that was handed to you earlier by Mr. Besser.  It says P34 in

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206cantstopH            L. Simpson - Redirect

 1   the bottom corner.

 2   A.  Uh-huh, yes.

 3   Q.  And I believe you testified this was one of the e-mails you

 4   had seen; is that right?

 5   A.  Yes.

 6   Q.  And do you see down the, kind of, second paragraph from the

 7   bottom, it says, "I plan to be in San Diego when, ellipses,

 8   dash, dash, dash, close ellipses, is deposed"?

 9            THE COURT:  I think you mean paren, dash, dash, dash,

10   close paren?

11            MS. MATZ:  Yes.  I guess I call them ellipsis.  I will

12   call them parens.

13            THE COURT:  To me, I think an ellipsis is dot, dot,

14   dot.

15            MS. MATZ:  I think your Honor is actually right about

16   that.  Sorry.

17   Q.  It says, "Awaiting confirmation of dates and ready for my

18   deposition.  Hopefully, it won't be needed, comma, but, dot,

19   dot, dot."

20            THE COURT:  There's your ellipsis.

21            MS. MATZ:  Yeah.  I appreciate that, your Honor.

22   Q.  Do you see that?

23   A.  Yes.

24   Q.  Is your understanding at least part of this communication

25   was also about the lawsuit --

                    SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                              (914)390-4053

180206cantstopH            L. Simpson - Redirect

1   A.  Yes.

2   Q.  -- that was happening in San Diego?

3   A.  Yes.

4   Q.  Just so I can understand clearly, after your conversation

5   with Mr. and Mrs. -- Mrs. Bell from Kool & The Gang, you said

6   you saw a "like" on a Facebook post, and that's what led you to

7   make the connection?

8   A.  Our page was tagged by -- saying that we were the people --

9   that Sixuvus was the performers; they sent it to us so we would

10  be a part of that post.

11  Q.  Okay.  And do you recall approximately how long after you

12  saw Mrs. Bell that you saw that post?

13  A.  I'd say about maybe two weeks.

14  Q.  Okay.  And at that point, had you become aware that the

15  Intervenor had an upcoming show with Kool & The Gang?

16  A.  That's when I became aware.

17  Q.  So that was the basis for your belief that they had thought

18  that Sixuvus was going to be performing with Kool & The Gang --

19  A.  Yes.

20  Q.  -- in an upcoming gig?

21  A.  Yes.

22  Q.  Thank you very much.  I appreciate your time.

23          THE COURT:  Anything else, Mr. Besser?

24          MR. BESSER:  Nothing further, your Honor.

25          THE COURT:  Ms. Willis.

180206cantstopH          L. Simpson - Recross - Willis

1   RECROSS EXAMINATION

2   BY MS. WILLIS:

3   Q.  Isn't it true, Ms. Simpson, that the purpose of the

4   communications on Exhibit 22 was to interfere with the

5   performance of Village People featuring Victor Willis?

6           THE COURT:  22?

7           MS. WILLIS:  I'm sorry.  For the record, I made a

8   mistake.  It's -- instead of Intervenor 14 it should be 22.  So

9   let's make that change.  I'm so sorry about that.  I crossed it

10  out.

11          MS. MATZ:  I don't think we have anything past 12.

12          MS. WILLIS:  I have other exhibits already marked.

13          MS. MATZ:  It's marked.

14          THE COURT:  So the e-mail forward will be -- that the

15  witness was shown on cross by Ms. Willis will be 22.

16          MS. WILLIS:  Thank you, your Honor.

17  Q.  So again, isn't it true that the purpose of this

18  communication to Kool & The Gang was to interfere with Village

19  People featuring Victor Willis' performance?

20          MS. MATZ:  Objection to form.

21          THE COURT:  The witness can answer if she understands

22  the question.

23  A.  I was merely asking a question if they realize when they

24  sent it to us, that we weren't a part of it, because had I

25  known about it, I said I would have told Bobby and Sakina that

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206cantstopH                L. Simpson - Recross - Willis

1    it wasn't us.

2    Q.  Isn't it true that they didn't send you anything,

3    Ms. Simpson?

4              MS. MATZ:  Objection.

5    A.  They tagged us.

6    Q.  Could you explain what tagging means?

7    A.  When they posted the -- this right here --

8    Q.  At least, what is your understanding of tagging?

9    A.  My understanding of tagging is when you are creating a show

10   that -- for example, creating a show that involves the other

11   person, you tag that person to let them know you're advertising

12   for -- on their behalf, as well as advertising for themselves.

13   So we were tagging advertisement, and it said it was official

14   Village People.

15   Q.  So is that anything like the recent tag of the Sixuvus

16   Village People of -- Village People featuring Victor Willis

17   performance?

18   A.  I'm sorry?

19   Q.  Is it anything similar to that type of tag, meaning that

20   all that means is that someone has put your Facebook address as

21   opposed to this Victor Willis Facebook; isn't it true that's

22   all that means?

23             MS. MATZ:  Objection to form.

24   A.  I don't understand the question.

25             THE COURT:  Sustained.

180206cantstopH          L. Simpson – Recross – Willis

1    BY MS. WILLIS:

2    Q.   Isn't it true that if someone tags another, meaning that

3    they have used your Facebook tag, isn't it true that they could

4    simply mistakenly tag that?

5              MS. MATZ:   Objection to form.

6    A.   I don't know.

7              MS. MATZ:   This is argument.

8              THE COURT:   Well, if I understand it, anybody can tag

9    anybody.   Somebody could create an advertisement saying they're

10   performing with me.   Anybody can tag anybody.   And then, when

11   you get the notification that you've been tagged, you can

12   respond if you want.   That's how I understand it.

13             Is that correct?

14             THE WITNESS:   Yes.

15   BY MS. WILLIS:

16   Q.   And isn't it true, Ms. Simpson, that immediately upon Kool

17   & The Gang discovering that they had actually tagged your

18   Facebook page as opposed to Victor Willis, isn't it true that

19   they removed it?

20   A.   After I requested it, yes.

21   Q.   Isn't it true that it was removed after they discovered it?

22   A.   They discovered it because I informed them.   That is the

23   reason I asked were they aware that it wasn't us.

24   Q.   Were you aware that I informed them prior to you?

25   A.   I don't know nothing about you and what you do.

180206cantstopH              L. Simpson - Recross - Willis

1   Q.  Okay.  So you're not aware of that?

2   A.  I'm aware that whoever responded to me said thank you for

3   giving us this information; we will remove the tag.  They

4   didn't mention you.

5   Q.  Isn't it true, Ms. Simpson, that the purpose of your

6   communication was to in fact attempt to malign Village People

7   featuring Victor Willis?

8        THE WITNESS:  What's "malign" mean to you?  I don't

9   know what "malign" means.

10       THE COURT:  Badmouth.

11  Q.  You don't know what --

12  A.  Oh, no.  I wasn't trying to badmouth; no.

13  Q.  Really?  Why don't I read this to you.

14       THE WITNESS:  Could she?

15  Q.  According to what you wrote here: Do you know if the

16  promoter who booked this knows it's not us?  In fact, a

17  group -- in fact, a group that has been -- that has never been

18  nor seen perform, the reviews have I guess been terrible.  It

19  is not too late to correct this.

20  A.  Yes.

21  Q.  Isn't it true that you're asking them to switch out Village

22  People featuring Victor Willis with the Sixuvus Village People?

23       You said it was not too late.

24  A.  Yes.

25  Q.  And why would you want them to do that, Ms. Simpson?

180206cantstopH          L. Simpson - Recross - Willis

A.  Because they came to us, so I thought perhaps they had made

a mistake.

Q.  So you just admitted on stage to interfering with this

event.  You said that your purpose was to switch it out.

          Your Honor --

          MS. MATZ:  Objection.  At this point, she's yelling at

the witness.

          THE COURT:  I gather there's some history here, but

right now we're in a court of law.  And you need to comport

yourself.  Right now, you're acting as your own attorney, and

this is not the time to take out whatever emotions you have.

          MS. WILLIS:  And it's not that -- no problem.

          THE COURT:  Let's try to take a deep breath.

          MS. WILLIS:  She has admitted that the purpose of --

          MS. MATZ:  Objection; she's testifying.

          THE COURT:  Nothing Ms. Willis says from the podium

is testimony.  She knows that.

          MS. WILLIS:  Thank you, your Honor.

          THE COURT:  She's trying to make an argument.  I don't

remember what the question was.  Let's see.

          Put the question.  The last question was a compound

question.

          MS. WILLIS:  I asked her whether or not her intent was

to have Kool & The Gang to -- she said it was not too late to

bring the Sixuvus version of Village People in to replace --

180206cantstopH            Hearing

1         MS. MATZ:  Objection to form.  That's not what the
2   document says.
3         THE COURT:  Well, since there's only one copy, I don't
4   remember exactly what it says, but the witness can answer the
5   following question:  Was it your intent or your hope that Kool
6   & The Gang would say, oh, we don't want Victor Willis's group;
7   we want Sixuvus's group?
8         THE WITNESS:  It was a question as to whether they
9   knew which group they had chosen since they brought it to my
10  attention that it was us.
11  Q.  You said that it's not too late to correct this.
12  A.  Yeah.  They didn't know it wouldn't be --
13  Q.  So you wanted them to bring your group in?
14  A.  Yes.
15        MS. WILLIS:  That is all, your Honor.
16        MS. MATZ:  I don't have anything further.
17        THE COURT:  You may step down, Ms. Simpson.
18        (Witness excused)
19        THE COURT:  Let's take our morning break.  We'll
20  resume at 11:40.
21        MR. BESSER:  May I inquire.  Are there additional
22  witnesses?
23        THE COURT:  Is the defendant calling anyone else?
24        MS. MATZ:  Subject to our right to call for
25  impeachment, no.  And I do just want to leave the exhibit issue

180206cantstopH            Hearing

1    that Mr. Adelman raised earlier open.  We will be submitting

2    those additional --

3              THE COURT:  Subject to that, the defendant rests.

4              What are you planning to do, Mr. Besser?

5              MR. BESSER:  I'll call my witness.

6              THE COURT:  And you'll be ready with your witness

7    right after, Ms. Willis?

8              MS. WILLIS:  I should be.  I can make a phone call.

9    It's ending earlier than we thought, which I'm happy about, by

10   the way.

11             THE COURT:  Give your witness a ring, and we'll resume

12   at 11:40.

13             MS. WILLIS:  Yes.

14             (Recess)

15             (In open court)

16             THE COURT:  Mr. Besser, you can call your first

17   witness.

18             MR. BESSER:  Yes.  We'll call Jonathan Belolo.

19             THE COURT:  Do we have to re-swear the witness?  He

20   testified in the other case.

21             You're still under oath, Mr. Belolo.

22             THE WITNESS:  Yes, ma'am.

23    JONATHAN BELOLO,

24       called as a witness by the Plaintiff,

25       having been previously duly sworn, testified as follows:

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH2        J. Belolo - Direct - Besser

1    DIRECT EXAMINATION

2    BY MR. BESSER:

3    Q.  Good morning.

4    A.  Good morning.

5    Q.  There has been some testimony in the case about a, I

6    believe we call it some kind of a mash-up?

7    A.  Yes.  I think you're referring to the mega-mix.

8    Q.  And also to the costumes ran at the Trash Disco?

9    A.  Absolutely; yes.

10   Q.  Are you aware -- have you been aware that the Sixuvus group

11   has performed a Trash Disco song?

12   A.  Yes, we were aware, myself and most of the people at the

13   Can't Stop/Scorpio.

14   Q.  And you were aware of the costume worn during that song?

15   A.  Yes.  I was aware of the kind of costumes being worn, the

16   wigs, the different disco attire.

17   Q.  Did you have the opportunity to view the costumes

18   firsthand?

19   A.  I did.

20   Q.  How so?

21   A.  I saw them firsthand in 2008 or '09 when I was invited by

22   Mitch Weiss to visit Sixuvus' corporate offices.

23   Q.  Did Can't Stop ever have any objections to the -- that

24   number being performed?

25   A.  No.

180206can'tstopH2          J. Belolo - Direct - Besser

1  Q.  I've just handed you what's been marked as Plaintiff
2  Exhibit 37.
3  A.  Yes.
4  Q.  Do you recognize it?
5  A.  I do.
6  Q.  Are these records that were maintained by Can't Stop in
7  their offices?
8  A.  Yes.  It's exactly that.
9         MR. BESSER:  I'd offer 37 into evidence, your Honor.
10         MR. ADELMAN:  Objection to authenticity.
11         THE COURT:  Did you say, Mr. Belolo, that you
12  recognized all of Exhibit 37 as being a document in the files
13  of Can't Stop?
14         THE WITNESS:  To be thorough, I'm just going to review
15  them once more.
16         (Pause)
17         THE WITNESS:  Yes.  They're all in our corporate
18  records.
19         THE COURT:  All right.  Were they -- are those
20  records -- were these documents made and kept in the ordinary
21  course of business of Can't Stop and Scorpio?
22         THE WITNESS:  Yes.  Yes, your Honor.
23         THE COURT:  And were they obtained from those files
24  recently?
25         THE WITNESS:  Yes.  We did a copy of the documents

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH2          J. Belolo - Direct - Besser

1   recently.

2            THE COURT:  And are these true and accurate copies?

3            THE WITNESS:  I believe they are.

4            THE COURT:  All right.  They're received.  Plaintiff's

5   37 is received.

6            (Plaintiff's Exhibit 37 received in evidence)

7            THE WITNESS:  Thank you.

8   Q.  I've just handed you what has been marked as Plaintiff

9   Exhibit's 39.

10  A.  Yes.

11  Q.  I would ask you to look at these documents.

12  A.  I can see them.

13  Q.  Are these from the corporate records of Can't Stop?

14  A.  Yes, they are.

15  Q.  Were they recently-obtained copies?

16  A.  Yes.

17  Q.  And these particular documents have been maintained in the

18  corporate records of Can't Stop?

19  A.  They have.

20  Q.  Since approximately 1990?

21  A.  Yes.

22           MR. BESSER:  I offer 39, your Honor.

23           MR. ADELMAN:  No objection.

24           THE COURT:  Received.

25           (Plaintiff's Exhibit 39 received in evidence)

180206can'tstopH2          J. Belolo - Direct - Besser

1    BY MR. BESSER:

2    Q.  Now, I note that on the third page of Exhibit 39, you see

3    that it's a fax from -- excuse me -- to Stephen Kopitko?

4    A.  Yes.

5    Q.  And that's the attorney for Can't Stop?

6    A.  It was the attorney for Can't Stop.

7    Q.  And it's from Mitchell Weiss?

8    A.  Yes.

9    Q.  And the second paragraph refers to the issues that Sixuvus

10   had with Howard Silverman?

11   A.  Yes.  Do you want me to read it?

12   Q.  It's not necessary.

13   A.  Okay.

14   Q.  Then I call your attention to the bottom paragraph of that

15   page.

16   A.  Uh-huh.

17   Q.  You see the last sentence?

18   A.  "Since this agreement..."  Okay.

19   Q.  You can read it.

20   A.  Okay:  Since this agreement is restricted to one year

21   anyway, we won't -- why we won't -- no, sorry -- why won't he

22   just let them do their best with the name Village People for 5%

23   of everything with the contingency that he will informed of all

24   in advance, a very simple proposal.

25   Q.  And then, the next paragraph at -- actually, it would be

180206can'tstopH2          J. Belolo - Direct - Besser

1   the second paragraph in that next page?

2   A.  It says:  So the bottom line is, yes, they will happily

3   sign licensing agreement with Henri.  We are not trying to play

4   negotiations here, only to ask Henri for an agreement

5   with Gateway -- I suppose "which" -- what gives them the

6   ability to make a living as Village People.  Within a year, we

7   will all know if they can make a success of themselves, and

8   then, hopefully, Henri will probably choose to extend the

9   option.

10  Q.  Sir, I've just handed you what we've marked Plaintiff

11  Exhibit 40, which is a photograph or a copy of a photograph.

12  Is this document taken from the files of Can't Stop?

13  A.  Yes, it is.

14  Q.  Regularly maintained in the course of their business?

15  A.  Absolutely.

16  Q.  Do you know what it is?

17  A.  Yeah, I know what it is.  It's a picture of the Village

18  People and all the crew - the trucks, cars, transportation -

19  that was in place during the touring -- extensive touring of

20  the U.S.A. in '79, '78, '79.

21  Q.  Are you referring to the tour you told us about

22  your testimony three days ago?

23  A.  Absolutely.  It was a tour of 50-plus dates produced by

24  Can't Stop with a huge production.  You can see some of the

25  trucks there, some of the cast, and some of the members.  You

180206can'tstopH2        J. Belolo – Direct – Besser

1   can see Randy Jones, Alex Briley, David Hodo –– oh, I can even

2   see Raymond Simpson.  I think it's him.  Yes.  And Glenn

3   Hughes.

4            MR. BESSER:  I offer 40 into evidence, your Honor.

5            MR. ADELMAN:  No objection.

6            THE COURT:  Forty is received.

7            (Plaintiff's Exhibit 40 received in evidence)

8   Q.  Okay, sir, I've just handed you what's been marked as

9   Plaintiff Exhibit 41, which is a photograph.

10  A.  Yes.

11  Q.  Do you recognize it?

12  A.  I do.

13  Q.  Is this a photograph kept in the records of Can't Stop?

14  A.  It is.

15  Q.  And who's in the photograph?

16  A.  You can see members of Sixuvus and my father, Henri Belolo.

17  Q.  And can you tell from looking at the photograph where it

18  was taken?

19  A.  I can't tell where it was taken.  I can –– it was probably

20  in France, but I don't know for sure.

21  Q.  But can you tell whether it was backstage at a performance,

22  for example?

23           MR. ADELMAN:  Objection.

24           THE COURT:  Don't lead.

25           MR. BESSER:  I won't.

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH2          J. Belolo - Direct - Besser

1  Q.  Can you tell -- is there anything about the situation that

2  you can tell us?

3  A.  Well, you can see my father is wearing a pass around his

4  neck, and Sixuvus are in full attire, so it was either

5  backstage at a concert or a TV show, some type of appearance,

6  live, and it was in 1997.

7          MR. BESSER:  I offer 41 into evidence, your Honor.

8          MR. ADELMAN:  No objection.

9          THE COURT:  41 is received.

10          (Plaintiff's Exhibit 41 received in evidence)

11  Q.  Sir, I've just handed you what's been marked Plaintiff

12  Exhibit 42.

13  A.  Uh-huh.

14  Q.  Do you recognize it?

15  A.  Yes, I do.

16  Q.  What is it?

17  A.  It's a copy, scan of a front page of the "Rolling Stone"

18  magazine dated April 19, 1979.  "Rolling Stone" magazine is a

19  very famous rock-n'-roll magazine music.

20  Q.  What was the date?

21  A.  '79, April.

22  Q.  And what was the balance -- are the remaining pages from

23  the article on "Rolling Stone"?

24  A.  Yes.  The first page is the front cover of the magazine,

25  and then those are pages from the article inside the magazine.

180206can'tstopH2        J. Belolo - Direct - Besser

1  Q.  And has Can't Stop kept a copy of this article since it

2  came out?

3  A.  Yes.  Absolutely.

4         MR. BESSER:  I'll offer 42.

5         MR. ADELMAN:  Objection.  It's hearsay, and it's not

6  even a business record.  It's a magazine.  There's no business

7  conducted with it.

8         THE COURT:  Is it being offered for the truth of

9  what's asserted in it or for some other purpose?

10         MR. BESSER:  It's offered to show that, because

11  "Rolling Stone" is such a well-recognized magazine in the music

12  world, it's offered to show the impression of the customer base

13  of what -- of what Village People were, in particular, the

14  second page where it says "The cartoon that conquered the

15  world."  And then it follows with interviews and descriptions,

16  but it's just -- it goes to what --

17         MR. ADELMAN:  Then I have no objection to the first

18  two pages, but I have objection to the article.

19         THE COURT:  Well, I'm not receiving it for its truth.

20         I'll receive it not for the truth of the matters

21  asserted, but just for the fact that the act in 1979 rated this

22  much coverage in "Rolling Stone."

23         MR. ADELMAN:  Thank you.

24         (Plaintiff's Exhibit 42 received in evidence)

25

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH2        J. Belolo - Direct - Besser

1  BY MR. BESSER:

2  Q.  Sir, I've just handed you what's been marked Plaintiff

3  Exhibit 43.  Can you tell us what it is.

4  A.  It is a scan of the front page of the magazine called

5  "Record Mart and Buyer" dated January 2000.

6  Q.  Are you familiar with the magazine "Record Mart and Buyer"?

7  A.  Yes, I am.

8  Q.  Can you tell us generally what it is.

9  A.  It's an industry magazine that's distributed to buyers in

10  the music industry, and it's freely available as well to be --

11  was, anyway -- freely available to buy in the newsstands.  I

12  think it's a U.K. magazine, but I might be wrong.

13  Q.  Is this something that has been maintained in the files of

14  Can't Stop?

15  A.  Yes.

16         MR. BESSER:  I'll offer 43 into evidence.

17         MR. ADELMAN:  Same objection.  It's not a business

18  record.

19         MR. BESSER:  It's offered for the same purpose, your

20  Honor.

21         THE COURT:  Same ruling.  It's authenticated because

22  the witness says it's been maintained in the files, and I'm not

23  receiving it for its truth.

24         (Plaintiff's Exhibit 43 received in evidence)

25

180206can'tstopH2        J. Belolo - Direct - Besser

1   BY MR. BESSER:

2   Q.  I've just handed you what's been marked Plaintiff

3   Exhibit 48.  Can you tell me -- look at it first and tell me

4   what it is.

5   A.  It's a correspondence by e-mail between an Alex Jarrett and

6   Mr. Weiss, or at least somebody at the Sixuvus AOL.com e-mail,

7   address replying signing Sixuvus Ltd.

8   Q.  At the time of this correspondence, which is

9   September 2008, was a copy of it provided to Can't Stop?

10  A.  Yes.  You can see a copy, vibelaw@aol.com is our attorney,

11  Stephen Kopitko.  He forwarded that to us.

12  Q.  And has this been maintained in the corporate record since

13  2008?

14  A.  Yes.

15          MR. BESSER:  I offer 48 into evidence.

16          MR. ADELMAN:  Objection as to authentication.

17          I'm sorry, what did he say about his attorney?

18          THE WITNESS:  This is the e-mail address of Stephen

19  Kopitko, vibelaw@aol.com.

20          THE COURT:  Oh, vibelaw@aol.com.  So, Kopitko is CCed

21  on this e-mail?

22          THE WITNESS:  Yeah.

23          THE COURT:  And was this in the files of Mr. Kopitko

24  or of Can't Stop?

25          THE WITNESS:  It's in our files.  I believe

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                              (914)390-4053

180206can'tstopH2        J. Belolo - Direct - Besser

1   Mr. Kopitko forwarded that e-mail to us, in particular, my

2   father, and that's how it became part of our covered records.

3            MR. ADELMAN:  There's no "forward" here, your Honor.

4   That's the CC --

5            THE COURT:  Did you find this in paper form or in

6   electronic form?

7            THE WITNESS:  This one, I didn't find myself.  It's my

8   father who gave it to me.

9            THE COURT:  Do you know if he found it in paper form

10  in the files or if he found it in his e-mails or in the

11  company's e-mails?

12           THE WITNESS:  My father keeps a paper copy of every

13  e-mail every received or sent because he's an old-school person

14  and he likes to print everything.  So I'm pretty sure he would

15  have scanned it and sent it to me by e-mail that way.

16           THE COURT:  I'll receive it.

17           (Plaintiff's Exhibit 48 received in evidence)

18           THE COURT:  It wouldn't suffice at a trial, but this

19  isn't a trial.

20           MR. ADELMAN:  Okay.

21  Q.  Sir, I have just handed you what's been marked Plaintiff

22  Exhibit's 49.

23  A.  Yes.

24  Q.  Ask you to look at it and tell me whether you recognize it.

25  A.  I do.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH2          J. Belolo - Direct - Besser

1   Q.  And is this a copy of a document maintained in the files of

2   Can't Stop?

3   A.  It is.

4   Q.  I notice the date is 2013.  Has it been kept there since

5   2013?

6   A.  Yes.

7   Q.  Now, it's from Mitch at Sixuvus telling Henri or telling

8   you, Can't Stop, I guess, a few things, right?

9   A.  It is.  It's addressed to Henri Belolo, myself, and my

10  brother, Marguerite DeCarlo, and Stewart Levy.  And it's

11  regarding a couple items, one of them is the record that

12  Sixuvus recorded with KC, Let's Go Back to the Dance Floor."

13          MR. ADELMAN:  Objection.  The document is not in yet.

14  He's testifying.

15          THE WITNESS:  Okay.

16          MR. BESSER:  I'll offer 49 into evidence.

17          THE COURT:  It's received.

18          (Plaintiff's Exhibit 49 received in evidence)

19  A.  Mitch is also telling us about Jim Newman, telling us when

20  his performance will be, about his contracts, that he was

21  feeling very good about his addition, and that he would send us

22  a photo shoot as soon as he have it.  He's also -- Mitch is

23  also talking about a press release.

24  Q.  Which he's proposing to send to you?

25  A.  Absolutely.  He's, in particular, saying that it will

180206can'tstopH2        J. Belolo - Direct - Besser

1   include our trademark info that he'll send it to us, of course.

2           THE COURT:  Did you understand the press release to be

3   about Jim Newman or something else?

4           THE WITNESS:  It's hard to say, but I would think the

5   press release was rather about the new single coming out.

6           THE COURT:  Okay.

7   BY MR. BESSER:

8   Q.  I've handed you a document which has been marked

9   Plaintiff's 53.

10  A.  Uh-huh.

11  Q.  I'd like you to look at it, tell me whether you can

12  identify it.

13  A.  I can identify it as being an e-mail between Mitch Weiss

14  and my father, Henri Belolo.

15  Q.  And also a second page.

16  A.  Yes.  That's -- it's a related e-mail.

17  Q.  We were talking about press releases, and this has

18  something to do with press release, without telling me what

19  yet; correct?

20  A.  Yes.

21  Q.  And this is part of the corporate records of Can't Stop?

22  A.  It is.

23          MR. BESSER:  I offer 53 into evidence.

24          THE COURT:  It's received.

25          (Plaintiff's Exhibit 53 received in evidence)

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH2        J. Belolo - Direct - Besser

1   Q.  Now, the press release talked about in here is not the

2   press release we just mentioned a few minutes ago in 2013; is

3   that correct?

4   A.  No, it's not.

5   Q.  In this press release, there's a discussion or a

6   discussion -- excuse me, I'll withdraw it and rephrase.

7          There's a discussion of a press release that Can't

8   Stop is paying for; is that right?

9   A.  That's right.

10  Q.  And did, in fact, Can't Stop pay for a press release for

11  Sixuvus?

12  A.  I believe we did.  We'd have to check.

13         MR. ADELMAN:  Objection.  That mischaracterizes the

14  e-mail.

15         THE COURT:  It looks like it's about a press

16  representative.

17         MR. BESSER:  Oh, excuse me.  Not press release.  I

18  misspoke.  You're right, your Honor.

19  Q.  It's a press representative that's being hired by Sixuvus?

20  A.  Yes, and his job would be to do press releases.

21         THE COURT:  And did you say whether Can't Stop, in

22  fact, paid for that?

23         THE WITNESS:  I couldn't confirm yet.  I'll find out

24  through our accounting, but I'm suspect we did, at least half.

25  Q.  I've handed you a document marked Plaintiff's 50.

180206can'tstopH2          J. Belolo - Direct - Besser

1   A.  Yes.

2   Q.  Can you tell me if you recognize it.

3   A.  I do.

4   Q.  And does this come from the corporate records of Can't

5   Stop?

6   A.  It does.

7          MR. BESSER:  I'll offer 50 in evidence, your Honor.

8          MR. ADELMAN:  No objection.

9          THE COURT:  Received.

10          (Plaintiff's Exhibit 50 received in evidence)

11   Q.  The second page is what, sir?

12   A.  The second page appears to be a flier or a general booklet

13   representing and promoting Sixuvus as the Village People and

14   mentioning the names of the performers.

15   Q.  And the -- part of the purpose of this e-mail was

16   Marguerite DeCarlo approved that photo; is that correct?

17   A.  That's correct.

18   Q.  Who is Marguerite DeCarlo?

19   A.  Currently, she is the president of Can't Stop.

20   Q.  Was she the president in, 2013?

21   A.  I don't believe she was, but she was an employee of Can't

22   Stop.

23   Q.  I've just handed you a copy of a two-page document that has

24   been marked as Plaintiff Exhibit 51.

25   A.  Yes.

180206can'tstopH2         J. Belolo - Direct - Besser

1   Q.  You recognize it?

2   A.  I do.

3   Q.  The author of the document is Mr. Stewart Levy?

4   A.  Yes.

5   Q.  That's Mr. Levy who is sitting here at this moment?

6   A.  I'm pretty sure it is.

7   Q.  And did he write this in connection with business of Can't

8   Stop?

9   A.  Yes, he did.

10  Q.  At the request of Can't Stop?

11  A.  Yes.

12          MR. BESSER:  I offer 51 into evidence, your Honor.

13          THE COURT:  51 is received.

14          (Plaintiff's Exhibit 51 received in evidence)

15  Q.  What was the purpose of Exhibit 51?

16  A.  In this particular instance, the purpose was to put on

17  notice the Royal Caribbean Cruises that they were employing a

18  band -- that the band they were employing to perform live on

19  their cruise ships under the name Village People was in fact

20  not Village People and that it was fraudulent; and we're asking

21  them to stop, basically.  It's -- we have many of those.  It's

22  examples of us trying to police the trademark, in this

23  particular instance, as it relates to live performances.

24  Q.  Do you know whether they stopped the performance?

25  A.  They stopped.

180206can'tstopH2        J. Belolo - Direct - Besser

1          THE COURT:  If there's going to be a bunch of these --

2          MR. BESSER:  I'm almost done.

3          THE COURT:  All right.  I was going to say, maybe we

4    can hand them out in groups so you don't have to keep taking

5    the time to roam around the courtroom.

6          MR. BESSER:  I'm getting my steps on my Fitbit, so

7    it's helping me, actually.

8          THE COURT:  But it's also eating up the clock here.

9          MR. BESSER:  I'm skipping through a lot of exhibits

10   that we're not going to use.  I'm almost done.

11         THE COURT:  Okay.

12   Q.  Sir, do you see Exhibit 54 that I've just handed to you?

13   A.  I do.

14   Q.  Can you tell us what it is.

15   A.  It's, again, an e-mail between Mitch Weiss and my father,

16   Henri Belolo.

17   Q.  Is this part of the corporate records of Can't Stop?

18   A.  It is.  I'm copied on some of it myself.

19         MR. BESSER:  I offer 54 into evidence, your Honor.

20         THE COURT:  It's received.

21         (Plaintiff's Exhibit 54 received in evidence)

22         MR. BESSER:  I'll be entering three more, and we'll be

23   done.

24   Q.  I've just handed you Exhibit 57.

25   A.  Yes.

180206can'tstopH2          J. Belolo - Direct - Besser

1    Q.  Do you recognize it?

2    A.  Yes.  It's an e-mail again from -- this time from my father

3    to Mitch Weiss.

4    Q.  This is part of the corporate records of Can't Stop?

5    A.  It is.

6          MR. BESSER:  I offer 57, your Honor.

7          MR. ADELMAN:  No objection.

8          THE COURT:  57 is received.

9          (Plaintiff's Exhibit 57 received in evidence)

10   Q.  Do you see the first line where it says "Dear Mitch, thank

11   you for update."

12   A.  Yep.

13   Q.  "I was with the VPs at the Zenith, just came back.  They

14   were superb."

15   A.  Yes.

16   Q.  Do you know what that means?

17   A.  The VP stands for the Village People, and the Zenith is a

18   huge concert hall in France, in Paris, holding 8,000 people

19   approximately.

20          MR. BESSER:  I have one further exhibit that I'll pass

21   out, your Honor.

22   Q.  I've just handed you Exhibit 59.

23   A.  Yes.

24   Q.  Do you recognize it?

25   A.  I do.

180206can'tstopH2          J. Belolo - Direct - Besser

1  Q.  What is it?

2  A.  Those are a series of bills, invoices, I believe, I think,

3  from Mr.-- an attorney called Mr. Briggs, Jeffry Briggs.

4  Q.  Do you know why -- strike that.  I'll rephrase.

5         Are these invoices from your corporate records at

6  Can't Stop?

7  A.  They are.

8  Q.  Do you know why Mr.-- why Can't Stop has copies of invoices

9  from Mr. Briggs?

10 A.  It's because we -- Can't Stop covered Mr. Briggs' expenses,

11 services for a few months.

12 Q.  And what -- in what regard was Mr. Briggs rendering

13 services?

14 A.  So Mr. Briggs was Sixuvus' attorney, and he was helping

15 them defend themselves during the trial involving Mr. Willis in

16 which we were parties, as well.  And I believe Sixuvus were

17 having financial difficulties at the time.  They asked us for a

18 loan, and apparently we didn't do the loan.  We decided to pay

19 out the invoices directly.

20 Q.  Do you have any idea -- strike that.

21        MR. BESSER:  I offer 59 into evidence.

22        THE COURT:  Received.

23        (Plaintiff's Exhibit 59 received in evidence)

24 Q.  Do you know approximately what the total of invoices were?

25 A.  More than $100,000, 120.

180206can'tstopH2         J. Belolo - Direct - Besser

1   Q.  There was a reference in earlier testimony about a

2   mega-mix.  Do you recall that?

3   A.  Yes, I do.

4   Q.  Do you know what the mega-mix is?

5   A.  The mega-mix is a recording that was produced and released

6   by Scorpio and Can't Stop and other licensees in '89, '90.

7   Q.  That's 1989 or 1990?

8   A.  Yes.  And we saw it earlier as a video -- we saw a video

9   clip of that record earlier.

10  Q.  The video we saw when you testified a few days ago was a

11  video made for what purpose?

12  A.  It was a video made to promote the mega-mix record and to

13  be broadcast on TV and used to help the release of the record

14  in Europe and the U.S.

15  Q.  And what exactly is a mega-mix?

16  A.  A mega-mix is a mash-up of -- it was -- it was something

17  that was really fashionable in the '80s and '90s, but it's when

18  you take a few songs, in particular in this case, the four or

19  five hits of the Village People and you reproduce -- you remix

20  them and putting them together, changing the arrangements, the

21  production values of the music, but keeping the vocals.

22          It's just a way to relaunch the career of the Village

23  People and to promote the songs and put them out there again in

24  '89.  It was quite successful.

25  Q.  Now, there was some testimony earlier, I believe, from

180206can'tstopH2        J. Belolo - Direct - Besser

1  Mr. Simpson dealing with the termination notice that you sent?

2  A.  Yes.

3  Q.  And by that, you understand, I mean, the termination of the

4  Sixuvus license?

5  A.  Absolutely.

6  Q.  Can you tell us the date progression of the events around

7  that termination.

8  A.  Yes, I can as I recall it.  I first called Mrs. Deborah

9  Crawford on the phone.  We spoke for about half an hour, 45

10 minutes to let her know --

11 Q.  What did you tell her in that conversation?

12 A.  I told her that we'd be sending an e-mail later on to

13 terminate the license, and I tried to explain the reasons why,

14 and let her know what was coming.  And I later sent the e-mail

15 that's in the evidence, I think, the next day or later that

16 day.

17 Q.  Before you sent the e-mail or talked to Mrs. Crawford, was

18 there any attempt by you to obtain any of the social media

19 sites of Village People?

20 A.  No.

21 Q.  So when Mr. Simpson put that as prior to that -- happening

22 prior to that, he's incorrect?

23 A.  He's incorrect.

24         MR. ADELMAN:  Objection.

25         THE COURT:  Overruled.

180206can'tstopH2          J. Belolo – Direct – Besser

1          MR. ADELMAN:  That's not the testimony.

2          THE COURT:  Well, I don't remember exactly.  The

3    record will reflect what the testimony was.

4          This witness is saying he and plaintiff did nothing to

5    attempt to get control of the social media sites before those

6    conversations.

7          MR. ADELMAN:  I was objecting to Mr. Besser's

8    question, actually, not the respondent's answer, as testimony.

9          THE COURT:  If Mr. Simpson didn't put it that way, the

10   record will reflect.  I don't remember one way or the other.

11         MR. ADELMAN:  Thank you.

12         MR. BESSER:  May I have a moment to consult.  I'm

13   almost done.

14         THE COURT:  Yes.

15         (Pause)

16   BY MR. BESSER:

17   Q.  I return very briefly, sir, to the legal fees that you

18   paid -- that Can't Stop paid for Mr. Briggs.

19   A.  Yes.

20   Q.  Just so it's clear on the record, what case was that?

21   A.  I believe it was the case which we discussed earlier.

22         THE COURT:  The one in San Diego?

23         THE WITNESS:  The one in San Diego, yes, involving

24   Sixuvus against Mr. Willis and ourselves as well against

25   Mr. Willis in a counterclaim.

180206can'tstopH2        J. Belolo - Direct - Besser

1  Q.  Mr. Willis had counterclaimed against Can't Stop?

2  A.  Yes, he did.  He had.

3  Q.  He had also counterclaimed, hadn't he, against other

4  entities that Can't Stop had done business with?

5  A.  Yes, absolutely.  Yes, he counterclaimed against some of

6  our licensees for the trademark - all of them, basically - all

7  the major ones.  Hallmark was a licensee in particular for

8  greeting cards; it was doing very well.  WMS Gaming.  About

9  half a dozen licensees were mentioned and sued in the

10  counterclaim.

11  Q.  And Can't Stop defended those licensees?

12  A.  Yes, we defended our licensees.

13  Q.  But then you also helped Sixuvus with their legal fees?

14  A.  We helped Sixuvus extensively with legal fees and advice in

15  general.

16  Q.  Now, as my final exhibit, I have only one of these.

17        THE COURT:  It's now Plaintiff Exhibit 60.

18        MR. BESSER:  I'll let the witness describe what it is,

19  and I will represent to the Court that my grandkids would love

20  to have this at this moment.

21        THE COURT:  What child wouldn't want a YMCA tour bus?

22  A.  Yes, yes.  My daughter drives me crazy with one of these.

23        It's -- so it's a toy that was released in 2005.  It's

24  a license that we gave to a manufacturer.  I think it was

25  released in the U.S. and Europe, at least, and perhaps Asia, as

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH2          J. Belolo - Cross - Willis

1  well.

2          As I recall, it did fairly well.  It wasn't a huge

3  success, but it was -- it sold quite a bit.  And it features

4  the music also a bunch of sounds, the truck moves on its own.

5  In particular, it depicts the concept of the Village People as

6  well, not with the pictures at that point, because in 2005, we

7  hadn't started the revamped merchandising program yet, but you

8  can see different characters, and they're doing the YMCA.

9          MR. BESSER:  I'll offer 60 into evidence.

10          MR. ADELMAN:  No objection.

11          THE COURT:  It's received.

12          (Plaintiff's Exhibit 60 received in evidence)

13          MR. ADELMAN:  Can I take a picture of it, your Honor?

14          THE WITNESS:  Sure.

15          THE COURT:  Yes.  Anybody who wants it for the record,

16  unless you want to send it up to the Court of Appeals some day,

17  you'll probably want to put it in something that can be part of

18  the record, photographed or something.

19          MR. BESSER:  Thank you.

20          Nothing further of this witness.

21          THE COURT:  Ms. Willis.

22  CROSS-EXAMINATION

23  BY MS. WILLIS:

24  Q.  Good afternoon, Mr. Belolo.

25  A.  Good afternoon.

180206can'tstopH2        J. Belolo - Cross - Willis

1    Q.  I'd like to bring your attention back to Exhibit 59.

2    A.  Yes.

3    Q.  Is it my understanding that Can't Stop funded up to

4    $100,000 to the Sixuvus' defense?

5    A.  When you add up all those bills, it's in excess of

6    $100,000; yes.

7    Q.  And would Can't Stop spend that type of money on a group

8    that it was not involved with or heavily involved with?

9    A.  No.

10   Q.  Thank you.  Mr. Belolo, does Can't Stop have quality

11   control standards?

12   A.  Yes, we do.

13   Q.  What are, like, some of Can't Stop's quality control

14   standards and would it include, for example, the six Village

15   People characters and the music, for example?

16   A.  Well, we -- Can't Stop owns different interests all

17   pertaining to Village People concept.  There's the publishing

18   of the musical compositions, the recordings, the trademark, the

19   character concept, as well.

20        And we try to keep an eye on every use of either of

21   these rights, either through our licensees or in general

22   outside by using external companies, such as the Web Sheriff

23   and other sub-publishers, in particular and directly ourselves,

24   as well, and through Scorpio Music, the other company involved

25   in which I am director, where there are employers specifically

180206can'tstopH2          J. Belolo - Cross - Willis

1    for that purpose.

2          So we monitor -- yeah, we monitor what's going on, and

3    we try to make sure that the Village People brand is used in a

4    correct way.

5    Q.  And would that, in particular, include the Sixuvus live

6    performances?

7    A.  Yes, sure.

8    Q.  Did Can't Stop communicate the standards to the Sixuvus at

9    some point, I'm sure, or did they not?

10   A.  I'm pretty sure there was communication -- well, yes, I'm

11   sure there was discussion over the quality of what -- in

12   general, we were very happy with Sixuvus' performances, if

13   we're talking about this in particular, about Sixuvus.  And

14   there was discussion ongoing around how they perform and we

15   thought they were doing a great job.

16   Q.  And I talked about earlier with another witness that, you

17   know, in today's world, you no longer, although the evidence

18   shows that Mr. Belolo appeared at some of the concerts, I think

19   I saw some exhibits with that, but it's no longer necessary to

20   actually show up at concerts.

21         So the question I have for you is, isn't it true that

22   one of Can't Stop's quality control methods was to constantly

23   review YouTube and other videos with respect to the Sixuvus

24   live performances?

25         MR. ADELMAN:  Objection to form.

180206can'tstopH2          J. Belolo - Cross - Willis

1            THE COURT:  Was it part of your quality control to

2    review videos online?

3            THE WITNESS:  Yes, your Honor, it is.  It is.

4    BY MS. WILLIS:

5    Q.  And how often did you do this?

6    A.  Regularly, on a regular basis, either us directly, Scorpio

7    Music, sub-publishers or the different companies we hired

8    constantly would monitor what was out there.

9    Q.  And so, Can't Stop was able to use the current methods into

10   the 21st Century, and that is reviewing the Sixuvus

11   performances, is that correct?  They could see them any time

12   they wanted to?  For example -- let me rephrase that.

13           If Can't Stop wanted to check out a particular

14   performance of Village People, could they simply go to the

15   Internet to do so to see --

16   A.  Sure.

17   Q.  And did they?

18   A.  Yes.

19   Q.  And if Can't Stop had noticed something wrong or something

20   askew with the Sixuvus performances by way of their costume or

21   other quality control methods, would Can't Stop have not told

22   them so?

23   A.  Absolutely.  I know my father and myself for sure are very

24   involved with the brand the Village People.  It's a part of our

25   DNA, who we are, and we care a lot.  So if we had felt it was

180206can'tstopH2       J. Belolo - Cross - Willis

1   going the wrong way, would have said so very, very clearly.

2   Q.  And is it fair to say that over the years you have reviewed

3   at least maybe 100 or more or less than 100 of those videos?

4   A.  Over the years, yeah, it would be fair.

5   Q.  Hundreds.  On an ongoing basis?

6   A.  I don't know a particular number, but it was constant.

7   Q.  It was constant?

8   A.  Yes.

9   Q.  So that was -- an important part of your quality control

10  was to review those videos?

11  A.  Absolutely, among others.

12          MS. WILLIS:  That's all.

13          MR. ADELMAN:  I was wondering, because my throat is

14  starting to go, I would like to take, if your Honor -- our

15  lunch break so I can repair my throat, and I can continue to

16  cross-examination of the witness.

17          THE COURT:  All right.

18          MR. ADELMAN:  If that would work for your Honor.

19          THE COURT:  We'll finish Mr. Belolo.

20          And Ms. Willis, your witness will be here this

21  afternoon.

22          MS. WILLIS:  I don't think it's necessary to call my

23  witness at all.

24          THE COURT:  So we're definitely finishing after lunch.

25          MR. ADELMAN:  Yes.

180206can'tstopH2          J. Belolo - Cross - Willis

1           MS. WILLIS:  I will be calling -- I'm sorry.  I'm

2    recalling a couple of witnesses here, but my direct witness is

3    not going to be necessary.

4           THE COURT:  Who are you planning to recall?

5           MS. WILLIS:  As I stated yesterday, I plan to recall

6    Mr. Raymond Simpson, and I also plan to recall Felipe Rose.

7           THE COURT:  And how long do you expect your direct of

8    those witnesses to take?

9           MS. WILLIS:  I won't do like they did.  I will make it

10   rather quick, your know.  It will go quite smoothly and

11   everything.

12          Also, your Honor, I have on my part of the case, I was

13   planning to call Mr. Belolo on one question only.  Now, your

14   Honor could have me just to do it with him when we come back,

15   and that way, it's over.  It will take less than a minute.

16          THE COURT:  That's fine.

17          MS. WILLIS:  Okay.  Good.

18          THE COURT:  All right.  So let us break until 2:00,

19   and then we'll finish.

20          (Luncheon recess)

21

22

23

24

25

180206can'tstopH3        J. Belolo – Cross – Willis

1              A-F-T-E-R-N-O-O-N S-E-S-S-I-O-N

2                        2:04 p.m.

3          (In open court)

4          THE COURT:  All right.  We had one more question from

5  Ms. Willis for Mr. Belolo.

6   JONATHAN BELOLO,

7  CROSS-EXAMINATION CONTINUED

8  BY MS. WILLIS:

9  Q.  Good afternoon, Mr. Belolo.

10  A.  Good afternoon.

11  Q.  In prior testimony here before the Court, I'm sure you'll

12  recall the defendants attempting to say that Village People

13  featuring Victor Willis is somehow subpar to the Sixuvus and

14  that he had walked off of the stage and all that.

15          Do you recall that type of testimony?

16  A.  I recall the subject was broached; yes.

17  Q.  And you're familiar with Victor Willis, aren't you?

18  A.  Yes, I am.

19  Q.  You know him to be, what, a professional artist or do you

20  not?

21  A.  He's a professional performer.

22  Q.  And have you heard him sing live, for example, in front of

23  you?

24  A.  Yes, I have recently.

25  Q.  And what was your impression?

180206can'tstopH3          J. Belolo - Cross - Willis

1   A.  That his voice was back and almost as good as 40 years ago.

2   Q.  Thank you.  So I'd like to show a video that we're going to

3   enter into evidence.

4           MS. WILLIS:  We're going to say this is Exhibit 25, I

5   suppose, your Honor.

6           THE COURT:  Intervenor's 25?

7           MS. WILLIS:  Uh-huh.

8           THE COURT:  All right.

9           MS. WILLIS:  Can the witness have permission to come

10  over and start it?

11          THE WITNESS:  I'm also tech support.

12          MS. WILLIS:  He's our tech person, too.

13          THE COURT:  You may step down.

14          MS. WILLIS:  Bring the lights down a bit and probably

15  the screen over.

16          MS. MATZ:  Your Honor, we ask we be given a copy of

17  this at some point.

18          THE COURT:  Yes.

19          Make sure you give everybody else a copy, and if you

20  want it to be in the record, you need to give it to me on desk.

21          MS. WILLIS:  Great.

22          For the record, what we're about to see are

23  performances, live performances of Victor -- it's Village

24  People featuring Victor Willis in Australia, and also a couple

25  of locations here, but 90% of it is the reaction from the

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH3          J. Belolo - Cross - Willis

1   Australia tour.

2           THE COURT:  What are the dates of this, just recently?

3           MS. WILLIS:  The dates are December 7, I believe,

4   through the 17th, somewhere around there, approximately.

5           (Video played)

6           THE COURT:  If I didn't say it, Intervenor's 25 is

7   received.

8           (Intervenor Exhibit 25 received in evidence)

9           MS. WILLIS:  Thank you, your Honor.

10  BY MS. WILLIS:

11  Q.  So is that your knowledge of what actually occurred in

12  Australia?

13  A.  This is a video that you sent me around that time that let

14  me see, among others, what would happen then; yes.

15  Q.  Okay.  Good.  And you know that during one performance in

16  Australia when Victor Willis arrived, he arrived with a very

17  bad cold.  You're familiar with that?

18  A.  I heard the stories.

19  Q.  And you also know that he was able to do the first show but

20  halfway through, he lost his voice because of the cold?

21          THE COURT:  Is this anything that you know yourself or

22  did you hear from a third person?

23          THE WITNESS:  I read it online, news stories, reports,

24  stuff like that.

25  Q.  And did you also hear that people I guess associated with

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                              (914)390-4053

180206can'tstopH3        J. Belolo - Cross - Adelman

1    the Sixuvus sort of took -- they started saying, oh, Victor

2    Willis walked off the stage?  You heard about that?  You heard

3    that part?  Oh, he walked off the stage?

4              MR. ADELMAN:  She wants to testify, she is free --

5              MS. WILLIS:  I'm not testifying.

6              THE COURT:  So far, I haven't heard anything from

7    anyone with any personal knowledge on this subject.  And

8    frankly, I'm not sure, as I think I've said before, whether it

9    matters whether Victor Willis' group is good or bad or better

10   or worse than the defendant's group or why.  It's not really

11   relevant to the issues in this hearing.

12             And this hearing is not supposed to be an opportunity

13   to settle any score anybody has with anybody else.  It's

14   supposed to be about whether the counterclaims that Sixuvus has

15   brought against Can't Stop are going to fly, and whether Victor

16   Willis lost his voice or not I'm having a hard time imagining

17   how that is going to affect the outcome.

18             MS. WILLIS:  Well said.  Thank you.  No more for

19   Mr. Belolo.

20             Thank you.

21             THE COURT:  Mr. Adelman.

22             MR. ADELMAN:  Thank you.

23   CROSS-EXAMINATION

24   BY MR. ADELMAN:

25   Q.  Good afternoon, Mr. Belolo.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH3        J. Belolo - Cross - Adelman

1   A.  Good afternoon, Mr. Adelman.

2   Q.  As you can tell, my voice has morphed significantly since

3   we last chatted.  So if you don't understand something I say,

4   please ask me to repeat it, and I will.

5   A.  Thank you.

6        THE COURT:  I hope it's just a cold and not the flu,

7   Mr. Adelman.

8        MR. ADELMAN:  I don't even think it's a cold, your

9   Honor, because I don't have any other symptoms on than my voice

10  sounding like Marlon Brando.

11       THE COURT:  Good.  I'd hate to have you spreading flu

12  germs around.

13       MR. ADELMAN:  No.  I would have called you and

14  suggested another day.

15       THE COURT:  I'm glad for your sake it's not the flu.

16       MR. ADELMAN:  Thank you.  I know.  Thank you, your

17  Honor.

18  Q.  So tell me, Mr. Belolo, what's the last show that the

19  Sixuvus -- withdrawn.

20       Where did the Sixuvus perform last?

21  A.  I don't know the specific place or date where they last

22  performed.

23  Q.  Okay.

24  A.  I don't recall, anyway.

25  Q.  Do you recall any show that they performed in the last two

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH3          J. Belolo - Cross - Adelman

1   years?

2   A.   Yeah.  Sure.

3   Q.   Okay.  Where?

4   A.   Well, they performed in Amsterdam.  The video I introduced

5   in the evidence, in these proceedings, they performed in Ibiza.

6   They tour extensively in the U.S.  They came to France.

7   Q.   And when is the last video you reviewed on YouTube of the

8   Sixuvus?

9   A.   Must have been during the summer of 2017.

10  Q.   Okay.  When you do a Google search of Village People --

11  A.   Yes.

12  Q.   -- do a lot of videos of the Sixuvus Village People shows

13  come up?

14  A.   Google searches change all the time.  They have a very

15  complex algorithm, but it comes up.

16  Q.   I understand, but it was suggested earlier if you wanted to

17  see any show, you could just find it on Google.

18         Do you believe that's the case?

19  A.   Well, you can find it on YouTube, which is a part of

20  Google, I guess.  And not any show.  A lot of shows are there,

21  but not all of them.

22  Q.   Isn't is it true that most of the shows put up by fans of

23  the Sixuvus on YouTube have been taken down because of -- do

24  you know why?

25  A.   We do take down some shows from time to time.

180206can'tstopH3        J. Belolo - Cross - Adelman

1   Q.  Not you, but there have been take-down notices by the

2   Willises --

3   A.  Yes.

4   Q.  -- quite consistently since you ended the lawsuit; isn't

5   that true?

6   A.  I don't remember take-down specifically after.  It's

7   possible.  But I've noticed that Mrs. Willis does take down

8   some videos often -- from time to time, anyway.

9   Q.  Why does she have the ability to take down videos off

10  YouTube?

11  A.  At least as a sub-publisher -- as a publisher of some of

12  the songs, she may have -- she may have the right.  I don't

13  really participate in that.  I don't know very much how she

14  does it.

15  Q.  But to your knowledge, it has to do with her rights in sync

16  licensing, correct?

17  A.  It has to do with music publishing.

18  Q.  But the term of art of syncing music with video is called

19  sync licensing; is that not correct?

20  A.  It's true.

21  Q.  And are you aware the Digital Millennial Copyright Act?

22  A.  I've heard of it.

23  Q.  Okay.  Tell me what it is, if you know?

24  A.  Well, the DMCA is one of the major acts that was passed in

25  the United States that set the rules to enforce copyright

180206can'tstopH3        J. Belolo - Cross - Adelman

1  protection online.

2  Q.  Right.  It gives the copyright owners of music the right to

3  tell YouTube to take down a video that syncs a video with their

4  music without their permission, correct?

5  A.  It's one of the uses; yes, correct.

6  Q.  And so, have you -- as one of the publishers of the Village

7  People music, have you granted anyone permission on YouTube to

8  put up a synchronized video?

9  A.  On YouTube specifically, may have happened.  We would --

10  but we do grant syncs all the time.

11  Q.  Okay.  Have you ever granted Sixuvus the right to put up

12  videos on YouTube?

13  A.  It's possible.

14  Q.  Okay.  Would you have to get the Willises' permission to

15  allow Sixuvus to put up videos on YouTube?

16  A.  It's a complex question.  I don't think I would, but it's

17  complicated.  Depends on the territory.  Nowadays -- yeah.

18  Q.  If you wanted to do a commercial like the Let's Go

19  commercial we discussed --

20  A.  Yes.

21  Q.  -- would you have to get the Willis' permission to use YMCA

22  in the "Let Go" commercial?

23       MR. BESSER:  I object.  He's testing his legal

24  knowledge.  These are very difficult legal issues, and I don't

25  know that they're relevant.

1          MR. ADELMAN:  They're actually not, your Honor.  This

2    is exactly what publishers do.  This is exactly what Can't Stop

3    and Scorpio Music are set up to do.  And Mr. Belolo said he's

4    intimately involved in the business of the music.

5          THE COURT:  You can ask him what he does.  Whether

6    it's permitted or not under the DMCA is a legal question, but

7    you can ask him what they do.

8          MR. ADELMAN:  I didn't ask him that point.  This

9    question was specifically about whether he needed to get

10   permission from the Willises to put music in a commercial.

11         THE WITNESS:  Okay.

12         MR. ADELMAN:  And he would know that.

13         THE WITNESS:  I can answer, if you want.

14   Q.  Of course.

15   A.  My understanding of it personally, and I'm not an expert,

16   is that in the U.S., any publisher has the right to grant a

17   sync license without asking the other sub-publishers, but they

18   have to account their share to everybody else, but that's not

19   our practice.

20         What we do is, we make sure Mr. Willis' publishing

21   company agrees and signs every license in the U.S., as well as

22   we do, just to make sure everybody's on the same page.

23   Q.  So you do ask for that permission?

24   A.  Well, we don't -- we don't, but the person who wants the

25   sync does.

180206can'tstopH3        J. Belolo - Cross - Adelman

1   Q.  Did you grant permission to "Let Go" to use music in that

2   commercial?

3   A.  I don't believe we did.

4   Q.  Was that because the Willises refused to grant permission?

5           MS. WILLIS:  Objection as to form.  It's irrelevant as

6   to whether or not the Willises granted a license or not.

7           MR. ADELMAN:  Actually, it is.  They tried to use the

8   "Let Go" commercial as an example --

9           THE COURT:  Overruled.

10          MR. ADELMAN:  Thank you, your Honor.

11  A.  I understand the Willises did not allow this commercial.

12  Q.  Okay.  The commercial aired anyway, didn't it?

13  A.  Without the music.

14  Q.  That's correct.  And Sixuvus was in the commercial,

15  correct?

16  A.  Yes, they were.

17  Q.  They used different type of disco music in the commercial?

18  A.  Yes.  There was a disco background, I guess.

19  Q.  Okay.  Thank you.  If we can turn to Exhibit 30 -- PX37,

20  please.

21  A.  It's your set?  PX37.

22  Q.  You testified about this document earlier, do you recall?

23  A.  I did.

24  Q.  The first page is a letter from David Fischoff to your

25  father, correct?

180206can'tstopH3        J. Belolo - Cross - Adelman

1  A.  Correct.

2  Q.  Okay.  And it's the outline of a license, correct?

3  A.  Appears to be, yeah.  It's not the outline, but with

4  regards to the license.

5  Q.  The license for performance?

6        THE COURT:  It looks like a proposal.

7        MR. ADELMAN:  Yeah, it's a proposal.  I'm sorry.  Did

8  I say something --

9        THE WITNESS:  I said --

10  Q.  It is a proposal.  Yes.  Turning to page 3.  This is a

11  letter from your father to Stephen Kopitko?

12  A.  Uh-huh.

13  Q.  In the first -- after it says, "Dear Stephen," it says,

14  Please find a copy of contract between Can't Stop Productions

15  and David Fischoff Productions, Inc. for the service mark and

16  trademark Village People.

17        Can you tell me where in this exhibit is the actual

18  contract?

19  A.  The contract is not in the exhibit.

20  Q.  Now, did you do the search for this document?

21  A.  This document in particular was extracted by my father.

22  Q.  Okay.  Did anybody ask him for the actual contract?

23  A.  I -- I don't know if anybody asked him.  I know that he's

24  thorough and he wants to check his records.

25  Q.  But there is no contract attached to this exhibit; correct?

180206can'tstopH3          J. Belolo - Cross - Adelman

1    A.  There is no contract.  I'm pretty sure we can find it.

2    Q.  You're assuming there is a contract?

3    A.  I'm assuming there's a contract.

4    Q.  Have you ever seen this contract?

5    A.  I've seen many contracts.  It's -- I think I may have seen

6    it -- I don't know if it was the contract or a draft.

7    Q.  Isn't it true that it's probable that this contract was

8    never entered into?

9    A.  No.  I'm sure it was entered into.

10   Q.  But you've never seen it, but you don't have a copy of it?

11   A.  Well, it's from '87, so...

12   Q.  If you look at paragraph 4 of this document --

13   A.  Which page?  Pardon?

14   Q.  Same page.

15   A.  Yep.

16   Q.  Actually, you know what?  Turning to the next page, which

17   is page 3, --

18   A.  Uh-huh.

19   Q.  -- it's a letter from Felipe Rose?

20   A.  Yes.

21   Q.  To your father, correct?

22   A.  Correct.

23   Q.  And did you -- prior to getting on the stand today or on

24   the stand, did you read the letter?

25   A.  Yes.

180206can'tstopH3         J. Belolo - Cross - Adelman

1    Q.  And what is your understanding of what this letter is?

2    A.  Well, my understanding is that when Sixuvus decided to

3    separate from David Fischoff services, they needed proof that

4    we had granted them a license and that's what Felipe is asking

5    Henri.

6    Q.  And that's because all they had at the moment was an oral

7    agreement with your father, correct?

8    A.  Probably, yes.

9    Q.  Okay.  And in any of these agreements that we've been

10   looking at right now, are there any quality control provisions

11   in any of the agreements that we've been looking at?

12   A.  We haven't seen agreements here.

13   Q.  That's right.  In any of these proposals or discussions in

14   these letters, are there any quality control demands or

15   provisions?

16   A.  It's not the essence of the letter, so I don't think there

17   are.

18   Q.  Now, if you go to the last page, this is a letter from your

19   father again to Steve Kopitko.

20   A.  Uh-huh.

21   Q.  It says: Dear Steve, please find enclosed a letter from

22   Village People Company.  They want Can't Stop to license to

23   them use of the Village People name for touring against the

24   royalty of 5% on gross income for Can't Stop.

25             Next sentence:  It's okay with me.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH3        J. Belolo - Cross - Adelman

1   A.  Uh-huh.

2   Q.  Okay.  Then he says:  Can you please contact Felipe Rose

3   and work with him, a letter of agreement for a period of 18

4   months...

5   A.  Yes.

6   Q.  ...we will see for extension afterwards.

7   A.  Yep.

8   Q.  And that's dated January 1990, correct?

9   A.  That's correct.

10  Q.  Okay.  So, was -- did they ever enter into a written

11  agreement?

12  A.  No.

13  Q.  Did Steve Kopitko ever draft an agreement for them?

14  A.  He drafted an agreement.

15  Q.  He did?  What happened to it?

16  A.  There was back and forth discussion around the draft, but

17  it never got signed.

18  Q.  And what happened after 18 months?  Did Can't Stop renew

19  the agreement, or did they just let it go?

20  A.  No.  Well, it was implicitly renewed.  My father agreed

21  with them continuing to tour.

22  Q.  Was there any documentation or e-mails or a letter from

23  Steve Kopitko saying, hey, it's 18 months, you're good to go?

24  Anything like that?

25  A.  Not on the record today.  Maybe there is in the documents,

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH3          J. Belolo - Cross - Adelman

1   but we could --

2   Q.   And this went on for the next 27 years, correct?

3   A.   Yes.

4   Q.   No -- nothing from Can't Stop?

5   A.   Well, nothing from Can't Stop.  Is it a question?

6   Q.   Yeah.  Was there anything from Can't Stop that gave any

7   indication that this license wasn't anything but what my

8   clients have been saying it is?

9   A.   Yes.  Of course we signed one of the evidence, in one of

10  the e-mails that my father -- we confirmed to Mitch, I think it

11  was Mitch, that they could continue touring as long as Can't

12  Stop allowed it, so that's at least one example.

13  Q.   Okay.  Let's turn to Exhibit 39.

14  A.   I got it.

15  Q.   Okay.  So this is a letter from Mitch Weiss to Steve

16  Kopitko, correct?

17  A.   Yes.

18  Q.   And basically, this is a letter -- is it your testimony

19  that it's during the negotiation of the license agreement?

20  A.   Seems to be.

21  Q.   Okay.  And my clients are asking for certain things,

22  correct?

23  A.   Correct.

24  Q.   Okay.  But no written agreement was ever signed, correct?

25  A.   Not to my knowledge.

180206can'tstopH3          J. Belolo - Cross - Adelman

1   Q.  In this letter, it talks about merchandise, doesn't it?

2   A.  It's possible.  Probably.

3   Q.  Just take a look at the letter and tell me if it talks

4   about merchandise.

5   A.  The first one?

6   Q.  The one we're talking about, 39.

7   A.  There's two letters.  I'm going to read it.

8   Q.  You're correct.  That's correct, sir.  From Mr. Weiss to

9   Mr. Kopitko.

10          (Pause)

11  A.  Yes.  Well, clause one is they asked for the right to

12  negotiate and exploit a deal for merchandise.

13  Q.  And if you turn back to Exhibit 37 for a second, if you can

14  keep them both up there, this proposal also asks for

15  merchandising records and live video, movies, a whole gamut of

16  things; correct?

17  A.  Yes.

18  Q.  So in the letter at the time that Sixuvus was negotiating

19  with Can't Stop, they were looking for a breadth of rights,

20  weren't they?

21  A.  Yes.

22  Q.  Because they only had a singular right at the time,

23  correct?

24  A.  The main right they had was a right to tour.  We also

25  granted them -- I'm pretty sure we granted them the right to

180206can'tstopH3        J. Belolo - Cross - Adelman

1   sell merchandise on the tour.

2   Q.  I'm sorry.  You granted them the right to sell merchandise?

3   A.  On the tour, I'm pretty sure.  I'm not sure it's in

4   writing, but --

5   Q.  Okay.  If you can turn to page 48.

6   A.  Exhibit 48?

7   Q.  Yes, sorry, Exhibit 48.  Thank you.  You're getting better

8   than me at this.

9   A.  Practice.  Yes?

10  Q.  Yes.

11  A.  Uh-huh.

12  Q.  This is a purported to be an e-mail from Sixuvus to

13  somebody named Alex at RIP Productions?

14  A.  Absolutely.

15  Q.  And they're telling them you can't talk to us about plays,

16  musicals; right?

17  A.  That's what they're saying.

18  Q.  That is consistent with their license, right?

19  A.  Yes.

20  Q.  They would refer anything other than that had to do with

21  touring to you, correct?

22  A.  Yes.

23  Q.  Okay.  So they acted in accordance with what they believe

24  the license was, correct?

25  A.  Correct.

180206can'tstopH3          J. Belolo - Cross - Adelman

1  Q.  That's what that e-mail is actually showing?

2  A.  That, and they also talk about trademark, but that's --

3  yes, they're referring the producer to us for the rights to do

4  a musical, as they should have.

5  Q.  When did the lawsuit between Can't Stop and Victor Willis

6  begin?

7  A.  There were more than one.

8  Q.  Okay.  When did the first one begin?

9  A.  The first one that I know of was in 1990.

10  Q.  Okay.  Right around the same time that you're negotiating

11  with Sixuvus, correct?

12  A.  Correct.

13  Q.  And what was that lawsuit about?

14  A.  This one, if I recall correctly, it was about -- I think

15  Victor Willis was complaining about the use of his voice on the

16  mega-mix.  I think that was the subject of his complaint, in

17  France, anyway.  It was a French case.

18  Q.  Okay.  And when did that lawsuit end?

19  A.  Not too long thereafter.  I think a couple -- one or two

20  years later.

21  Q.  Okay.  Was Sixuvus sued in that lawsuit?

22  A.  I don't know.  I don't think so.

23  Q.  When is the next time Victor Willis and Can't Stop were in

24  a lawsuit?

25  A.  Well, the one -- next time that strikes me is the one we've

180206can'tstopH3          J. Belolo - Cross - Adelman

1  been talking about in 2010.

2  Q.  And who was the plaintiff in that suit?

3  A.  Honestly, I don't recall the details, if the plaintiff

4  countersued -- it was complicated.

5  Q.  Do you know who sued who first?

6  A.  I don't remember who sued who first.

7  Q.  Okay.  Did they sue Sixuvus along with you?

8  A.  We were brought into this as a counterclaim against us, I

9  believe.

10 Q.  Was Sixuvus already sued in the lawsuit?

11 A.  Probably, yes.  That would make sense.

12 Q.  What was Sixuvus sued for?

13 A.  I don't remember the details of the case.  I haven't read

14 it recently.

15 Q.  I'm asking you because you made a big deal about the legal

16 fees in that case --

17 A.  Yes.

18 Q.  -- and how you paid Sixuvus legal fees.

19 A.  Yes.

20 Q.  But you don't even know what they were being sued for?

21 A.  I know there were lots of details in the lawsuit.  I didn't

22 take part of it myself.  I wasn't involved then.  My father

23 would know instantly what you're talking about.  I haven't read

24 it in a long time.

25 Q.  Fair enough.  What was Victor Willis suing Can't Stop for?

180206can'tstopH3        J. Belolo - Cross - Adelman

1    A.  He was suing Can't Stop on the subject of our use of

2    re-records we have done of the music and that we licensed to

3    some of our licensees.

4    Q.  Okay.  And was that the lawsuit that was just recently

5    settled last year?

6    A.  No, it wasn't.

7    Q.  Okay.  So, did -- what happened with that lawsuit?  Did you

8    settle it?

9    A.  The one in 2010?

10   Q.  The one you're talking about right now.

11   A.  Yes.  We settled it.

12   Q.  Did you pay Victor Willis money?

13   A.  I believe we did.

14   Q.  Okay.  Did Sixuvus pay Victor Willis any money in that same

15   lawsuit?

16   A.  I don't recall.

17   Q.  Isn't it true that in actuality, the settlement was that an

18   injunction was part of the settlement in which Victor Willis

19   was supposed to stay away from Sixuvus?

20        MS. WILLIS:  Objection.

21   Q.  Was that not the settlement, sir?

22        THE COURT:  Overruled.

23        MR. BESSER:  If I may, the settlement the record was

24   on the record, defendant's introduced it, I believe as their

25   Exhibit X --

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                            (914)390-4053

180206can'tstopH3          J. Belolo - Cross - Adelman

1          THE COURT:  I can't even tell if we're talking about

2    the same lawsuit.

3          MR. BESSER:  It is.

4          THE COURT:  Well, the witness can answer if it's part

5    of his understanding.

6          Was an injunction that Mr. Willis not interfere with

7    any of Sixuvus' performances part of the settlement that you

8    know of?

9          THE WITNESS:  I believe there was an injunction in

10   there.  I don't know if the term was "injunction," but part of

11   the proceeding was that there was something in that nature;

12   yes.

13   BY MR. ADELMAN:

14   Q.  So isn't it the case that you actually paid for Sixuvus

15   legal fees because you didn't believe that the lawsuit against

16   them was meritorious and that they had only been sued because

17   of Can't Stop?

18   A.  No, I don't think so.

19   Q.  Okay.  Thank you.

20          If you can turn to Exhibit 53.

21          THE COURT:  53?

22          MR. ADELMAN:  53.

23   Q.  This is about the press representation letter.  Do you

24   recall testifying about it?

25   A.  I recall this document.

180206can'tstopH3          J. Belolo - Cross - Adelman

1    Q.  Okay.  Now, did Sixuvus ask Can't Stop to pay for half of
2    the press representative or did your father offer to?
3    A.  In this e-mail, we can see that it's Mitch who is asking.
4          THE COURT:  Mitch is saying -- he's writing about your
5    kind offer to help with the press rep. costs.
6          Do you know firsthand anything about these
7    conversations?
8          THE WITNESS:  I don't know firsthand.  My father was
9    the one who had the conversation.
10   Q.  Okay.  Let's turn to Exhibit 50, if you'll turn to the
11   second page.  If I understand your testimony correctly, Can't
12   Stop approved this picture?
13   A.  Yes.
14   Q.  And it approved all the detail around the picture?
15   A.  It approved the picture as a whole.
16   Q.  Yes.  And this picture was meant to be a poster, correct?
17   A.  It was meant -- my understanding was that it was meant to
18   be a lot of things, poster probably, as well.
19   Q.  What other things would it have meant to be?
20   A.  A leaflet to promote the tour, for instance.
21   Q.  Anything else?
22   A.  You'd have to ask Sixuvus with that.
23   Q.  Okay.  Now, take a look at this poster/picture and tell me
24   where Can't Stop's name is on it.
25   A.  Not on this page that we're seeing here.

180206can'tstopH3        J. Belolo - Cross - Adelman

1    Q.  Right.  This is the poster, though, correct?

2    A.  I don't know if it's a poster, but it's what it is, the

3    document with the picture and the trademark.

4    Q.  And look at the bottom-right corner.  It says "R" in a

5    circle Village People?

6    A.  Yes.

7    Q.  Do you know what "R" in a circle means?

8    A.  It's a registered trademark.

9    Q.  Okay.  Does it say registered Can't Stop?

10   A.  No, not on the front page, not on this page.

11   Q.  And approved by your company, Can't Stop, correct?

12   A.  Yes, apparently.

13   Q.  Okay.  Thank you.  You just ended a lawsuit with Victor

14   Willis, correct?

15   A.  Correct.  A year ago.

16   Q.  And when did you end that lawsuit?

17   A.  Pardon?

18   Q.  When did that lawsuit end?

19   A.  It ended by a settlement at the beginning of 2017 in March,

20   I think.

21   Q.  At what stage of litigation, if you know, was the case in?

22   A.  There were multiple cases.  There was a case in the U.S.

23   that was pending an appeal or that had just been oral arguments

24   on appeal, and there was a case in France, as well --

25   Q.  Okay.

180206can'tstopH3          J. Belolo – Cross – Adelman

1  A.  -- that hadn't started really; yes.

2  Q.  Had there been a ruling in the case in the United States?

3  A.  Yes.

4  Q.  And what was the ruling?

5  A.  It was a case regarding the recapture rights of Victor

6  Willis, and then it evolved into what percentages could

7  Mr. Willis recapture.  And there was a ruling in San Diego that

8  split the songs.  There were 24-something songs involved.  And

9  some of them, half about, were ruled 50/50, would attribute 50%

10  of the copyright to Mr. Willis in the U.S., and the other half

11  at one-third.

12  Q.  And did the Court grant the Willises any money?

13  A.  There was lawyers' fees.

14  Q.  Other than lawyers' fees, did it grant any back-royalties?

15  A.  Not significantly.  As I recall, I might be wrong, but I

16  don't think so.

17  Q.  So it granted Mr. Willis a bigger percentage in a number of

18  the songs?

19  A.  Yes.

20  Q.  And it granted them attorneys' fees, correct?

21  A.  Yes, correct.

22  Q.  Was that case -- was that appealed?

23  A.  It was appealed.

24  Q.  Who appealed it?

25  A.  Both parties appealed it.

180206can'tstopH3          J. Belolo - Cross - Adelman

1   Q.  Okay.  Now, what was the settlement then?  You settled

2   before -- withdrawn.

3           You settled before the appeal was decided, correct?

4   A.  Before it was decided, yes.  There were -- there had been

5   oral arguments, I think, but yes, it was before it was decided.

6   Q.  So what was the settlement?

7           MS. WILLIS:  Objection, your Honor.  The settlement is

8   confidential, and I fail to see the relevance here.

9           THE COURT:  What's the relevance?

10          MR. ADELMAN:  The relevance is that I believe that the

11  license agreement that they granted to Ms. Willis was part of

12  the settlement agreement.

13          THE COURT:  Well, you can ask that.

14          MR. ADELMAN:  All right.

15  Q.  That's the question.  Was the license agreement part of the

16  settlement agreement?

17  A.  No.  It's a separate agreement.

18  Q.  And what's the -- in return for the license, what's the

19  consideration that Mr. -- that Mrs. Willis, doing business as

20  Harlem West, is granting to Can't Stop?

21  A.  We -- we try to make it the same as the license that we had

22  with Sixuvus, so I think it's 5% commission on gross and

23  various other provisions.

24          THE COURT:  The question was, in exchange for giving

25  Ms. Willis the license, what did you get in return, if it

                SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                                (914)390-4053

180206can'tstopH3         J. Belolo – Cross – Adelman

1   wasn't part of the settlement?

2           MR. BESSER:  That goes into the settlement agreement,

3   your Honor, which is confidential.

4           THE COURT:  Well, the witness testified it wasn't part

5   of the settlement agreement.  That's what confused me.

6   A.  No.  Okay.  So, to be clear, there were two agreements:

7   there was a settlement agreement and a license agreement, and

8   they're separate documents, but we signed the license agreement

9   at the same time we settled, so that there's no confusion.

10  Q.  Was there any consideration given in the settlement

11  agreement in exchange for the license agreement?

12  A.  No.

13          THE COURT:  Well, if you had decided not to give the

14  license agreement, would the settlement have gone through?

15          THE WITNESS:  I don't believe so.

16          THE COURT:  So how is it that you can say that the

17  license agreement wasn't a part of the settlement agreement?

18          If the deal was we'll give you a license agreement and

19  maybe some other stuff as part of the settlement, then it's

20  part of the settlement.

21          If it wasn't part of the settlement and it was just

22  something you did because you woke up on that side of the bed

23  that morning --

24          THE WITNESS:  No, no, no.  I thought the question was,

25  was it the same agreement.

180206can'tstopH3          J. Belolo - Cross - Adelman

 1          THE COURT:  No.  The question is not were they the

 2   same pieces of paper.

 3          The question is, did you give Ms. Willis the license

 4   agreement as part of your settlement of these lawsuits?

 5          THE WITNESS:  Of course.

 6          MR. ADELMAN:  Thank you, your Honor.

 7   BY MR. ADELMAN:

 8   Q.  Okay.  Earlier you testified that you had called

 9   Ms. Crawford to talk to her about the termination?

10   A.  Yes, uh-huh.

11   Q.  And what date was that?

12   A.  It was -- I think it was the same day I sent the e-mail.

13   Q.  So May 30th?

14   A.  Yes.  Maybe the day before, but I'm pretty sure it was the

15   same day.

16   Q.  And the license agreement you entered into May 19th.

17   Does that sound familiar?

18   A.  It's possible, yes; consistent.

19   Q.  Okay.  Eleven days before you called Ms. Crawford?

20   A.  I don't recall the exact date, but if you know for a fact,

21   then...

22   Q.  Other than the video that we saw -- withdraw that.

23          The video that we just saw that Ms. Willis played, do

24   you know if it was edited in any way?

25   A.  The video we just saw?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH3          J. Belolo - Cross - Adelman

1   Q.  Yeah.

2   A.  Yeah.  It's very edited.

3   Q.  And the audio track is not actually the audio track from

4   the concerts, correct?

5   A.  I don't know because I didn't edit it, but my

6   professional --

7   Q.  That's what I'm looking for.

8   A.  -- in my professional assessment is that some of it is in

9   sync in the beginning, and then another track gets overlaid,

10  but part of it are actual -- part of it are in sync with the

11  real -- with the scene that would go with it, and other is

12  overlaid, but it's edited.

13          THE COURT:  But you can kind of tell -- even I can

14  kind of tell that the music was continuous in some portions

15  where the video was jumping from --

16          THE WITNESS:  Sure.  Sure.  It was edited.  It was

17  overlaid.

18          THE COURT:  Okay.

19  Q.  I'm almost done here, so I thank you for your patience.

20          In previous testimony, you talked about having agents

21  and others monitor the performances of Sixuvus; correct?

22  A.  Not the main attribution, but some of them do; yes.

23  Q.  And are they trained to do that?

24  A.  Trained to do that?  I wouldn't know if they had any

25  training for that.

180206can'tstopH3          J. Belolo - Cross - Adelman

1  Q.  Did you train them to monitor Sixuvus?

2  A.  I didn't train them.

3  Q.  Do you have anybody monitoring Victor Willis and his group?

4  A.  Yes.

5  Q.  Who?

6  A.  Myself, I monitor it, and we've got people in-house at

7  Scorpio and Can't Stop.  We've had a few back-ups as well by

8  our sub-publishers in Australia.

9  Q.  And you have quality control provisions within your

10 trademark license agreement with Ms. Willis?

11 A.  We do.

12 Q.  And how are those enforced?

13 A.  Well, Ms. Willis sends me reports on a regular basis,

14 mentioning the dates they're booking, sends me pictures and

15 biographies for approval for the performance -- performers, and

16 she sends me a video and press clippings and material like

17 that.

18 Q.  Okay.  Last thing that just came to me, was the

19 consideration for the license agreement in exchange for you not

20 having to pay the Willises either their attorneys' fees or

21 other monetary damages?

22        MR. BESSER:  Object.  It's a confidential settlement

23 agreement.

24        THE COURT:  I don't really see the relevance of the

25 rest of the terms.

180206can'tstopH3          J. Belolo - Recross - Willis

1    Q.  Thank you very much, Mr. Belolo.

2    A.  You're welcome.

3              THE COURT:  Redirect, Mr. Besser.

4              MR. BESSER:  No, your Honor.  Nothing further.

5    RECROSS EXAMINATION

6    BY MS. WILLIS:

7    Q.  Mr. Belolo, do you recall counsel here ask a question about

8    consideration with respect to the license agreement?

9    A.  Yes.

10   Q.  For -- what was the consideration for your understanding

11   for Can't Stop's license agreement with the Sixuvus?

12             MR. BESSER:  Your Honor, it's a confidential

13   settlement.

14             THE COURT:  The question was, what was the

15   consideration for Can't Stop's license agreement with Sixuvus.

16             MR. BESSER:  Oh, with Sixuvus.  I misheard.  I

17   apologize.

18   A.  Well, the consideration was the percentage on the gross.

19   Q.  Thank you.  And so you also said that there was the same

20   percentage, didn't you, 5%?

21   A.  Yes.

22   Q.  So would that be the same consideration?

23   A.  The royalties are the same.

24             MS. WILLIS:  Thank you.

25             THE COURT:  You may step down, Mr. Belolo.

              SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                           (914)390-4053

180206can'tstopH3          Hearing

1          THE WITNESS:  Thank you, your Honor.

2          (Witness excused)

3          THE COURT:  Anything else from defendant, Mr. Besser?

4          MR. BESSER:  From plaintiff?

5          THE COURT:  From plaintiff.  Sorry.

6          MR. BESSER:  I sometimes feel like a defendant.

7          THE COURT:  Well, for this proceeding, you sort of

8     are.

9          MR. BESSER:  Nothing further, your Honor.

10         THE COURT:  Ms. Willis.

11         MS. WILLIS:  Nothing further, your Honor.

12         THE COURT:  Everybody rests.  Rebuttal case?

13         MS. MATZ:  Subject to just being able to send the

14    additional documents from the USPTO.

15         THE COURT:  All right.  And I think Ms. Willis owes a

16    document and maybe Mr. Besser owes a document.  There were a

17    couple of things today, but the transcript will reveal what

18    they were.

19         Ms. Willis owes a paper document and a disk.

20         MS. MATZ:  That's Exhibits 22 and 25.

21         THE COURT:  22 and 25.  I can't remember --

22         MR. BESSER:  We're going to do pictures of the bus.

23         THE COURT:  You're going to do pictures of the bus;

24    that's right.  All right.

25         Well, I'm glad we're finished, although I'm not glad

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH3          Hearing

1  that I cleared tomorrow morning, but these things happen.

2          Proposed findings of fact and conclusions of law are

3  next.  When I thought we were going to finish Wednesday, I was

4  going to give you 'til Monday.  What I propose is to give you

5  until Monday, but get me whatever you're going to get me in the

6  morning on Monday.

7          MS. MATZ:  That would be fine.  We won't get the

8  transcript until tomorrow, so I appreciate that.

9          THE COURT:  Anything else we should do?

10          What I hope to do is get to work on this right away

11  when I get your proposed findings.

12          If I reach a decision, but I think it's going to be a

13  while before I can get you my reasoning, I may just issue a

14  sentence saying what the decision is and reasoning to follow,

15  but if I can get the reasoning fairly close to the decision,

16  I'll do it both at once.

17          And we'll be making a priority of this matter.

18          MR. LEVY:  On the proposed findings of fact and

19  conclusions of law, your individual rules have rules for briefs

20  on motions.  I assume those don't apply to proposed findings of

21  fact and conclusions of law.

22          THE COURT:  Oh, you mean in terms of length?

23          MR. LEVY:  Length.  Or do they?

24          THE COURT:  Well, they don't, but I certainly don't

25  want either the findings of fact or conclusions of law to

180206can'tstopH3          Hearing

1   exceed 25 pages, and I can't imagine that they would have to.

2          So, a finding of fact is not so-and-so testified to

3   this so-and-so testified to that.  A finding of fact is the

4   fact you want me to find and then the places in the record

5   where you think I should look to find it.

6          If the finding of fact that you want me to make is

7   that there was never a written agreement between plaintiff and

8   defendant, for example, the finding of fact would not be

9   so-and-so testified to this and so-and-so testified to that.

10  The finding of fact would be there was never a written

11  agreement, and then you're going to put in parenthesis all the

12  places in the record where you think I would find support for

13  that finding of fact.

14         So I can't imagine why anybody's findings of fact or

15  conclusions of law would exceed 25 pages.

16         MR. LEVY:  Do you want a table of authorities?

17         THE COURT:  That would be helpful.

18         MS. MATZ:  If I can just ask, when you say that the

19  either/or wouldn't exceed -- are you expecting them to be two

20  separate documents with a 25-page limit each?

21         THE COURT:  It can be one document, but neither half

22  should exceed 25 pages.

23         MS. MATZ:  Understood.

24         THE COURT:  Ideally, the whole thing wouldn't exceed

25  25 pages, but that's probably too much to ask.

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH3          Hearing

1          Please don't infer from the fact that I'm giving you

2     up to 25 that it should be that long.  It seems to me it could

3     be a lot shorter.

4          MS. WILLIS:  You had asked for an update on the Second

5     Circuit this morning.  And so there was -- I don't know if you

6     saw it -- there's an order which came down a couple of hours

7     ago.  They're requesting oral argument on the stay.

8          THE COURT:  When?

9          MS. WILLIS:  On the stay, on the request for the stay

10    for the order is scheduled.

11          THE COURT:  They don't usually communicate with me

12    except to tell me the bottom line, whether I was right or

13    wrong.

14          When is the oral argument?

15          MS. MATZ:  The oral argument is on the 20th.  To

16    clarify, earlier Mrs. Willis said it had been referred to the

17    panel, which it has, but in the meantime, just so the Court

18    knows, and I think they did send this decision to you, but they

19    denied the original request for the emergency stay.  They did

20    refer it to the panel.  And the oral argument was scheduled for

21    February 20, I believe.

22          THE COURT:  That is all news to me.  I didn't know --

23          MS. WILLIS:  Actually --

24          THE COURT:  -- that they had done anything.

25          MS. WILLIS:  -- they denied the temporary stay in the

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH3          Hearing

1    interim in lieu of it being transferred to the panel in which

2    it is now to actually consider the stay.

3           THE COURT:  Well, I'm sure if they were telling me

4    that I had to -- if they were taking action that required me to

5    do something, I would have heard about it, and I haven't heard

6    about it.

7           When they punt something to the panel, they're doing

8    nothing essentially and leaving it to the panel, so we'll see

9    what they do.  And I'm sure if they issue something that either

10   requires me to do something or shows me I'm wrong about

11   something I've already done, they'll let me know.

12          And if something happens that I should know about and

13   you don't see it hitting the docket here and you want to tell

14   me about it, that would be good.  All right.  Thank you, all.

15   And needless to say, if you work anything out between now and

16   Monday, let me know.

17          MS. MATZ:  One last housekeeping thing, and that is,

18   we noticed in preparing for this and in a couple of other

19   things the motion that Mrs. Willis' attorney filed on, I

20   believe it was December 8 and apologize if I have the date

21   wrong, but when they intervened in the case, I'm pretty sure it

22   was December 8, the papers never actually got uploaded to the

23   docket.

24          I know usually after the Court issues the order, then

25   the papers in support of that get uploaded.  That never

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH3          Hearing

1    actually happened.  Just before we get too far out so that for

2    completeness of the record, could those be uploaded by either

3    the Court or Mrs. Willis?

4            THE COURT:  Let me take a look at the docket so I'm

5    sure I know what you're talking about.  Hold on one sec.  Let's

6    see.  December 8 is when you made your motion.

7            MS. MATZ:  We actually made ours on November 30, which

8    is when we physically walked the papers in.  We uploaded them

9    on the eighth.  We realized they hadn't been uploaded, and

10   that's when we did it.

11           THE COURT:  Okay.  The first thing I have from -- the

12   first thing that appears on the docket from Intervenor looks

13   like a December 15 letter.

14           MR. LEVY:  December 8, what happened -- that's when we

15   had the second meeting before the Court.  We had one on

16   November 30.  And then, I'm looking at the transcript here, on

17   December 8, they had brought their papers in.  Mr. Caplan had

18   it approached.  The clerk's office brought it up here.  And

19   then I think you took everybody in to argue it, and the

20   transcript --

21           THE COURT:  Then we screwed up on my end -- oh, wait.

22   What I have on the docket happened on December 15 was --

23           MR. LEVY:  That's the third time we were here, your

24   Honor.

25           THE COURT:  You're interrupting me, Mr. Levy, and it's

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH3          Hearing

1    not going to come out on the transcript if we talk over each

2    other.

3             I have a minute entry for December 15, which just says

4    no contempt sanctions at this time, but strict compliance with

5    the Court's order is expected.

6             You're telling me — and I believe you — that counsel

7    for Ms. Willis had filed papers before that.  It looks like he

8    filed a notice of appearance -- they both filed a notice of

9    appearance on December 12.

10            MS. MATZ:  Yes.  He walked the papers in on December 8

11   and Mr. Levy is correct.  That's the day we had a hearing where

12   Mr. Caplan, who at the time represented Mrs. Willis, was

13   present.  He handed out copies of the paper, but they never

14   actually made it to the electronic docket.

15            THE COURT:  Let me just see if I have that.

16            MR. LEVY:  Would it help if you saw the transcript

17   from the eighth?

18            THE COURT:  I believe you.  I'm just looking to see

19   what I have.

20            I have a December 15 letter with attachments from

21   Mr. Carita (ph), but that's not what you're talking about.  I

22   have proposed order to show cause; a proposed counterclaim; a

23   declaration of Mr. Michaels; a declaration of Mr. Caplan; a

24   declaration of Ms. Willis; and a memorandum of law.

25            That's what you're referring to.

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH3          Hearing

1          MS. MATZ:  I believe.  I'm not sure the declaration of

2    Mr. Michaels is a part of it.  Off the top of my head, I don't

3    remember.  But I do believe all the papers are actually listed

4    in the TRO that the Court signed on December 14.  I believe it

5    listed all of our original papers and all of Intervenor's

6    papers in the wherefore clauses before it went into the order.

7          THE COURT:  I don't have electronic copies of those

8    papers, but they should be filed.

9          Do you, Ms. Matz, have electronic copies of those

10   papers?

11         MS. MATZ:   Part of the reason I'm asking that maybe

12   Ms. Willis file them is because mine has my handwriting all

13   over them.  They were hand-filled right before the hearing.

14         THE COURT:  But you have paper copies.  I'm asking if

15   you have electronic copies.

16         MS. MATZ:  Oh, I don't have electronic copies.  No.

17   Only hard copies.

18         THE COURT:  Does anybody have electronic copies

19   besides former counsel for Ms. Willis?

20         MR. LEVY:  We don't, your Honor.  No.

21         THE COURT:  Ms. Willis, you're going to have to get in

22   touch with your prior counsel and either ask them to

23   electronically file those documents or send electronic copies

24   to you so that you can electronically file them --

25         MS. WILLIS:  I have them.

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

180206can'tstopH3          Hearing

1          THE COURT:  -- so the record is complete.

2          MS. WILLIS:  I have them already.  Would you like me

3    to upload them?

4          THE COURT:  Yes.

5          MS. WILLIS:  It will appear as a later docket number;

6    is that okay?

7          THE COURT:  They're dated -- it looks like they're

8    dated December 7.  And yes, they'll show up on the docket as if

9    they were -- actually, probably the clearest thing to do would

10   be, is if you could put a cover letter on them, date it today,

11   and say attached pursuant to the Court's order are copies of

12   documents provided to the Court and counsel for plaintiff and

13   defendant on December 8.

14         MS. WILLIS:  In that case, do you want me just to send

15   it to chambers on the e-mail and you'll --

16         THE COURT:  Attach them to a letter and just upload

17   it.  This way, the record will be clear that everybody had

18   these documents on December 8 and it's not a new application.

19         MS. WILLIS:  I shall do that.

20         THE COURT:  Thank you very much.

21         MS. MATZ:  Thank you, your Honor.

22         MR. LEVY:  Thank you.

23         THE COURT:  All right.  Thank you, all.

24                          - - -

25

1                           INDEX OF EXAMINATION

2    Examination of:                                Page

3     WILLIAM WHITEFIELD

4    Cross By Mr. Besser  . . . . . . . . . . . 545

5    Cross By Ms. Willis  . . . . . . . . . . . 547

6    Redirect By Ms. Matz . . . . . . . . . . . 548

7     FELIPE ORTIZ ROSE

8    Direct By Mr. Adelman . . . . . . . . . . . 550

9    Cross By Mr. Besser  . . . . . . . . . . . 562

10   Cross By Ms. Willis  . . . . . . . . . . . 571

11   Redirect By Mr. Adelman . . . . . . . . . . 578

12    LESLIE SIMPSON

13   Direct By Ms. Matz . . . . . . . . . . . . 582

14   Cross By Mr. Besser  . . . . . . . . . . . 591

15   Cross By Ms. Willis  . . . . . . . . . . . 596

16   Redirect By Ms. Matz . . . . . . . . . . . 605

17   Recross By Ms. Willis  . . . . . . . . . . 608

18    JONATHAN BELOLO

19   Direct By Mr. Besser . . . . . . . . . . . 615

20   Cross By Ms. Willis  . . . . . . . . . . . 638

21   Cross By Mr. Adelman . . . . . . . . . . . 647

22   Recross By Ms. Willis  . . . . . . . . . . 673

23                    PLAINTIFF EXHIBITS

24   Exhibit No.                              Received

25    34    . . . . . . . . . . . . . . . . . 592

1    35   . . . . . . . . . . . . . . . . . 593

2    36   . . . . . . . . . . . . . . . . . 594

3    37   . . . . . . . . . . . . . . . . . 617

4    39   . . . . . . . . . . . . . . . . . 617

5    40   . . . . . . . . . . . . . . . . . 620

6    41   . . . . . . . . . . . . . . . . . 621

7    42  . . . . . . . . . . . . . . . . . 622

8    43   . . . . . . . . . . . . . . . . . 623

9    48   . . . . . . . . . . . . . . . . . 625

10   49   . . . . . . . . . . . . . . . . . 626

11   53   . . . . . . . . . . . . . . . . . 627

12   50   . . . . . . . . . . . . . . . . . 629

13   51   . . . . . . . . . . . . . . . . . 630

14   54   . . . . . . . . . . . . . . . . . 631

15   57   . . . . . . . . . . . . . . . . . 632

16   59   . . . . . . . . . . . . . . . . . 633

17   60   . . . . . . . . . . . . . . . . . 638

18                    INTERVENOR'S EXHIBITS

19   Exhibit No.                            Received

20   22   . . . . . . . . . . . . . . . . 604

21   25   . . . . . . . . . . . . . . . . 646

22

23

24

25