```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2
     ------------------------------------x
 3   CAN'T STOP PRODUCTIONS, INC.,

 4                          Plaintiff,

 5                              Case No.  7:17-cv-06513-CS
         -vs-
 6
     SIXUVUS, LTD., et al.,
 7
                          Defendants.
 8
     ------------------------------------x
 9
                              United States Courthouse
10                            White Plains, NY
                              May 4, 2018
11                            12:02 p.m.

12   Before:
                 HONORABLE LISA M. SMITH
13
                      United States Magistrate Judge
14

15                          APPEARANCES

16   EISENBERG, TANCHUM & LEVY
     STEWART L. LEVY
17   Attorneys for the Plaintiff

18   ADELMAN MATZ, P.C.
     GARY PHILIP ADELMAN
19   Attorney for Defendants

20   KAREN WILLIS, Intervenor, pro se
     (Appearing via telephone)
21

22

23

24

25
```

```
 1        THE COURT:  You may be seated.

 2        THE CLERK:  In the matter of Can't Stop Productions, Inc.

 3   versus Sixuvus, Limited.

 4        Counsel and parties appearing pro se, please note your

 5   appearance for the record.

 6        MS. WILLIS:  Karen Willis.

 7        THE COURT:  Good afternoon, Ms. Willis.

 8        MS. WILLIS:  Good afternoon.

 9        MR. LEVY:  Stewart Levy for the plaintiff, Can't Stop.

10        THE COURT:  Good afternoon, Mr. Levy.

11        MR. ADELMAN:  Gary Adelman for the defendant.

12        THE COURT:  Good afternoon, Mr. Adelman.

13        Ms. Willis, we discovered when we listened -- I discovered

14   when I listened to the tape recording of our previous conference

15   that, although we can hear you on the phone, the recording was

16   not as clear as we might have liked; and so I have asked for a

17   court reporter today to make sure that we have a clear record

18   and a full transcript of everything that occurs.  So it's

19   possible that the court reporter might have to ask you to repeat

20   yourself, so I don't want you to be surprised if that happens.

21        MS. WILLIS:  Okay.  No problem.

22        THE COURT:  All right?  I understand that there had been

23   some issues about the proposed settlement, and the way I

24   understood it, Ms. Willis, was that as of Tuesday, you had not

25   yet had an opportunity to review the proposed agreement which
```

 1    Mr. Levy and Mr. Adelman had drafted based on the agreement that

 2    we had reached on March 28th, and it was our hope that by

 3    putting this over to today, you would have an opportunity to

 4    review that agreement and be able to identify if there are

 5    issues with that agreement.

 6         MS. WILLIS:  Your Honor, yes.  And I think the problem that

 7    we have here is that, apparently, Mr. Levy and Mr. Adelman's

 8    understanding of the settlement, which they have -- were

 9    supposed to have reviewed it outside of me and then I am -- it's

10    given to me, and I am like, okay, we have agreed to this.  Now

11    look at it, and it's sort of -- it's created a bit of friction

12    that there are things in there, for example, the amount -- I am

13    hearing a bit of feedback here.  I don't know why, but I don't

14    know if you can hear me clearly.  I am trying to ignore it.

15         THE COURT:  We can hear you clearly.  We are not getting

16    any kind of feedback.

17         MS. WILLIS:  Okay.  I will try to ignore it.

18         For example, they talk about the time -- one of the things

19    that stood out to me was the time which the parties had to

20    remove any negative information that might appear on Facebook,

21    for example, like Kings of Disco.

22         THE COURT:  Can you tell us what page you are talking

23    about?

24         MS. WILLIS:  Well, let me slow down because I didn't -- let

25    me see.  I didn't go to the area.  If Mr. Levy sees it before I

1  do, or Mr. Adelman, let me know that, gentlemen.  It's in here.

2  I am looking at -- let me see here -- I didn't get a chance to

3  highlight anything.  So we are doing this in real-time.

4      THE COURT:  I think it's on page 8.

5      MS. WILLIS:  Let me go down here.  7, 8.  Okay.  Let's see.

6  Okay.  All right.  So what happened was, initially I think they

7  had like ten days or seven, whichever, and then apparently it's

8  been -- it was pared down to five.  And so, to me, I am not okay

9  with that because, are you kidding?  I don't know of any post on

10  Facebook that lasts five days.  The life of a post when we do it

11  on Facebook, for example, particularly to do damage, it's within

12  24 hours.  Whenever there is a posting to Facebook, Your Honor,

13  they don't last long for the amount of time that people get to

14  look at it.  They look at it all within -- within an hour to

15  24 hours.  And so, therefore, to say that, oh, we are going to

16  have five days.  Like what?  Are you kidding?  Five days, you

17  are ruined, you know.  So it has to happen immediately.

18      THE COURT:  Ms. Willis, I have to ask you to slow down.  I

19  am having a hard time understanding you because your words are

20  running into each other.  So --

21      MS. WILLIS:  Okay.

22      THE COURT:  We want to make sure that we really understand

23  you.  So --

24      MS. WILLIS:  Okay.  I will speak slower.

25      THE COURT:  Thank you.

1        MS. WILLIS:  All right.  For example, the average post, the

2   life of a post where people are actually reading and responding

3   is within the period of time that Facebook, you know, normally

4   offers an opportunity to "like" what they call boost to post or

5   whatever.  So the life of a post, in all honesty, Your Honor, is

6   really within an hour to 24 hours.  After you get into 24 hours,

7   48 hours, three days, five days, the post is already over.  It's

8   still there, but you don't get as many people looking at it; and

9   so to say that someone can post something negative and then you

10  can be lackadaisical and wait five days, you're already ruined.

11  We are talking -- they would have to agree that it's done

12  immediately.  I mean, you have to remove it and without delay or

13  something like that, you know.  Not five days.  And it's my time

14  on Facebook, not his.

15       THE COURT:  Let me hear from Mr. Levy first.

16       MR. LEVY:  Yes, Your Honor.

17       THE COURT:  Mr. Levy, you don't have to stand up.

18       MR. LEVY:  Whatever makes Ms. Willis and Sixuvus attorneys,

19  anyone happy is fine us.  I don't know whether five days is a

20  lot or too much.  Ms. Willis is correct that initially it was

21  ten days, and we whittled it down to five, and that seemed to be

22  what Sixuvus was comfortable with.  We are fine.

23       I will point out, though, that you know, we were supportive

24  of Ms. Willis, we want to get this thing corrected, but as far

25  as these documents being done without her knowledge, I did the

 1    draft of the settlement agreement on April 10th, and I then
 2    proceeded to have a week's worth of emails to Ms. Willen saying,
 3    here, take a look at it.  Take a look at it.  I had two
 4    telephone conversations with her during that week period where
 5    she gave me the changes.  I made the changes and sent it over
 6    to her.  I said, okay, is this done?  I actually have an email
 7    dated April 12 from Ms. Willis saying that it's okay, the draft
 8    is okay, and based upon -- with one exception -- I didn't have
 9    an email response, which I have, I could show the Court, where I
10    said, look, I will make -- I made the change.  So now I am going
11    to send it over to the other side to look at.
12        So before the Sixuvus side saw a document, I waited to get
13    an email from Ms. Willis saying it was okay.  Now, I understand
14    that, you know, upon further review you can find things that you
15    want to change, and she is not locked in, but I did want to make
16    it clear that nothing was sent to Sixuvus attorneys before I got
17    Ms. Willis's okay to send the draft.
18        Now if subsequently there are issues here, I am happy to
19    work them out.  In fact, I told Mr. Adelman this morning, I
20    said, look, I am not comfortable with this Internet stuff
21    because he says one thing, and Ms. Willis says something else,
22    and Ms. Willis is a licensee, and we support her; but if need
23    be, then if we can't resolve it here, I would be okay if those
24    two parties hire a company that specializes in Internet research
25    and let them hire a company, make a list and submit the report

```
 1   to the Court to narrow it down and let a third party tell you
 2   whether, for example, in this case, is five days enough or is it
 3   too much because my fear is, Ms. Willis says that five days is
 4   too much time to ask for a correction.  I will -- look, I will
 5   support her on that.  But I am sure Mr. Adelman will say it's
 6   not, and maybe the way to resolve it is to get an expert company
 7   in here and let them do a report to the judge and then you make
 8   your ruling based upon that.
 9        THE COURT:  Mr. Adelman?
10        MR. ADELMAN:  So we received a --
11        THE COURT:  Move the microphone to you.
12        MR. ADELMAN:  Oh.  We did receive the draft from Mr. Levy.
13   Ms. Willis was not on the email.  He stated in the email that he
14   had sought approval from Ms. Willis, his client and Mr. Besser.
15   Great.  We took the draft, and we reviewed the transcript, and
16   in our opinion, the only changes we made were changes that
17   complied with the transcript or they were administrative such as
18   the stipulations and things like that.  We made those changes
19   and sent them back to Mr. Levy.  Mr. Levy confirmed with us that
20   he had sent those changes on to Ms. Willis and his client.
21        Nevertheless, the original draft contains the ten days,
22   which is what all parties said they agreed to.  We, in fact, cut
23   it down to five.
24        As far as Ms. Willis's argument that the damage is done, so
25   to speak, my response to that would be, well, if the damage is
```

 1  done, what's the difference at that point between immediately or
 2  five days?  If -- but nevertheless, I don't think immediately is
 3  available.  And what I mean by that is, is that my client, the
 4  person who runs Facebook does it part time, and they are
 5  comfortable with the five days.  If three days would be more
 6  comfortable to Ms. Willis, I think that is probably a good
 7  compromise, and nevertheless, there is still a notice of cure.
 8      The point here is not the amount of time.  I am sure my
 9  client will try to get it down as quickly as they can because no
10  one has any interest in this sort of disparagement back and
11  forth.  My clients do not want that sort of thing to continue to
12  happen.  They want to go forth in peace.  So I would say three
13  days is a compromise with a gentlemen-ladies agreement that if
14  we get a notice from Ms. Willis, we will do it expeditiously.
15  But the papers themselves should at least give us three days.
16  That's my position.
17      THE COURT:  What do you think of that, Ms. Willis?
18      The first thing that I would comment is, you need to
19  remember this is not a one-way street.  This is for both sides
20  not to disparage the other.  Both sides have an opportunity to
21  bring to the other side's attention that there is something
22  unflattering on a social media site and both sides would then
23  have an obligation to comply with whatever is said has been
24  posted, but keep in mind, it's simply not possible to require
25  removing something within 24 hours of its posting because there

 1   is no guarantee that either side would be aware of the posting.

 2   It's within a certain period of time of receiving notice.

 3        Now, as a practical matter, I think both sides don't want

 4   to have difficulty with this issue, and I would suspect that

 5   anyone involved, whether it's you or a member of Sixuvus, if you

 6   become aware of something negative on your own social media, you

 7   are going to delete it right away even before you get notice

 8   from the other side; but there is necessarily delay involved,

 9   whether it's an hour, or a day or a week before notice is

10   effectively given, and it can't be instantaneous on the receipt

11   of notice.  Just for both sides.

12        For example, for example, what if you and Victor Willis are

13   traveling somewhere and don't have -- and I know you probably

14   have your electronic devices with you all the time -- but you

15   may not have immediate access to all of the tools you need to

16   delete this item off of Facebook at that time, at that exact

17   moment, but three days seems, to me, like a reasonable

18   compromise.

19        What do you think, Ms. Willis?

20        MS. WILLIS:  Well, no.  And again, I will tell you why.  On

21   Facebook, and you have to really -- I don't mean to be so wonky

22   about this, but I know a lot about social media.  Okay?  I am

23   almost like a specialist on it.  And so social media these days,

24   Your Honor, is so very crucial and important, and you can ruin a

25   person on social media in a matter of hours, and I am not

 1   kidding here.  And so therefore, when you talk -- and by the
 2   way, Your Honor, I am referring to the time that we notify each
 3   other.  From that point on, either side ought to immediately
 4   speak to -- because it's a quick process.  And not only that,
 5   Your Honor, Facebook's own standards require.  They say if there
 6   is something on the site that's offensive, that's, you know,
 7   mocking or whatever, they want it gone immediately or they can
 8   shut your site down.  And so I propose to the Court, again, that
 9   it should be without delay upon notice of it.  All right?  And
10   it could be done.  If someone tells me now, Your Honor, Karen,
11   look, on the Village People Facebook page right now someone is
12   disparaging the Sixuvus, all I have to do, Your Honor -- as I
13   told you this a few seconds ago is to go to Facebook and delete
14   it instantaneously.
15       So no, this whole idea of five days, that's because the
16   Sixuvus is also aware of what can happen in two days, five days,
17   and I am -- it would have to be immediately -- and we are
18   talking about within hours.  If we don't get it narrowed down
19   now, Your Honor, they will say, oh, well, I am sorry.  That fell
20   through the cracks, you know, and everything.  And so now
21   everyone else has picked up on the negativity that they have
22   stated, and of course that goes to both sides; and so no, we
23   can't go on three days.  It has to be without delay and
24   hopefully within just several -- within hours they have to be
25   gone.

```
 1        THE COURT:  Well, let me just suggest this, Ms. Willis:
 2   Presumably we would have some understanding of how that notice
 3   is going to be provided.  Let's just say at the moment -- and I
 4   don't know what the parties have in mind -- let's say that the
 5   notice would go to Mr. Adelman, and Mr. Adelman is in the
 6   dentist's chair and is having a --
 7        MR. ADELMAN:  Root canal.
 8        THE COURT:  -- major dental surgery and is under the
 9   influence of some kind of anesthetic and isn't able to
10   communicate with his clients for 36 hours from when the notice
11   hits his email account because he was simply unable to do it.
12        How about this, let's see if this language might work:  The
13   parties agree that they will make every effort to delete any
14   such disparaging or negative posting without unnecessary delay
15   and in no event longer than 48 hours from the time of notice?
16        MS. WILLIS:  Twenty-four hours.  Forty-eight hours is --
17   it's over.  The post is over.
18        THE COURT:  But --
19        MS. WILLIS:  -- site, Your Honor, it's 24 hours.  The time
20   that Facebook has on it, Your Honor.
21        MR. ADELMAN:  Your Honor, I don't think there's been any
22   posts.
23        THE COURT:  Ms. Willis, let me ask you this:  Are you
24   three, four, five times a day checking the Sixuvus Facebook
25   page, Twitter account, Instagram account?  It could be --
```

```
 1        MS. WILLIS:  Yes.

 2        THE COURT:  -- days before you even become aware of it or

 3   anyone on your staff becomes aware of it, in which case why

 4   24 hours?  We have no way of controlling how long it is before

 5   notice would occur.

 6        MS. WILLIS:  Your Honor, I am saying from the time --

 7   24 hours from the time we put them on notice that it's there, or

 8   they have put me on notice that it's there.

 9        THE COURT:  I think that's --

10        MS. WILLIS:  It can be done, Your Honor.  It's quick.  You

11   just delete.  It's gone.  It's quick.

12        THE COURT:  I understand that, but --

13        MR. ADELMAN:  Can I say one thing?  Sorry.

14        THE COURT:  You can't speak when I am speaking,

15   Mr. Adelman.

16        MR. ADELMAN:  I apologize.

17        THE COURT:  Because I assure you the court reporter is

18   hearing me, not you.

19        MR. ADELMAN:  You are right, Your Honor.  I apologize.

20        THE COURT:  Ms. Willis, I just -- I don't think I could

21   approve 24 hours because -- or recommend to Judge Seibel that

22   she approve 24 hours because it's just not reasonable.  People

23   are not -- maybe you can -- but most of the rest of us are not

24   poised to immediately make changes to something on social media,

25   and it's not as though there is a staff person ready, willing
```

 1  and able to do this.

 2      If we incorporate the language that the parties on both

 3  sides will make every effort to delete the posting without

 4  unnecessary delay, then that accommodates you, but then we set

 5  an outside time of 48 hours.  It seems to me that that's

 6  eminently reasonable.

 7      MS. WILLIS:  Well, again, if you knew anything about social

 8  media and Facebook, it's a lot of time; but Your Honor, let's do

 9  this because I don't want to get stuck on that issue because

10  there are other issues relating to social media, but look,

11  again, and Your Honor, yes, they do have someone.  Sixuvus does

12  have several people that administer the posts, and they are very

13  good at it.  They are in the site in the middle of the night.

14  They know how to do it, Your Honor.  I assure you of it.  We

15  have experienced it from them, and they have experienced it from

16  us.  The Court just may not be familiar with it, as familiar

17  with this process on Facebook as I am or social media, but I

18  assure you that they have at least four to five of their members

19  who are also on their social media as administrators.

20      THE COURT:  So can you --

21      MS. WILLIS:  I don't want to get stuck on it.

22      THE COURT:  Can you live with my suggestion?

23      MS. WILLIS:  I can if they can say that they are going to

24  make every effort to do it within 24 hours after notice.

25      THE COURT:  Well, I would just say, I don't think you need

```
 1   to say something specific like that.  I think -- I think will
 2   make every effort to delete the posting without unnecessary
 3   delay and in no event longer than 48 hours.
 4        MS. WILLIS:  I -- again, I think we are back to -- I think
 5   in no event 24 hours.  It's over, Your Honor, within 48 hours.
 6   It's --
 7        THE COURT:  It's not reasonable.
 8        MS. WILLIS:  -- immediate.  It's immediate.  In Facebook
 9   and social media it is, yes, it is.
10        THE COURT:  I understand what you are saying, but it's not
11   reasonable in the real world, Ms. Willis.  It's just not, and I
12   couldn't recommend to Judge Seibel that she approve that in the
13   agreement, nor do I think Mr. Adelman would accept it, but I
14   will twist his arm to accept 48 hours.
15        MS. WILLIS:  Well, Your Honor, again, Facebook's own social
16   standards say that.  It's got to be done.  They know it can't
17   stay up there 24, 48 hours.  The damage is done.
18        Again, I don't want to get stuck here.  I believe that both
19   sides have the ability -- the Sixuvus certainly does -- to
20   remove something within hours, and so do I.  Now Your Honor may
21   think that that's not something that's reasonable.  Of course it
22   happens every day.  I assure the Court of that.  It's not a
23   problem.  It's not even hard to do upon notice.
24        THE COURT:  Obviously, if there were a violation of
25   Facebook's own rules, that's between the owners of the site and
```

1   Facebook, but can you live with my recommendation as a part of
2   this agreement?
3           MS. WILLIS:  Okay, ma'am.  I will go along with it.
4           THE COURT:  Mr. Adelman, can we live with that?
5           MR. ADELMAN:  Yes, Your Honor.
6           THE COURT:  All right.  So that takes care of that issue.
7           There was another issue, Ms. Willis, that you had raised in
8   one of your letters to the Court --
9           MS. WILLIS:  Uh-huh.  Uh-huh.
10          THE COURT:  -- that I have to tell you, you had already
11  agreed on March 28th that you could live with it; and I can read
12  to you from the transcript.  You were talking about how the
13  Village People Facebook had been transformed into the Kings of
14  Disco Facebook and had a page that had 40,000 -- 40,000 "likes"
15  for the Village People, and then you said, "Now I said that.  So
16  let me move on.  I will agree to the settlement.  Okay.  And not
17  to challenge the Sixuvus takeover of the Village People Facebook
18  page or other social media as long as, as Your Honor stated, a
19  non-disparagement clause is in the settlement."
20          And then we went on, and we discussed the non-disparagement
21  clause, which is what we were just now talking about.  So I
22  appreciate that you are still not happy about it, but you have
23  already committed yourself not to contest that issue; and once
24  you have committed yourself, Mr. Adelman would be entitled, if
25  he wished, to make a motion to enforce the settlement in that

1    regard.

2         So I appreciate that you don't like it, but one of the

3    things about a settlement is that everybody accepts things that

4    they don't really like.  It's a compromise.

5         So on this issue, on the issue of the Village People

6    Facebook page and the "likes," I think you have already

7    committed yourself to that.  That's what I would recommend to

8    Judge Seibel.

9         I also want to point out that some of what you were raising

10   with regard to doing Google searches and what comes up first, my

11   law clerk on this case and I each did a Google search.  We did

12   it within minutes of each other, and the results were different.

13   We weren't using the same computer network.  Our computers are

14   about 30 feet apart from each other, and yet we came up with

15   different results.  None of us can control the algorithm that

16   Google uses to produce its search results.

17        Now, you, on behalf of the Village People featuring Victor

18   Willis, could utilize the services of a search engine advisory

19   company to help you to improve the Google results for your

20   client.  You are certainly capable of doing that, but the fact

21   that a certain order came up when you did a Google search is

22   outside the confines of this agreement because no one has

23   control over that.

24        MS. WILLIS:  Okay.  I am just waiting for Your Honor to let

25   me respond.

1        THE COURT:  It's your response now.

2        MS. WILLIS:  Okay.  All right.  So here is why

3   Mr. Adelman's -- in the attempt to attempt to force that aspect

4   would fail, Your Honor, and here is why.

5        THE COURT:  Force what aspect?  I don't understand what you

6   are saying.

7        MS. WILLIS:  I am sorry.  The -- that I somehow have agreed

8   to, you know, forego the issue of the Internet.  I'm speaking of

9   Facebook concerns.

10       THE COURT:  No, he is not arguing that.  I am arguing it.

11   I am reading the transcript.  I just read it to you.  He hasn't

12   made any argument at all in this regard.  I am telling you --

13       MS. WILLIS:  Okay.

14       THE COURT:  -- that during the conference before me in

15   clear language you said, "I will agree not to contest that

16   issue."  And then we went on and discussed the non-disparagement

17   clause, and you affirmatively said, "We have a settlement."  So

18   I am the one who is saying it.

19       MS. WILLIS:  Okay.

20       THE COURT:  And with regard to Mr. Adelman, I simply said

21   he would be entitled, if he wished, to make a motion to enforce

22   that settlement, but he hasn't done it.  He is here in good

23   faith trying for all of us to work out some kind of an

24   understanding.

25       I don't mean to be putting words in his mouth, and I

1    apologize if that's what it seems like.  So yes, please.  Go

2    ahead.

3         MS. WILLIS:  Well, as I said in my -- in my several

4    communications that have appeared with respect to that, at the

5    time when I discovered this, and particularly when Mr. Adelman

6    first dropped it on us in court, that the Facebook had flipped

7    their page, okay, it took, as I stated, a bit of time for me to

8    really discover what had really occurred here.  Okay.  And the

9    type of damage, okay, that was happening; and I discovered right

10   after that, Your Honor, that the Sixuvus had also taken over a

11   Village People Wiki page that is pointed at them right now, and

12   Facebook clearly states it, that it's there, and so it is in

13   that context, Your Honor, that I am saying that I don't have to

14   stick with that because I have discovered that they have done

15   things in the pendency of this agreement to sort of put them in

16   a better position with respect to the Facebook stuff.  So that's

17   where I am at, Your Honor.

18        So it doesn't matter what I said then.  I am simply

19   arguing, as I argued in the communications, that things have

20   occurred since then, okay, that have made me fully understand

21   the extent of what they have done with Facebook.  I didn't

22   understand it at that time, but I do now, and I am not going to

23   go along with it because of this.  Okay?  And so I am proposing

24   a separate thing that must occur here if I am going to go along

25   with this.

1          MR. ADELMAN:  Your Honor.

2          MS. WILLIS:  And, Your Honor, the thing I would like to ask

3    Mr. Adelman is:  Where are the social media accounts?  Where are

4    they?  Why don't we have them?  What did they do with them?

5          THE COURT:  I have no idea what you are talking about.  I

6    have no idea what you are talking about, and with regard to

7    Wiki, if you are talking about a Wikipedia entry, which I have

8    looked at --

9          MS. WILLIS:  It's not, Your Honor.

10         THE COURT:  I have no idea what you are talking about.  A

11   Facebook Wiki page?  And --

12         MS. WILLIS:  See, that's a problem.

13         THE COURT:  -- by the way, on Wikipedia, the website that

14   readers are directed to is your website, so I don't understand

15   what you mean by a "Wiki Facebook page."

16         MS. WILLIS:  Okay.  Your Honor, there -- there is a -- if

17   you take a look, if Your Honor would like to go there now, to

18   the Kings of Disco --

19         THE COURT:  I can't.

20         MS. WILLIS:  What I did is -- take a look at my exhibit,

21   Your Honor, and that will make it easier for you.

22         THE COURT:  Exhibit what?  Exhibit to what?

23         MS. WILLIS:  Take a look at the attachment.  Take a look at

24   the attachment to the -- to the letter I have sent over.

25         THE COURT:  What date?

 1      MS. WILLIS:  Let me just see if I can find it here.  Oh,
 2  God, it would be -- it would have been on -- let me see here --
 3  it's on there, too.  Let's see here.  Sent -- it was the two
 4  letters that were sent, and I think there were two emails that
 5  were sent as part of an attachment, and I have it there.  Let me
 6  see if I can find it here.
 7      THE COURT:  Are you talking about the Google search that
 8  says "Village Legal Facebook page?"
 9      MS. WILLIS:  Yes.  On that exhibit that I sent on -- take a
10  look at -- read it.  It will tell you right up there that this
11  page is -- was directed here from the Wiki page, and this is the
12  Kings of Disco.
13      THE COURT:  No.  It says, "You were redirected here from
14  the unofficial page Village People."
15      MS. WILLIS:  Yes.  That's it.  That's the page I am
16  referring to.
17      THE COURT:  It doesn't say anything about Wiki.  I have no
18  idea what you are talking about.
19      MS. WILLIS:  Okay.  But that's what it's known as, Your
20  Honor.  So disregard the word "Wiki."  Okay?  It's just a --
21  it's just a term that's used because it's generated by
22  Wikipedia.  That -- what that says right there, Your Honor, is
23  that the Kings of Disco have commandeered an unofficial Village
24  People page that was created by Wikipedia through Facebook, and
25  now when you enter Village People, it goes directly over to the

 1  Kings of Disco.

 2     Why is the Village People page being directed to the Kings

 3  of Disco?  And by the way, it is that Wiki page that gives them

 4  that high ranking because they are really -- it's really the

 5  Village People page that has that ranking, and they are blocking

 6  my Village People from having the opportunity to claim that page

 7  because it belongs to Village People, not the Kings of Disco,

 8  but they forward it over to themselves, and they know they did

 9  it.

10     MR. ADELMAN:  Whenever you want me to respond, Your Honor.

11     THE COURT:  I have to say that my understanding of the

12  conversation that we had, which is on the record, which you

13  explicitly agreed to, acknowledged these circumstances.  I hear

14  you saying that you have now learned more things; but I am not

15  seeing anything new and different from what we already knew on

16  March 28th, what you referenced yourself in your discussion on

17  March 28th, and if you didn't know enough, then you shouldn't

18  have agreed to a settlement, I am afraid.

19     MS. WILLIS:  Well, well, if you allow me to let Your Honor

20  know what is new, Your Honor.  I was -- I was not aware of

21  the -- I was not aware of this Wiki page forward until the

22  last -- in the last week.  I was unaware that they have gone in

23  and actually positioned their search algorithm through Facebook

24  to actually draw everyone over.  These are all things that were

25  not learned at the time.  These are the reasons why, you know, I

```
 1   am like, okay, you know what?  I can't go along with this.

 2   These are things that you guys have done; you have done in the

 3   interim of this, in the pendency of this settlement I have

 4   become aware of it.  I was unaware at that time that they had

 5   actually commandeered the Village People Facebook page and

 6   turned it over to them.  That's what I am getting to, and it's a

 7   biggie, Your Honor.  You have to really understand social media

 8   to know what I am talking about, but it was a major move they

 9   made to do that.  Major.

10        MR. ADELMAN:  Your Honor --

11        MS. WILLIS:  And I want it stopped.

12        MR. ADELMAN:  First of all, none of that happened.

13        Second of all, on March 16th, which is when Ms. Willis

14   brought her TRO, okay, she brought this up, and said, and the

15   Judge said, "They either surrender these URLs or they can shut

16   it down completely."  She said, Ms. Willis.  "They can either

17   surrender those URLs, or they can shut it down completely."

18        We surrendered the URLs.  Here is the proof.  Right here.

19   And if you read this Official Village People page, you know it's

20   not my clients.  It's actually disparaging people.  I do not

21   think my clients would ever do such a thing.

22        Secondly, in the TRO, the Court issued an order, which --

23   in which she said, "I want a transfer of the content of the

24   Facebook page and Twitter account to different URLs."  That's

25   what was done.
```

1        I don't know what Ms. Willis is talking about as far as

2   redirect.  Right?  I don't even think my clients have that

3   ability, nor do I even understand how that happens, but I can

4   assure you that my clients aren't doing it.  All they want is

5   peace.

6        And I agree with you that Ms. Willis had all the facts

7   between this TRO and the settlement agreement, and she agreed to

8   it, and this conversation should be about enforcement of what

9   was agreed to.

10        MS. WILLIS:  Your Honor, you know, again, if you want to go

11   down that line of thinking, you know, of enforcement, this

12   agreement has not been consummated.  Judge Seibel made it very

13   clear that despite the fact there's the settlement, the terms

14   that we feel that we reached certainly have to be consummated,

15   and there are a lot of things that -- forgetting that right

16   now -- the least of which is what I just told you that I

17   discovered, and that is that Sixuvus has commandeered the

18   Village People's Facebook page, and it is causing major

19   problems, and I am asking them to rectify it.  I won't go along

20   with it unless they agree that they are going to un -- unhinge

21   themselves, unattach themselves to that Village People Facebook

22   page, and it's very easy to do, number one; and then number two,

23   I want them to surrender over as a result of their own behavior,

24   Your Honor, that has occurred after this -- these -- the

25   settlement talks, and as a result of their own behavior, I want

 1  them to turn over the Official Village People Facebook page to

 2  Can't Stop or me.  I want them to turn over the Official Village

 3  People Twitter page to Can't Stop or me, and I want them to turn

 4  over the Official Village People Instagram.  Where are those

 5  accounts?  We can't very well settle without them giving us

 6  those.  What did they do with them?  We don't have them.  They

 7  have control of them, Your Honor.

 8      MR. ADELMAN:  No, Your Honor.

 9      MS. WILLIS:  Really --

10      THE COURT:  Stop.  Mr. Adelman was trying to speak while

11  you were speaking, and it's just not working.

12      MR. ADELMAN:  I apologize, Your Honor.

13      THE COURT:  Go ahead, Ms. Willis.  I think you are wrong,

14  by the way, but go ahead.

15      MS. WILLIS:  Okay.  We are -- okay.  The Village People

16  have a set of social media accounts, Your Honor.  Okay?  And

17  they were quite popular.  Where are they?  We don't have them.

18  Your Honor, they have not given them to us.  Why didn't they

19  simply give those accounts over?  All you do is say, okay, you

20  know what?  We are not Village People anymore.  Here are your

21  social media accounts.  Where are they?

22      THE COURT:  Ms. Willis, when I did a Google search, I came

23  up with www.OfficialVillagePeople.com, VillagePeople-official

24  website of Village People, and it's my understanding that that's

25  your Facebook page.  It's not theirs.

 1        MS. WILLIS:  No, no, Your Honor.  That's a website you are

 2   referring to.  OfficialVillagePeople.com and VillagePeople.com

 3   are websites.  I am not talking about websites.

 4        THE COURT:  And are they yours?

 5        MS. WILLIS:  Yes.  I am not arguing the website.  No, no,

 6   no, no.  I am talking about social media, which is Facebook,

 7   Twitter, Instagram, which is what Mr. Adelman is trying to get

 8   the Court to sort of ignore here.

 9        Can't Stop allowed them -- Can't Stop allowed them to have

10   four -- three to four different accounts.  Your Honor, we want

11   them.  Where are they?

12        THE COURT:  The first -- the first Facebook page that came

13   up when I looked up Village People Facebook page, which is, in

14   fact, entitled www.Facebook.com slash Official Village People is

15   neither of you.  It's nobody.  It's --

16        MS. WILLIS:  May I say --

17        THE COURT:  Hello.  Let me finish.

18        It's called "Your Village People," and it's a bunch -- it

19   looks -- I can't really tell, and I didn't look very deeply into

20   it, but it has to do with people who, I think, hang around in

21   Greenwich Village.

22        MS. WILLIS:  Your Honor --

23        THE COURT:  It has an entry -- it has an entry from

24   April 26th that says, "Traveling to the village.  Who wants to

25   come?" It has nothing to do with any of the parties in this

1    case.

2         MS. WILLIS:  Your Honor, Your Honor, you just -- you made

3    note of something that I made note of in my first communication.

4         THE COURT:  It has nothing to do with this case.

5         MS. WILLIS:  Yes, it does.  That is the Official Village

6    People Facebook page right there.  What the Sixuvus did, Your

7    Honor -- and they have done this, by the way, since the time

8    that we have the settlement talks -- you know what they did,

9    Your Honor?  They took the Official Village People Facebook

10   page -- which is actually outrageous -- they took it, and they

11   went running with it, and we are going to throw away the key.

12   We aren't going to give it to Can't Stop.  We aren't going to

13   give it to Karen Willis.  We are going to just throw it away.

14        Because now what they have done, Your Honor, is that

15   someone else has picked up the Official Village People Facebook

16   page, but I will tell you who it is, Your Honor.  It's someone

17   who's associated with the Kings of Disco because they still have

18   what they call the administrative rights to do it.  Facebook

19   will not release a page like Official Village People to the

20   public that quick.  They don't do that.  So it's only the

21   Sixuvus who have done that.  That's a trick right there, Your

22   Honor, what they are doing.  They are trying to distract from or

23   cause problems for Village People by creating a fake Your

24   Village People site so that it prevents the Official Village

25   People, which is what is happening right now with us, from

1    having access; and when you do that, that page comes up as

2    opposed to the Village People page.  The Village People, Your

3    Honor, that I am telling you that the Sixuvus are engaged in,

4    and they started it right after we put into the settlement.

5    They threw it away.  They still control it, Your Honor.  They --

6    and by the way, if we get in touch with Facebook on discovery,

7    Facebook is going to confirm that the Sixuvus still controls

8    that Your Village People.  They did that, and that's what got me

9    so upset.

10        THE COURT:  Mr. Adelman?

11        MR. ADELMAN:  First of all, no.

12        THE COURT:  Stay seated.

13        MR. ADELMAN:  Okay.  Not at all.  My clients let go of

14   that -- that Facebook URL as per the Court order.  It sat out

15   there.  Ms. Willis could have taken it.  However, in her TRO on

16   page 23, line 6 -- I am sorry -- line 8, "Your Honor, quite

17   frankly, we are not interested in the Official Village People

18   handle."  Talking about Facebook.

19        This is a red herring to somehow subjugate the agreement

20   that we all agreed to, and the only thing we were supposed to do

21   was put it in -- was take the transcript and effectuate it in

22   writing so that we would all know how we were going forward.

23   That's all this is.

24        My clients do not want Official Village People.  They are

25   not doing anything.  The technology that Ms. Willis is talking

```
 1   about, I don't even know if my clients have the ability to do

 2   that, even if they wanted to, which they don't.  They just want

 3   to go in peace, and this is just a distraction so that

 4   Ms. Willis can take us back to court, and she can continue to

 5   litigate this.  We agreed.  We have an agreement.

 6       This whole transcript was about what Ms. Willis is talking

 7   about.  The judge ordered, and we have complied to exactly what

 8   Judge Seibel ordered, and we know that because Ms. Willis sent a

 9   letter to the judge saying that we had violated the order, and

10   you know what the judge said?  No.  The judge said, no, they did

11   not violate the order.  This has all been litigated and decided.

12   Nothing new has happened.

13       MS. WILLIS:  The red herring is what you just proposed now,

14   Mr. Adelman.  I have -- I am suggesting to the Court again that

15   they are engaged -- you have to really understand social media

16   to know exactly what I am getting at, but they are engaged in

17   the whole scheme right now to put the Kings of Disco in --

18   excuse me -- to place the Kings of Disco in the position where

19   every time you enter a Facebook page, it goes to either the

20   Kings of Disco or it goes to Your Village People with -- it's

21   something they know that they still control.  Facebook will

22   not -- again, I will say it again, Your Honor, on the record

23   here, and it will be proven -- Facebook will not allow what's

24   known as a major URL like Official Village People to be -- to go

25   back into the public domain once someone has let it go.  Why?
```

1   Because there are trademarks involved.

2        So the only people that -- hold on, Mr. Adelman -- so the

3   only way that Your Village People, Your Honor, was able to do

4   what they did is to -- is that -- is that the Sixuvus allowed

5   and invited one of their friends -- we believe it was David Hodo

6   who's been doing it -- invited one of their friends to become

7   the administrator of the Official Village People page.  Once

8   that person accepted that invitation to actually become the

9   administrator of the Official Village People page, that's when

10  that administrator flipped the page over.  Oh, we are going to

11  state it's Your Village People.

12       THE COURT:  Okay.  Ms. Willis.  Ms. Willis, I understand

13  your objection here.  I understand what you are arguing.  You

14  said there were a number of issues.  We discussed the issue with

15  regard to the timing of deleting disparaging and negative

16  information.  We can't come to an agreement on the issue with

17  regard to the transfer of the Facebook page.  So let's put that

18  to the side for the moment.

19       I want to know what else you have issues with, which, by

20  the way, you didn't raise with Mr. Levy when he provided this

21  document to you, but go ahead.  Tell me what your other issues

22  are.

23       MS. WILLIS:  Well, Your Honor, the document -- I never --

24  when Mr. Levy gave the document to Mr. Adelman, Mr. Adelman made

25  his changes, and that's not -- I didn't agree to Mr. Adelman's

1    changes.  That's the problem.  All right.

2        So, look, here is the other issue:  In this particular

3    proposal that -- that Mr. Adelman submitted, and which I did not

4    agree to, he put in there that I am to make a representation

5    that I have control over Victor Willis's personal Facebook page.

6    I never agreed to that.  Are you kidding?  No.  I have personal

7    control over the Village People Facebook page.  Mario Cosconosco

8    (phonetic) and two other people are administrators of Victor's

9    Facebook page, you know.  No, not me.  I can go there from time

10   to time to put stuff, but I am not the main person or the person

11   that controls, and Victor Willis is not part of this particular

12   case, and I am not going to allow them to think that I can

13   somehow bring Victor Willis in by saying, oh, I control his

14   page.  Well, I do not.

15       But I do control the Village People Facebook page.  That's

16   like me saying, Your Honor, make sure you have Mr. Adelman have

17   his clients say that -- that the Sixuvus controls Leslie

18   Simpson's Facebook page.  They control it.  And what?  They do?

19       So I am not going to -- I am not going to agree or make a

20   statement that somehow I -- you know, control Victor's Facebook

21   page because I don't.

22       THE COURT:  Okay.  We hear you.  What else?

23       MS. WILLIS:  That was it.  That one, and I know we talked

24   about the new stuff I discovered they were doing behind the

25   scenes.  I think those were the areas -- those are the only

1  things that I recall me having problems with in this agreement.

2      And they can rectify -- again, Your Honor, they can rectify

3  these other things by simply agreeing that -- oh, oh, I am

4  sorry, Your Honor.  I did leave out one thing.

5      I discovered now the extent of the Sixuvus transfer or

6  commandeering of the actual Village People Facebook page by

7  having Facebook to convert it over to the Kings of Disco.

8      At the time of our last hearing, Your Honor, I didn't even

9  know exactly how Facebook had done what they did, and of course

10 I have since discovered that they have -- that the Sixuvus made

11 representations, Your Honor -- because I talked to Facebook

12 about this, and I can go on record here -- Sixuvus made

13 representations to Facebook that they -- they were the Village

14 People who simply changed their name.  That is why Facebook

15 switched it over and converted the Official Village People

16 Facebook page -- including the "likes," Your Honor, including

17 the -- all the content to the Kings of Disco.  These are things

18 that has occurred, Your Honor, also, this is one major thing

19 that occurred after we had the last meeting.

20     THE COURT:  That's just not true, Ms. Willis.  We discussed

21 those "likes" and how you were so unhappy that those 40,000

22 "likes" had been transferred to the Kings of Disco page.  It's

23 just not true that you didn't know that.  You know -- you know,

24 when you talk when I am talking, it's as though you are not

25 talking.  So it's really important to wait until I am done.

1    You knew about the 40,000 "likes."  I know it because you

2    told me about it.  I am now aware of it, and it's in the

3    transcript.  So -- and, frankly, this is exactly what we talked

4    about 20 minutes ago.  I am not sure that there is anything new

5    here.

6        MS. WILLIS:  Your Honor, you are mixing it up here.  You

7    are mixing up the fact that I knew.  I am not arguing that I did

8    not know at the time that they had done it; that's not what I

9    stated, and if you go back to the record here, and read the

10   transcript of what I just said a moment ago, you will see that

11   what I said was, I have discovered what they did in order to get

12   Facebook to convert the site, Your Honor.  That's the issue.

13   That's the new thing that I have discovered.  That's what I am

14   telling you.

15       Facebook now -- I have discovered through Facebook, that

16   the Sixuvus made representations to Facebook that they simply

17   changed their name from Village People to the Kings of Disco.

18   That's why Facebook did that.  That's the new part of this, Your

19   Honor.  Not that I didn't know, but I am telling you because I

20   have discovered now the extent of it.  Facebook made the change,

21   Your Honor, because the Sixuvus lied to them.  I did not know

22   that --

23       THE COURT:  But until --

24       MS. WILLIS:  -- at the time.

25       THE COURT:  But until Can't Stop withdrew the license, they

1    were the Village People.  That happens to be a fact.  Until

2    Can't Stop withdrew the license, that group was the Village

3    People.  They are not the Village People anymore, but we can't

4    undo the past.

5        MS. WILLIS:  Well, Your Honor, I don't know what you

6    exactly mean by that, but I will tell you what Facebook can't

7    do, and Facebook has admitted that, and that is this:  Facebook

8    wants to be reputable.  Okay.  Facebook will not take a major

9    Facebook page like the Village People and suddenly convert it

10   over to a group member that used to be in there.  That would be

11   like Victor Willis at some point saying to Facebook, you know,

12   while the Sixuvus were still in control, well, you know, I used

13   to be Village People because I recorded the first few albums, so

14   we want every visit.  So Your Honor, please talk to Facebook.

15   Please convert the Village People Facebook page to Victor

16   Willis.  Never mind it is just converted, and then Facebook

17   says, oh, are you telling me that you actually just changed your

18   name to Victor Willis?  Yeah.  Oh, okay.  Then here, you can

19   have this page.

20       That's what they did.  I discovered it, Your Honor, after

21   the last conference hearing that we had, and they are not going

22   to get away with it.  Facebook is prepared to tell all, and they

23   are going to.

24       THE COURT:  Where is the affidavit?  Do you have some proof

25   beyond your say-so?  Where is the affidavit to support your

 1  claim that there's been some impropriety here?

 2      MS. WILLIS:  Your Honor, here is -- here is what I am going

 3  to do if we don't settle this.  As Judge Seibel has made it very

 4  clear, did not consummate it here.  I intend to sue Facebook,

 5  and I intend to get all of the evidence that's necessary to show

 6  not only did the Sixuvus lie to tell the Facebook that they were

 7  actually the -- that the Village People had changed their name

 8  to the Kings of Disco, but I intend to show that they violated

 9  the Court's order by doing that because Judge Seibel ordered

10  that site shut down.  So, yes, I do plan -- I do plan on suing

11  Facebook because what the Sixuvus has done is disingenuous.

12  They have attempted to interfere continuously here in this case,

13  even in midst of the settlement, and yet I am to go here now and

14  say, oh, let's settle.  I want to settle, Your Honor.  But I am

15  simply saying to them, I want them to -- to unattach the Village

16  People Facebook page from the Kings of Disco, and do it quickly.

17  I want them to tell Facebook that they are not associated with

18  Village People.  Once they tell Facebook that, Facebook is going

19  to shut them down, once they tell them the truth.  Those are the

20  two things I want them to do.

21      Now, if they don't want to do that, Your Honor, I will

22  simply say to them, please surrender over the "likes" because

23  those "likes" do not belong to you.  Those "likes" belong to

24  Village People, not the Kings of Disco, and the Kings of Disco

25  does not have a right to be communicating with those Village

 1    People fans any more than the Village People page I would have a

 2    right to communicate with the handful of Kings of Disco's fans.

 3    It's not fair.  It's not fair.  And we can settle this, Your

 4    Honor.  We can settle this now by them simply agreeing to do

 5    those things.  It shouldn't be hard.

 6        THE COURT:  The whole issue of the "likes" was fully

 7    discussed, and you surrendered that as an issue.  You explicitly

 8    said, that's not going to stand in the way of a settlement.  I

 9    agree to the deal.

10        So the whole issue of the "likes," as far as I am

11    concerned -- now I am not the final arbiter; Judge Seibel may

12    disagree -- but I would recommend to Judge Seibel that the issue

13    of the "likes" on the Facebook page has already been resolved,

14    but I want to hear from Mr. Adelman at this point.

15        MR. ADELMAN:  Yes.  So on page 61 of the same TRO

16    transcript, "So why don't I say transfer of the content of the

17    Facebook page and Twitter account, the two different URLs, would

18    constitute compliance?"  That's Judge Seibel agreeing with you,

19    Your Honor, that all of the content, which includes the "likes,"

20    is the property of Kings of Disco.

21        Not only that, okay, my understanding of why Facebook

22    changed the name from Official Village People to Kings of Disco

23    was because of the judge's court order, and that makes much more

24    sense than my client saying anything.

25        So I don't think Facebook would do anything but with a

1  court order.  That's why they are not giving Karen Willis an

2  affidavit.  That's why they are not giving her any information,

3  and I don't believe that they are saying to her any of this

4  stuff because -- nevertheless, if I could just make one more

5  point, which is about intellectual property law, and that is the

6  only way that Can't Stop would own any of the "likes" or any of

7  the material would be if there was a writing which specifically

8  transferred that intellectual property to them.  As we know in

9  this case there is none.  So that is a moot point, and I think I

10 agree with Your Honor when you say, you can't erase the past.

11 That is their past.  They have historical -- that's historical

12 accuracy.

13      The other thing I might say is I did a little snooping

14 myself in Facebook, and while I don't know whether this actually

15 happened or not, but I believe what happens when you transfer a

16 URL from one name to another is Facebook sends out a message or

17 a notice or what have you, and lets everybody know that it's

18 happening, and that would make perfect sense to me because

19 Facebook would want to do that.

20      The stuff that makes sense to me is that Facebook is a huge

21 company, and is not going to just turn things over and move

22 things around simply because somebody asks.  The court order of

23 Judge Seibel, though, makes much more sense to me.

24 Nevertheless --

25      MS. WILLIS:  Your Honor?

 1        MR. ADELMAN:  Excuse me.  I am still talking.

 2        MS. WILLIS:  No.

 3        MR. ADELMAN:  I agree, Your Honor, this matter was agreed

 4   to and it is moot, but nevertheless, saying that she discovered

 5   it in the last two weeks I think is disingenuous.  I think it's

 6   in the transcript.  Not only the last transcript, but in the

 7   March 16th transcript.

 8        MS. WILLIS:  Your Honor, if Mr. Adelman here is attempting

 9   to suggest to the Court that somehow the Sixuvus has provided

10   Facebook with the Court's order.  In fact, if -- I believe

11   Sixuvus has, in fact, provided the Court -- Facebook with the

12   Court's order because Facebook would never have moved the page

13   over, okay, because the Court's order does not support it being

14   switched or transferred over to the Kings of Disco.  And, again,

15   you can -- you can point -- you can talk about what I -- what I

16   said at the last meeting, you know.  All they want here -- I am

17   simply saying to you that since that time I have discovered that

18   the Sixuvus have falsely claimed Facebook, that they have the

19   right to transfer over the Village People Facebook page to the

20   Kings of Disco, something that I was unaware at the time.  They

21   have no right to do, and as a result of that, Your Honor, as a

22   direct result of that, and as a direct result of me discovering

23   that they have also transferred over an actual Village People

24   page over to themselves, and it's right there on there telling

25   you they have done so.  They are denying that they did.  Because

```
 1   of those things, Your Honor, I am not going to go along with
 2   what I said.  I have the right to change on that.
 3        THE COURT:  No, you don't.  No, you don't.  No, you don't.
 4        Once you have agreed, and we have a record of your
 5   agreement, you can be held to that agreement.  You don't get to
 6   say, oops, I changed my mind.  So I appreciate that you don't --
 7   I appreciate that you don't think that's fair, but that's the
 8   way it works.  That's why there is a record.  That's why we keep
 9   a record so that we know what the agreement is.  That's why I
10   made sure that after the details were discussed, I elicited from
11   you that you understood and agreed.
12        So I appreciate that you don't want to agree now, but you
13   agreed of your own free will -- nobody was twisting your arm --
14   on March 28th.  And I am very sad that you see things
15   differently now.
16        MS. WILLIS:  Your Honor, look, the thing is that, again, I
17   am being clear to the Court here, okay, is that I can, in fact,
18   have a change of heart for a cause.  I can, in fact, have a
19   change of heart if I discovered that the Sixuvus have done
20   things after the fact that is going to impact me agreeing to
21   that.  That's what has occurred here.  Yeah, if you want to
22   litigate that issue, Your Honor, they want to litigate, go right
23   ahead.  I am confident that Judge Seibel will likely say, yes, I
24   can, in fact --
25        THE COURT:  Okay.  Then --
```

1        MS. WILLIS:  -- make that change.

2        THE COURT:  Then perhaps what we need to do is to move

3    forward with some additional litigation over whether the

4    settlement that we agreed to is going to be enforced, and let me

5    point out that's going to happen soon.  You are not going to

6    have time to begin litigation against Facebook and try to get

7    discovery from Facebook to be able to use here.  Obviously, if

8    you can obtain information from Facebook in the meantime, that's

9    perfectly fine.  You are free to do that.  But I think we are

10   just so clearly not on the same page now, even though we were on

11   the same page on March 28th, incorporating perhaps what we

12   talked about earlier in this last hour and a half, but I think

13   what I ought to do is to give Mr. Adelman an opportunity to make

14   a motion, if he chooses to do so, to enforce the settlement, and

15   then you are entitled to respond and to oppose it.

16       MS. WILLIS:  Absolutely.  And to appeal, too.  So let him

17   go right ahead.  But that's the easy thing.  But if Mr. Adelman

18   wants to go down that road, I am happy to walk that road with

19   him.

20       However, it will be much easier, Your Honor, I propose to

21   him to simply do what I am asking, and it's simple.  I am simply

22   asking that they stop the whole issue of the Facebook page.  If

23   they want to fight over that, go right ahead.  Go right ahead.

24   If they want to settle it, it may be easier just to say, look,

25   she is simply asking that we un -- unhinge this Village People

1    page right now, and also she is simply saying, hey, we have

2    commandeered a Village People Facebook page through Facebook,

3    and she is saying she doesn't want me to have them, why do we

4    need them?  Why don't we start anew?

5        THE COURT:  Ms. Willis, let me hear from Mr. Adelman.

6        MR. ADELMAN:  I would like on the record to know the URL of

7    the Facebook page she thinks we have commandeered.  Then I would

8    like on the record right now exactly what she thinks the steps

9    are and the procedure is to unhinge that Facebook page from my

10   client's Kings of Disco page.

11       MS. WILLIS:  Okay.  All right.  I can tell you now --

12       MR. ADELMAN:  And then I can tell you my response.

13       MS. WILLIS:  Okay.  Well, Facebook has what's known as a

14   Wiki page.  They have it for every --

15       MR. ADELMAN:  All I wanted was a URL.

16       MS. WILLIS:  Well --

17       MR. ADELMAN:  I don't know what a Wiki page is.  I know

18   that the whole Internet is governed by URLs.

19       MS. WILLIS:  Hold on.  Let me see if I see this now, the

20   actual URL.  Hold on a second here.

21       MR. ADELMAN:  I apologize, Your Honor, for speaking over.

22       THE COURT:  Just so everyone knows, I have 20 minutes

23   before I turn into a pumpkin, so whatever we are going to do, it

24   has to happen in the next 20 minutes.

25       MS. WILLIS:  All right.  Well, Judge Seibel has given us

 1  11 -- until a certain date to get this resolved.

 2      THE COURT:  I feel -- I feel without question she will

 3  extend that time.

 4      MS. WILLIS:  All right.  So let me see here.  It's -- let

 5  me see if it actually -- if that page actually gives the URL.

 6  Facebook, Kings of Disco.  Here it is.  I am putting it in here

 7  now.  Okay.  Here it is.  It says, "You are redirected here" --

 8  on the Official Kings of Disco page -- it says, "You were

 9  redirected here from the unofficial page Village People."

10      So I am going to click on that Wiki page right now, and it

11  will -- should give me a URL.  Here it is.  I have it right

12  here.  It's in front of me.

13      MR. ADELMAN:  Read it out.

14      MS. WILLIS:  It's Village People -- it's Facebook.com slash

15  pages, P-A-G-E-S, pages, slash Village dash People slash

16  109861955707362 question mark, "N" as in Nancy, "R" as in

17  Richard.  If you click on that page right now, it is a Village

18  People Facebook page created by Wikipedia.  That's the page that

19  -- that 99 percent of all the people now are being directed to,

20  and that's how the Sixuvus is getting ranked high because they

21  have commandeered that page by transferring it over.  They need

22  to unhinge that page.  It's very easy to do.

23      MR. ADELMAN:  Yeah, it's very easy to do.  Let's hear it:

24  How do you do it?

25      THE COURT:  How?  How?  How, Ms. Willis?

 1         MS. WILLIS:  Here is how they do it.  This is how they do

 2    it.

 3         MR. ADELMAN:  Uh-huh.

 4         MS. WILLIS:  Someone that's connected to them -- because

 5    there is no other reason for anyone to do it other than someone

 6    connected to them -- it's in the system.  Someone connected to

 7    them actually went to that page and claimed it.

 8         THE COURT:  No.  No.  No.  No.  No.  No.  The question is:

 9    How do they un-connect from it?  What is the method?

10         MS. WILLIS:  I am telling you.  I need to tell you how it's

11    done.  Then you forward it.  Just a moment.  I am trying to

12    explain it here.

13         THE COURT:  You are telling us how you think it did happen

14    in the past.

15         MS. WILLIS:  No.  No.  No.  I know exactly how it happened,

16    and this is how you have to undo it.  Now --

17         THE COURT:  Tell us the "undo it."

18         MS. WILLIS:  All right.  All right.  Look, to undo it, if

19    they -- by the way, it's David Hodo that's actually the

20    administrator of that Wiki page that he claimed it on behalf of

21    Village People, and so all he has to do, Your Honor, is to -- is

22    to basically go in -- into the actual page and just delete it or

23    just say, okay, we are going to unattach it.  It's a little

24    button in there.

25         Or the Sixuvus, the other way is for the Kings of Disco to

 1  send a note to Facebook, the same people that they communicated
 2  with to get it switched over to say, by the way, this particular
 3  URL right here has been -- has been mistakenly -- this is a
 4  Village People URL.  It's been -- it's been attached to Kings of
 5  Disco.  Can you please unattach that because we are not -- we
 6  are not Village People?  We are the -- so there is two ways of
 7  doing it.  That -- those are the two ways they can do it.  If
 8  they agree that they are going to do it, we've got that issue
 9  out of the way, at least that part.  Then we go to the next part
10  here.
11      THE COURT:  I thought that was the major issue.  So,
12  Ms. Willis, I have a printout of the Kings of Disco homepage,
13  and you are saying there is a button, a little button that
14  allows it to be unattached.  I am looking at the page.  I have
15  about six pages that I printed out.  Where is the "unattach"
16  button?
17      MS. WILLIS:  Your Honor, it's not there.  It's going to be
18  administration of the page.  You have to be an administrator to
19  do that.  Some -- okay.  It's not -- it's not that -- it's done
20  as a part of the -- you have to go in what they call the hosting
21  area, the administration area.  Again, they can either request
22  Facebook to unattach it, meaning that -- but they would have to
23  represent to Facebook that they are not -- they should not have
24  access -- that they have to represent to Facebook that the
25  Village People page should not be directed to them.  Once the

```
 1   Sixuvus informs Facebook of that, Facebook will immediately
 2   unattach that or unhinge it as they call, right?
 3          The other way is for the actual administrator of that
 4   Village People page, who we have tracked to be David Hodo, who
 5   is still involved with them, by the way.  All he has to do is to
 6   send a note to Facebook saying, oops, I mistakenly pointed the
 7   Village People page to the Kings of Disco.  Could you please,
 8   you know, delete that?  And they will do it there.  There is two
 9   ways of doing it.  All the Sixuvus have to do is agree that they
10   are going to get it done.
11          THE COURT:  Mr. Adelman?
12          MR. ADELMAN:  No.  I have no idea.  First of all, I don't
13   think -- why would David Hodo have anything to do with this?
14   And but the thing is, is that she gave us a page with a whole
15   bunch of numbers, and none of it makes any --
16          MS. WILLIS:  You asked for it.
17          MR. ADELMAN:  Again, yes, and I am happy to investigate it.
18   If this is the only issue left, I will look into it myself
19   personally, and if I say, okay, we will do this, we have a
20   settlement.
21          MS. WILLIS:  Yeah, but it's only part of this.  Read my
22   letter I sent over.
23          Here is the other part.  It's very simple for the Sixuvus.
24   If you don't want to settle because of this, you want to hold
25   onto it, go right ahead.
```

1      Okay.  The Sixuvus right now, okay, if you want to keep the

2  content, right, go right ahead and keep the content, but what I

3  am saying is that the Sixuvus must request that Facebook delete

4  the Village People "likes," and then they will have an

5  opportunity to acquire their own "likes" as the Kings of Disco.

6      THE COURT:  I have already said this to you, Ms. Willis.

7  This was expressly discussed, and you expressly said, "Never

8  mind.  I don't need to deal with that.  I give up contesting

9  that issue."  I cannot imagine that Mr. Adelman would agree to

10  have any further discussion on the "likes."

11      So here is what we are going to do:  And I am telling you,

12  I literally am turning into a pumpkin in 12 minutes.  Here is

13  what we are going to do:  I am going to give Mr. Adelman

14  whatever time he wants to try to reach an agreement that the

15  three of you -- that is to say, Ms. Willis, Mr. Levy and

16  Mr. Adelman -- can live with.  Either you do it before -- and I

17  will ask Judge Seibel to extend the date for a consummation of

18  the settlement -- either you do it before May 25th or on

19  May 25th, Mr. Adelman can file a motion to enforce the

20  settlement.

21      Similarly, on that date, Ms. Willis, if you want to make a

22  motion to reopen the case, assuming Judge Seibel grants your

23  currently-pending motion, then that could also occur on

24  May 25th.  I don't know what else to do at this point.

25      Any opposition --

1          MS. WILLIS:  Your Honor --

2          THE COURT:  Any opposition to the motions would be due

3    May 8th.  Replies May 13th.

4          MR. ADELMAN:  You mean June?

5          THE COURT:  I am sorry.  June, June, June, June, June.

6    June 8th.  Replies June 15th.

7          MR. ADELMAN:  And we make that motion to you?

8          THE COURT:  Yes.  The motion to me, and I will undoubtedly

9    proceed by report and recommendation to Judge Seibel.

10         MR. ADELMAN:  That sounds good.

11         THE COURT:  So that gives you opportunities to make your

12   objections to Judge Seibel as well.

13         MR. LEVY:  Your Honor, just for clarification, on the two

14   most recent letters from Judge Seibel, she pointedly said that

15   only the plaintiff -- she said the plaintiff may apply by letter

16   within the restoration period to restore the case.

17         THE COURT:  Yes.  And Ms. Willis has made a letter motion.

18         MR. LEVY:  She made a motion.

19         THE COURT:  I just received it.

20         MR. LEVY:  Right.

21         THE COURT:  She's made a letter motion to be allowed to do

22   that.  I don't know what Judge Seibel is going to do with her

23   letter motion, but I expect she will decide it promptly.

24         MR. LEVY:  Well, right now, though, if -- I know you

25   just -- your orders are Mr. Adelman on behalf of his client can

```
 1    move to restore.  If he doesn't --

 2         THE COURT:  No.  No.  I said he can move to enforce the

 3    settlement.

 4         MR. LEVY:  Move to enforce.  I am sorry.

 5         But if he doesn't, would we have to make that -- if he

 6    decides to enforce the settlement, do we have to make the motion

 7    or it's already been granted, and we would choose just not to

 8    act within the 30-day period to restore it?

 9         THE COURT:  No.  You have to -- you have to make an

10    affirmative application to restore.

11         MR. LEVY:  Would that be a motion or just an application

12    saying --

13         THE COURT:  You can just do it by letter to Judge Seibel

14    asking to have it restored to the calendar.

15         MR. LEVY:  And the only other thing, and again, in most

16    cases, Mr. Adelman and I are fine, and I think we can resolve

17    things.  There are certain things like my client asked me, and I

18    don't know, he said there was a domain name VillagePeople.band,

19    which was supposed to be shut down.  I am sure you could take a

20    look into that, and then --

21         MR. ADELMAN:  We can do this offline.  This is the whole

22    thing, Your Honor, if I may -- I am sorry, Stewart, I am going

23    to get in -- is that the settlement agreement doesn't mean the

24    communication ends.  If there is an issue, you have a

25    conversation.  So yes, we can look into that, and if that's a
```

1   problem, we will take care of it.

2       MR. LEVY:  And the only other thing, and maybe this will

3   satisfy Ms. Willis a little bit, well, we looked and we saw that

4   Red Entertainment, which is a booking agency, which I believe

5   Mr. Adelman said Sixuvus doesn't use anymore, they have been

6   advertising on the Internet a picture of the Sixuvus group and

7   they call it, "The Kings of Disco 1977 to 2018 now in their 41st

8   year."  Now, I don't blame Sixuvus for this if they tell me they

9   don't use this company anymore, but maybe there is a way for

10  Sixuvus to contact people they used to use and tell them to

11  knock it off because it's causing problems.

12      MR. ADELMAN:  Just let me know.  I mean, this is the

13  silliness of all of this is I could -- just let me know what the

14  issue is very succinctly.  We will take care of whatever needs

15  to be done within the confines, but I just want to make sure I

16  understand something, Your Honor, and that is, the enforcement

17  of the settlement agreement includes what we agreed to today.

18      THE COURT:  Yes.  Yes.  I think that's right and --

19      MR. ADELMAN:  Okay.

20      THE COURT:  -- on behalf of the Court, I am ordering the

21  transcript.  Thank you.

22      MR. ADELMAN:  Thank you, Your Honor.

23      MR. LEVY:  Did we revise the agreement?

24      MR. ADELMAN:  Just the one piece where we are going to --

25      THE COURT:  The changing the timing within which to remove

PROCEEDINGS

1   any negative or disparaging material.

2        MR. ADELMAN:  Otherwise, it's as-is.

3        MR. LEVY:  That would be the document that if the -- I want

4   to enforce the settlement, that's the document that memorializes

5   the settlement, and if we, Can't Stop, want to enforce the

6   settlement, that would be summary of the letters saying we don't

7   want to restore the case.  We are happy with the document.

8        THE COURT:  I am not going anticipate.  Try to work it out.

9        MR. ADELMAN:  Yes.

10       THE COURT:  Okay?  All right.  Thank you very much.  We are

11   adjourned.

12        (Time noted:  1:20 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25