20183qcant cf

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
CAN'T STOP PRODUCTIONS, INC.,

        Plaintiff,

      v.               17 Civ. 6513(CS)

                      SETTLEMENT CONFERENCE

SIXUVUS, LTD., et al.,

        Defendants,

      v.

KAREN WILLIS, doing business as
Harlem West Entertainment,

        Intervenor.
----------------------------------x

                     United States Courthouse
                     White Plains, N.Y.
                     March 26, 2018

Before:  THE HONORABLE LISA MARGARET SMITH, Magistrate Judge


                     APPEARANCES

EISENBERG, TANCHUM & LEVY
    Attorneys for Plaintiff
STEWART L. LEVY


ADELMAN, MATZ, P.C.
    Attorneys for Defendants
GARY PHILIP ADELMAN


KAREN WILLIS, Pro Se Intervenor

1          (Case called)

2          THE COURT:  Good afternoon.

3          So I read Judge Seibel's two most recent orders, and

4    she has referred the matter to me for a further settlement

5    conference.

6          Where do we stand, Mr. Levy?

7          MR. LEVY:  Well, your Honor, as you may recall, Can't

8    Stop would like (INDISCERNIBLE) a settlement here.  If the

9    parties are happy (INDISCERNIBLE) licensee, and a formal

10   licensee, if they're happy with the way they're functioning as

11   of this weekend, I've told Mr. Adelman that we're prepared to,

12   if we have to, contribute something to try and make this more

13   palatable, but the issue -- and we would be fine, but the issue

14   seems to be that neither of the two parties here are happy with

15   the way things are functioning as of this weekend.  And what I

16   was trying to do before you came out here, your Honor, is to

17   find out exactly what is bothering them, what do they want to

18   do.

19         We're content to let the Sixuvus group perform as

20   Kings of Disco consisting of four former members of the Village

21   People.  I threw out the idea -- I'm not going to bind Karen

22   Willis to it, but we threw out the idea that, if they wanted to

23   do a medley, a tribute, for 10 minutes as part of their act to

24   Village People, that would be okay, too.  What we don't want to

25   have happen is for them to be basically performing as the

1    Village People under a different name and do the exact same act

2    using our trademark costumes.  But that's what we're willing to

3    do.  We think that's a fair settlement.  But it's really

4    between the Sixuvus people and Karen Willis and her husband,

5    who are the licensees.

6            So we're here.  We would like to settle it, but I --

7    and we're fine with the Court's opinion, but it's really up to

8    the two of them.

9            THE COURT:  Mr. Adelman, what seems to be the

10   problem?

11           MR. ADELMAN:  Well, the problem is our disagreement

12   on whether my client can use any of the costumes or not.  There

13   are -- and I brought some educational materials to show that

14   there are tribute bands out there that wear the costumes in

15   full.  In fact, there are tribute bands out there for over 150,

16   200 different top bands in the country that wear the costumes

17   like Kiss and other bands that are associated with a certain

18   look.  That seems to be the main disagreement here.

19           There is case law out there -- well, not -- it's a

20   likelihood of confusion issue, your Honor.  It's one of the

21   things that Judge Seibel asked us to brief for the hearing on

22   the 10th as to whether, if they change their name to Kings of

23   Disco and they wear the costumes, is there a likelihood of

24   confusion.  My response to that is there can't be.

25           Mr. Willis and his group market themselves as Village

```
 1   People, many times saying featuring Victor Willis.  There's no
 2   question that the public is aware now, especially with this
 3   lawsuit, that there are two different groups that are
 4   performing, I think, with the Judge's decision.  And, in fact,
 5   Mr. Willis posted it on his Facebook page.  So everybody is now
 6   aware that my clients will not be using the name Village People
 7   except in the permitted historical context and, as you read in
 8   the Judge's order, permitting us to use the name Kings of
 9   Disco, former members of Village People.  I think that in and
10   of itself clears away any likelihood of confusion argument.
11           And so I think that Mr. Levy is correct that that may
12   be -- except for some discussions on minor details and the
13   discussion Can't Stop and us have to have as far as monetary
14   damages, that seems to be it.
15           MR. LEVY:  Your Honor, I would like to just address
16   the tribute band issue.
17           Judge Seibel said -- first of all, she affirms my
18   client's ownership rights in the name Village People as well as
19   the fair use trademark characters.  And she was very clear.
20   She said you cannot perform in character and duplicate the
21   entire act of the Village People.
22           At the last preliminary injunction hearing we had, it
23   was clear that, for the last 30 years, the Sixuvus group has
24   been performing almost the same act that existed 30 years ago,
25   when the group was put together by my client and Jacquez
```

1   Morali, his French partner.  And the Judge was clear that they

2   can't just change their name and say former Village People and

3   then, when the consumer goes to see the concert, it's the

4   Village People concert again, because that's our licensed

5   product.

6              Now, there was some issue as to whether there was

7   some patented dance moves or something.  Frankly, I don't think

8   that's the issue.  I don't think my client cares one way or the

9   other about that.  But to sing for half their act to be our

10  songs, to dress up in our fair use trademarked costumes is not

11  what the Court held they can do.

12             Now, as far as tribute bands go, tribute bands make

13  it clear they're a tribute band.

14             THE COURT:  Am I missing something?  I don't see her

15  discussing costumes or performance or songs.  Is that in the

16  previous order?

17             MR. LEVY:  It's (INDISCERNIBLE) the order.  I don't

18  know if it's in the -- in the text when she was discussing it.

19  Because she was giving us instructions.  It's in the

20  transcript, which I did not bring.  But in the transcript, when

21  she was giving us instructions on what she would like briefed

22  for the next preliminary injunction hearing, she was talking

23  about that, and one of the issues was she asked me, well, do we

24  have an objection to them using dance moves that were patter,

25  and we said we would research it.  Frankly, I don't think we

```
 1     care one way or the other about that, at least as far as the
 2     settlement.
 3            But the issue is, when you have a tribute band, the
 4     consumer knows it's not the band.  It's like Beetlemania on
 5     Broadway, which was stopped.  Most of these tribute bands --
 6            THE COURT:  Ms. Willis, I really want you to stop
 7     commenting until it's your turn.
 8            MS. WILLIS:  Actually, I didn't say anything.
 9            THE COURT:  You said mmhmm.  I can hear you.  I'm not
10     deaf.  You were commenting.  And before that, you inserted some
11     words.  I don't remember what they were.  I'm just asking you.
12     Please.  You'll have your turn.  I want to hear what he has to
13     say at this moment.
14            Go ahead.
15            MR. LEVY:  So, your Honor, when you have a tribute
16     band -- and I represented the group Kiss for many years.  There
17     are -- Mr. Adelman was right.  There are a lot of tribute bands
18     out there.  Most bands have no problem with a bunch of guys
19     playing in local bars and it's clear that they're paying
20     tribute to Bruce Springstein and the E Street Band and they
21     play something, but the problem is when the consumer thinks
22     they're seeing the actual band.  And that's when you go in and
23     you say, hey, no, no, this is our trademark.  You can't do
24     that.  And Mr. Adelman is right.  The issue is likelihood of
25     confusion.  It's a trademark issue.  That's what it is.
```

1          But there's a whole slew of these cases.  Now,

2     fortunately, most get resolved short of litigation.  But you go

3     back to Jefferson Airplane.  When Grace Slick broke off, their

4     main group became Jefferson Starship.  Okay?  They changed the

5     name.  So, yes, people knew that they changed the name, they

6     changed the lead singer and they updated their songs.  Okay?

7     So it was a little bit different.  When the group Boston split

8     up, Tom Scholz, who was the founder of the group, went off as

9     Boston and Barry Goudreau and Sib Hashian, the drummer and lead

10    guitarist, they went off as another group featuring former lead

11    guitarist of Boston.  That's fine.  We have no problem with

12    that as long as the public is not confused.

13          I think it's a little disingenuous to take a tribute

14    band, which usually are guys who look like they were playing in

15    the garage for years and they say it's a tribute and say, oh,

16    that's the same thing here.

17          If the Sixuvus defendants want to perform as a

18    tribute band, we're open to it, but then they're not the

19    Village People.  The consumer is not seeing formerly Village

20    People.  It cannot be that the consumer goes in and sees the

21    exact same act that's associated with our trademark rights.

22    That's the difference.  So if they want to be a tribute bands,

23    I'm happy to discuss that as a framework, but that was not what

24    was discussed.  And I think if they're Kings of Disco,

25    featuring former members of the Village People, and they want

1  to do a little medley for 10, 15 minutes where they get on

2  stage and they say, you know, we're very proud of -- for years,

3  I was the Indian in the Village People and I was this and they

4  want to do a medley of our songs, go do a medley.  If they want

5  to even -- I'm not -- I'm overstepping my authority a little

6  bit, but if they want, during that 10-minute segment, to wear

7  an Indian headdress and cowboy boots, maybe we could do that,

8  too.  But what they can't do is have an hour and a half show

9  where the Kings of Disco does the Village People show in all

10  our fair use trademark costumes, because, in this case, they

11  just are confusing the public because the public's going to

12  say, oh, the Village People changed their name, so we just saw

13  the Village People, but they go by another name now.  And the

14  Judge did discuss that in detail in her transcript when she was

15  giving us instructions on the injunction hearing that's coming

16  up.

17          So, again, we're flexible, but they have to make a

18  decision on what they want to do, be a tribute band or be a

19  band in their own right.  And whatever little things bother

20  them -- I think Mr. Willis has problems with the internet.  I

21  am not that savvy on it.  I thought the internet was fine.  But

22  if there are problems with the usage, I'm sure we can work that

23  out -- or they can work that out and we shouldn't be that far

24  apart.

25          THE COURT:  Mr. Willis.

```
 1              MS. WILLIS:  Here's the problem, your Honor.  I agree
 2     with what Mr. Levy said.  It's all about distinguishing
 3     themselves.  Right now, they're still on the mantra.  And I can
 4     show you tons of communications even now on the Kings of Disco
 5     that they've simply changed their name, that they're still the
 6     same act, they're still encouraging the public that, oh, you
 7     know, we've done this for years, we're the Village People, we
 8     just -- we're performing now under the Kings of Disco.  They
 9     keep -- and it's on there.  I can point it out right now.  If
10     they would stop that, if they would stop that and simply say --
11              THE COURT:  No, I'm sorry.  Tell me -- tell me
12     specifically what you want them to stop.  Do you want them to
13     stop calling themselves Kings of Disco, formerly known as
14     Village People?  Because that's exactly what Judge Seibel said
15     they could do.
16              MS. WILLIS:  Your Honor, that's not what I said.
17              THE COURT:  Okay.  But that's why I'm not
18     understanding --
19              MS. WILLIS:  Right.
20              THE COURT:  -- what it is you want them to not do or
21     to change.
22              MS. WILLIS:  I'll say it again.
23              THE COURT:  Thank you.
24              MS. WILLIS:  What they're doing is -- the Judge has
25     said that they are able to say that they are former members of
```

20183qcantcr

```
1    Village People.  They are not allowed to say that they are,

2    as -- you know, that they have simply changed their name.

3    Okay?  Now they're performing as the Kings of Disco; however,

4    they're just formerly Village People, that's who they are,

5    they're the Village People.

6            So as long as they're able to make it clear and they

7    stop -- unless they stop -- I mean stop communicating with

8    their fans, informing them that, hey, we just changed our name.

9    That's all.  Pass the word.  The Village People is now the

10   Kings of Disco.  And that (INDISCERNIBLE) right now.  They're

11   saying that.  Village People is now the Kings of Disco.  That's

12   what's confusing.  That's what the Judge has said they can't

13   do.

14           And if we are able to agree that they're going to

15   stop blurring the line, stop making it appear that they simply

16   changed Village People, simply changed their name -- that's

17   what they're still doing.  If we're able to get an agreement

18   whereby, okay, we're not going to do that anymore, we're going

19   to clearly state that we are going to stop saying that we

20   are -- we changed our name and now we're performing as the

21   Kings of Disco.  Okay?

22           They've not changed their name.  They lost their

23   license to perform as Village People.  They're no longer

24   Village People.  You see?  And so they just have to move away

25   from that.  And I'm open to settlement on those issues if we
```

1    can get them to just stop it.  Don't do that anymore.  You

2    know, it's like Mr. Levy said.  If you want to be a tribute

3    band, let's talk about that.  If you are going to be the Kings

4    of Disco, formerly Village People -- or former -- excuse me --

5    former members, because they can't say formerly Village People.

6    They can say former members.  If that's what you would like to

7    do, sure.  No problem.  The Judge has said you can do it.  But

8    don't attempt to tell the public that you've simply changed

9    your name.  That's where you're claiming that you're Village

10   People under a different name.  And that's what Mr. Levy has

11   talked about earlier.

12            So that's all.  Those are the issues there.

13            THE COURT:  Mr. Adelman.

14            MR. ADELMAN:  Okay.  I'm going to try to take this in

15   order.

16            So first I want to talk about the Jefferson

17   Airplane/Jefferson Starship issue.  It's a little confusing to

18   me because Jefferson Airplane changed their name because it

19   modernized and then Grace Slick left the band.  And she toured

20   singing Jefferson Starship/Jefferson Airplane songs.  And it

21   was quite clear that she sang those songs for years before and

22   she's singing them now.

23            My client -- add into that my client is not

24   suggesting anything other than that they are former members of

25   Village People.  You can't disassociate certain things.  The

performances themselves are not copyrighted.  They're not

trademarked.  It's the name, clearly.  And my client has

changed the name to Kings of Disco as per the Judge's order.

As far as the costumes are concerned, I believe --

and if you read the transcript, you'll hear my associate -- or

my partner, who, unfortunately, couldn't be here today, make an

argument that, since they're now Kings of Disco, there's no

likelihood of confusion if they wear the costumes.  And the

Judge asked us to brief that issue.  And we are -- and

hopefully we'll settle and we won't have to.  But,

nevertheless, let's move to the likelihood of confusion in any

event.

Saying you're the Kings of Disco -- well, first of

all, let's talk about the shows themselves.  Only about half

the show is -- I'll call it Village People songs, but they

weren't even originally sung by the Village People.  They were

sung by Mr. Willis and some background singers.  And, actually,

one of my clients is one of the background singers that

performed on that record.

So there's a myriad of things happening here.

There's the right to the name.  There's a separate trademark

right to the costumes per se.  There's the performance itself.

And then there's the bigger issue, which is do all three of

those in combination or out of combination -- where does the

likelihood of confusion start?  Where does it end?  Is there a

likelihood of confusion over those three issues?

Now, I would, again, continue to argue that once
they've changed their name to Kings of Disco -- let's take away
former members of Village People.  Let's say they just called
themselves Kings of Disco and they just used former members of
Village People historically, say, in their About Us page or
they have 30 years of photos of them dressed as Village People.
That's historic content.  That's allowable.  So let's go with
they're just changing their name to Kings of Disco.  They
booked themselves at the Nassau Coliseum as Kings of Disco.
People are aware that they're not seeing the Village People.
There's no likelihood of confusion there.

Now, these people go to the show and, as often
happens in other shows where bands play covers or whatnot,
sometimes they put on costumes.  There's no likelihood of
confusion as to what band they're seeing.  If my client plays
eight songs, four of them are Village People, dressed in the
costumes, four of them are not, dressed in other costumes, it
is clearly different than Mr. Willis and his group, which are
named Village People putting on a whole performance as Village
People in the costumes singing only Village People songs, et
cetera.  That is clearly different.  Someone showing up at a
Kings of Disco performance is not going to think that they are
seeing the Village People because they're being told they're
not from the get-go.  And if, in fact, someone thinks that or

they give the impression of that, to me, that's bait and switch

almost.  But, no.  If they want to see the Village People, they

see Mr. Willis' group.  If they want to say Kings of Disco,

they see my client's group.  There's no likelihood of

confusion.  The fans know.  And I think that's one of the major

issues here is my clients have, you could say, fans around the

world who identify with Sixuvus, with the six actual people,

and they want to see them perform.

So is there a compromise here?  Certainly.  I mean,

if there's some way to make it clear in marketing and

advertising that my client's not them and, therefore, Kings of

Disco is not Village People, but they dress up in the costumes

and, for half the show, they sing some of the golden oldies, as

they call it, I think that's the making of the settlement.

No booker or venue or anyone else is going to be

confused.  I mean, and that's the first step.  Remember, a

venue and a booker has to know what they're buying.  And they

will.  Everybody who books these bands knows who they are and

knows what they do.  That's the first line of defense.

So I think that there is a compromise.

THE COURT:  What about -- Mr. Levy's talking about 10

minutes as a tribute medley.  You're talking about half the

show.  What about 25 percent of the show being whatever you

want to call it; tribute, medley or Village People songs.

MR. ADELMAN:  Well, I don't think the songs are the

1    issue here because the songs are governed by --

2              THE COURT:  There's some issue of the songs.

3              MR. ADELMAN:  Well, unless they change the law, my

4    clients can sing the songs at any venue that has a public

5    performance license.  There's no changing that.  It's the

6    public rights organization's blanket license that permits

7    anyone to sing any song in any public place that has a license

8    from one of the three PROs.

9              THE COURT:  But we're talking about a settlement

10   here.

11             MR. ADELMAN:  Yes, no, I understand.  I'm saying

12   that --

13             THE COURT:  And it requires giving something, even

14   something you may be entitled to.

15             MR. ADELMAN:  No, I agree, I agree.  And I'm saying

16   that if you want to say -- well, which is it?  Can we -- maybe

17   it's, you know, limiting the wearing of the costumes for a

18   certain amount of time.

19             THE COURT:  I was going to get to that.

20             MR. ADELMAN:  Yeah.  I mean -- yeah.  I think that

21   could be the compromise.  Yeah.  I don't see why not.

22             So I'm wondering -- and I know we're supposed to talk

23   to you, your Honor, but this is really a question for the other

24   side of the table, and that is, if they wore the costumes the

25   whole show, but only played 25 percent of the time Village

1    People songs, would that be an adequate compromise?

2                MR. LEVY:  The answer, your Honor, is no.  The

3    overreaching is a little much to take.

4                Your Honor, the --

5                MR. ADELMAN:  Your Honor, I appreciate --

6                MR. LEVY:  No, let me finish.

7                We have a fair use trademark in the costumes.  During

8    the preliminary injunction hearing, individual members of

9    Sixuvus -- in fact, Felipe Rose is an original member -- was

10   proud of the fact that they have been performing the legacy of

11   my client and Jacques Morali from 30 years ago.  The same

12   songs.  Very similar.  They changed it a little bit here and

13   there, but basically it's the same show.  The Court found that

14   the degree of supervision that we had to give was less than

15   would otherwise be because it's the same show and they do a

16   good job with the same show.

17               If you allow them to wear our costumes and have half

18   their show being all our songs, word will get out.  People will

19   say I just saw the Kings of Disco, they're the Village People,

20   and our license and our rights are totally subverted.  It all

21   falls down to confusion, you know, as to the public.

22               And again, with all deference, when Grace Slick left

23   the band, she didn't perform as Jefferson, you know, Starship.

24   They made a clear distinction of who was who.  There's no --

25   this muddies -- what Mr. Adelman is proposing totally muddies

 1    it.

 2          Look, if they want to sing our songs, there may be an

 3    issue, frankly, of grand rights licensing, if they act them

 4    out, because grand rights licenses are not automatically given.

 5    So if they're going to act out in costume, they will need the

 6    approval of the publishers.  I can guarantee you they won't get

 7    it because we are the publishers, along with Mrs. Willis.  So

 8    there's a limit as to how far they can act in costume anyway.

 9          As far as singing our songs as disparate songs, yeah,

10    I mean, they can sing our songs, but why do they have to be in

11    costume?

12          So the point is if they want the public to see how

13    they sing and they perform, okay, sing our songs.  If you're

14    good, you'll stand up (INDISCERNIBLE).  You'll be fine.  You

15    want to touch base a little bit that you used to be in the

16    Village People, yeah, a short medley.  But if they're going to

17    use as a crutch all our costumes in half their show, they

18    basically (INDISCERNIBLE) our entire trademark, they've taken

19    our trademark rights, and the consuming public will say, well,

20    they're the same group, and we can't allow that.

21          THE COURT:  Although you did say that you would be

22    willing, possibly, you might have been overstepping, to permit,

23    say, a brief use of maybe parts of the costumes, maybe

24    headwear, during I think you referred to a 10-minute tribute

25    medley.

1          MR. LEVY:  Yes, I did.  And I think we would push

2     that.  We think that would be fair, I mean, because, under the

3     nominative fair use doctrine -- I mean, look, Felipe Rose was

4     the Indian in the Village People.  No one's taking it away from

5     him.  If he wants to come out in headdress and say, in my prior

6     incarnation, I was the Indian of the Village People and he

7     comes out and he does a medley with the other guys for a couple

8     minutes and then he says but now we're on to new and better

9     things, as the Jefferson Starship did, they changed their music

10    and were now doing something different, yeah, that's fine.

11         I have -- we have no grudge against the Sixuvus

12    members.  We don't want to erase history.  But they can't just

13    rubber stamp themselves as the Village People performing under

14    a different name.

15         MS. WILLIS:  And that's the issue, your Honor, is

16    that's what they're doing.  That's what they've done.  That's

17    what they continue to do.  If we can get an agreement that it's

18    going to stop -- they're basically saying to the public we're

19    the Village People, we just changed our name.  That's what

20    they're doing.  And that's the problem.  If we can get them to

21    stop doing that, sure, that would solve it.

22         If you're the Kings of Disco, former members, that's

23    who you are.  Your act should not be Village People dressed in

24    costumes anymore, you know, singing all the songs because,

25    wink, wink, you knew that's who we used to be, that's who we

1    are anyway.

2              So the question becomes how do we -- it's simple,

3    really.  Just agree that they're not going to do it.  Don't say

4    or lead the public to believe that the Kings of Disco -- the

5    Village People are now the Kings of Disco.  That's what they're

6    doing right now.  It's up to them to stop it.  If they stop it,

7    if we can agree, sure, we have a settlement.  That's all the

8    problem I have.  Stop saying that you simply have changed the

9    name.

10             MR. ADELMAN:  I don't think that's what is happening,

11   and the Judge, just on Tuesday, said so.  So she didn't find --

12             THE COURT:  She said there was no reason to amend

13   the --

14             MR. ADELMAN:  Right.  And that there was no violation

15   of our rights.

16             THE COURT:  -- existing order or to impose sanctions,

17   but the hearing still remains in place.

18             MR. ADELMAN:  Agreed.  And that's actually -- it's

19   part -- part of the hearing is the issue with likelihood of

20   confusion and the costumes.  So there has to be a compromise.

21             I want to point out one thing, that Felipe Rose is an

22   American-Indian and wore that outfit before he even met anybody

23   from the Village People.  In fact, Mr. Belolo and Jacquez -- I

24   forgot what his last name is --

25             MR. LEVY:  Morali.

 1           THE COURT:  They found Felipe in the Village wearing

 2   his costume.  It's a historic legend.

 3           And so, I mean, I think it's a little -- I don't like

 4   using word disingenuous.  But I think that there is a

 5   compromise as far as the costumes.  They can change the

 6   performance to what they've been doing for 30 years.  No

 7   question about it.  I think that part of this is that --

 8           THE COURT:  I'm sorry.  I need to make sure I heard

 9   you.  They can change the performance to what they've been

10   doing or --

11           MR. ADELMAN:  No.  I'm saying that the performance --

12   there's a performance.  They're going a little overboard as far

13   as they've been doing the same performance for 30 years.  They

14   haven't.  If you look at the videos, you can see how the

15   costumes have changed, the dance moves have changed.  My

16   clients are not professional testifiers.  They didn't

17   articulate it extremely well on the stand.  But the fact of the

18   matter is they can't -- they come up -- they can come up with

19   new dance routines.  They can come up with new banter that

20   doesn't invoke the Village People.  They can call themselves

21   Kings of Disco.  They're not going out there and saying they're

22   the Village People, but we've changed our name.  Their identity

23   is still who they are.  That's what they're saying.  We're

24   still the same six guys.  Okay?  They weren't saying that on

25   social media.  There was one comment when they changed the

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

Facebook page and basically said they can take our name, but they can't take our fame.  And I think that is, you know, a fair comment.  These guys have been doing it for over 30 years.

Now, as far as the legal issues are concerned, I definitely think that there is probably a compromise between the three aspects that I talked about.  Maybe, instead of having all six of them wear all six costumes, we can reduce the number of actual costumes that they use.  In fact, I want to step out of the legal realm, but if we changed one of the members to a different costume, or maybe two, that actually would be a different group.  If it didn't have, say, the construction worker and the motorcycle guy, it wouldn't be the Village People any longer, would it?  Because those six actual members, the actual six -- the Indian, the leather guy, the Army guy, et cetera -- that's the identifiable trademark.  Makes the likelihood of confusion even more de minimus.

So that's what I'm saying.  It's just not one thing.  You can't just reduce to a 10-minute medley.  We have to take the three components and come to a balance that works for both parties.  That's my suggestion.  And that's what I think a fair settlement is.  Nobody's happy.  Everybody's unhappy.  But it's a fair balance to the settlement.

MS. WILLIS:  Your Honor, here's the problem.  Mr. Adelman stated a moment ago that it was -- it was a fair statement for them to make on their website that they can take

1    the name, but they can't --

2                THE COURT:  That issue has already been presented to

3    Judge Seibel.  I can't do anything about that issue.  She said

4    it wasn't a violation of her order, the comment you can change

5    the name, but you can't change the fame.  She's already ruled

6    on that.

7                MS. WILLIS:  Well --

8                THE COURT:  I certainly can't overrule her.

9                MS. WILLIS:  But I'm not --

10               THE COURT:  I'm smarter than that.

11               MS. WILLIS:  Your Honor, he brought it up, not me.

12               MR. ADELMAN:  It's take the fame, your Honor.

13               MS. WILLIS:  So now I should be allowed to respond.

14    That's all I'm doing.  He introduced it, your Honor.  Your

15    Honor should have told him at the time.

16               But, look, all I'm saying in response to what he

17    stated is here's why that statement continues in the mind that

18    they have been on.

19               THE COURT:  Which I can't agree with.

20               MS. WILLIS:  I understand.  And that is that you can

21    take the name.  Look, it was never their name.  They didn't own

22    that trademark.  So no one took anything.  They were

23    terminated.  You see?  So if they say, look, we've lost our

24    name, right?  That's the issue.

25               Now, all I'm saying is it's yet to be seen how their

1    act will be, but I know what they're doing now and I'm asking

2    them to stop, and that is stop suggesting to the public that

3    you have simply -- that the Kings of Disco are simply Village

4    People by another name.  That's what the Judge asked them to

5    stop doing.

6            What I suggest is that maybe we take about five or

7    ten minutes where we get together, turn on the computer so we

8    can -- so I can point out to Mr. Adelman what it is that we are

9    objecting to here and, that way, you know, he can say, okay,

10   I'll agree, we'll ask them not to do that, da, da, da, da, and

11   there it is.  And I think that's a basis for a settlement.

12           I have no idea what they're going to say with their

13   live performances.  He's talking about live performances.  I'm

14   not saying that they're going to be actually presenting their

15   live performance as the Village People.  I'm simply saying that

16   now they are actually still misleading the public to believe

17   that the Kings of Disco are simply Village People by another

18   name.  That's all I'm saying.  And they need to stop that.  If

19   we can agree on that, there it is.

20           MR. ADELMAN:  If I may shortly address that.

21           I don't think they're doing that.  And the Judge

22   clearly didn't think they were doing that.  However, I'm happy

23   to look at anything that Mrs. Willis wants me to and tell her

24   why I think or I don't think she's correct.  If she's correct,

25   if I think she's correct, I'll have my clients remove it.  But

1    I don't think there's any ongoing conspiracy.  The whole thing

2    is to let the public know that they're no longer Village

3    People, and that's made clear in the name that the Judge

4    picked, former members of.  Former.  That means you're not it

5    anymore no matter what you do, you're not the Village People

6    any longer.  And that's crystal clear to my client.  And the

7    Judge made that crystal clear.

8            MS. WILLIS:  Well, your Honor, if he says that -- if

9    the client -- if his clients were to state plainly, you know,

10   we are not the Village People, we're not attempting to be the

11   Village People, you see, or something like that, that would

12   make it very clear, but they don't want to say that because

13   they actually want the public to believe that they are simply

14   the Village People by another name.

15           MR. ADELMAN:  I would like the -- I would love to see

16   where my clients are actually saying that.

17           MS. WILLIS:  I'll show it to you.

18           MR. ADELMAN:  They changed their Facebook page to

19   Kings of Disco.  They changed their Twitter.  They changed

20   their Instagram.  They notified all their fans.

21           THE COURT:  Well, as I understood the argument in the

22   letters that went back and forth, to the degree that the

23   Facebook page, which is now entitled the Kings of Disco,

24   included a reference in the upper left-hand corner to official

25   Village People and, at the bottom, to see more of official

Village People on Facebook, as I understood your argument,

those two notations were controlled by Facebook.

MR. ADELMAN:  That's right.  And I've been told, but

I haven't officially confirmed it, that Facebook agreed to

change the upper left-hand corner, which also, I believe,

controls the lower from at official Village People to Kings of

Disco, which would eliminate any of the issues.  The issue in

our letter was basically we didn't want to lose all the content

and all the historic things.  I'm told that Facebook has

approved it.

In any event, as of this moment, that page, at

official Village People, is disengaged, as the Judge requested,

and Kings of Disco 1 is the Village People that they're

utilizing until Facebook can make the proper correction.  So,

yeah, I think that has been dealt with and, moving forward, it

won't be an issue any longer.

In fact, if I may say one more thing, since we're

having this.  Rather than send a letter to the Judge, if

Mr. Willis had just sent an e-mail to us, it would have been

easier to deal with.  Probably would have gotten what you

wanted sooner.

MS. WILLIS:  Well, your Honor, maybe so, but Judge

Seibel was clearly able to see that what I presented didn't

comply.  However, what they presented later would show that

they were in compliance.  They play games.  That's all it was.

1              MR. ADELMAN:  I --

2              MS. WILLIS:  They changed it.

3              MR. ADELMAN:  I resent that characterization.  The

4    Judge gave us 'till Friday to do it.  She wrote a letter to the

5    Judge on Monday.

6              MS. WILLIS:  No.  You are referring to --

7              THE COURT:  No, no, no.  You don't talk to him.  You

8    talk to me.

9              MS. WILLIS:  Your Honor, he's referring to the

10   takedown of the site was to be by Friday; however, they were to

11   actually make the (INDISCERNIBLE) -- that the site was not

12   Village People by Monday.  That was the issue.  And so they --

13   I was able to show the Judge, based on the prima facie

14   evidence, that they were not in compliance.  However, within

15   about four, five hours later, the counsel said, hey, change it.

16   So they went and changed it, your Honor.  Take a look at what I

17   submitted.  What they have done -- and then you take a look at

18   what they did later.  What they did later, your Honor, did, in

19   fact, comply.

20             THE COURT:  Okay.  So it's complying.

21             MS. WILLIS:  Yes.

22             THE COURT:  And now we're going forward.  We're not

23   going backward.  We're going forward.  So it complies.  Judge

24   Seibel has clearly said she didn't see any violation of her

25   order.  I don't know what we're arguing about at this point.

 1              I do have a problem, having grown up in the age when

 2     the Village People were originally popular, I do have an issue,

 3     Mr. Adelman, with the notion that changing one or two costumes

 4     somehow changes the likelihood of confusion.  It seems to me,

 5     just as an example, that the Indian along with either the

 6     construction worker or the leather guy is immediately going to

 7     say to me Village People.  And so changing one or two, I'm not

 8     impressed with that in terms of avoiding likelihood of

 9     confusion.  And, of course, I'm saying that just from my own

10     personal thoughts.

11              MR. ADELMAN:  That's fine.  I have no problem with

12     that sentiment.

13              I mean, from a personal perspective, the guys that

14     I'm representing -- I grew up in the '80s -- they are the

15     Village People to me.  Nobody else will ever be.  That's just

16     my personal opinion.  You know, a rose by any other name, as

17     Shakespeare would say.  Taking away their name doesn't take

18     away, you know, my feelings about them.

19              MR. LEVY:  Can I --

20              THE COURT:  No.  My point is -- I really want to get

21     to this.  My point is that if the issue is trying to

22     substantially reduce any likelihood of confusion, an offer of

23     changing one or two costumes doesn't do it is my point, and so

24     I wonder if you have any other thoughts or suggestions that

25     might begin to approach that.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1          MR. ADELMAN:  Not off the top of my head.  Maybe it's

2     three, then.  Maybe they just wear the hats.  I mean, there's a

3     thousand different ways you could skin this cat.

4          By the way, anyone who is a fan of Village People,

5     Victor Willis' group, is going to know, if the Indian is

6     missing or if the construction worker is missing, that it's not

7     the Village People.  Just personally.  I mean, it has been --

8     but, nevertheless --

9          THE COURT:  Well, but that's up to them to do.

10          MR. ADELMAN:  Yes.  I'm just saying --

11          THE COURT:  I mean, that's up to Mr. Willis' group --

12          MR. ADELMAN:  But my point being is --

13          THE COURT:  -- to decide how to present themselves.

14          MR. ADELMAN:  Yeah.  No.  They can present themselves

15     any way they wish.  They don't have to -- they have the right

16     to use the trademark, but they don't have to.  Well, maybe they

17     do under their agreement.  They probably have to have controls

18     and whatnot.

19          But my point is, I think, that let's -- if you

20     took -- let's say you took three of the characters and then

21     made three new characters.  I mean, it can't be just -- you

22     know, clearly, that would not be Village People.  If one of the

23     characters was a fireman, for instance, there's no way that

24     anybody who's been watching the Village People for the last 40

25     years is going to say that's the Village People.  There's a

1    fireman.  There's no fireman in the Village People.  So, while

2    we disagree, I think one or two would change the complexity of

3    it.  Changing one or two would certainly change the complexity

4    of the group.

5              MS. WILLIS:  Your Honor, I --

6              THE COURT:  But I don't think it would eliminate the

7    concern that we're talking about, which is the likelihood of

8    confusion.

9              MR. ADELMAN:  No.  I disagree.  Primarily because

10   the -- again, there's a three-step process to booking live

11   bands.  And I think that's part of the issue here is -- I mean,

12   I work in the music business every day.  There's a lot that

13   goes into the marketing of bands.  There's a lot that goes into

14   the promotion.  There's a lot that goes into the performance,

15   the venue, the ticket selling.  These are all steps along the

16   way that, in this specific case, would eliminate the confusion.

17             THE COURT:  I want to hear from Mr. Levy with regard

18   to the question about the costuming.  I know that that's one of

19   the three criteria that you talked about, Mr. Adelman.

20             And, Mr. Levy, at the outset, you had talked about

21   the costumes have to go.  Do you have any thoughts about

22   whether there's a middle ground that might reduce the risk of

23   confusion?

24             MR. LEVY:  Well, I do.  I will point out -- I'm sorry

25   I didn't bring the transcript with me, but the -- Judge Seibel

 1    actually said -- because (INDISCERNIBLE) this should come out

 2    as an actuary with a slide rule, and the Judge said, no, no, if

 3    you have six people in costume, it's going to look like the

 4    Village People, which is along the lines of what you're

 5    suggesting.

 6            But here's what I suggest.  Let them do a 10-minute

 7    homage of the greatest Village People hits.  They testified --

 8    the Sixuvus people testified at the hearing that they right now

 9    do an homage to the disco era.  They've taken some non-Village

10    People songs, made a medley out of it, and they do -- part of

11    their act is an homage to disco.  And then they do -- they do

12    (INDISCERNIBLE) of other people.  So what I'm suggesting is do

13    a 10-minute homage of Village People songs.  In the course of

14    doing that, instead of coming out in full regalia, one guy can

15    wear an Indian headdress and one guy can wear an Army thing,

16    but they're not featured as Village People.  This is all an

17    homage to them.  It's no different than if I was doing a

18    tribute to Kiss.  I would come out with some white kabooky face

19    paint or something.  The audience would know they're not Kiss.

20    They're doing an homage to it.  And it's not the whole act.

21            So they do 10 minutes with little tidbits of the

22    costumes.  They advertise themselves as Disco Kings, you know,

23    featuring former members of Village People, and then they just

24    build on, as Jefferson Starship did.  They modernize and built

25    on with other songs, because, that way, the people -- the

```
 1    consumer will say I always liked these guys when they toured as
 2    the Village People, I think their lead singer has a good
 3    voice -- I mean, as my client testified, we thought they were
 4    doing a fine job.  For various business reasons, we had to
 5    cancel the license, but it wasn't because we thought they
 6    weren't good.  So, you know, better themselves.  Do the homage.
 7    Use tidbits of the costumes for 10 minutes.  Advertise yourself
 8    as Kings of Disco, but tell the public that you were former
 9    members of the group.  And we'll go on.  And they'll go on.
10    They've already branched out to do the medley of disco.
11    They've performed with KC and The Sunshine Band.  I believe
12    they've done that.  Just branch out a little bit.  And my
13    client's -- and don't want to put it on the record right now,
14    but we're willing to --
15                THE COURT:  You are on the record.
16                MR. LEVY:  -- contribute something to greese the
17    skids a little bit and that's -- I think that will make
18    everybody happy.
19                MS. WILLIS:  Well, I think that we could get
20    somewhere here if Mr. Adelman -- he has articulated his
21    clients' position very well when he used the metaphor a rose,
22    they're Village People.  Actually, they're not.  The Village
23    People is actually, if you want to talk about it that way,
24    Victor Willis, my husband.  He did all the hits.  He co-wrote
25    everything.  That's the Village People.  His clients have
```

simply performed Village People music and they have simply

acted out Village People.  So they're not Village People.

They're -- in their mind, they think, because they've done it

for so long, that they are, but they're not.  The original

Village People features Victor Willis.  You can't get away from

that.  That's like Victor taking the position, your Honor, and

he could have, and he could have done a lot to distract them,

to say, look, don't worry about this guy over here singing my

songs because I'm Village People.  You can't take that away.

He's not the singer.  The real singer is me.  He was always

silent on that.  And so that's why Judge Seibel said to them at

the meeting, look, your clients are going to have to create

another act.  They are no longer Village People.  Their

attitude is, oh, you can't change that, we're Village People.

Well, no, you're not.  Go take a look at American Bandstand.

You're not the original Village People.  Get out of here.

          So that's the attitude, your Honor, that they have to

change, and if they do that, they will cut out attempting to

say to the public over and over again we're Village People by

another name.

          THE COURT:  I'm never going to convince you.  No

matter what I get these two gentlemen to do, I'm never going to

convince you because we're not using the court computers to

look up the Kings of Disco so that you can decide and

micromanage what you think every word has to be.  We're not

1    doing that.  You don't have screen shots, other than the things

2    that were attached to the letters that were submitted to the

3    Court, all of which I've looked at.  And what I'm hearing from

4    you is you want to start from scratch and undo everything

5    that's already been done, and that's what I'm hearing from you.

6    You want them to somehow back up time to undo any reference to

7    the Village People and I can't do that.

8            MS. WILLIS:  Your Honor, I didn't say that.

9            THE COURT:  Well, that's what I heard.  That's what I

10   heard.

11           MS. WILLIS:  Let me be clear.  It's back to what --

12   this is what Mr. Levy said earlier and I'm simply repeating it.

13   They are presenting the Kings of Disco -- and your Honor, Judge

14   Seibel, said they can't do it.  They are saying the Kings of

15   Disco is simply the Village People by another name.  If they

16   stop that --

17           THE COURT:  It doesn't say that on those websites,

18   copies of which you sent to the Court.  It doesn't say what you

19   are saying it says.

20           MS. WILLIS:  Well, Mr. Levy said it does earlier, and

21   it does.

22           Your Honor, look, you don't have to look at the

23   website.  Okay?  We can all just agree that they're going to

24   stop and say, look, we're no longer going to -- we're going to

25   not do anything to suggest that we -- us, the Kings of Disco,

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

```
 1   is simply Village People under another name.  That's what your

 2   Honor said that they can't do.  And I'm simply saying if they

 3   agree that they're not going to do that, right, then we have a

 4   deal.

 5           MR. LEVY:  What happened to my proposal?  What

 6   happened to my proposal?

 7           MR. ADELMAN:  Your Honor, I'm going to get to that in

 8   one minute.  The Judge will --

 9           Judge, I heard exactly what you heard.  And the thing

10   is we can't agree to do something we're not doing.

11           But I think that Mr. Levy actually has a basis to

12   start moving towards the compromise.  If we're talking -- I

13   don't like the word homage.

14           No offense, Mr. Levy, but I think that invokes

15   something different.

16           MR. LEVY:  Okay.

17           MR. ADELMAN:  I think tribute is definitely a better

18   word.

19           THE COURT:  Say the word again.

20           MR. ADELMAN:  Tribute.  If you want to use a word.

21   But I think that --

22           THE COURT:  Can you live with that?

23           MR. LEVY:  Homage is French.

24           MR. ADELMAN:  No, I'm just saying --

25           MR. LEVY:  I don't care.
```

1          MR. ADELMAN:  It's just words.

2          Your Honor, I think, again, I'll go back to my three

3    principles.  If we can agree on a number of minutes, if we can

4    agree on the amount, the headdress -- the hats and a little bit

5    of clothing and what Mr. Levy said to smooth the rails, as they

6    say, we're -- yes, I think that I can sell that.  But I would

7    like to ask your Honor for a one-minute recess.

8          THE COURT:  Sure.

9          MR. ADELMAN:  In order -- and I want to tell you why.

10   In order to make sure my clients are always available, I told

11   them I would check in with them on the half hour.

12         THE COURT:  Sure.

13         MR. ADELMAN:  And we're already into an hour.

14         THE COURT:  Okay.

15         MR. ADELMAN:  So maybe it's a good opportunity for me

16   to actually just update them and talk to them right now about

17   what we've discussed and then we can continue this.

18         THE COURT:  I would like you to talk to them about

19   Mr. Levy's proposal to see what kind of a response you get.

20         MR. ADELMAN:  Yes.  I'm happy to.

21         THE COURT:  To see if that might be --

22         MR. ADELMAN:  This is why I was suggesting --

23         THE COURT:  -- the beginning of a structure.

24         MR. ADELMAN:  That's why I was suggesting the break,

25   your Honor.

1              THE COURT:  Okay.  We'll take 10 minutes.

2              MR. ADELMAN:  Can I use the jury room?

3              THE COURT:  Yes.

4              MR. ADELMAN:  Okay.

5              MR. LEVY:  Your Honor, I'm going to call up my

6      co-counsel, who has a phone that makes overseas calls, because

7      my client's in Paris, so I'll probably need the full 10

8      minutes.

9              THE COURT:  Sure.  Okay.

10             (Recess)

11             MR. ADELMAN:  So, your Honor, thank you for giving me

12     more than 10 minutes.  I appreciate that.

13             THE COURT:  Okay.

14             MR. ADELMAN:  So our suggestion.

15             So first, to let you know, in the first 10 minutes of

16     the show, there's only one Village People song.  It's not even

17     the first song.  So what we're suggesting is that they be

18     allowed to wear the full costumes for the first 10 minutes of

19     the show in which they'll only sing one Village People song and

20     then they'll modify their dress for the rest of the show and do

21     their mix of Village People and non-Village People songs not in

22     costume.

23             See, one of the things my clients brought up, they

24     think this is the cleanest way.  What my clients brought up

25     is -- so Mr. Levy suggested the hat and some -- I forgot what

1    the word was.  Part of clothing is what I wrote down.  And my

2    clients don't really want to get into the back and forth with

3    Mr. Willis about what was too much and what was -- you know,

4    how much they can wear, what they can wear.  So this seemed to

5    be the cleanest way.

6              THE COURT:  And what about the remainder of the show

7    with regard to Village People songs?

8              MR. ADELMAN:  Well, again, their show is a mix.  As

9    testified, it's half Village People songs, half other songs.

10   They mix it up anyway.  They don't always use the same Village

11   People songs.  They don't always use the same -- it's not the

12   same -- it hasn't been the same show every night for 30 years,

13   notwithstanding what Mr. Levy has said.  There's been different

14   costumes.  There's been different arrays.  They actually have

15   three different shows.  You know, one's I think 20 minutes, one

16   is 45 minutes and one is an hour.  So, depending on the length

17   of show, sometimes the songs are different.  Once they're out

18   of the costumes, I don't know why there's an issue about what

19   songs they sing.

20             I'm trying to make this uncomplicated so I don't have

21   to keep coming back here, as I'm sure everybody else would

22   agree.  Anyway.  And of course Mr. Levy's gracious offer to

23   greese the wheels, which we can come to after we get through

24   this.

25             MR. LEVY:  There's not that much greese, your Honor.

1          THE COURT:  Well, let's talk about some of these

2     other things first.

3          What immediately strikes me, Mr. Adelman, is, if it's

4     a 20-minute show, you're talking about doing half of it in full

5     costume.

6          MR. ADELMAN:  Well, we can prorate.  If it's a

7     20-minute -- you know, I would have to get more detail about

8     what their 20-minute show looks like, but we can certainly

9     prorate.  I was -- this is their opening.  They sing some song

10    that's not Village People, then they sing Macho Man.  Again, I

11    think that we can -- I can talk to them about what their

12    shows -- this is why this is -- you know, it's not just

13    something that's plain and simple like you do this and

14    everything will be fine.  So I'm certain that my clients will

15    happily prorate it if it's a 20-minute show.  We can do -- I

16    think the first song is 4 minutes, so we can start -- on part

17    of the expression getting out of costume, you know, at the tail

18    end of that song if it's a 20-minute show.

19          (Pause)

20          THE COURT:  Mr. Levy, your thoughts?

21          MR. LEVY:  Well, I'm a little skeptical because I

22    asked Mr. Adelman what kind of costumes will they be wearing

23    afterwards and if the Indian just takes off his headdress and

24    is wearing the rest of what he came out with for the rest of

25    the show, if the cop is wearing jumpers and boots, but takes

off his cop hat and puts on a baseball cap, which seems to be

what Mr. Adelman is suggesting, we're not happy with that.

MR. ADELMAN:  Can I stop him right now?

That's not what I said.  I actually said if he takes

off his headdress and any other feathers, which is what makes

up the majority of his -- of what looks like the Indian

costume, and as far as -- and the cop, I said he takes off his

badge and gun belt and his hat.  Then all he's wearing is

ostensibly a guy that sweeps up the floor and puts on a

baseball cap.

But the extent -- I mean, I think it has to -- it

would be clear that the costume -- it wouldn't be the costume

that's in their trademark any longer.  But you can't come up

with that today, details of what that transition will look

like.  We can just say it won't look like the Indian, it won't

look like a cowboy, it won't look like whatever the leatherman

actually is.

MR. LEVY:  See, the problem is the beginning.  There

are a lot of problems.

And, your Honor, I hope you don't mind I'm sitting.

I hurt my right leg.

THE COURT:  I saw that you were having difficulty

standing up.

MR. LEVY:  Yes.

If they start off with the Village People in full

1  regalia, it's sending a message to the audience that we're the

2  Village People and now we changed our name.  It's different

3  what I proposed, they do a homage at the beginning of the show

4  and it's like, okay, yeah, we were all former members, or some

5  were former members, and this is a tribute to what we did for a

6  living.  That's fine.  But when they start off in full regalia,

7  doesn't that just send a message to everybody, hey, we are the

8  Village People, wink, wink, and now we'll take off or

9  headdress, and we are the Village People, though.  And that's

10  what I'm -- I'm going to have to talk to my client about it,

11  but I think that's going to be a little troublesome.  It's too

12  much Village People.

13          THE COURT:  What about, Mr. Adelman -- it seems to me

14  that the key part of the costume is the headwear for each of

15  the six.  And I'm just looking at the picture from the website

16  that was attached as an exhibit to something.  What about

17  having them not be dressed, you know, in full military

18  fatigues, but just wear the headwear for that first 10-minute

19  period and then removing the headwear or replacing it with

20  something else and they're no longer appearing like the Village

21  People.

22          MR. ADELMAN:  Okay.  What are they wearing?  That's

23  where it gets into like this detail.  We'll be here --

24          THE COURT:  A John Travolta-style white suit with a

25  silk shirt.

1              MR. ADELMAN:  But that's not appealing.

2              THE COURT:  Well, what were they going to wear during

3    the rest of the show?  You're talking about leaving them in the

4    costumes for the rest of the show --

5              MR. ADELMAN:  No.

6              THE COURT:  -- and that doesn't vitiate any

7    likelihood of confusion.

8              MR. ADELMAN:  That's not what I said and that's not

9    what I was suggesting.

10              THE COURT:  Okay.  I'm not sure I'm understanding

11    you, then.

12              MR. ADELMAN:  I think that the -- what I'm suggesting

13    is that -- that may work, but, again, that's going to have to

14    take styling.  So, like I said, I came up with what I thought

15    was the cleanest solution.

16              And I don't think -- again, going to a Kings of Disco

17    show starts eight months in advance.  Having them appear in

18    costume for 10 minutes at the beginning does not wink, wink,

19    nod, nod anything.

20              THE COURT:  It does if it's a 20-minute show.

21              MR. ADELMAN:  And I said I would prorate it.  And it

22    still doesn't because these people are coming to see Kings of

23    Disco.

24              So, like I said, there's an eight-month journey to

25    getting to that one night.  But you know what?

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1           THE COURT:  Well, as you said, there are three

2    components to this entire issue, and one entire component has

3    to do with the use of the costumes.  And so it's a pretty major

4    issue.  And the costumes are more than just the headwear.  The

5    headwear, in my view, is a key indicator that would go nicely

6    with singing either a tribute or an homage, whatever you would

7    like to call it.

8           MR. ADELMAN:  Okay.

9           THE COURT:  But I --

10          MR. ADELMAN:  I think that there should be one more

11   element besides the headwear.

12          MS. WILLIS:  I think, your Honor --

13          MR. ADELMAN:  Because it sounds -- I mean, again, I'm

14   not a stylist.

15          MS. WILLIS:  I think your Honor has nailed it

16   absolutely.  It would be very easy for me to agree that they

17   would put on the headdress because, as your Honor suggested,

18   even taking it off -- quite frankly, your Honor, I don't really

19   care what they're wearing, you know, but they do.  And so

20   counsel here seems to make it a big deal, like, no, no, no, we

21   don't -- you know, what they're going to have on is

22   complicated.  No.  They want to keep on the image of the

23   Village People.  And so what you do is, if we agree that they

24   are to wear just a top as a part of an homage, like Mr. Levy

25   said, they can have on blue jeans, they can have on a suit.  It

doesn't matter.  But what counsel is suggesting is more

complicated.  He would like them to be able to keep on the

Village People-like costumes throughout and we're simply

saying, no, you're not the Village People.  You're going to

simply give an homage.

And as Mr. Levy suggested, if you open your show and

you're there as Village People, you've already painted the

picture, we're Village People, but you know we have to change

into something else now.  And so that's what we're trying to

avoid here.

So, yes, I believe the easiest way and I would agree

to the first few minutes they can put on the headdress, take it

off and whatever there's left, blue jeans or whatever they want

to wear, there it is.  But Mr. Adelman don't want that because

his client would prefer to attempt to say that they're still

Village People.

MR. ADELMAN:  That's a lovely sentiment, but my issue

is not that.  My issue is how do we determine what's okay and

what's not.  I mean, if you want to take -- there's a

picture -- actually, I think we can.  There's a picture of most

of my clients in the trademark filing.  So if you want to say

that they can wear the headdresses and nothing else in that

picture, but they can wear whatever else they want -- because

that's the trademark, your Honor -- then I think that we can

come to an agreement.

1          The question -- the thing is and why I wanted to make

2     it very simple is that I don't want to get a cease and desist

3     letter after every show.  Oh, he wore a leather handkerchief.

4     He's not allowed to wear leather because he is not the

5     leatherman anymore.  Oh, he wore a feather out of his back

6     pocket.  He's not the Indian anymore.  He can't wear any

7     feathers.  I mean, where do we draw the line on this thing?

8     Rather than, simply, they wear the costumes for 10 minutes and

9     then they don't wear any of that regalia.  Maybe change into

10    blue jeans or something like that.  I don't know.  But I'll

11    take either one.

12          You want to just say they can wear the headdresses

13    and this is the bright line, this picture from the trademark, I

14    think that I could convince my clients that that would be fine.

15    They can't wear any of that stuff.  But I want to understand

16    how we're going to figure out if my client wears bare knuckles,

17    is that something that the leatherman would wear?  Or chains?

18    Which they've never worn.

19          MS. WILLIS:  Here's the basis for the sentiment.  And

20    Mr. Levy and I have discussed this.  And, of course, he can

21    speak for himself.  We're very (INDISCERNIBLE) on the idea and

22    the acceptance of it if they are to do some kind of tribute,

23    your Honor.  However, a tribute or homage does not start out as

24    the group that you're attempting to pay tribute to.  I believe

25    that they would have to open their show in whatever they are.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

20183qcantcf

You know, let's see the Kings of Disco.  Right?  Let's see what
they look like.  They open their show and then, your Honor,
after, what, maybe one or two songs, I don't know, then, all of
a sudden, they put on the tops.  Right?  This is part of their
tribute to Village People.  It will not be confusing to the
public.  But the whole idea that they are to simply open up the
show to sort of solidify in the public mind here we are,
Village People -- this is what Mr. Levy said -- but we're going
to take this off now, so -- look, you can do the homage or the
tribute, but it properly move to occur at some point in the
show; two songs down, three songs down.  Now you're not
attempting to suggest that you're Village People.  It's that
simple, your Honor.  And I would agree to that.  And that's
what Mr. Levy and I would agree to.

          MR. ADELMAN:  I don't know what the big problem is
here.  Mr. Willis has already told us that her husband is
Village People and everybody knows it.  He's the original guy.

          Nevertheless, again, we're getting more and more
complicated instead of simple.  I've made a proposal that we
would do the headdresses for the first 10 minutes or so.  I
would talk to my clients about that.  Just as long as there is
a bright line as to what the trademark is.  And I am suggesting
that the picture in the trademark filing be that bright line.

          THE COURT:  As you may be aware, my computer has
decided to die, so I can't pull up the trademark filing to look

1    at it.  I have a picture from Facebook that has the six members

2    of Kings of Disco depicted; the cowboy, the construction man,

3    the police officer, the Indian, the -- I don't know what you

4    call -- I think you called him a leatherman.  I think of him as

5    the motorcycle guy.

6            MR. ADELMAN:  Yes.  He prefers leatherman.

7            THE COURT:  Okay.  Although, the leatherman is also a

8    trademark, you know, for a tool.

9            MR. ADELMAN:  Yes, I do.  I once had an issue with

10   them, as a matter of fact.  I defended a case against

11   leatherman.

12           THE COURT:  And the soldier.

13           MR. ADELMAN:  Right.  But there is a picture and we

14   can get it.

15           THE COURT:  I'm sure there is.

16           MR. ADELMAN:  We may not be able to get it today.

17           The other thing is -- and I'm sorry for not

18   standing -- the construction worker wears blue jeans now.

19           THE COURT:  And no shirt.

20           MR. ADELMAN:  Yes.  Even Mrs. Willis made an error

21   there suggesting that they wear blue jeans.  That's part of --

22           THE COURT:  Well, I think the -- it looks like the

23   cowboy may be wearing blue jeans as well.

24           MR. ADELMAN:  I think he does as well.

25           MS. WILLIS:  Actually, your Honor, I didn't suggest

```
1    that they wear it.  I said it would matter to me if they wore

2    them.  That's what I said.  I said they could wear them.

3              MR. ADELMAN:  But that's my point.

4              MS. WILLIS:  I also said they could wear suits if

5    they want to.  Right?  I said I didn't care what they wore.

6              The question is this, your Honor.  And this is what

7    Judge Seibel attempted to make clear.  Who are the Kings of

8    Disco?  Okay?  Who are they?  What image are they trying to

9    give?  If you are the Kings of Disco, you come out as the Kings

10   of Disco.  Okay?  And then you may, Judge, give an homage,

11   tribute, to Village People.  Okay?  No.  They want to come out

12   as Village People.

13             THE COURT:  Well, I don't think it's up to any of us,

14   and up to me at all, but I don't think it's up to anyone other

15   than them how they want to present themselves as long as

16   they're not trespassing on someone else's mark.  We can't tell

17   them what to sing when.  I think that goes too far.  We're not

18   micromanaging their group.

19             MS. WILLIS:  But when do they do -- the question --

20   there was a real issue as to when is the homage done.

21             MR. ADELMAN:  It can't be, your Honor.  It cannot be.

22   Because the people are already there.  The tickets have already

23   been sold.  The public already knows what they're getting.

24   There's no confusion at that issue, at that juncture.  They can

25   come out in Kiss uniforms.  It wouldn't -- you know, Kiss is
```

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1   not going to say, hey, you can't come out at the beginning.  At

2   that point when the show opens, the public already knows.

3   There's no confusion.  They know Victor Willis is not there,

4   which means they know the Village People are not there.

5         Mrs. Willis, on her Facebook page, on Victor Willis'

6   Facebook page -- actually, on the Village People Facebook page

7   it says Village People, featuring Victor Willis.  It says that

8   right on the page.  It doesn't just say Village People.  They

9   tout the fact that Victor Willis is the original member, the

10  singer of some incredible songs, which I paid homage to.

11  Nevertheless, there's no confusion over when they come or go.

12        We're offering, like you said earlier, a compromise

13  on the number of minutes, and I think the beginning is the most

14  practical more than anything else.  Or maybe it's the end.  I

15  could talk to my client about the end.  But what's the

16  difference, whether it's the beginning or the end or the

17  middle?  The beginning is the most practical.

18        THE COURT:  Mr. Levy.

19        MR. LEVY:  Well, it seems to me if -- okay, if we do

20  the prorated thing to begin with, if 10 minutes is to an hour,

21  that's 16.7 percent, so if you're going to do a 20-minute show,

22  it should be 3 and a half minutes.

23        If they -- what I don't want is for them to give the

24  impression that we're the Village People and we're solidifying

25  that at the very beginning and then the rest of the show, it's

 1    you know it's the Village People.  All we did is take our hats

 2    off, but it's us.

 3           What I would suggest is that, you know, if they --

 4    they do the homage for the prorated amount of time and they use

 5    it as a springboard to basically tell the audience that this is

 6    our past.  We formerly were affiliated with the Village People

 7    and now we're moving on.  Just like Jefferson Airplane moved on

 8    to Jefferson Starship, they're moving on.  And that would mean

 9    the remaining clothes should not harken back to what they wear

10    with the full regalia.

11           Now, whether they're blue jeans or not, I think the

12    test is, when they come out in full costume, whatever they're

13    wearing in full costume has got to end after the homage ends.

14    Now, whether what they were wearing were Army fatigues or what

15    they were wearing were gauchos or whatever, it ends after the

16    homage.  They have to wear something different.  It cannot be

17    that they still have vestiges of the full costume throughout

18    the concert.

19           MR. ADELMAN:  I would agree with that.

20           MR. LEVY:  Okay.  So that's a full change down to

21    their pants.  It's a full change.

22           THE COURT:  Well, what we were saying -- what I

23    thought we were talking about was the possibility of, at some

24    point, either at the beginning or the end -- I don't think the

25    middle makes any sense -- to wear the headwear identified with

1    the Village People and that the remainder of the costumes,

2    whatever they're choosing to wear, would not be -- reminiscent

3    is not a very good legal word.  It's not specific enough.  But

4    that's the idea that I'm trying to impart, reminiscent of the

5    trademarked costumes.

6           Now, I have, courtesy of my deputy, a copy of the

7    Service Mark Principal Register.  I also have a specimen of a

8    billboard that was filed on March 1st, 2010 for the trademark

9    renewal, although, in my opinion, only four of those people

10   look as though they're costumed in the same way as the costumes

11   in the mark.

12          MR. ADELMAN:  That is my point, actually.  That's why

13   I pointed out the specimen.  If you notice, that specimen, I

14   believe, is somewhere in the '80s, the real, you know, flashy,

15   leathery, shiny ear.  And so there is two costumes in which --

16   I don't even know that Mr. Simpson is actually wearing a real

17   cop's outfit.  I think he's wearing a sparkly hat, if I recall.

18   And this is my issue.  Pick a picture.  We won't replicate that

19   after the 10 minutes.

20          (Pause)

21          THE COURT:  Is there a way to create language which

22   could incorporate that notion?  I mean, I don't think the March

23   1st, 2010 specimen is what you're looking to protect because

24   it's got a -- it doesn't have -- well, it has two guys, neither

25   of whom look to me like either the soldier or the leatherman.

1    It has Indian, construction worker, police officer, cowboy.

2              MR. ADELMAN:  Your Honor, that's their specimen.

3    That's who -- that's what their trademark is.  That's what

4    they're representing their trademark is.  This is part of our

5    argument, especially on the likelihood of confusion front.

6    Their original trademark is a caricature.  Since you're looking

7    at it, you can see it.  But their specimen is not what

8    everybody thinks is the Village People, the six characters per

9    se.  This is our argument.  These are our points.  We think

10    what they're wearing today actually, to a certain degree, is

11    permissible and not confusing to the trademark, your Honor.

12              MR. LEVY:  Your Honor, can I see what you're looking

13    at?

14              THE COURT:  And I also have in front of me a copy

15    from the Kings of Disco Facebook page.

16              MR. ADELMAN:  Yes, your Honor.

17              THE COURT:  Which has the picture of the six of them.

18              (Pause)

19              MR. LEVY:  Your Honor, I think it's what Judge Seibel

20    said.  Changes -- there might be some changes, but, still, you

21    have that grouping.  It's the Village People.  Okay?  So you

22    could have a Marine man as opposed to an Army sergeant.  He's

23    in a slightly different uniform, but the same thing.  This guy,

24    looks like a green beret in a regiment.  I don't know how --

25    you know, it's a little strange regiment.

1          THE COURT:  Doesn't look like a soldier to me.

2          MR. ADELMAN:  Not at all.

3          THE COURT:  Doesn't look like a motorcycle guy to me.

4          MR. ADELMAN:  Not at all.

5          MR. LEVY:  It depends on which regiments you're used

6     to.  This could be a different regiment.

7          MR. ADELMAN:  I would argue that's (INDISCERNIBLE).

8          THE COURT:  But that's your mark, Mr. Levy.  It's not

9     his mark.  It's not her mark.  It's your mark.

10         MR. LEVY:  Yes, but when it's in conjunction with the

11    others, it's --

12         THE COURT:  That's what you sent to the trademark

13    office as your specimen.  What?  For the renewal of the mark.

14         MR. LEVY:  I'll take his word for that.  I don't know

15    that, but I'll take his word for it.

16         THE COURT:  That's what it says on the docket.

17         MR. ADELMAN:  Judge Seibel took judicial notice of

18    it, and I will represent --

19         MS. WILLIS:  Your Honor --

20         MR. ADELMAN:  -- that it is.

21         MS. WILLIS:  Your Honor, may I?

22         I'm looking at this.  Right?  And you're right.  This

23    has to do with the period of time.  Right?  And I'm looking to

24    the left here.  This is a flashy leatherman.  And look at the

25    hat he has on.  He has the official leatherman hat, which is

1    silver.  For example, your Honor, even to this day, when the

2    Village People featuring Victor Willis performs, sometimes

3    we'll change the color.  We did a big benefit for the

4    (INDISCERNIBLE) and they wanted the Village People to all be in

5    red.  These -- this is just flashy.  Look at the hat.  That has

6    got the eagle on it.  That is the leatherman.  Anyone who knows

7    anything about a leatherman -- he's dressed in silver, but

8    that's a leatherman.

9            Now, your Honor, let me look at the picture to the

10   right of him.  Okay?  This he has on -- this is a military guy.

11   He has on the beret, beret, which is of an Army beret hat.

12   It's there.  And, also, he has on what they call the jumpsuit

13   that some of the beret people would wear.  Okay?  Jumpsuit.

14   This is Army.  That's Army.  He's flashy.

15           Now let's look over to the construction worker.  He

16   has on the construction worker hat.  Okay?  And he has on some

17   clothing under the bottom, including jeans or whatever.  It's

18   just flashiness.

19           And look at the Native American.  You can see him.

20           And by the way, the police officer, your Honor, look

21   at him to the right.  He has on the police hat with the actual

22   police emblem on the hat.  And look at the outfit he has.  He's

23   a flashy officer.

24           And then, finally, look at the cowboy to the right.

25   He has on gauchos.  He has on a current cowboy hat.

20183qcantcf

```
1          I remind your Honor that, during the filming of the
2    movie Can't Stop the Music, they were dressed similarly.  They
3    had on these really flashy type of things.  So this is
4    representative, your Honor -- regardless of what counsel is
5    attempting to say here, this is clearly representative of the
6    Village People.
7          THE COURT:  But what I'm really hearing you say is
8    that the crucial identifier is the headwear.  The crucial
9    identifier for each and every one of these is their headwear.
10         MS. WILLIS:  Actually, your Honor, no.  Take a look
11   at the cowboy.  He has on the gauchos.  He has on the actual --
12         THE COURT:  But that's -- the Kings of Disco aren't
13   wearing that.  The Kings of Disco aren't wearing gauchos.
14   They're not treading on the mark if the gauchos are key.  It's
15   not there.
16         MS. WILLIS:  Well, it's the image of a cowboy.
17         THE COURT:  Oh.  Each and every image of a cowboy.
18   Boy, Roy Rogers is in trouble now.
19         MS. WILLIS:  Yes.
20         THE COURT:  Each and every image of a cowboy in any
21   construct?
22         MS. WILLIS:  Not separately, but together.  You see.
23   The cowboy today, your Honor, is different from the cowboy of
24   the '70s.  The original Village People had the cowboy image
25   totally.
```

20183qcantcf

 1          THE COURT:  Doesn't really matter what the original
 2     Village People had.  What matters is what is the mark that's
 3     protected.
 4          MS. WILLIS:  Here's the mark.  As Judge Seibel made
 5     very clear, the mark is the actual image of the group, meaning
 6     there is a -- can you identify a cowboy here?  Yes, we can.
 7     Can we identify a police officer?  Yes.  Can we identify the
 8     construction worker?  There he is.  Of course.  Can you
 9     identify the Native American?  Absolutely.  And can you
10     identify to the left the -- what they call the leatherman?
11     Yes.  He's being flashy.
12          MR. ADELMAN:  Your Honor, she just made my point.
13          MS. WILLIS:  The Judge said that you're not to
14     interrupt.  She did not want me to interrupt you.
15          MR. ADELMAN:  I apologize.  Sorry about that.
16          THE COURT:  Give her a moment.
17          MR. ADELMAN:  Yes.  You got it, your Honor.  I'm
18     sorry.
19          MS. WILLIS:  And then the military guy here is
20     dressed in a military outfit here.  It's a flashy one.  And he
21     has the beret.  That's a green beret.  This is the image of the
22     Village People.
23          MR. ADELMAN:  And that's why I said earlier if you
24     replace the cowboy with a fireman, it's no longer the mark.
25     It's also why I said earlier that --

1          THE COURT:  He's got a point.  He's got a point.

2     You're saying it's all six of them that is the mark.  He's got

3     a point.  You replace one of them --

4          MS. WILLIS:  Absolutely.

5          THE COURT:  -- then it's not the mark anymore.

6          MS. WILLIS:  Well, not one.

7          THE COURT:  Why not?  Why not?  You just said it's

8     all of them together that are the mark.  That's the

9     identifiable construct is this group of these identifiable

10    people.

11         MS. WILLIS:  Well, I bring your Honor's attention to

12    what Judge Seibel said on the transcript.  She said you can't

13    just think that you want to be a military officer and then, all

14    of a sudden, instead of being the Army, you will be Air Force.

15    You know, it's --

16         MR. ADELMAN:  This is not --

17         MS. WILLIS:  It's not just one.

18         THE COURT:  I think -- frankly, I think we're just

19    really, really done.  We're in the weeds now.

20         MS. WILLIS:  I think --

21         THE COURT:  We're completely in the weeds --

22         MR. ADELMAN:  Yes.  That's why I think we can do

23    this.

24         THE COURT:  -- and off topic.

25         MR. LEVY:  I think -- because we don't want to get

20183qcantcf

the secondary meaning and everything else.  I think we can do
it with, you know, a 10-minute for 60-minute show, a tribute or
homage wearing head gear.

THE COURT:  He's not said anything about a tribute or
homage.

MR. LEVY:  No, he said --

THE COURT:  No, he said they --

MR. LEVY:  -- they would do a medley.

THE COURT:  Excuse me.

He has said -- you keep on saying 10-minute medley.
He has said about half of their songs are Village People songs.
He's never talked about doing a specific group of Village
People songs in whether you call it a tribute or a medley or an
homage ---

MR. LEVY:  Or if he --

THE COURT:  Really don't interrupt me, sir.  Really
don't.

He has not said that.  He's not agreed to that.  You
keep on coming back to it, but he's not agreed to do an homage,
a tribute, a medley.  They have -- he has said to us, and I
wrote it down, that they do half of their songs from original
Village People songs.  There it is.  Half of them are Village
People songs.  Half are other songs.  Their second song is
Macho Man, a Village People -- clearly a Village People song.
I concede that.

20183qcantcf

1          So I appreciate that you have an idea, Mr. Levy, but

2     it hasn't translated to what would be acceptable to what this

3     group currently does, as I understand it.

4          MR. ADELMAN:  Yes, your Honor.

5          MR. LEVY:  I also heard the settlement proposal.  Ten

6     10 minutes, he said, the opening ten minutes.  Now, I called it

7     a medley.  He can do two songs for 10 minutes.  He can do

8     three.  But most songs are three or four minutes long.

9          THE COURT:  He had said they have their opening set.

10    The first song is not a Village People song.  The second song

11    is Macho Man.  He's putting the proposal in the context of the

12    show that they already have.

13         MR. LEVY:  So that's fine.  I'm saying, okay, you've

14    got 10 minutes to be dressed up with the headdress.  After

15    that, don't wear the headdress anymore and do the rest of your

16    show.

17         MS. WILLIS:  And I think Mr. Levy has articulated

18    where we are.  In other words, counsel for defendants is saying

19    one thing, right, your Honor?  And we're saying another.  And

20    so we're saying 10 minutes --

21         THE COURT:  I'm not hearing any way of defining how

22    to limit costuming going forward.

23         So if they wear the headdresses, whichever way you

24    want to define them, for the first 10 minutes -- or not

25    headdresses -- head gear, headwear, for the first 10 minutes

and then take them off, are they going to get a cease and

desist letter if the person who is appearing as the

construction worker has no shirt on?  Because that's not, by

the way, what shows in here.  They're all wearing shirts.  The

construction worker's shirt is open, but if he's shirtless the

way he appears to be in the Kings of Disco Facebook photograph,

are you going to be claiming that's a takeoff on your

trademark?

          MR. LEVY:  Your Honor, we've haven't done that.  I

don't think -- I don't think we ever, ever have done something

like that.  No.  You have to wear your -- you have to be

dressed like a construction worker with a helmet and with a

hammer and something.

          MR. ADELMAN:  There is no hammer in the trademark.

          MR. LEVY:  Well, yeah, but -- well, you know, a

cowboy carrying a gun.  He now has a lariat.  You don't want a

construction worker carrying a jackhammer instead of a helmet.

But, sure, something like that.

          MR. ADELMAN:  But how do we define that?  Because

my -- I mean, I could think of a simple way to do it.  The

headdresses that are in the photo they can wear for the first

10 minutes.  Then they take those off.  They can wear anything

else they want.  It's just -- it's clothing.  You don't have a

trademark on clothing.

          I think, your Honor --

1          THE COURT:  Well, I think we would need something a

2     little more than that.

3          MR. ADELMAN:  I'm being --

4          THE COURT:  Mr. Adelman, they would need to agree to

5     make no effort to appear as they were when they were dressed as

6     the Village People.  I mean, there has to be some way of

7     defining it.

8          MR. ADELMAN:  A picture.  I mean, that's why I wanted

9     the specimen.  We'll agree not to wear any of those outfits.

10         I think that --

11         THE COURT:  That's what you've got, though, Mr. Levy.

12    That's what your mark is.

13         MR. LEVY:  The mark has a -- is a strong mark.  So

14    the secondary meaning goes beyond just that particular pair of

15    boots on the cowboy.  You know, it's the cowboy.  There's a

16    secondary meaning.  So it's not just -- oh, it's not that exact

17    hat.  It's a cowboy hat.

18         MR. ADELMAN:  But the idea here is to come to a

19    compromise.  And you don't want to go to -- that's what we're

20    briefing.  So you're going to make that argument that it has

21    secondary meaning to Judge Seibel?  We're trying to avoid that.

22    That's what the settlement conference is for.

23         We actually have a strong argument.  You think we

24    lost a couple weeks ago.  Great.  We did lose on the name.  But

25    we are strong on the mark for the costumes.  And so there needs

20183qcantcf

```
 1    to be compromise.  And we've come a long way on this
 2    compromise.
 3             MS. WILLIS:  Your Honor, there is a such thing as
 4    trade dress.  Okay?  As I argued in my brief.  And there is
 5    trade dress.  It's not -- it doesn't have to be to a T.
 6             THE COURT:  I'm not deciding who wins or loses.  I'm
 7    not deciding how this case should come out.  I'm trying to see
 8    if there is a middle ground that makes everyone a little bit
 9    unhappy, but not so unhappy that you would walk away from a
10    settlement.  So of course there are lots of issues in this
11    case.  Of course there are.  Maybe he wins.  Maybe his clients
12    win.  Maybe his clients win.  Maybe your client wins.  Maybe
13    each of you wins a little.  Maybe nobody wins.  But the
14    question is is there a way for us to find some middle ground
15    that would work.
16             In my view, Mr. Adelman had talked about three
17    primary issues:  One, the right to the name, which, as far as
18    I'm concerned, has already been resolved by Judge Seibel;
19    number two, the right to the use of the costumes; and number
20    three, the performance itself.
21             Now, let's just, for the moment, put the costumes
22    aside.  Mr. Levy has been talking about a 10-minute tribute or
23    homage or medley of Village People songs.  Mr. Adelman has been
24    talking about half of the performance being Village People
25    songs.  Mr. Adelman is presenting an argument that, with or
```

1    without a settlement in the case, his clients could -- as long

2    as the venue had the proper license, could perform whatever

3    songs they wanted to.

4            Any thoughts, Mr. Levy, about what we can do about

5    this to try to find an agreement on the content of the

6    performance?

7            MR. LEVY:  Yes.

8            THE COURT:  You can remain seated.  I know it's

9    painful for you.

10           MR. LEVY:  Thank you.

11           Yeah.  I think that, other than the 10 minutes where

12   they're wearing the head gear, they can sing whatever they want

13   to sing as long as they're not wearing the head gear and

14   they're not dressed in a way that -- I mean, I -- I'm sure we

15   can think of better language, but in a way that's a reminiscent

16   end of what the Village People characters look like.

17           THE COURT:  So you're not objecting to their use of

18   additional music that started with the Village People?

19           MR. LEVY:  As long as they're not acting -- and I

20   understand that, you know.  I don't think it's going to be a

21   grand rights usage.  As long as -- and I don't think they do it

22   anyway.  So, yeah, I mean, anyone -- I could sing -- I could do

23   an hour set singing their songs as long as the venue -- well,

24   don't laugh.  I could do it.  You know.  So I'm not going to --

25   look, we like them.  We licensed them for 30 years.  So we're

```
 1    not there to kill them.  And if they want to sing those songs,

 2    fine.  Just don't harken back to the Village People.  Don't let

 3    the audience think you're still the Village People.  So you

 4    want to do 10 minutes?

 5            And I'm sorry I got you all upset when I kept calling

 6    it an homage.  I thought it that was a classy thing.

 7            If they want to do 10 minutes in head gear of 10

 8    minutes worth of Village People or other songs, be my guest,

 9    but, after that, don't wear any anything that suggests those --

10    the Village People trade dress, costumes and sing whatever

11    songs you want to sing.  I don't think there's a problem.  We

12    can't stop them anyway.

13            MS. WILLIS:  And that's what I would agree to, also,

14    your Honor.  In other words, who are they?  You know.  What are

15    you going to wear?  Oh, we want to wear Village People stuff.

16    That's what we hear here.  So we're simply saying 10 minutes

17    homage we won't object to, but wear what -- maybe they'll wear

18    the disco afro wig, your Honor.  I have no idea.  The flashy

19    John Travolta type of outfit that says they're the Kings of

20    Disco.  Because the king of disco is a person that can dance.

21    But the disco, the Kings of Disco, you know, whatever.  So who

22    are they?  Judge Seibel made it very clear they have to create

23    their own image and it can't be related to the Village People.

24            So the homage.  We've said it.  Apparently, he's not

25    agreeing.  So there it is, your Honor.  That's where we are.
```

We're not just going to come over to him, oh, fine, you know,

we're going to dismiss our position (INDISCERNIBLE) and we are

going to agree to allow you to have a 10-minute homage.  You

can put the headdress on, but, after that, you can't have

anything reminiscent of Village People, and then he says -- he

says, oh, no, no, no, my client wants to do this.

         So there are two sides here and it's becoming

increasingly obvious to me, your Honor, that we're not even

agreeing on it.

         MR. LEVY:  I thought we were pretty close.

         MR. ADELMAN:  I don't even know what any of that

means because me and Mr. Levy have an understanding.  That's

for sure.  I came to them with this idea.  Mr. Levy, before we

broke, said head gear and some tidbits of costumes.

         MR. LEVY:  Right.

         MR. ADELMAN:  Okay.  I came back and said how about

the first 10 minutes of the show with the head gear and tidbits

of costumes.  They don't even play Village People the whole

time.  There's one song -- the opening song is not Village

People.  The second song is Macho Man.  And then they'll take

off the costumes, head gear and tidbits.

         THE COURT:  Tidbits is --

         MR. ADELMAN:  I mean, we could -- but so is the

essence of Village People.  What does that mean?  If I walk

down in a costume of a Native American, am I emulating the

Village People?  I don't think so.  But if me and a guy in
jeans and an open shirt and a helmet, my friend from the
construction yard, walks down and I -- again, I'm in my Indian
costume -- are we emulating the Village People?  They're
suggesting that we are and I'm suggesting we're not.

          But I am agreeing to this compromise, which is head
gear and tidbits of costumes for 10 minutes and then we'll
move, you know.  But the moving on part is the part that has to
be carefully constructed, because if my guys are wearing -- if
my construction guy takes off his helmet and his construction
vest and is wearing jeans and an open shirt, he's not the
construction guy anymore.  And that has to be crystal clear
because I don't want to get cease and desist letters every four
minutes.

          THE COURT:  So could we agree that the Kings of Disco
would wear -- would be permitted under the settlement
agreement -- they don't have to, but they would be permitted
under the settlement agreement to wear the Village People style
headwear.  You know, again, you can't specify a given cowboy
hat.  It has to be something in the style of the headwear.

          MR. ADELMAN:  And so Felipe Rose has a half a dozen
different headdresses.

          THE COURT:  Yes.  That's why I'm saying a Village
People style headwear and one or two other pieces of costume
per person to be worn for the first 10 minutes, give or take a

20183qcantcf

```
 1    minute.  Then remove that headwear and the other pieces of
 2    costume and agree not to attempt to be costumed as the Village
 3    People for the remainder of the show.
 4            MR. LEVY:  I think you would have to prorate it.  If
 5    it's a 20-minute show, it can't be 10 minutes.
 6            MR. ADELMAN:  Well, I mean, songs are a certain
 7    length.  The shortest song in their repertoire is four minutes.
 8    So I would agree to prorate a 20-minute performance to four
 9    minutes, but, otherwise, they should get the full 10.  If
10    they're doing a 30-minute show, it's really not that -- it's
11    still the same two songs, your Honor.
12            THE COURT:  Well, you said 20, 45 and an hour were
13    the three lengths.
14            MR. ADELMAN:  Yes, but, I mean, listen, what if --
15            THE COURT:  So 10 minutes is less than a quarter of
16    the show, except for the 20-minute.
17            MR. ADELMAN:  Right.
18            THE COURT:  Which he's agreed to prorate down to 4
19    minutes, which is a fifth of the show.
20            MR. ADELMAN:  Right.
21            THE COURT:  So we're at less than 25 percent of each
22    length of show with 20 minutes for the 45 and hourlong shows
23    and 4 minutes for the 20-minute show.
24            MR. ADELMAN:  Okay.  And if they do any other show,
25    we'll just prorate it accordingly.  Like if they do a 30-minute
```

20183qcantcr

 1   show.  I mean, it's possible.

 2              THE COURT:  Right.

 3              MR. ADELMAN:  Yes.  We'll prorate it accordingly

 4   between the 4 minutes and the 10 minutes.

 5              MS. WILLIS:  Your Honor, I would agree to that.

 6   However, under no circumstances would I agree to allow them to

 7   do that Village People dress as their opener.  So that's the

 8   issue, your Honor.  Where are they going to do it?  I'm saying

 9   that I will not agree to permit -- I will agree to every aspect

10   of this.  The question is when do they do it?

11              I believe that if you open your show, as Mr. Levy

12   also said earlier, with the headdress on -- right? -- you're

13   suggesting something here.  Okay?

14              I'm not going to be fooled.  I wasn't born yesterday.

15   Okay?

16              However, I really --

17              THE COURT:  I'm not on anybody's side, Mr. Willis.

18              MS. WILLIS:  I'm not talking to you.  You said to

19   address it to you, so don't take it personally.  I'm not saying

20   anything about it.

21              But what I'm saying is it looks like we can have a

22   deal here, your Honor.  The question is how much leeway -- or

23   how much opening are they going to be -- are they going to give

24   on, look, we've got a deal, but they're saying they simply

25   won't agree to do this at the opener.  You must do it in the

1    middle of the song -- of the show or you must do it at the end.

2    That's where I'm at.  If they agree to one of those, there it

3    is.

4            THE COURT:  I think you're better off doing it at the

5    end because then you're going to leave the impression with the

6    audience that these are the Village People.

7            So, Mr. Adelman, I think that's a great suggestion

8    that would benefit your client.

9            MR. ADELMAN:  Well, there's two things here.  One is

10   you may be right, but I don't know.  Two is, again,

11   practicality.  Okay?  I don't know how long their change is

12   going to be, but -- I don't know what this language is going to

13   be, this essence of Village People.  I don't know yet.  But

14   practically speaking -- and I've done over a thousand shows,

15   I'm sure, from very elaborate festivals to very small theater

16   things, and I will tell you that changing your outfit, even if

17   it's just the headdress, especially a headdress, and a tidbit

18   is difficult in midstream.  And again, I'm going with the

19   practicality.

20           Mrs. Willis can shout all she wants about how they're

21   giving the audience the impression, but I'll say over and over

22   again the audience already knows who it's coming to see.

23           THE COURT:  The difficulty, Mr. Adelman, is either we

24   come to an agreement or we don't.

25           MR. ADELMAN:  I know, but --

1          THE COURT:  And she's saying she's won't agree.

2          So I think you could recommend to your clients that

3     they figure out a way to work it into the show at the end.

4          MR. ADELMAN:  Well, I don't want to -- listen, I

5     mean, what's the beginning of the show, the first 60 seconds?

6     How do you define that?

7          MS. WILLIS:  That's up to your client.

8          MR. ADELMAN:  Great.  We'll do it after 30 -- we'll

9     do it 30 seconds in.  How about that?

10          And I'm not being facetious, your Honor.  I'm just

11     showing you that this beginning, middle and end makes no sense.

12     But, nevertheless, I will bring it to my clients.  But it is

13     definitely less valuable to them than putting it wherever they

14     feel it's practical.  I'm not even saying they want to put it

15     at the beginning.  I'm just saying that it makes practical

16     sense to put it at the beginning.

17          THE COURT:  Well, putting items -- adding items to

18     the way one appears is something typically you would want to do

19     in front of a mirror.

20          MR. ADELMAN:  That's correct.

21          THE COURT:  On the other hand, removing it is

22     something that can be done with a sweep of a hand.

23          MR. ADELMAN:  That's right.  And some of them wear

24     makeup.  There's makeup to be applied.  It's easy to un-apply

25     makeup by just taking a makeup cloth and running it down your

1    face.  It's very hard to put on makeup in the middle of a show

2    or towards the end of a show.

3         So, while she's saying she will not absolutely agree

4    and we're the ones who are stopping the settlement because we

5    won't agree, I have to think about practical issues.

6         THE COURT:  Yes.

7         MR. ADELMAN:  And there are other practical issues

8    involved in this settlement that I'm willing to work with,

9    which is what is the essence of Village People.  The timing of

10   the show is so irrelevant, but, practically, it's very

11   relevant.

12        THE COURT:  Well, I think what we need to do is to

13   set another conference date so that Mr. Adelman can have an

14   opportunity to discuss the practical components of the

15   possibilities, to see if there's a practical resolution that --

16   or if there's an impossibility component to this in terms of

17   trying to make it done.

18        MR. ADELMAN:  That's fine.  I'm happy to come back,

19   your Honor.  I have a couple of practical problems.  The first

20   one is that my schedule over the next two weeks.  But I can

21   figure that out.  But more -- more -- the bigger problem is

22   that --

23        THE COURT:  You've got your motion.

24        MR. ADELMAN:  That's right.  And so I have to devote

25   resources to that.  So if I'm devoting resources to that, this

1    is -- it's problematic.  We had agreed in the past to push the

2    PI hearing two weeks.  And Judge Seibel, I'm sure, would be

3    very happy to reset the date.  That's up to the Intervener.

4              MS. WILLIS:  Your Honor, we're agreeing to give him

5    everything he wants.  We simply -- the issue is where.  And

6    we're suggesting --

7              THE COURT:  Now, we're talking about timing now.

8              MS. WILLIS:  I know.

9              THE COURT:  That's all we're talking about is whether

10   you would agree to request of Judge Seibel that she pushes back

11   the remaining schedule so that we can have an opportunity to

12   continue this conversation.

13             MS. WILLIS:  I would not because --

14             THE COURT:  I saw that one coming.

15             MR. LEVY:  Wait, wait, wait.

16             Why not?

17             MS. WILLIS:  Well, I have to do it on -- what do we

18   want to push?  I don't understand.

19             MR. ADELMAN:  I would not object to Mr. Willis

20   conducting the next conference on the phone.  I don't think

21   that's -- I -- we did the hearing with Judge Seibel last week

22   by the phone, and I think, with technology these days, it's --

23   it -- you know, it's easy to do.  I know having everybody in

24   front of you is -- but, again, practically speaking, I would

25   not object to that.

1          MR. LEVY:  Yes, but, your Honor, I would definitely

2     think we should postpone the hearing because -- Judge, my

3     client is willing to throw some money into this.  The more this

4     gets eaten up, you know, that's another component here.  And I

5     don't want to be preparing for a preliminary injunction hearing

6     and then going to a hearing if the case is going to settle.

7          And, frankly, I don't see how we're that far apart.

8     I mean, it's language, but (INDISCERNIBLE).  It's good

9     language, so I don't -- we'll probably have an issue with

10    money, I have a feeling, but --

11         THE COURT:  Well, we can work through that.

12         MR. LEVY:  Yes.  But it will get worse if my client

13    tells me you just cost me how much money, Stewart, on a

14    preliminary injunction hearing.

15         THE COURT:  How about -- I can see you tomorrow at

16    2:00.  And I'm happy to allow Mr. Willis to attend by phone.  I

17    can see you Wednesday at 2:00.  After that, I don't have

18    anything until the middle of April.

19         MR. ADELMAN:  Well, can we do it all by phone?

20         I have two giant -- I have a huge motion I've been

21    preparing for weeks tomorrow at 2:00, and it's just -- that's

22    why I said my schedule is impractical.  I mean, Friday I could

23    absolutely -- I could do.  And then I'm taking my -- next week

24    I'm taking my daughters to visit colleges.  It's unfair to

25    them.

| | |
|---|---|
| 1 | MR. LEVY:  I can do tomorrow. |
| 2 | MR. ADELMAN:  I can't do tomorrow. |
| 3 | THE COURT:  He just said he can't do tomorrow. |
| 4 | How about Friday at 3? |
| 5 | MR. ADELMAN:  May I, your Honor, look at my calendar? |
| 6 | THE COURT:  Yes, of course. |
| 7 | (Pause) |
| 8 | MR. LEVY:  Your Honor, it's Passover.  I have to get |
| 9 | back. |
| 10 | THE COURT:  I know.  It's Passover and it's Good |
| 11 | Friday. |
| 12 | MR. LEVY:  It's Good Friday, too. |
| 13 | MR. ADELMAN:  May I suggest -- I'm not imposing on |
| 14 | you, but what else do you have during the day?  Because maybe |
| 15 | we could be here talking to each other and then just jump in |
| 16 | and out while you're doing other things. |
| 17 | MR. LEVY:  Are we supposed to be before the Judge on |
| 18 | Wednesday?  Could we take that -- |
| 19 | MR. ADELMAN:  Oh, yeah. |
| 20 | MR. LEVY:  Actually, why don't we take that time. |
| 21 | THE COURT:  I could do Friday morning. |
| 22 | MR. LEVY:  Well, how about -- |
| 23 | MR. ADELMAN:  Mr. Levy just had a good idea. |
| 24 | MR. LEVY:  We're before Judge Seibel anyway.  Can't |
| 25 | we -- |

1              THE COURT:  When?  What day?

2              MR. ADELMAN:  Wednesday.

3              MR. LEVY:  Wednesday at 2:30.

4              MR. ADELMAN:  That, I could do.

5              MR. LEVY:  Maybe if we substitute your time with her,

6     if she would allow it.

7              MR. ADELMAN:  Well, she said that if we submitted an

8     order, we wouldn't have to appear, so --

9              MR. LEVY:  She said if we're settled.

10             MR. ADELMAN:  No, no, no.  She said to submit the

11    order.  We're just going there for a status conference.

12             MS. WILLIS:  And I'm not going to be there.  I'm

13    doing it by phone.

14             THE COURT:  How about --

15             MR. ADELMAN:  You're not going to be --

16             THE COURT:  You're in front of her at 2:30?

17             MR. ADELMAN:  Yes.

18             THE COURT:  I could see you at 1.  And I can let her

19    know what we're doing.

20             MR. ADELMAN:  I think we should reread the order,

21    because what the order said was that if we submitted the

22    discovery order -- it's the compliance.

23             MR. LEVY:  No, but she said don't submit a discovery

24    order.

25             MR. ADELMAN:  All right.  So do we even --

1          MR. LEVY:  She said don't do that.  Remember, I asked

2     her.

3          MR. ADELMAN:  Then I'm sure -- she wants us to

4     settle.  I'm sure she would give up the time to continue to

5     settle.

6          MR. LEVY:  I could call up chambers.

7          THE COURT:  Which order are we talking about?

8          MR. ADELMAN:  It was on the record, your Honor.  It

9     was on the record.

10          THE COURT:  Oh.  I don't have the transcript.

11          MR. LEVY:  Normally she asks the parties to submit a

12     discovery schedule, but she --

13          MR. ADELMAN:  You're right.  She did.

14          MR. LEVY:  I asked her and she said no, don't bother

15     this time.

16          MR. ADELMAN:  But did she say to come back?  I

17     thought she said not to because we had the hearing.

18          MR. LEVY:  Well, your Honor, if we called chambers or

19     you called chambers, I'm sure she would rather have us try and

20     settle this than show up at 2:30.

21          THE COURT:  We'll check with her chambers right now.

22          MR. LEVY:  So maybe we could take her time.

23          MR. ADELMAN:  I think that's a --

24          THE COURT:  And you're available on Wednesday by

25     phone.

1          MS. WILLIS:  By phone.

2          THE COURT:  Okay.

3          MR. LEVY:  And I'm here.  I am here.  I am here.

4          MR. ADELMAN:  Just, your Honor, my only issue -- I

5    would like to -- I could start at 1.  I could start at 1 on

6    Wednesday.  And I would love to because I have a 6:00 CPR test.

7          (Pause)

8          MR. ADELMAN:  We're going to be here.  Should we just

9    schedule it?

10          THE COURT:  I mean, we can schedule it for 1:00

11    anyway.

12          MR. ADELMAN:  Yes.  That's what I'm saying.

13          MR. LEVY:  Let's do it for 1:00 Wednesday.

14          THE COURT:  Yes.

15          MR. ADELMAN:  Great.

16          (Pause)

17          THE COURT:  So we'll have you here at 1:00 on

18    Wednesday.  And make sure that Ms. Czechowski has a good phone

19    number for you.  And you will be scheduled to see Judge Seibel

20    at 2:30.  What we'll do is we'll let her know what the results

21    of our efforts are and, with luck, we'll say thank you very

22    much, we're done.  Otherwise, they'll issue a new schedule for

23    whatever Judge Seibel thinks she needs.

24          MS. WILLIS:  The only issue is when can they do it?

25          THE COURT:  Well, when, plus Mr. Levy and Mr. Adelman

1    have a monetary concern, to resolve.

2             MR. ADELMAN:  We're going to talk tomorrow.

3             THE COURT:  Yes.  Of course.

4             MR. ADELMAN:  Try to figure this out in advance.

5             THE COURT:  All right, folks.  I will see you on

6    Wednesday.

7             MR. ADELMAN:  Thank you, your Honor.  I appreciate

8    it, your Honor.

9             MR. LEVY:  Thank you very much, your Honor.

10

11                          - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25