# Exhibit 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
CAN'T STOP PRODUCTIONS, INC.,

                    Plaintiff,

          v.                        17 CV 6513 (CS)

SIXUVUS, LTD., ERIC ANZALONE,
ALEXANDER BRILEY, FELIPE ROSE,
JAMES F. NEWMAN, et al.,

                    Defendants.
------------------------------------x

                    U.S. Courthouse
                    White Plains, N.Y.
                    February 6, 2020
                    10:40 a.m.


Before:        HON. CATHY SEIBEL,
               United States District Judge


APPEARANCES

EISENBERG TANCHUM & LEVY
BY:  STEWART L. LEVY, Esq.
707 Westchester Avenue, Suite 300
White Plains, N.Y.  10604
Attorney for Plaintiff

ADELMAN MATZ, P.C.
BY:  SARAH M. MATZ, Esq.
1173A Second Avenue, Suite 153
New York, N.Y.  10065
Attorney for Defendants

KAREN WILLIS, Pro Se
Intervenor


Sue Ghorayeb, R.P.R., C.S.R.
Official Court Reporter

1              THE COURT:  Mr. Levy is here for Can't Stop and Ms.

2    Matz is here for Sixuvus, and Ms. Willis is on the phone.  We

3    are on the record.

4              You guys can have a seat.

5              We have a few matters.  There were a couple of

6    motions pending and then we have the proposed settlement

7    between Can't Stop and Sixuvus.

8              Ms. Willis, I don't -- I hope it was just that you

9    weren't thinking when you posted on the public docket a

10   settlement agreement that said right in it that some of its

11   terms are confidential.

12             MS. WILLIS:  It was, Your Honor.  It was just a

13   mistake.

14             THE COURT:  I'm sure you will be more careful in the

15   future.  In the meantime, my courtroom deputy somehow

16   magically sealed the agreement itself, so that part is not

17   public.  And we do need to talk about it and what effect it

18   will have going forward, but my inclination, since there are

19   pending motions, is to rule on them, it won't take a whole lot

20   of time, and then we'll talk about whether and to what extent

21   the settlement is going to change things.

22             So, the first motion is Proposed Intervenor Karen

23   Willis's motion for recovery on the TRO bond posted by the

24   Sixuvus Defendants, and Intervenor also filed a proposed

25   Amended Complaint intervention, which the Sixuvus Defendants

1    say I should not allow.

2              You guys are all familiar with the facts of the

3    case.  I'm not going to take the time to recite them.

4              Procedurally, just for the record, Can't Stop filed

5    this lawsuit against Sixuvus and its members back on August

6    25th, 2017, for trademark infringement and a declaratory

7    judgment that Plaintiff is the owner of all rights, title and

8    interest in the "Village People" trademarks.

9              Okay.  Hey, Ms. Willis, I don't know if you're

10   moving papers or what, but there's some kind of crackling

11   noise that's coming over, that's making it hard for the court

12   reporter.

13             MS. WILLIS:  Okay.

14             THE COURT:  If you can either put yourself on mute

15   or just be still, that will be helpful.

16             MS. WILLIS:  Mm-hmm.

17             THE COURT:  Okay.  On November 30th, the Defendants

18   answered and asserted a bunch of counterclaims.

19             On December 1st, Defendants filed for a TRO and

20   preliminary injunction.  I entered a TRO that day temporarily

21   permitting Defendants to perform under the title "Sixuvus

22   Presents The Legendary Village People" and restraining

23   Plaintiff and its assignees, which include Ms. Willis, from

24   directly or indirectly interfering with Defendants' ability

25   to book live performances.

                    Sue Ghorayeb,  Official Court Reporter

1          On December 8th, 2017, the Intervenor, doing

2    business as Harlem West Entertainment, filed a motion to

3    intervene and to vacate or modify the TRO, contending that

4    Harlem West was the exclusive licensee of the marks and that

5    vacating or modifying the TRO is necessary to avoid harm to

6    the Intervenor and likelihood of confusion.

7          After reviewing the Intervenor's papers and hearing

8    argument, I provisionally allowed Ms. Willis to intervene as

9    a preliminary plaintiff and a preliminary counterclaim

10   defendant, and I issued an amended TRO that set forth how

11   each of Intervenor's and Defendants' groups would perform and

12   required certain disclaimers.

13         Then we had some litigation about compliance, and

14   there was a mediation in January.  Then we had -- because

15   that failed, we had a preliminary injunction hearing on

16   January 29th through February 1 and February 6th of 2018.

17         On February 16th, I issued an order denying the

18   motion for the P.I. and vacating my December 14th TRO and I

19   explained my reasoning in a March 6th written decision.

20         That same day, Intervenor filed her Complaint

21   against Sixuvus, its members and others, bringing the

22   following claims:  Passing off in violation of 15 U.S. Code

23   Section 1125(a) as to all Defendants; trademark infringement

24   in violation of 15 U.S. Code Section 1114 against the same;

25   unfair competition in violation of New York unfair

1    competition law and General Business Law Section 349 against

2    Sixuvus and Red Entertainment Agency, arising from

3    Defendants' use of the "Village People" trademark and trade

4    dress, and their use of the names -- the name "Kings of

5    Disco," under which Defendants were performing, in

6    conjunction with the Village People mark.

7            Thereafter, there was motion practice, including a

8    motion to enforce a settlement agreement, motions to modify

9    and dissolve the TRO, and TRO and P.I. hearings in a related

10   case, Number 19-CV-4354, Willis v. Sixuvus.

11           On June 24th of last year -- without following my

12   individual practices requiring a pre-motion letter and a

13   pre-motion conference -- Intervenor filed a motion seeking

14   disbursements of funds from the bond Sixuvus had posted in

15   connection with the TRO.  Defendants opposed and Intervenor

16   replied.

17           At a conference on July 18th, I also directed

18   Intervenor to file her proposed amended complaint and

19   Defendants to respond with their position and Intervenor to

20   reply, and this was all done by the end of September.

21           So, Ms. Willis filed the Proposed Amended Complaint

22   on August 21st, and with my permission corrected it on August

23   26th.  That's Document 246, the Proposed Amended Complaint,

24   which I'm going to call the "PAC".  It alleges that

25   Defendants Sixuvus, Anzalone, Briley, Rose, Newman, Simpson

1   and Whitefield (1) used the "Village People" mark and/or

2   trade dress in connection with "Kings of Disco" and in

3   connection with "Village People featuring Ray Simpson" for

4   purposes of live performance, thereby passing themselves off

5   as Village People, in violation of 1125(a); (2) used the

6   Village People mark and trade dress to cause confusion, in

7   violation of Section 1114, in connection with Kings of Disco

8   and Village People featuring Ray Simpson; and (3) passed off

9   their services as those -- as those of the Village People, in

10  violation of New York's unfair competition law and G.B.L.

11  Section 349.

12          She seeks an injunction preventing Defendants from

13  using the mark "Village People" or marks that suggest Village

14  People, such as "Kings of Disco", in connection with live

15  performances, or marks that are likely to cause confusion

16  between Village People and Kings of Disco, or using Village

17  People media sites styled as "Kings of Disco," and using

18  Village People trade dress.

19          She also wants an order delivering for destruction

20  any merchandise or promotional materials bearing the marks

21  "Kings of Disco" and "Village People featuring Ray Simpson,"

22  as well as money damages, costs and attorneys' fees.

23          I turn first to the motion to recover on the bond.

24          "Rule 65(c) of the Federal Rules of Civil Procedure

25  allows for recovery on posted security where the party has

1    been wrongfully enjoined or restrained."  U.S. D.I.D. v.

2    Windstream Communications, 775 F.3d 128, at 137.

3            "The only damages recoverable from an injunction

4    bond are those arising from the operation of the injunction

5    itself and not from damages occasioned by the suit

6    independently of the injunction."  Medafrica Line v. American

7    West African Freight, 654 F.Supp. 155, at 156 (S.D.N.Y.

8    1987).

9            The "wrongfully enjoined" party must "demonstrate

10   that the damages sought were proximately caused by the

11   wrongful injunction" and "properly substantiate those

12   damages."  Nokia Corp. v. InterDigital, 645 F.3d 553, at 559.

13   Once the party seeking recovery adequately establishes the

14   damages, there is a presumption in favor of recovery.  Nokia

15   at 560.  That means the District Court must have a "good

16   reason" for denying recovery and "the burden of demonstrating

17   that recovery should be denied is on the party opposing

18   recovery."  Nokia at 560.

19           Intervenor argues here that she was "forced to hire

20   outside counsel to defend her in compliance with the Sixuvus

21   TRO" and thereby incurred "significant legal fees."  That's

22   in her memorandum at Page 1.  She also contends that she

23   incurred travel and miscellaneous costs "related to her

24   defense in compliance with the TRO while defending against

25   the Sixuvus preliminary injunction hearing," as well as costs

1    "related to mediation, injunction hearing, change of website

2    and social media, and change of group name."  Also at Page 1

3    of her memo.  She argues these fees and expenses were not

4    incurred litigating the injunction but rather in complying

5    with the injunction.  That's in her reply at Page 1.

6            Finally, in her reply and attached declaration, she

7    says she lost "over $100,000 in bookings" because the TRO

8    "forced" her to share the use of the Village People mark with

9    the Defendants.  That's in her reply at Page 2.  See Document

10   248-1 at Paragraph 4.

11           As an initial matter, only the costs that could

12   have arisen from the operation of the injunction, rather than

13   litigating it, must have been occurred -- must have been

14   incurred in connection with the December 14th TRO.  To the

15   extent that Intervenor is one of Can't Stop's "successors or

16   assigns," or any one of her bunch of other categories, the

17   December 1 TRO enjoined her from "directly or indirectly,

18   interfering with or preventing Sixuvus from booking live

19   performances, accepting live engagements and performing live"

20   as "Sixuvus Presents The Legendary Village People."  That's

21   from the December 1 TRO at Pages 1 to 2.

22           Intervenor has not established any damages arising

23   from compliance with that TRO.  The legal fees she may have

24   incurred in trying to get that TRO lifted are unrecoverable

25   fees incurred in litigating the injunction, not costs and

1    damages incurred as a result of complying with the

2    injunction.  See Sterling Industries v. Sheet Metal Workers'

3    National Pension Fund, 2015 Westlaw 3407927, at Page 3

4    (Eastern District May 27th, 2015).  Accordingly, I address

5    only costs incurred after the December 14th, 2017 injunction.

6           "It has long been established that a prevailing

7    party may not generally collect as damages against an

8    injunction bond attorneys' fees expended in litigating the

9    injunction."  Nokia, at 560.  The party seeking to recover

10   must "establish with reasonable certainty that it was damaged

11   by the issuance of the injunction."  Nintendo v. Lewis Galoob

12   Toys, 16 F.3d 1032, at 1038 (Ninth Circuit 1994).

13          Because the December 14th TRO required Intervenor

14   to make changes to her advertising and use of the name

15   Village People, costs related to such changes could

16   conceivably arise from complying with the TRO rather than

17   litigating it.

18          As to Intervenor's attorneys' fees, which were set

19   forth in her memorandum at Exhibit A, the only fees that fit

20   that bill are a December 14th entry that says, "E-mails with

21   client and graphic artist," and a December 15th entry

22   relating to "E-mails with client re: fixing online material."

23   These costs, at the most, total $3,520, and that figure is

24   too high and would have to be reduced because the line items

25   also include other activities unrelated to -- could include

1    other items -- other activities unrelated to graphic

2    design -- I'm sorry.  Those line items do include other

3    activities unrelated to graphic design or fixing online

4    material.

5            As to the remaining costs, Intervenor has not

6    established with any certainty that her hotel, rental car, or

7    airfare costs were expended in compliance with rather than

8    litigating the injunction.  Indeed, the preliminary

9    injunction hearing in January for which she incurred those

10   expenses would have occurred regardless of the imposition of

11   the December 14th TRO.

12           As to Intervenor's booking losses, "although

13   damages need not be proved with mathematical certainty, they

14   cannot be speculative."  Source Interlink Distribution v.

15   Bauer, 2009 Westlaw 1755270, at Page 2 (Southern District

16   June 22nd, 2009).  Proper substantiation of costs requires

17   "extrinsic proof, such as an invoice or receipt" or "a sworn

18   statement or declaration under penalty of perjury that

19   certain amounts were expended on particular items."  Mendoza

20   v. CGY & J Corporation, 2017 Westlaw 4685100, at Page 3

21   (Southern District October 17th, 2017).

22           Intervenor's conclusory claim that she lost

23   $100,000 in bookings while the TRO was in effect because she

24   "split Village People live performances" with Sixuvus --

25   that's Paragraph 4 of Document 248-1 -- is unsupported by any

1    detail whatsoever, let alone who hired Sixuvus instead of
2    Intervenor, when, where, how, at what cost, and how she knows
3    this occurred.

4           The alleged booking losses are too speculative to
5    serve as the basis for recovery, especially because
6    Intervenor was evidently using the name "Village People
7    featuring Victor Willis" before the December 14th TRO was
8    entered.  See Document 46-7.  Further, Intervenor has not
9    properly substantiated this loss because her declaration does
10   not show that certain amounts were connected to particular
11   items."  See Mendoza, 2017 Westlaw 4685100, at Page 3.

12          Accordingly, Intervenor is entitled to the
13   presumption of recovery only as to some fraction of the
14   $3,520 in attorneys' fees — the costs that she has
15   demonstrated were proximately caused by the wrongful
16   injunction.  See Nokia, at 559.

17          Defendants argue that the bond recovery motion
18   cannot be granted regardless, because there has not been a
19   final adjudication on the merits and therefore it cannot be
20   determined that Intervenor was "wrongfully enjoined."  That's
21   in their opposition at Pages 11 to 12.

22          "A party has been 'wrongfully enjoined' under
23   Federal Rules of Civil Procedure 65(c) if it is ultimately
24   found that the enjoined party had at all times the right to
25   do the enjoined act."  Guzman v. Local 32B-32J, 72 F.3d 260,

1    at 263.

2              "In the usual case the wrongfulness inquiry

3    generally must be resolved by a trial on the merits," because

4    "it is the final adjudication on the merits, after the full

5    presentation of the parties' cases, that ordinarily

6    establishes whether the party should not have been engaging

7    in the conduct that was enjoined."  U.S. D.I.D., 775 F.3d at

8    138.

9              "TRO and preliminary injunction proceedings do not

10   typically give the parties" the full benefit -- excuse me --

11   "do not typically give the parties the benefit of a full

12   opportunity to present their cases or a final judicial

13   decision based on the actual merits of the controversy."

14   That's U.S. D.I.D. at 138.  In that case, the court found no

15   need for a final adjudication on the merits where plaintiff

16   voluntarily dismissed the complaint and abandoned its right

17   to a full opportunity to present its case, see 775 F.3d at

18   138, which has not occurred here.

19             At this stage, I cannot determine that Intervenor

20   has been wrongfully enjoined.  I denied the motion for the

21   P.I. and vacated the December 14th TRO because Defendants

22   failed to show a likelihood of success on the merits.  See

23   Document 118.  This was not a final adjudication on the

24   merits.

25             I agree with Defendants that they have yet to be

1    given the full opportunity to present their case because the

2    pleadings have yet to be finalized and discovery has yet to

3    take place.   Accordingly, Intervenor's bond recovery motion

4    is denied at this stage, without prejudice to renewal after a

5    final adjudication on the merits, but at that time it will be

6    limited to the $3,520 in fees.

7           Now, turning to the proposed Intervenor Complaint:

8    Rule 15(a) provides that leave to amend should be freely

9    given "when justice so requires," but it's "within the sound

10   discretion of the district court to grant or deny leave to

11   amend for good reason, including futility, bad faith, undue

12   delay, or undue prejudice."  Broidy Capital Management v.

13   Benomar, 2019 Westlaw 6646623, at 7 (Second Circuit December

14   6th, 2019).

15          "Amendment is futile if the proposed amendment

16   complaint" -- sorry.

17          "Amendment is futile if the proposed amended

18   complaint could not survive a motion to dismiss."  Soroof

19   Trading v. GE Microgen, 283 F.R.D. 142, at 147 (S.D.N.Y.

20   2012).   The familiar plausibility standard from Ashcroft v.

21   Iqbal, 556 U.S. 662, and Bell Atlantic v. Twombly, 550 U.S.

22   544, at 570, is applicable.

23          The PAC adds allegations involving Intervenor's and

24   Defendants' use of the term "Kings of Disco," as well as the

25   trade dress including the cop, cowboy, Native American, G.I.,

1    leather man, and construction worker costumes worn by the

2    performers.   See Paragraphs 28, 38 and 43.   It removes two

3    Defendants, the Pennsylvania Horticultural Society and Red

4    Entertainment Agency, as well as allegations involving

5    Sixuvus's use of the term "Village" -- "Official Village

6    People."

7            Defendants argue that amendment would be futile as

8    to Intervenor's Section 1125 passing-off claim in

9    conjunction -- in connection with the use of the "Kings of

10   Disco" mark, her 1114 claims, and her G.B.L. 349 claims.

11   Defendants make no argument that the 1125 passing-off claim

12   in connection with the use of the Village People mark would

13   be futile.

14           To state a claim for passing off and trademark

15   infringement, Intervenor must plausibly allege "that she

16   possesses a valid, legally protectable trademark, and that

17   the junior user's mark is likely to cause confusion as to the

18   origin or sponsorship of the product at issue."  U.S. Polo

19   Association v. PRL USA Holdings, 800 F.Supp.2d 515, at 524

20   (S.D.N.Y. 2011), affirmed, 511 Fed. Appendix 81.

21           "The elements of a cause of action of unfair

22   competition under New York common law mirror the requirements

23   of claims stated under the Lanham Act and similarly require

24   that a party demonstrate a valid, protectable mark and a

25   likelihood of confusion between the marks of the alleged

1    infringer and the charging party."  Alzheimer's Foundation of

2    America, Inc. v. Alzheimer's Disease & Related Disorders

3    Association, Inc., 796 F.Supp.2d 458, at 465 (S.D.N.Y. 2011).

4              As to the 1125 passing-off claim with respect to

5    Kings of Disco, Defendants argue that the PAC fails to allege

6    facts that support the inference that Intervenor possesses or

7    has the exclusive right to a valid, protectable trademark in

8    "Kings of Disco."  That's in their opposition at 3.

9    According to Defendants, Intervenor's License Agreement with

10   Can't Stop does not grant her use of the term "Kings of

11   Disco."  See Document 110-3.  That may be so, but Intervenor

12   has plausibly alleged that Kings of Disco is entitled to

13   protection regardless of the License Agreement.

14             "An unregistered mark is entitled to protection

15   under the Lanham Act if it would qualify for registration as

16   a trademark.  To qualify for registration, a mark must be

17   sufficiently distinctive to distinguish the registrant's

18   goods from those of others.  Such distinctiveness may be

19   demonstrated in either of two ways.  The mark may be

20   inherently distinctive if its intrinsic nature serves to

21   identify its particular source.  Alternatively, even if not

22   inherently distinctive, the mark may be distinctive by virtue

23   of having acquired a secondary meaning in the minds of

24   consumers."  Star Industries v. Bacardi, 412 F.3d 373, at

25   381.

1          In the Second Circuit, courts analyze six factors

2     to determine whether a mark has acquired secondary meaning:

3     "advertising expenditures, consumer studies linking the mark

4     to a source, unsolicited media coverage of the product, sales

5     success, attempts to plagiarize the mark, and length and

6     exclusivity of the mark's use."  Christian Louboutin v. Yves

7     Saint Laurent, 696 F.3d 206, at 226.

8          "Determining whether a descriptive mark has

9     acquired secondary meaning is a fact-intensive inquiry"

10    ill-suited for resolution on a motion to dismiss; A.V.E.L.A.

11    v. Estate of Marilyn Monroe, 131 F.Supp.3d 196, at 212

12    (S.D.N.Y. 2015), but even so, several of the Louboutin

13    factors counsel in favor of finding Intervenor has plausibly

14    alleged a valid, protectable mark.

15         Taking her allegations as true, as I must -- and I

16    have no idea whether she'll be able to back this up with

17    evidence -- the term "Kings of Disco" is well-known and has

18    been used worldwide to describe the Village People in

19    newspapers, magazines, and other publications since 1979.

20    See PAC Paragraphs 20, 21, and 26.  Defendants allegedly

21    "knew the term 'Kings of Disco' was already associated with,

22    and descriptive of, Village People" but used it anyway.  See

23    Paragraphs 24 to 27.

24         See Cartier, Inc. v. Four Star Jewelry Creations,

25    348 F.Supp.2d 217, at 243 (S.D.N.Y. 2004), which noted that

Sue Ghorayeb,  Official Court Reporter

1    in the attempt to plagiarize factor, "the relevant question

2    is whether the copying was done deliberately, so as to

3    benefit from the mark holder's name and goodwill."

4          As a whole, Intervenor's allegations just barely

5    plausibly suggest that she could establish secondary meaning,

6    and, by extension, distinctiveness, at least for purposes of

7    a motion to dismiss where I have to take her claims as true.

8    See A.V.E.L.A. at 213.  She has also plausibly alleged

9    confusion in Paragraphs 46 through 50.

10         At the P.I. hearing in Number 19-CV-4354, I was not

11   impressed with her showing, but at the motion to dismiss

12   stage I must take her allegations as true.  I cannot dismiss

13   just because I am skeptical that the Intervenor will be able

14   to show that in fact Kings of Disco refers to the Village

15   People in the minds of consumers.  Accordingly, the amendment

16   of the 1125 claim regarding the use of Kings of Disco would

17   not be futile.

18         Defendants next argue that "claims under 1114 are

19   only available for imitation of a 'registered mark.'"  That's

20   in their opposition at 3.  In Lopresti v. Spectrum Press,

21   2001 Westlaw 1568434, at Page 4 (Southern District December

22   5th, 2001), the court dismissed an 1114 claim where plaintiff

23   did not show the mark was federally registered.

24         Although courts apply the same analysis to claims

25   under 1114 and 1125 -- see, for example, Louis Vuitton v.

1    Dooney & Bourke, 454 F.3d 108, at 114; Coty v. Excell Brands,

2    277 F.Supp.3d 425, at 441 (S.D.N.Y. 2017), and Chanel v.

3    Veronique, 795 F.Supp.2d 262, at 266 (S.D.N.Y. 2011), Section

4    1114 protects registered marks and 1125 protects unregistered

5    marks.

6            See Chambers v. Time Warner, 282 F.3d 147, at 155,

7    where the Circuit observed that 1125 "is a broad federal

8    unfair competition provision which protects unregistered

9    trademarks similar to the way that 1114 protects registered

10   marks."  1125 actually could protect registered or

11   unregistered marks.  See also Van Praagh v. Gratton, 993

12   F.Supp.2d 293, at 301 (E.D.N.Y. 2014).

13           Here, Intervenor has failed to allege federal

14   registration for the mark Kings of Disco, so her claim under

15   1114 as to that mark would fail.  Accordingly, amendment

16   would be futile as to such a claim.

17           Next, Defendants contend that the Intervenor lacks

18   standing to sue under 1114 with respect to both Kings of

19   Disco and Village People, because she is not the assignee of

20   the marks.  As to the Village People mark and trade dress,

21   they are correct.

22           In Calvin Klein Jeanswear v. Tunnel Trading, the

23   court held that "only the registrant of a trademark or its

24   legal representatives, predecessors, successors, and

25   assigns" -- and not exclusive licensees -- "have standing to

1    sue for trademark infringement under 1114."  2001 Westlaw

2    1456577, at Page 4 (S.D.N.Y. November 16th, 2001).  Because

3    "licensee or exclusive licensee" are not among the terms that

4    define a "registrant" under the Lanham Act, Intervenor "must

5    show that her license amounts, in fact, to an assignment to

6    establish entitlement to sue under 1114."  Federal Treasury

7    v. SPI, 726 F.3d 62, at 78.

8            The License Agreement between Intervenor and Can't

9    Stop involves "all trademark rights in 'Village People' and

10   the characters" and provides that "nothing in this Agreement

11   shall be deemed ... to constitute a sale or assignment of the

12   Licensed Marks" to Intervenor.  That's Document 110-1,

13   Exhibit 1, which is the License Agreement, at Page 1, and

14   Paragraph 2.4(c).

15           I note that the Intervenor incorporated the License

16   Agreement by reference in the PAC, in Paragraph 14, so I can

17   consider it on a motion to dismiss.  Even if it were not

18   incorporated, it is integral, because the PAC relies heavily

19   on its terms and effect.  DeFalco v. MSNBC, 662 F.3d 104, at

20   111.  The plain language of the Agreement shows that Can't

21   Stop -- oh, and there's -- the parties are also not disputing

22   the authenticity of the License Agreement.

23           The plain language of the Agreement shows that

24   Can't Stop did not make an assignment to Intervenor.

25   Accordingly, because she has not plausibly alleged an

1    assignment of ownership rights, she does not have standing to

2    support infringement claims under 1114 as to the "Village

3    People" mark and trade dress.  See Prince of Peace

4    Enterprises v. Top Quality Food Markets, 760 F.Supp.2d 384,

5    at 392 (S.D.N.Y. 2011), where the court said that "the

6    beneficiary of a license agreement and not an assignment of

7    ownership rights lacks standing to bring an infringement

8    claim."  That was adhered to on denial of reconsideration at

9    2011 Westlaw 650799 (S.D.N.Y. March 14th, 2011).

10            As to the term "Kings of Disco," the License

11   Agreement does not concern use or ownership of that term, and

12   Intervenor does not allege that she obtained rights in that

13   term through the License Agreement.  But, as discussed, the

14   1114 claim relating to Kings of Disco fails because it is an

15   unregistered mark.  So, even if Kings of Disco is synonymous

16   with Village People, as Intervenor contends, 1114 is

17   unavailable to her for claims involving the Kings of Disco

18   mark.

19            Finally, Defendants argue that Intervenor's claim

20   under G.B.L. 349 or claims under G.B.L. 349 are futile

21   because Intervenor is not a "consumer" and therefore lacks

22   standing.  That's Defendants' opposition at Page 4.  I agree

23   for substantially the reason stated by Defendants that

24   Intervenor is a competitor, not a consumer.

25            "Claims under 349 may only be brought by consumers,

1    not competitors."  Greenlight Capital v. GreenLight of

2    Switzerland, 2005 Westlaw 13682, at Page 6 (Southern District

3    January 3rd, 2005).  See Paragraph 47 of the PAC, which

4    include allegations of the identical class of purchasers

5    between Intervenor's and Defendants' products.  Intervenor

6    makes no argument to the contrary in her reply and I find

7    amendment of the 349 claim will be futile and the claim must

8    be dismissed.

9            So, for the foregoing reasons, the motion to

10   recover on the bond is denied without prejudice.

11           Defendants' application to discharge the bond,

12   which they made in their opposition at Page 15, is also

13   denied, because I have not determined that there can't be any

14   recovery of the bond, but it is granted to the extent the

15   bond exceeds $3,520.  See Chevron v. Donziger, 2012 Westlaw

16   1080288, at Page 2 (Southern District April 2nd, 2012).

17           And the motion to -- Intervenor's motion to amend

18   her Complaint is granted in part and denied in part.  The

19   claims that remain are the passing off 1125 claim as to the

20   Village People and its trade dress; the passing off, an 1125

21   claim as to Kings of Disco, and the New York common law

22   unfair competition claim as to both.

23           The clerk has to terminate two motions, Number 218

24   and 243.  Actually, I'm not sure if 243 is shown on the

25   docket as a motion, but if it is, it should be closed.

1                   So, that's where we are.  Just give me one second.

2                   All right.  So, I got a letter from Ms. Willis on

3    February 4th -- well, first, I got a letter from Mr. Levy

4    saying that -- back when this was originally on, saying that

5    Can't Stop and Sixuvus had reached a deal and asking to put

6    this conference off.  I got a letter from Ms. Willis saying

7    she doesn't see how that can happen without her being part of

8    it.  Then I guess Ms. Willis got a copy of it.

9                   She wrote a letter yesterday saying that there are

10   certain items in the settlement agreement that she thinks

11   affect her interests and therefore the settlement -- I should

12   not permit the settlement to be consummated.  Specifically,

13   she's talking -- referring to Paragraph 3, on Page 3,

14   Paragraph --

15                  MS. WILLIS:  Your Honor, one, one clarification on

16   that, if I might.  You stated that, that I was seeking to

17   have -- not have the agreement consummated.  So, the

18   clarification, Your Honor, my position is, is that, I'm not

19   necessarily saying that the agreement cannot be consummated.

20   I'm simply saying that the actual dismissal of the case cannot

21   occur.  However, I don't know how the Court can allow them to

22   consummate that.

23                  To be clear, I'm not necessarily saying they can't

24   sign it outside of the court.  I'm simply saying if they do,

25   the case cannot be dismissed.  I just wanted to clarify that.

1              THE COURT:  Okay.  I guess I don't understand how

2    that can happen, because part of the agreement is that the

3    case will be dismissed.  So either it can or can't be

4    consummated.

5              MS. WILLIS:  I agree, Your Honor.  Okay.

6              THE COURT:  All right.  So -- and then I got, a

7    little while later, a joint letter from Ms. Matz and Mr. Levy

8    telling me that they've settled and they want me to dismiss

9    the action with prejudice, and they submitted a proposed

10   order.

11             Oh.  What I started to say is, there seems to be

12   three parts of the settlement agreement that Ms. Willis finds

13   troubling:  One is Page 3, Paragraph 3, which says -- which

14   is Can't Stop's acknowledgment that it does not now have, nor

15   has it ever had, any claim to or rights in the mark Kings of

16   Disco.  And then, Page 6, Paragraph 12, which says, "the

17   parties will request the Court to discontinue the action."

18             Well, actually, now that I see that wording,

19   it's -- what I said a moment ago isn't quite right.  The

20   agreement just requires the parties to ask me to discontinue.

21   It doesn't mean that I have to do it.  So, maybe Ms. Willis

22   is right that the deal can be consummated without there being

23   a dismissal.

24             And, then, the third paragraph that she flags in

25   her letter is Paragraph 14, on Page 7, which says, "upon the

1    Court discontinuing the action, the clerk will return the

2    $50,000 bond."  I think that last part is easy to fix.  I

3    don't think the parties can direct the return of the bond,

4    but they can agree to ask me to direct the return of the bond

5    and I would except for 3,250.

6           The parties have requested me to discontinue the

7    action, and I'm not sure frankly why Page 3, Paragraph 3 is a

8    reason not to approve the agreement, not that my approval is

9    really necessary.  All that means is that's going to be a bad

10   fact for Ms. Willis in the litigation between her and

11   Sixuvus, if that continues.

12          The main question I have is:  Given all the water

13   under the bridge, whether there is a legal basis for Ms.

14   Willis's position that I can't dismiss because the case needs

15   to go on between her and Sixuvus.

16          MS. WILLIS:  Your Honor, a clarification on that.

17   That's not what I'm saying, actually.

18          THE COURT:  All right.  Well, tell me what you are

19   saying.

20          MS. WILLIS:  What I'm saying is that as the

21   Intervenor, right, I don't see how the Court can dismiss a

22   case in which I am an Intervenor without my consent, actually,

23   you know, actually my consent for dismissal.  And actually

24   that, Your Honor, if you look at the Complaint, I did

25   intervention in this action for enforcement of the

1    registrant's proprietary rights.  And, so, in terms of

2    infringement, although I may not have the standing to bring a

3    direct infringement, however, I do have standing to actually

4    step in and enforce the registrant's proprietary rights, which

5    is a totally different issue here.

6            So, I want to make sure that the Court understands

7    that there's two distinctions here.  I didn't bring the claim

8    to actually act as if I am suing myself, right, acting,

9    acting the licensee.  I'm not, I'm not suing to say, "look,

10   I'm the licensee and I have a right to sue for trademark

11   infringement."  That's not what the Complaint says.  The

12   Complaint actually says that I'm merely exercising

13   enforcement of the registrant's proprietary rights.  That's a

14   different case.  I do have standing for that.

15           So, I just wanted to clarify that with the Court

16   just so that the Court understands that if the Court is

17   saying that I am attempting to bring a claim actually for

18   trademark infringement with respect to the Sixuvus, that is

19   incorrect.  I am --

20           THE COURT:  What's the difference?

21           MS. WILLIS:  The difference is -- and there is case

22   law on that, and I think I actually quoted it in one of the --

23   the difference is this, Your Honor.  When an intervenor or a

24   licensee -- a licensee has the right to actually enforce the

25   proprietary rights of the -- of the licensor, and that's all

1    I'm doing.  I'm simply, I'm simply saying, "hey, there is some

2    rights here with respect to trademark infringement.  I am

3    simply enforcing those rights on behalf of the registrant

4    while not actually bringing a trademark infringement claim in

5    itself."  I'm simply enforcing the -- if you look at the -- in

6    fact, the Complaint is an intervention for enforcement of

7    registrant's proprietary rights.  That's it.

8            THE COURT:  So, you're not --

9            MS. WILLIS:  I just want to make sure that the

10   Court --

11           THE COURT:  So, you're not seeking damages; you're

12   just seeking to get them to stop?

13           MS. WILLIS:  I'm seeking -- in other words, I am

14   stepping in as the Intervenor to simply enforce the

15   proprietary rights of the registrant, which is the licensor,

16   and which I can do, but I'm not pressing my claim to say that

17   I'm actually bringing an independent -- I'm not bringing a

18   claim for trademark infringement.  And, Your Honor, again, and

19   I would like the Court to pay close attention to the

20   distinction here, I can do that.  I'm simply enforcing the

21   proprietary rights.

22           THE COURT:  Well, that's a distinction that was so

23   far between the lines in the parties' submissions that I

24   couldn't -- absolutely did not see it.  Do you want to

25   comment, Ms. Matz?

1          MS. MATZ:  Yeah.  I'll be honest, I don't entirely

2    understand that, especially because the claims she is

3    asserting are far beyond what Can't Stop pled in its original

4    Complaint.  That doesn't really make any sense to me that she

5    could be able to -- I'm sure Mr. Levy has a view on this

6    also -- that she could be able to come in and force Can't Stop

7    to do something that it doesn't want to do.  Typically, that's

8    not --

9          THE COURT:  I think she is saying even if she

10   doesn't have standing to bring a trademark infringement claim

11   herself, as the licensee, she has the right to enforce the

12   licensor's rights.  I'm not sure --

13         MS. MATZ:  Yeah.

14         THE COURT:  -- what the difference is.

15         MR. LEVY:  Your Honor, look, she cannot create

16   rights that my client as the licensor doesn't have.  As you

17   pointed out, there's nothing in the License Agreement that

18   even mentions Kings of Disco.  In the discussions with our

19   client, our client says they never claimed in all those years

20   that they had a trademark in Kings of Disco.  They haven't

21   filed for an application.  They never established a secondary

22   meaning as far as my client is concerned.  And, so, the only

23   rights that were granted in the License Agreement relate to

24   the Village People trademarks, which are identified by their

25   registration numbers in the Trademark Office.  Now --

1            MS. WILLIS:  The Kings of Disco has nothing to do --

2            MR. LEVY:  Can I have the courtesy of finishing my

3      thought?

4            You cannot have a licensee who then says, "well, I'm

5      going to do the licensor a favor, I'm going to expand the

6      rights the licensor has, even though the licensor doesn't

7      acknowledge he has those rights."  Well, that's very nice, but

8      you can't do that.  Her rights are circumscribed by what's in

9      the License Agreement and what she's doing is -- really goes

10     against the whole concept of what's called progressive

11     encroachment.

12            The courts are very clear, when licensors admit

13     there's licensees, the licensees cannot keep going back to

14     licensor and saying, "I don't like this, I don't like that, I

15     want you to do something," unless it's specifically set forth

16     in the License Agreement, because then you'd have the licensor

17     bringing lawsuits all over the place that make no economic

18     sense, that take positions that are off-the-wall, with the

19     licensee saying, "yeah, but I think you gave me those rights,

20     so I'm protecting your rights."

21            If you allow her theory to go, it would mean that

22     the licensee controls the licensor, because what's to stop her

23     next from saying, "oh, by the way, Queens of Disco was also

24     used, and even though, even though Can't Stop never realized

25     that it had these rights, it falls within the penumbra of the

Sue Ghorayeb,  Official Court Reporter

1    Village People trademark rights and we're going to do Can't

2    Stop a favor and we're going to enforce lawsuits on Queens of

3    Disco."  Well, what's going to end up happening?  We get

4    dragged in and we're only going to say, "well, we never

5    claimed that.  We don't know what you're talking about."  As

6    Your Honor noted, our position undercuts hers.

7            So, I don't think she can broaden our rights beyond

8    what we gave her and then confer upon us rights to Kings of

9    Disco which we never claimed ever.  In fact, there's never

10    been a case where we charged a fee to anyone to use it, where

11    we wrote a cease and desist letter.  I checked this with my

12    client.  We've never exercised control over that phrase ever.

13    So, for us to be -- for Karen Willis to now say, "Yeah, I know

14    you didn't realize that, but I'm telling you that the rights

15    to Kings of Disco fall within the penumbra of your trademark

16    rights, and I'm gonna, I'm gonna protect it," that's wrong.

17            MS. WILLIS:  Your Honor, may I -- Your Honor, may I

18    respond to this?

19            Your Honor, I can appreciate Mr. Levy attempting to

20    cloud the issue here, but the actual Complaint for

21    enforcement of the registrant's proprietary rights has

22    nothing to do with the Kings of Disco.  What I'm referring to

23    is that in terms of the Court -- the Court has initially here

24    stated that you didn't think that I have the right to bring a

25    claim for copyright infringement, so let's just stick with

1   that, and that's what I'm referring to here.

2            So, what I clarified with the Court is, no, I'm not

3   actually seeking to actually bring a claim for, for

4   infringement.  My Complaint actually merely seeks to enforce

5   the registrant's rights; meaning that, that what -- the

6   claims that the registrant actually brought, okay, which is

7   the Complaint that's before the Court, I'm seeking to enforce

8   the rights with respect to that in terms of the copyright

9   infringement, okay.  However, the issue of Kings of Disco, as

10  I've stated, I'm not saying -- if Can't Stop doesn't want --

11  does not have an interest in it, I can certainly have an

12  interest in it, as, as the register -- as the -- as the

13  licensee and as an individual, and that's what this Complaint

14  is about.

15           Mr. Levy is trying to cloud -- but independent of

16  what he said, I'm not saying Can't Stop has to want to have

17  ownership rights to do stuff.  I'm simply saying that me as a

18  licensee has an interest, I believe that it's associated with

19  Village People, and it's interfering with my actual -- you

20  know, me actually exploiting it.

21           And, so, there are two different issues, Your

22  Honor.  I'm not saying that -- I'm not trying to say, "oh,

23  Can't Stop, you have to own Kings of Disco."  I'm simply

24  saying by virtue of the fact that I'm the licensee, I know

25  that the Kings of Disco is associated and describes Village

1    People, and I have a right to protect that interest either

2    personally as an individual or, or in terms of enforcing

3    Can't Stop's rights to that because it does not want to, and

4    that's the whole case of the intervention.

5              So, Your Honor, please --

6              THE COURT:  Let me interrupt you and ask you to

7    please slow down, because I'm having trouble understanding

8    you.  Are you saying that this concept that you're only

9    enforcing the rights of Can't Stop relates only to Village

10    People, not to Kings of Disco?

11             MS. WILLIS:  No, it does, it does relate to that,

12    but that's just -- you know, it's both.  But what I'm saying

13    is it's independent in terms of the Court saying that I did

14    not have a right to bring a trademark infringement.  I'm

15    simply saying, I'm not bringing -- I never brought a Complaint

16    for trademark infringement.  I simply brought a Complaint to

17    enforce the registrant's proprietary rights in those -- in the

18    trademark with respect to that.

19             THE COURT:  That's a distinction that I'm having a

20    hard time wrapping my mind around.  I don't know if Mr. Levy

21    or Ms. Matz has ever heard of this idea.

22             MR. LEVY:  Well, you know, on the -- on her

23    intervention motion, as the Court has ruled, she sued under

24    both Section 1114, which deals with the registered mark, and

25    1125, and the Court has dismissed the 1114 claims as to both

1    Kings of Disco and Village People.  So, when Ms. Willis says,

2    oh, she never sought to bring a trademark action, well, she

3    did and the Court just dismissed it.

4           What's left is intervention, is the 1125, which is

5    nonregistered marks create a secondary meaning.  Well, that

6    has nothing to do with our case.  We sued on fairly

7    registered trademarks, Kings of Disco is not within the

8    penumbra of those.  And, again, I just think, practically

9    speaking, her argument is the licensee can decide that the

10   license is broader than even the licensor knows.  Although,

11   as she now admits, if we don't want it, she's gonna use us,

12   Can't Stop, to justify her going after the Sixuvus people,

13   and I guess -- you asked her, Your Honor, but she hasn't

14   answered it, is she seeking money.  If she's seeking money,

15   is she seeking it on my client's behalf?

16          I mean, after all, she seems to be so noble that

17   she wants to -- even though we don't want to do it, she's

18   going to enforce our rights to Kings of Disco, and I'd like

19   to know if she collects money, I assume she's doing it as an

20   agent for us then, because --

21          MS. WILLIS:  Your Honor --

22          MS. MATZ:  -- she is not doing it for herself.

23          MS. WILLIS:  Your Honor --

24          MS. MATZ:  If she's doing it for herself, where does

25   she -- what stops her now from finding other phrases and

1    saying, "I think I'm going to sue Proctor and Gamble for, you

2    know, for something.  I think I'll just add -- I'll just take

3    any kind of thing and I'll say, you know, it's -- you know, I

4    think" --

5              MS. WILLIS:  Your Honor.

6              MR. LEVY:  -- "it has a secondary meaning."  It's a

7    ridiculous --

8              MS. WILLIS:  Your Honor, Your Honor -- Your Honor,

9    the claim before us here, which Can't Stop -- by the way,

10   Can't Stop brought this claim, I didn't.  The Sixuvus filed

11   their counter, I didn't.  They also brought me in, okay, into

12   this by enjoining me here.  And, so, because of the fact that

13   I intervened, again, I'm simply saying, with respect to Your

14   Honor's denial of the -- of the infringement aspect, I'm

15   saying that because of the fact that my Amended Complaint in

16   Intervention clearly states that I am seeking enforcement of

17   registrant's proprietary rights, and what that means is, is

18   that the claim that Can't Stop has currently against the

19   Sixuvus, I can continue that claim, and so the Court cannot

20   simply dismiss it, that's all I'm saying, because I have a

21   right to actually enforce the registrant's proprietary rights

22   as an Intervenor.  But I'm not actually -- I'm being careful

23   not to actually bring a claim for infringement.  I'm simply

24   saying I'm enforcing their rights as the licensee.

25             THE COURT:  Maybe Ms. Matz --

1          MS. WILLIS:  And, Your Honor, I can provide some --

2     I can provide some case law -- I don't know if Your Honor --

3     on that, Your Honor, if Your Honor would like to get that, and

4     I can -- I have it too.  I don't have it in front of me.

5          THE COURT:  Ms. Matz.

6          MS. MATZ:  Thank you, Your Honor.  It's a basic

7     tenet of copyright law, trademark law -- and I realize this is

8     only a trademark case, although Ms. Willis has used the term

9     "copyright" a couple of times -- a licensee cannot acquire

10    rights greater than what the licensor has.  It's in every

11    basic 1-L intellectual property class.  The, you know, example

12    we were all given:  Intellectual property is a bundle of

13    sticks, and you can license a piece of the bundle, you can

14    license the whole bundle.  But if, you know, Can't Stop gave

15    Ms. Willis three sticks, they said, "you have the right to use

16    these three registrations," or whatever it was, she cannot

17    expand that.  Not only is that the law, it's in her License

18    Agreement.  Her License Agreement --

19         MS. WILLIS:  I'm not expanding it.

20         MS. MATZ:  Excuse me, may I finish?

21         Her License Agreement actually says, "Except for

22    the rights granted to Licensee pursuant to this Agreement,

23    Licensee shall not acquire any rights in the Licensed Marks

24    or any other right adverse to Licensor's interest in the

25    Licensed Marks by virtue of this Agreement or by virtue of

1    Licensee's use of the Licensed Marks."

2          She -- her entire claim is premised -- her entire

3    claim regarding Kings of Disco is premised on the idea that

4    somehow the use of the Village People, prior to the time she

5    was a licensee, made it have a secondary meaning.  Even if

6    that was the case, which it's clearly not and we vehemently

7    dispute, even if that was the case, she wasn't granted those

8    rights in this Agreement, she does not have standing, and

9    Can't Stop is standing here saying, "we don't own any of

10   those rights.  We don't even know what she's talking about."

11         Intervention is, is meant to allow parties to

12   assert certain rights, but it doesn't give them a wild card

13   to dictate what those rights are when that isn't supported by

14   the law or her own License Agreement.

15         Also, I would like to point out that the right to

16   sue when you are a licensee is something that is usually

17   heavily negotiated between parties and Can't Stop did not

18   give her the right to sue in the License Agreement.  If they

19   had wanted to let her control litigation, they would have,

20   but they don't.

21         THE COURT:  So, here's, here's what I think we

22   should do.  There is one very narrow issue here, which is a

23   civil procedure question, which is:  If plaintiff and

24   defendant have settled, can the Court dismiss the case when

25   there is an intervenor which has claims pending?  I don't know

1    the answer to that.  Maybe I can, and if Ms. Willis still

2    wants to pursue her claims, she can file a new lawsuit

3    somewhere.  I don't know.

4              Do you have an opinion on that?

5              MS. MATZ:  I do.  She is not actually an intervenor

6    yet.  You allowed her to temporarily intervene for the

7    purposes of the TRO, and I will point out that I disagreed.

8    First of all, she is not an assignee.  I disagree that that

9    first TRO affected her.  She chose to intervene and that's

10   fine.  You allowed her to intervene so she could be heard in

11   the TRO process while there was -- while my client was

12   asserting claims that could have actually affected her

13   license, right.

14             My client was saying, "you nakedly licensed the

15   marks.  We really have the right to use the marks."  We said

16   that the determination was premature and we wanted a longer

17   tail on that.  We asserted all those claims and it made sense

18   to allow her to be heard during those proceedings, but you

19   did not allow her to intervene for all purposes.  It was a

20   temporary intervenor, which means that she has not actually

21   been granted intervenor status.  And while you have said what

22   claims she would ultimately be allowed to assert if she was

23   allowed to intervene -- because if you recall, we set this

24   briefing schedule up so that after you ruled on this, we

25   would then -- we would then brief on the intervention issue.

```
1              So, my point is this, that that made absolute
2   sense, but Plaintiff and Defendant have now done away with
3   those claims.  We're dismissing those claims.  And, frankly,
4   all due respect to the Court, and I don't mean any offense by
5   this, you can't stop us from doing it, okay.  So, those
6   claims are going away.  She has no interest.  My client is no
7   longer challenging the Village People marks.  Part of this
8   agreement is that we have acknowledged and agreed not to
9   challenge those marks, and they have said, "we acknowledge
10  that there is fair use rights," and we're all good.  So, you
11  know, there is no --
12              MS. WILLIS:  Your Honor, the fact that she's
13  saying --
14              THE COURT:  Ms. Willis, Ms. Willis, wait your turn.
15              Ms. Willis, wait your turn.
16              MS. WILLIS:  Okay.
17              MS. MATZ:  The fact there is nothing left for her to
18  intervene in, for her to say -- the basic tenet of
19  intervention, the Court asked the question:  Is there a right
20  that the Intervenor has that's being affected here?  And the
21  answer to that question is no, because we have settled.  And
22  if she thinks she can bring claims outside that -- because she
23  hasn't actually -- because the claims aren't actually in this
24  action yet, you're dismissing our claims and you're dismissing
25  their claims and the case is over.  The pleading hasn't been
```

1    accepted by the Court.  She is not an intervenor for all
2    purposes.  So, yes, I don't see any reason why the Court
3    couldn't.

4           MS. WILLIS:  Your Honor, I am an Intervenor, you
5    know, to their chagrin, until the Court says otherwise.

6           Look, the fact Your Honor has already clearly
7    stated that there are some claims that survived, three of
8    them, okay.  So, how she can say that I'm not an intervenor
9    is beyond me.

10          But look, Your Honor, again, I'm only saying with
11   respect to the issue of the trademark infringement, okay, I'm
12   simply saying that I have a right to bring -- to enforce,
13   okay, the proprietary rights of the registrant.  Now, that's
14   all I'm saying.  And, so, as to the bulk of that, I don't see
15   how the Court could actually dismiss the case when, as an
16   Intervenor, I can continue those, you know.  And, so, it is
17   not wise for them to attempt to have done this settlement
18   because they should have involved me and we would not be
19   here.

20          So the Court may not be able to stop them from
21   signing a piece of paper here outside of the Court, but the
22   Court does have control over whether or not it can disregard
23   an intervention case and just dismiss it.  It has to
24   continue.  They created this problem, you know, and that's
25   all I'm saying.

```
 1              THE COURT:  What I allowed was for you to intervene
 2    provisionally as a plaintiff, because you were aligned with
 3    Can't Stop in preventing Sixuvus from infringing the Village
 4    People mark.  They are -- up till now it's always been
 5    provisional, just because of all the side shows we had with
 6    other cases and settlements and all that.
 7              I'm not going to dismiss without getting some law
 8    from everybody, but let's go off the record for a moment.
 9              MS. MATZ:  Your Honor, could I add one thing on the
10    record before we go off?
11              THE COURT:  All right.  Ms. Matz is going to add one
12    thing on the record.
13              MS. MATZ:  And that is that -- well, I'm going to
14    add two things.  One is a clarification from earlier that I've
15    been waiting to add.
16              But the thing I want to add about this is, she's
17    also basically asking Your Honor to continue a case.  I have
18    a release from the licensor.  She can't enforce those rights
19    on their behalf anymore.  They released them.
20              The second thing I wanted to add --
21              THE COURT:  But she can enforce them on her own
22    behalf.  Can't she?
23              MS. WILLIS:  As a licensee.
24              MS. MATZ:  Subordinate to the licensor.  She
25    cannot -- she just said to you, "I'm trying to enforce the
```

1    licensor's rights."  Those don't exist anymore.  They were

2    released.  That is my point.

3            And the other thing I just wanted to clarify -- and

4    I apologize, Your Honor.  When you were giving the ruling

5    about the bond motion, you gave a couple of different numbers

6    and I think that might have been an inadvertent error on Your

7    Honor's part.  Because at one point you said $3,520, which I

8    believe was the correct number.

9            THE COURT:  Yes.

10            MS. MATZ:  And at another point you said 3,220.  And

11    then at one point you said 32,000.  So, am I correct in

12    understanding --

13            THE COURT:  3,520 is the right number.

14            MS. MATZ:  Okay.  So, with the exception of the

15    $3,520, my client's bond will be released back to them?

16            THE COURT:  Yes.

17            MS. WILLIS:  Okay.  Your Honor, first of all,

18    that -- no, I'm not gonna tell Your Honor how to handle it,

19    but I can, I can say this.  I, you know, don't agree with

20    that, you know.  But, again -- once again, and I'm done with

21    it, Your Honor, and I understand what you may do here to try

22    to get some more case law.  But, again, I cannot say it

23    enough, I -- my -- I have an actual Intervention Complaint for

24    enforcement of registrant's proprietary rights.  The

25    registrant cannot simply circumvent that by saying, "oh, I've

1    made, I've made a deal here, so that's going to undercut you

2    as the Intervenor."

3              The very purpose of intervention is to prevent a

4    licensor or someone from actually making a deal or actually

5    litigating a case in a way that would actually adversely

6    affect the rights of that licensee or the Intervenor.  So, it

7    just cannot -- I don't see how it can be dismissed.  However,

8    we can't stop them.  I don't think the Court can stop them

9    from signing.  But just because they did that, they knew this

10   case was pending.  They knew that I was involved here.  They

11   knew it.  They chose not to involve me, so whatever the

12   results are, if I end up winning in the end, because an

13   intervenor can continue a case, you know, even if the -- even

14   if the -- a Plaintiff fails.

15             THE COURT:  Off the record.

16             MS. WILLIS:  That's what intervention is all about.

17             THE COURT:  We're going off the record.

18             (Discussion held off the record)

19             THE COURT:  All right.  Back on the record.

20             We're going to do what we planned to do, which is,

21   Ms. Willis is going to make a motion to intervene.

22             MS. MATZ:  Your Honor, can I make one suggestion?

23             THE COURT:  Yes.

24             MS. MATZ:  Could we -- I'm just thinking that -- I

25   do think that there are some new facts now that could

1    potentially change the Court's ruling on what claims are even

2    still viable in light of the release and Can't Stop's

3    agreement that it does not have any rights here.  Could there

4    potentially be -- rather than going down the road of

5    intervention, it might be simpler if there was just a legal

6    determination about whether or not she can even still assert

7    these claims or maybe it's something we do at the same time.

8    I'm just --

9              THE COURT:  Yes.  I mean, look, I would like nothing

10   better -- I would like nothing better than to be through with

11   this case, which has dragged on forever and sucked up a lot of

12   my time and energy.  However, that's what the taxpayers pay me

13   for.  What I think should happen is, Ms. Willis should make a

14   motion to intervene, to file her Proposed Amended Complaint,

15   and Defendants can oppose the motion to intervene and

16   cross-move to dismiss on different grounds than have already

17   been raised.

18             MS. MATZ:  Understood.

19             THE COURT:  And I may decide Ms. Willis can't

20   intervene at all.  I may decide she can intervene, but I'm

21   going to dismiss.  Or I may decide she can intervene and I'm

22   not going to dismiss.  So we'll just see what happens.

23             So we need to set a schedule.  Ms. Willis, when can

24   you file your motion to intervene?

25             MS. WILLIS:  Yes, Your Honor.  For clarification

```
 1   would it be based on the three causes of action that the Court
 2   has allowed?
 3            I'm looking at the calendar.  I can actually file
 4   my motion --
 5            THE COURT:  Just give me a date.
 6            MS. WILLIS:  Okay.  Your Honor, it looks like the
 7   28th of March is when I can turn in my motion.
 8            THE COURT:  Okay.  And, then, how long thereafter,
 9   Ms. Matz, for your opposition and cross-motion to dismiss?
10            MS. MATZ:  Just so -- Your Honor, I believe the 28th
11   of March is a Saturday.
12            MS. WILLIS:  I meant to say the 27th, I'm sorry.
13            THE COURT:  Okay.  No problem.
14            MS. MATZ:  Okay.  Could I have until May 1st?
15            THE COURT:  Yep, May 1st.  And, then, how long for
16   your reply on your motion and opposition to the motion to
17   dismiss?
18            MS. WILLIS:  Okay.  What was it, May what?  I'm
19   sorry, Your Honor.
20            THE COURT:  May 1.
21            MS. WILLIS:  Okay.  Hold on.  I could actually
22   reply -- I'm looking at this tour schedule at the same time
23   here -- on the 29th.
24            THE COURT:  May 29th.  And, then, how long for your
25   reply, Ms. Matz?
```

```
 1              MS. MATZ:  Right, it's a cross-motion.  Sorry.

 2         How about June 17th?

 3         And, obviously, that assumes we actually do

 4    cross-move, which I would assume we would, but --

 5              THE COURT:  All right.  Okay.  All right.

 6         I really suggest, Ms. Willis, that you think about

 7    whether it's possible to resolve the case short of them

 8    giving up their Facebook page, because they're never going to

 9    do that.  But maybe there is a way for you to -- for both

10    sides to move on with their heads held high, which to me

11    would be some reasonable, not massive sum of money.

12              MS. WILLIS:  I'm not opposed to -- I'm not opposed

13    to settlement, and it's not about money, but I'm certainly not

14    opposed to settlement, Your Honor.

15              THE COURT:  I understand that.  You've said that

16    many times, but you -- the only thing you've asked for, which

17    is -- let's go off the record again.

18              (Discussion held off the record)

19              THE COURT:  I have directed Ms. Willis to think

20    about what she wants here and either to make a demand of

21    Defendants by February 13th or to tell them that she is not

22    making a demand because she's not interested in resolving it,

23    and that's obviously her option.

24              In the meantime, we have the dates we've set, and

25    I'll get briefing from the parties not only -- I'm expecting
```

1    not only on, you know, the usual factors that govern when

2    there is a motion to intervene and whether it should be

3    permissive or as of right, but also whether the fact that the

4    licensor has now released its claims means that there is

5    no -- there's nothing to intervene on, or maybe that issue

6    fits in better to the renewed motion to dismiss, which I

7    should be clear is not going to be on the same grounds that

8    were previously raised, but can be made on sort of the

9    grounds raised by developments between then and now.

10            MS. MATZ:  Your Honor, one other point of

11   clarification.  Are you going to be issuing a written order

12   for the return of the piece of the bond that is being returned

13   or should we submit something to you for you to so order?

14            THE COURT:  That will be great.

15            MS. MATZ:  No problem.

16            THE COURT:  All right.  Thank you all.

17            MR. LEVY:  Thank you.

18        (Case adjourned)

19

20

21

22

23

24

25